**ASSET PURCHASE AGREEMENT**

**DATED AS OF JUNE 17, 2020**

**BY AND BETWEEN**

**PLANET FITNESS HOLDINGS, LLC**

**AND**

**JEG-MEXICO BUENO, SRL**

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ...................................................................................................... 4

    1.1.    Definitions ................................................................................................. 4

ARTICLE II PURCHASE AND SALE OF ASSETS; CLOSING .................................................. 10

    2.1.    Sale of Assets ............................................................................................ 10
    2.2.    Excluded Assets ........................................................................................ 12
    2.3.    Assumption of Certain Liabilities and Retention of All Other Liabilities ........... 12
    2.4.    Closing; Closing Date ................................................................................ 13
    2.5.    Purchase Price .......................................................................................... 13
    2.6.    Purchase Price Adjustments ....................................................................... 13
    2.7.    Closing Deliveries .................................................................................... 14

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLER ........................... 15

    3.1.    Organization and Ownership ...................................................................... 15
    3.2.    Capitalization ........................................................................................... 15
    3.3.    Fictitious Business Names ......................................................................... 16
    3.4.    Authorization of Transaction ..................................................................... 16
    3.5.    Noncontravention ..................................................................................... 16
    3.6.    Title to Assets .......................................................................................... 16
    3.7.    Condition of Tangible Assets ..................................................................... 16
    3.8.    Real Property ........................................................................................... 16
    3.9.    Compliance with Laws .............................................................................. 17
    3.10.   Litigation ................................................................................................ 17
    3.11.   Labor and Employment Matters ................................................................. 18
    3.12.   Taxes ...................................................................................................... 18
    3.13.   Members and Membership Information ........................................................ 19
    3.14.   Material Contracts .................................................................................... 20
    3.15.   No Brokers .............................................................................................. 21

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE BUYER ........................... 21

    4.1.    Organization ............................................................................................ 21
    4.2.    Authorization of Transaction ..................................................................... 21
    4.3.    Noncontravention ..................................................................................... 21
    4.4.    No Brokers .............................................................................................. 22

ARTICLE V COVENANTS ................................................................................................... 22

    5.1.    Confidentiality ......................................................................................... 22
    5.2.    Further Assurances ................................................................................... 23
    5.3.    Clearances; Transfer Taxes ........................................................................ 23
    5.4.    Seller's Accounts Receivables ................................................................... 24

ARTICLE VI INDEMNITY ........................................................................................... 24

    6.1.    Indemnification by the Seller ................................................................. 24
    6.2.    Indemnification by the Buyer ................................................................. 24
    6.3.    Time for Claims ...................................................................................... 25
    6.4.    Third Party Claims .................................................................................. 25
    6.5.    Tax Treatment ......................................................................................... 26

ARTICLE VII MISCELLANEOUS .............................................................................. 27

    7.1.    Notices .................................................................................................... 27
    7.2.    Successors and Assigns; No Third-Party Beneficiary ........................... 28
    7.3.    Amendments and Waivers ...................................................................... 28
    7.6.    Entire Agreement ................................................................................... 29
    7.7.    Counterparts ........................................................................................... 29
    7.8.    Severability ............................................................................................ 29
    7.9.    Headings ................................................................................................. 29
    7.10.   Governing Law ....................................................................................... 29
    7.11.   Construction ........................................................................................... 30
    7.12.   Jurisdiction; Venue; Service of Process ................................................ 30
    7.13.   Certain Rules of Construction ................................................................ 31

**ASSET PURCHASE AGREEMENT**

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made effective as of June 17, 2020, by and among (i) Planet Fitness Holdings, LLC, a New Hampshire limited liability company (the "Buyer"), and (ii) JEG-Mexico Bueno, SRL ("the "Seller").

RECITALS

WHEREAS, the Seller owns and operates Planet Fitness health clubs located at the locations set forth on Exhibit A (the "Clubs");

WHEREAS, on March 19, 2020, JEG-United, LLC exercised a Put Option under the Side Letter Agreement, dated as of March 5, 2019, by and between JEG-United, LLC and Planet Fitness International Franchise, obligating the Buyer and the Seller to consummate the Contemplated Transactions; and

WHEREAS, the Buyer has agreed to purchase and acquire certain assets and contractual rights (and assume certain liabilities) from the Seller in connection with the Clubs, and the Seller has agreed to sell such assets and contractual rights to the Buyer, in accordance with the terms and conditions set forth in this Agreement.

AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises and consideration set forth below, and for other good and valuable consideration,

receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1.    <u>Definitions</u>.  For purposes of this Agreement:

"<u>Accounts Receivable</u>" is defined in <u>Section 2.2(f)</u>.

"<u>Acquired Assets</u>" is defined in <u>Section 2.1</u>.

"<u>Action</u>" means any claim, charge, controversy, action, cause of action, suit, litigation, arbitration, investigation, opposition, interference, audit, assessment, hearing, complaint, demand or other legal proceeding (whether sounding in contract, tort or otherwise, whether civil or criminal and whether brought at law or in equity) that is commenced, brought, conducted, tried or heard by or before, or otherwise involving, any Governmental Authority.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such specified Person.  For purposes of the foregoing, (a) a Person shall be deemed to control a specified Person if such Person (or a Family Member of such Person) possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such specified Person or (b) if such other Person is at such time a direct or indirect beneficial holder of at least 50% of any class of the voting Equity Interests of such specified Person.

"<u>Agreement</u>" is defined in the Preamble.

"<u>Assumed Contracts</u>" is defined in <u>Section 2.1(g)</u>.

"<u>Assumed Liabilities</u>" is defined in <u>Section 2.3(a)</u>.

"<u>Bill of Sale</u>" is defined in <u>Section 2.7(c)</u>.

"<u>Business</u>" means the businesses conducted or actively planned to be conducted by the Seller, including the operation of the Clubs.

"<u>Business Day</u>" means a day on which banks are open for business in the State of New Hampshire but does not include a Saturday, Sunday or a statutory holiday in the State of New Hampshire.

"<u>Business Service Provider</u>" is defined in <u>Section 3.11(a)</u>.

"<u>Buyer</u>" is defined in the Preamble.

"<u>Closing</u>" is defined in <u>Section 2.4</u>.

"<u>Closing Date</u>" is defined in <u>Section 2.4</u>.

"<u>Club(s)</u>" is defined in the preamble hereto.

4

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Confidential Information" is defined in Section 5.1.

"Contemplated Transactions" means the transactions contemplated by or in this Agreement or by or in any of the Transaction Documents.

"Contractual Obligation" means, with respect to any Person, any written or unwritten, contract, agreement, deed, mortgage, lease, sublease, license, sublicense or other commitment, promise, undertaking, obligation, arrangement, instrument or understanding, to which or by which such Person is a party or otherwise subject and legally bound or to which or by which any property, business, operation or right of such Person is subject or legally bound.

"Corporate Names" means the names of the Seller set forth on Exhibit B.

"Debt" means, with respect to any Person, and without duplication, all Liabilities, including all obligations in respect of the Seller, accrued interest, penalties, fees and premiums, of such Person (a) for borrowed money (including amounts outstanding under overdraft facilities), (b) evidenced by notes, bonds, debentures or other similar Contractual Obligations, (c) in respect of "earn-out" obligations and other obligations for the deferred purchase price of property, goods or services (other than trade payables or accruals incurred in the Ordinary Course of Business), (d) for the capitalized liability under all capital leases of such Person (determined in accordance with applicable accounting principles), (e) in respect of letters of credit and bankers' acceptances (other than reimbursement obligations with respect to undrawn amounts thereunder), (f) for Contractual Obligations relating to interest rate protection, swap agreements and collar agreements, in each case, to the extent payable if such Contractual Obligation is terminated at the Closing, and (g) in the nature of Guarantees of the obligations described in clauses (a) through (f) above of any other Person.

"Disclosure Schedules" is defined in the introductory paragraph to Article III.

"Encumbrances" means all liens, claims, mortgages, pledges, security interests, charges and other encumbrances of every kind and nature whatsoever, whether arising by agreement, operation of law or otherwise.

"Enforceability Exceptions" is defined in Section 3.4.

"Enforceable" means, with respect to any Contractual Obligation stated to be Enforceable by or against any Person, that such Contractual Obligation is a legal, valid and binding obligation of such Person enforceable by or against such Person in accordance with its terms, except to the extent that enforcement of the rights and remedies created thereby is subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application affecting the rights and remedies of creditors and to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

"Equity Interest" means, with respect to any Person, (a) any capital stock, partnership or membership interest (including profits interest), unit of participation or other similar interest (however designated) in such Person and (b) any option, warrant, purchase right, conversion

right, exchange right or other Contractual Obligation which would entitle any other Person to acquire any such interest in such Person or otherwise entitle any other Person to share in the equity, profits, earnings, losses or gains of such Person (including stock appreciation, phantom stock, profit participation or other similar rights).

"Escrow Agreement" shall mean the escrow agreement attached hereto as Exhibit [●] among Seller, Buyer and the Escrow Agent.

"Escrow Amount" shall mean One Million Five Hundred Ninety Thousand Three Hundred Seventy-One Dollars ($1,590,371).

"Escrow VAT Amount" shall mean Two Hundred Fifty-Four Thousand Four Hundred Fifty-Nine Dollars and Thirty-Six Cents ($254,459.36).

"Excluded Assets" is defined in Section 2.2.

"Excluded Liabilities" is defined in Section 2.3(b).

"Excluded Taxes" means (a) all income Taxes owed by the Seller for any period; (b) all Taxes relating to the Excluded Assets or Excluded Liabilities for any period; (c) all Taxes relating to the Acquired Assets, the Business or the Assumed Liabilities for any Pre-Closing Period, other than Transfer Taxes which are governed by Section 5.3; (d) all Taxes of the Seller or any other Person by reason of being a member of a consolidated, combined, unitary or affiliated group that includes the Seller or any of its present or past Affiliates prior to the Closing, by reason of a Tax sharing, Tax indemnity or similar agreement entered into by the Seller or any of its present or past Affiliates prior to the Closing (other than this Agreement) or by reason of transferee or successor liability arising in respect of a transaction undertaken by the Seller or any of its present or past Affiliates prior to the Closing; and (e) Taxes imposed on the Buyer as a result of any breach of warranty or misrepresentation under Section 3.12, or breach by the Seller of any covenant relating to Taxes. In the case of any Straddle Period, the amount of any Taxes based upon or measured by net income, gain, or gross receipt, which relate to the Pre-Closing Period will be determined based on an interim closing of the books as of the close of business on the Closing Date (and for such purpose, the taxable period of any partnership or other pass-through entity in which an entity holds a beneficial interest will be deemed to terminate at such time). The amount of Taxes other than Taxes based upon or measured by net income, gain or gross receipts, but including property Taxes and similar *ad valorem* Taxes for a Straddle Period which relate to the Pre-Closing Period will be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the portion of the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.

"Family Member" means, with respect to any individual, (a) such Person's spouse, (b) each child of such Person or such Person's spouse, (c) the spouse of any Person described in clause (b) above, (d) each parent, brother or sister of such Person, (e) each child of any Person described in clauses (a), (b) or (c) above, (f) each trust created for the benefit of one or more of the Persons described in clauses (a) through (e) above and (g) each custodian or guardian of any

property of one or more of the Persons described in clauses (a) through (f) above in his or her capacity as such custodian or guardian.

"Governmental Authority" means any United States federal, state or local or any foreign government, or political subdivision thereof, or any multinational organization or authority, or any other authority, agency or commission entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court or tribunal (or any department, bureau or division thereof), or any mediator, arbitrator or arbitral body.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, ruling, decision, verdict, determination or award made, issued or entered by or with any Governmental Authority.

"Guarantee" means, with respect to any Person, (a) any guarantee of the payment or performance of, or any contingent obligation in respect of, any Debt or other Liability of any other Person, (b) any other arrangement whereby credit is extended to any obligor (other than such Person) on the basis of any promise or undertaking of such Person (i) to pay the Debt or other Liability of such obligor, (ii) to purchase any obligation owed by such obligor, (iii) to purchase or lease assets under circumstances that are designed to enable such obligor to discharge one or more of its obligations or (iv) to maintain the capital, working capital, solvency or general financial condition of such obligor and (c) any liability as a general partner of a partnership or as a venture in a joint venture in respect of Debt or other Liability of such partnership or venture.

"Indemnified Party" means, with respect to any Indemnity Claim, the party asserting such claim under Section 6.1 or 6.2, as the case may be.

"Indemnifying Party" means, with respect to any Indemnity Claims, the Buyer or the Seller Indemnified Person under Section 6.1 or 6.2, as the case may be, against whom such claim is asserted.

"Indemnity Claim" means a claim for indemnity under Section 6.1 or 6.2, as the case may be.

"Lease Assignment Fees" means those fees charged by any landlord in connection with the assignment of and pursuant to the Real Property Leases.

"Legal Requirement" or "Law" means any federal, state, local or foreign law, statutes, codes, regulations, ordinances, rules, regulations and policies having the force of law or any Governmental Order.

"Liability" means, with respect to any Person, any liability or obligation of such Person.

"Losses" is defined in Section 6.1.

"Material Adverse Effect" means an effect, event, development, change, state of facts, condition, circumstance or occurrence that, alone or together with all other effects, events, developments, changes, states of facts, conditions, circumstances or occurrences, (i) is or would

be reasonably expected to have a material adverse effect on the Business, its results of operations, or the Acquired Assets, taken as a whole, or (ii) is or would reasonably be expected to have a material adverse effect on the ability of the Seller or its Affiliates to consummate the Contemplated Transactions or to perform their respective obligations under this Agreement on a timely basis; provided, however, that none of the following will be deemed either alone or in combination to constitute, and none of the following will be taken into account in determining whether there has been or will be, a Material Adverse Effect: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Seller operates; (iii) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyer; (vi) any matter of which Buyer is aware on the date hereof; (vii) any changes in applicable Laws or accounting rules or the enforcement, implementation or interpretation thereof; (viii) the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with the Seller; (ix) any natural or man-made disaster, pandemic, or acts of God; or (x) any failure by the Seller to meet any internal or published projections, forecasts or revenue or earnings predictions (provided that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded).

"Members" is defined in Section 2.1(e).

"Membership Agreements" is defined in Section 2.1(e).

"Ordinary Course of Business" means an action taken by any Person in the ordinary course of such Person's business or day-to-day operations that is consistent with the past customs and practices of such Person (including past practice with respect to quantity, amount, magnitude and frequency).

"Organizational Documents" means, with respect to any Person (other than an individual), (a) the certificate or articles of incorporation or organization and any joint venture, limited liability company, operating or partnership agreement and other similar documents adopted or filed in connection with the creation, formation or organization of such Person and (b) all by-laws, voting agreements and similar documents, instruments or agreements relating to the organization or governance of such Person, in each case, as amended or supplemented.

"Parties" means the Buyer and the Seller.

"Permits" means, with respect to any Person, any license, franchise, permit, consent, approval, right, privilege, certificate or other similar authorization issued by, or otherwise granted by, any Governmental Authority to which or by which such Person is subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

"Permitted Encumbrances" means (a) liens for Taxes not yet due and payable or being

contested in good faith by appropriate procedures; (b) mechanics', carriers', workmen's, repairmen's or other like liens arising or incurred in the Ordinary Course of Business; (c) easements, rights of way, zoning ordinances and other similar encumbrances affecting Real Property; (d) other than with respect to owned Real Property, liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the Ordinary Course of Business; and (e) other imperfections of title or Encumbrances, if any, that have not had, and would not have, a Material Adverse Effect.

"Person" means any individual or any corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Authority or other entity of any kind.

"Personnel Supply Contract" means the Personnel Supply Contract, dated December 14, 2017, by and between the Seller and Grupo Esoro, S. de R.L. de C.V.

"Planet Fitness Franchising" means Planet Fitness Franchising LLC, a Delaware limited liability company.

"Post-Closing Operational Expenses" is defined in Section 2.6(b).

"Post-Closing True-Up" is defined in Section 2.6(b).

"Pre-Closing Operational Expenses" is defined in Section 2.6(b).

"Pre-Closing Period" means any taxable period (or portion thereof) ending on or prior to the Closing Date.

"Premises" means each of the premises located at each address specified in each of the Real Property Leases.

"Prepaid Expenses" is defined in Section 2.1(c).

"Prorated Operational Expenses" is defined in Section 2.6(b).

"Purchase Price" is defined in Section 2.5(a).

"Real Property Leases" means the lease agreements set forth on Exhibit C.

"Representative" means, with respect to any Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"Seller" is defined in the Preamble.

"Seller Indemnified Person" is defined in Section 6.2.

"Seller's Knowledge," "Knowledge of Seller" and similar formulations means the actual knowledge of Kevin Kelly and John Williams.

"Straddle Period" means any taxable period ending after and including the Closing Date.

"Tenant Improvements" is defined in Section 2.1(f).

"Tax" or "Taxes" means (i) any and all federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar, including FICA), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind or any charge of any kind in the nature of (or similar to) taxes whatsoever, including any interest, penalty, or addition thereto, in each case whether disputed or not and (ii) any liability for the payment of any amounts of the type described in clause (i) of this definition as a result of being a member of an affiliated, consolidated, combined or unitary group for any period, as a result of any tax sharing or tax allocation agreement, arrangement or understanding, or as a result of being liable for another Person's taxes as a transferee or successor, by contract or otherwise.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Third Party Claim" means any Action that is asserted or threatened by a Person other than the parties, their successors and permitted assigns, against any Indemnified Party or to which any Indemnified Party is subject.

"Transaction Documents" means this Agreement, the Bill of Sale, and the Instrument of Assignment of Assumed Liabilities.

"Transfer Taxes" means (i) all transfer, documentary, sales, value added, use, stamp, registration, and other such similar Taxes (which, for the avoidance of doubt, shall not include any Tax paid on or measured by income) and (ii) any conveyance fees or recording charges, in the case of each of (i) or (ii), incurred in connection with the purchase and sale of the Acquired Assets or assumption of the Assumed Liabilities pursuant to this Agreement, together with any interest, penalty, addition or additional amount thereon imposed, assessed or collected by or under the authority of any Governmental Authority in connection with any of the foregoing.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS; CLOSING

2.1.   Sale of Assets.   At the Closing, the Seller agrees to grant, sell, assign, transfer, convey and deliver to the Buyer, and the Buyer agrees to purchase from the Seller at the Closing, subject to and upon the terms and conditions contained herein, free and clear of any and all Encumbrances other than Permitted Encumbrances, all of the Seller's right, title and interest in and to all of the following assets owned or used by the Seller in connection with the Business, other than the Excluded Assets described in Section 2.2 (collectively, the "Acquired Assets"):

(a)      All exercise equipment, "Black Card" amenity equipment, furniture, office equipment, computer hardware and software, signage and other tangible personal property used at the Clubs, whether located onsite or offsite, including, without limitation, those items listed on Schedule 2.1(a);

(b)      All supplies, spare parts, clothing, retail products and inventory used, or held for use, for the Clubs as of the Closing;

(c)      All prepaid expenses of the Seller as of the Closing pertaining to the Clubs or any of the Acquired Assets, including any security deposits, listed on Schedule 2.1(c) (collectively, the "Prepaid Expenses");

(d)      All membership lists, vendor lists, phone numbers, electronic data base records, ledgers, files, documents, reports, licenses, and similar items relating to the Clubs;

(e)      The rights of the Seller under all written agreements between the Seller and each Person who as of the date of this Agreement, is a member at any Club (collectively the "Members"), and that expire on or after the Closing (the "Membership Agreements"), including, without limitation, the right to all membership fees payable by or received from Members following the Closing;

(f)      All (i) leasehold rights of the Seller under the Real Property Leases listed on Schedule 2.1(f)(i), provided such rights are assignable under the Real Property Leases, including the Seller's respective interests in any trade fixtures and tenant improvements at the Premises (the "Tenant Improvements") and any security deposits or prepaid rent and (ii) the Tenant Improvements at the locations set forth on Schedule 2.1(f)(ii).  As of the Closing, the Real Property Leases listed on Schedule 2.1(f)(i) will be assigned to the Buyer, and the Buyer will assume such obligations to the extent arising after the Closing;

(g)      The Seller's rights under those certain contracts described in Schedule 2.1(g) attached hereto (such contracts, including the Real Property Leases and the Personnel Supply Contract, the "Assumed Contracts");

(h)      With the exception of all books and records that must be retained by the Seller as part of its accounting records pursuant to applicable law, all books and records (including electronic database records) of the Seller relating to (A) the Clubs that pertain to Members and memberships, including without limitation, copies of the data billing records, service records, repair orders, purchase contracts, and the like, (B) any Business Service Provider (but only to the extent that the Seller is legally permitted to transfer such books and records to the Buyer), and (C) any independent contractor engaged by the Seller to provide services to any of the Clubs who becomes engaged by the Buyer on or following the Closing Date;

(i)      All Permits which are held by the Seller and required for the conduct of the Business or for the ownership and use of the Acquired Assets, including, without limitation, those listed on Schedule 2.1(i), to the extent transferrable; and

(j)      The vehicles listed on Schedule 2.1(j).

2.2.  <u>Excluded Assets</u>.  The following properties are "<u>Excluded Assets</u>" and will not be sold or otherwise transferred to the Buyer hereunder:

(a)  The Seller's Organizational Documents, taxpayer and other identification numbers, seals, minute books, stock transfer books, blank stock certificates and other documents relating to the organization, maintenance, and existence of the Seller as a corporation;

(b)  All cash and cash equivalents of the Seller as of the Closing other than security deposits for the Real Property Leases;

(c)  All Contractual Obligations other than the Assumed Contracts, including all Contractual Obligations (i) with any of the Seller's present, former or prospective employees or independent contractors at any of the Clubs or (ii) involving any performance-based, severance, retention, change-in-control or similar arrangement;

(d)  All personnel, employment, payroll and benefit records that relate to any former or current employee of the Seller who is not a Business Service Provider and all records that relate to any former or current independent contractor of the Seller who is not engaged by the Buyer as of the date hereof, and all other records and documents that the Seller is required by Law to retain in its possession;

(e)  Any Company benefit plan and any assets thereof;

(f)  The accounts receivable of the Seller for the period prior to the Closing (the "<u>Accounts Receivable</u>"), <u>provided</u>, <u>however</u>, collection of the Accounts Receivable shall be done pursuant to <u>Section 5.4</u> hereof;

(g)  All claims and refunds of federal, state or local income, value added tax or franchise Taxes and other charges of any Governmental Authority of whatever nature;

(h)  All insurance policies and rights thereunder and all rights to applicable claims, benefits and proceeds thereunder, including any worker's compensation insurance premiums due the Seller as of the Closing;

(i)  The property and assets expressly designated on <u>Schedule 2.2(i)</u>, including all automobiles and personal computers, tablets, and cell phones identified therein;

(j)  All strategic plans, operating procedures, correspondence, creative materials, advertising and promotional materials, studies, goodwill; and

(k)  All other assets not described or identified in <u>Section 2.1</u> as Acquired Assets;

2.3.  <u>Assumption of Certain Liabilities and Retention of All Other Liabilities</u>.

(a)  At the Closing, the Buyer will assume: (i) all Liabilities of the Seller arising under the Assumed Contracts after the Closing Date other than Liabilities arising from any breach or default occurring prior to the Closing Date; (ii) all Liabilities relating to or arising

out of the Acquired Assets from and after the Closing Date; and (iii) the obligations of the Seller to the Members expressly set forth in the Membership Agreements (collectively, the "Assumed Liabilities").  At the Closing, the Buyer and the Seller will execute and deliver the Instrument of Assumption of Assumed Liabilities in the form attached hereto as Exhibit D.

(b)    Except as expressly set forth in this Agreement, the Assumed Liabilities will not include, the Buyer will not assume or perform, and the Seller shall retain, pay, perform, discharge and satisfy any Liabilities not specifically contemplated as Assumed Liabilities under Section 2.3(a) hereof (collectively, the "Excluded Liabilities").  For the avoidance of doubt, any: (i) Excluded Tax; (ii) Liability arising out of or related to the employment or engagement of any of the Business Service Providers or independent contractors engaged by the Seller to provide services to the Business prior to the Closing Date, including any severance rights or obligations incurred in connection with the Closing, together with any Liability arising out of or related to the Seller's termination of the engagement of any independent contractor engaged by the Seller to provide services to the Business, (iii) the engagement by the Seller of any of the Seller's independent contractors following the Closing Date and (iv) any benefit plan of the Seller shall, in each case, be an Excluded Liability. Without limiting the generality of the foregoing, the Seller will be responsible to pay all of the Seller's outstanding trade accounts payables, lease payables, Debt incurred for the purchase or lease of furnishings, fixtures, equipment and leasehold improvements constructed used in the operation of the Business or otherwise secured by or relating to the Business, excluding any such Debt included in the Assumed Liabilities.

2.4.    Closing; Closing Date.  The purchase and sale of the Acquired Assets and the Assumption of the Assumed Liabilities (the "Closing") shall occur contemporaneous with the execution of this Agreement on or before June 17, 2020, unless a later date is mutually agreed to by the Parties (the "Closing Date") remotely by exchanging and delivering electronically scanned copies of the original documents to be delivered on the Closing Date, and then exchanging and delivering original counterparts of such documents with each of the Parties promptly following the Closing.  The Closing shall be deemed effective as of 12:01 a.m., local time, on the Closing Date.

2.5.    Purchase Price.

(a)    The aggregate purchase price for the Acquired Assets shall be TwelveMillion Two Hundred Nine Thousand Six Hundred Twenty-Nine Dollars ($12,209,629)] (as adjusted pursuant to Section 2.6 below (the "Purchase Price") and the assumption of the Assumed Liabilities. Notwithstanding anything to the contrary stated in this Agreement, the Purchase Price will be subject to the 16% Mexican value added tax that shall be paid by the Buyer to the Seller pursuant to applicable law in the amount of One Million Nine Hundred Fifty-Three Thousand Five Hundred Forty Dollars and Sixty-Four Cents ($1,953,540.64). The Seller shall generate and deliver an electronic invoice (CFDI), which shall comply with all tax and requirements and information set forth by applicable law and include a breakdown of the Mexican value added tax.

2.6.    Purchase Price Adjustments.

(a)     The Purchase Price shall be (i) increased by the amount of the Prepaid Expenses *plus* the total amount of all Real Property Lease security deposits *plus* the amount equal to the prorated portion of all rent for the Premises pursuant to the Real Property Leases for any period after the Closing paid in advance by the Seller (ii) reduced by the aggregate amount of Lease Assignment Fees unpaid prior to the Closing Date; and any Debt of the Seller required to be paid in order to release any Encumbrance on an Acquired Asset at the Closing, and (iii) increased by the resulting Mexican value added tax.

(b)     The Seller shall pay any and all rent and other tenant lease obligations, utility expenses, advertising expenses, royalty fees, advertising fund contributions, vendor payments and other expenses that are invoiced prior to the Closing Date (the "Pre-Closing Operational Expenses"). The Buyer shall pay any and all utility expenses, advertising expenses, royalty fees, vendor payments, rent or other tenant lease obligations (specifically excluding the Seller's pro-rata share of property taxes), and other expenses that are invoiced on or after the Closing Date (the "Post-Closing Operational Expenses"). To the extent that such Pre-Closing Operational Expenses are due for tenant lease periods or services rendered or goods supplied after the Closing Date, and to the extent that the Post-Closing Operational Expenses are due for tenant lease periods or services rendered or goods supplied prior to the Closing Date, the Seller and the Buyer shall prorate such expenses as an adjustment to the Purchase Price (the "Prorated Operational Expenses"). Such Prorated Operational Expenses shall be reconciled, taking into account any adjustments reflected in the Closing Date Payment for Prepaid Expenses, within one hundred twenty (120) days after the Closing Date (the "Post-Closing True-Up").  Any purchase price adjustments due to Seller or to the Buyer, as the case may be, shall not be subject to the Indemnity Deductible set forth in Section 6.1(b).

(c)     Within five (5) business days following completion and mutual approval of the Post-Closing True-Up, any amounts finally determined to be due from either the Seller or the Buyer as a result of the Post-Closing True-Up shall be paid to the other by wire transfer, or other mutually agreed upon payment process. To the extent any Pre-Closing Operational Expenses or Post-Closing Operational Expenses are not trued up by the Post-Closing True Up, such expenses shall not be subject to the Indemnity Deductible threshold set forth in Section 6.1(b).

(d)     All Purchase Price Adjustments shall be adjusted to the applicable Mexican value added tax.

2.7.   Closing Deliveries.   At the Closing and upon the terms and subject to the conditions set forth in this Agreement, the Parties shall take the actions set forth in this Section 2.7:

(a)     The Buyer shall deliver or cause to be delivered to the Seller an aggregate amount in cash equal to the Purchase Price;

(b)     The Buyer and the Seller will deliver to each other Party the executed Instrument of Assignment of Assumed Liabilities in the form attached hereto as Exhibit C, effecting the assignment to and assumption by the Buyer of the Assumed Liabilities;

(c)     The Seller will deliver to the Buyer an executed bill of sale in the form attached hereto as <u>Exhibit D</u> transferring all Acquired Assets to the Buyer (the "<u>Bill of Sale</u>");

(d)     The Seller will deliver to the Buyer all books and records relating to the Business or the Clubs which are included in the Acquired Assets (and which, for the avoidance of doubt, shall not include the accounting records that must be retained by the Seller);

(e)     The Seller will deliver to the Buyer documentation (e.g., payoff letters and release of lien letters) reasonably satisfactory to the Buyer evidencing repayment of all Debt, if any, of the Seller that creates Encumbrances on any Acquired Assets and the termination of all such Encumbrances; and

(f)     The Seller shall deliver to the Buyer the required Mexican electronic invoice (CFDI) in accordance with all legal and tax requirements, including the breakdown of the Mexican value added tax.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby represents and warrants to the Buyer that, except as set forth in the corresponding section of the disclosure schedule document being delivered by the Seller to the Buyer concurrently herewith (the "<u>Disclosure Schedules</u>"), the statements contained in this <u>Article III</u> are true and correct as of the date hereof.

3.1.    <u>Organization and Ownership</u>.  The Seller:

(a)     is duly organized, validly existing and in good standing under the Laws of Mexico;

(b)     has the requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted; and

(c)     is duly qualified or licensed to do business and in good standing in every jurisdiction in which such qualification or licensing is required except where failure to so qualify has not had, and would not reasonably be expect to have a Material Adverse Effect.

3.2.    <u>Capitalization</u>.

(a)     <u>Ownership</u>.  <u>Schedule 3.2</u> sets forth the names of the record and beneficial holders of all of the outstanding Equity Interests of the Seller and the number of shares or units held by each such record and beneficial holder.  The Seller has not issued any options, warrants or other rights to purchase its Equity Interests or to participate in the profits of the Seller; and

(b)     <u>No Subsidiaries or Other Centers</u>.  The Seller has no subsidiaries and does not hold a direct or indirect interest in any health and fitness center other than the Clubs.

3.3.   <u>Fictitious Business Names</u>.   The Seller does not conduct any business under any name other than the Corporate Names, except for any "doing business as" or alternate or fictitious names permitted by Planet Fitness Franchising or required by applicable Law.

3.4.   <u>Authorization of Transaction</u>.   The Seller has the legal right and authority to enter into this Agreement and each of the other agreements and instruments attached as Exhibits hereto or contemplated hereby (collectively with this Agreement, the "<u>Transaction Documents</u>") and to perform the Seller's obligations hereunder and thereunder.   The execution, delivery and performance by the Seller of this Agreement and the other Transaction Documents have been duly authorized by all necessary entity power and authority on the part of the Seller.   This Agreement and the other Transaction Documents have been duly executed and delivered by the Seller and constitutes a valid and legally binding obligation of the Seller enforceable against the Seller in accordance with their respective terms,   except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity) (the "<u>Enforceability Exceptions</u>").

3.5.   <u>Noncontravention</u>.   Except as disclosed on <u>Schedule 3.5</u>, neither the execution and delivery by the Seller of this Agreement or the other Transaction Documents, nor the consummation by the Seller of the Contemplated Transactions, will (i) conflict with or violate any provision of the Organizational Documents of the Seller, (ii) require on the part of the Seller any notice to or filing with, or any permit, authorization, consent or approval of, any Governmental Authority or any other Person (iii) result in the imposition of any lien, charge, encumbrance or claim of any nature upon any assets of the Seller, (iv) violate any Governmental Order applicable to the Seller or any of its properties or assets or (v) require any consent under, constitute (with or without notice or lapse of time or both) a default under, result in any breach of, or give any Person any rights of termination, acceleration or cancellation of, any contract to which the Seller is bound.

3.6.   <u>Title to Assets</u>.   The Seller has good and marketable title to, or a valid and subsisting leasehold interest in or valid rights under contract to use, all of the Acquired Assets, free and clear of all Encumbrances.

3.7.   <u>Condition of Tangible Assets</u>.   Except as set forth on <u>Schedule 3.7</u>, the tangible Acquired Assets are "as is" and "where is."

3.8.   <u>Real Property</u>.

(a)   Except as set forth on <u>Schedule 3.8(a)</u>, none of the real property that is used in the operation of the Business is owned by the Seller.   The Seller has delivered to the Buyer a true and complete copy of each Real Property Lease, Guarantee agreement, letter of credit, and any other material document executed by the Seller and any landlord related to the Real Property Leases;

(b)   The Seller enjoys peaceful and undisturbed possession of the Premises;

(c)     The Seller is not, nor, to the Seller's Knowledge, is any other party, in material breach or default under any Real Property Lease, and, to Seller's Knowledge, no event has occurred or circumstance exists which, with the delivery of notice, passage of time or both, would constitute such a breach or default, and Seller has paid all rent due and payable under any Real Property Lease;

(d)     The Seller has not received nor given any notice of any default or event that with notice or lapse of time, or both, would constitute a default by Seller under any Real Property Lease, and neither Seller nor any other party has exercised any termination rights with respect thereto;

(e)     The Seller has not subleased, assigned or otherwise granted to any Person the right to use or occupy such Premises or any portion thereof;

(f)     The Seller has not pledged, mortgaged or otherwise granted an Encumbrance on its leasehold interest in any Premises;

(g)     The Seller has not exercised any option to extend the original term of any Real Property Lease; and

(h)     The Seller has not made any alterations to the Premises that must be removed and/or restored at the expiration or termination of the term of any Real Property Lease, other than as permitted by the applicable Real Property Lease or as set forth in Schedule 3.8(h) attached hereto.

3.9.    Compliance with Laws.

(a)     The Seller has been duly granted all material Permits under all Legal Requirements necessary for the conduct of Business at its Clubs. Except as disclosed on Schedule 3.9, (i) the Permits are valid and in full force and effect, and (ii) Seller is not in material breach or violation of, or default under, any such Permit, and, to the Seller's Knowledge, no basis exists which, with notice or lapse of time or both, would constitute any such breach, violation or default; and

(b)     The Seller is not, with respect to the Seller's Business at the Clubs, in material breach or violation of, or default under, nor has the Seller been in breach or violation of, or default under (i) its Organizational Documents (nor, to the Seller's Knowledge, is there a basis which could constitute such a breach, violation or default) or (ii) any Legal Requirement (nor, to the Seller's Knowledge, is there a basis which could constitute such a breach, violation or default).

3.10.   Litigation.  With the exception of the action filed against Seller's affiliate in the United States District Court for the District of New Hampshire, captioned Planet Fitness International Franchise v. JEG-United LLC, No. 1:20-cv-00693, there is no suit, action, arbitration, or legal, administrative, or other proceeding, or governmental investigation pending or, to the Seller's Knowledge, threatened, against the Seller or the Acquired Assets.  The Seller is not in default with respect to any Governmental Order.

3.11.   <u>Labor and Employment Matters</u>.

(a)     The Seller does not have employees.  All individuals providing services to the Seller (the "<u>Business Service Providers</u>") do so pursuant to the Personnel Supply Contract, <u>Schedule 3.11(a)</u> sets forth a complete and accurate list of the Business Service Providers and, with respect to each, his or her (i) title or position (including whether full or part time), (ii) start date, (iii) bonus compensation and other compensation (such as commission or other incentive-based compensation) paid with respect to the most recently completed fiscal year.

(b)     The Seller is not a party to, or otherwise subject to, any Contractual Obligation with a labor union or other employee representative body, and no such Contractual Obligation is being negotiated by the Seller with respect to any Business Service Providers at any of the Clubs.  None of the Business Service Providers are represented by a labor union or other employee representative body.  To the Seller's Knowledge, there is no effort by or on behalf of any labor union or other employee representative body to organize any of the Service Providers. To the Seller's Knowledge, no petition has been filed or proceedings instituted by any labor union or other employee representative body with any Governmental Authority seeking recognition or certification as the bargaining representative of any of the Business Service Providers.  There is no strike, work slowdown, picketing or similar activity pending, or to the Seller's Knowledge, threatened against the Seller with respect to any of the Business Service Providers.  To the Seller's Knowledge, there are no unfair labor practice complaints pending before any Governmental Authority against the Seller with respect to any Business Service Providers.

3.12.   <u>Taxes</u>.

(a)     The Seller has (i) timely filed all Tax Returns which are required to be filed by them as of the date hereof and such Tax Returns are accurate, complete and correct in all material respects, (ii) except as set forth in <u>Schedule 3.12</u>, paid all Taxes owed by the Seller as of the date hereof and (iii) made appropriate provisions for the payment of all such Taxes where return estimates and statements are not yet required to be filed and Taxes are not yet required to be paid.  No income tax return of the Seller has been audited by any taxing authorities, and the Seller has not received notice of any audits by any taxing authorities. There is no unclaimed property or escheat obligation with respect to property or other assets held or owned by the Seller; and

(b)     The Seller will file all future income tax returns required under federal, state or local law in connection with its gross or net income.  The Seller will pay any taxes due as shown or required to be shown on such return, including any penalties and interest.  There are no tax liens or tax liabilities attaching to, or arising from, any of the Acquired Assets to be transferred to the Buyer pursuant to this Agreement that have not been paid as of the date of this Agreement, and no action, proceeding or, to the Seller's knowledge, investigation has been instituted against the Seller which would give rise to any such Lien on the Acquired Assets or that would have an impact on the Buyer's future Tax position.  The Seller has collected and paid to the appropriate Governmental Authorities all Taxes required to have been collected and paid in connection with amounts received with respect the provision of tanning services. The Seller has withheld and paid to the appropriate Governmental Authority all Taxes required to have been

withheld and paid in connection with amounts paid or owing to any Business Service Provider, independent contractor, member, creditor of the Business, or other third party.  The Buyer will not be required to include in income, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of (i) any installment sale or open transaction disposition made on or prior to the Closing Date, or (ii) any prepaid amount received on or prior to the Closing Date.

(c)     Notwithstanding anything to the contrary, the Acquired Assets and other payment items provided in this Agreement are subject to the Mexican value added tax, pursuant to the applicable legal provisions.

3.13.   Members and Membership Information.

(a)     Attached hereto as Schedule 3.13(a) is a brief description of each type of membership offered at the Clubs, including a description of any promotions (e.g. "lead-box" or other short-term programs) either in effect or pursuant to which outstanding memberships were issued.

(b)     The membership information for each of the Clubs, including but not limited to, the name, type of membership, monthly charges, current status of the payment for membership fees, and the expiration dates for each Member at the Clubs in each case, as on the Twin Oaks system is, to the Seller's Knowledge, true, correct and complete in all material respects as of the date hereof, and, to the Seller's Knowledge, no Member is subject to any membership arrangement except as set forth on the Twin Oaks system. To the Seller's Knowledge, all Members of the Clubs appearing on the Twin Oaks system as of the date hereof have valid Membership Agreements;

(c)     All membership fees are billed in advance;

(d)     Except as otherwise disclosed to the Buyer, each Member has prepaid such Member's last month's fees;

(e)     The accounts of Members paying via electronic fund transfer (checking or savings account) are debited on or about the 17th of each month and the credit cards of members paying via credit card are debited on or about the 17th of each month.  Such debits entitle the Member to use the Club for the month-long period beginning on the 17th of the month in which the debit took place until the 16th of the following month;

(f)     The Seller has not transferred, assigned or conveyed to any Person any of the Seller's rights to renewals, monthly membership fees or receivables under any of the Membership Agreements;

(g)     No Member of any Club has the right to renew such Member's membership at any specified rate or for any specified term, except as described on Schedule 3.13(g);

(h)     Initiation fees and prepaid monthly facility fees obtained by the Seller from any Members are not refundable except as set forth in the Membership Agreements or in Schedule 3.13(h) hereto.

3.14.   Material Contracts.   Schedule 3.14 lists each of the following Contractual Obligations which are deemed by Seller material to the Business and (x) by which any of the Acquired Assets are bound or affected or (y) to which the Seller is a party or by which it is bound in connection with the Business or the Acquired Assets (such Contractual Obligations, together with the Membership Agreements, the Real Property Leases, and the Assumed Contracts, the "Material Contracts"):

(a)     any agreement with a utility company other than broadly applicable rate tariffs; and

(b)     any other Contractual Obligation, that:

i.      constitutes a binding obligation of the Seller and involves the payment or receipt by the Seller of $25,000 or more over its term (including renewal options) and is not cancelable by the Seller, without penalty, on less than thirty (30) days' notice to the other Party;

ii.     imposes material restrictions on the Business of the Seller, including those that limit or purport to limit the ability of the Seller to compete in any line of Business or with any Person or in any geographic area or during any period of time;

iii.    will, or is reasonably expected to involve, a loss to the Seller of $25,000 or more;

iv.     was made in connection with a capital expenditure, including capitalized lease obligation, in excess of $10,000;

v.      results in an Encumbrance on any asset or property of the Seller;

vi.     relates to trade receivable or Debt of the Seller (including, without limitation, any Guarantees);

vii.    is with any Business Service Provider or independent contractors engaged to provide services to the Business and provides for (A) annual base compensation in excess of $75,000 and/or (B) severance, retention, change-in-control or similar benefits; or

viii.   is with a labor union or other employee representative body that covers any Business Service Providers.

Each Material Contract is a valid and binding obligation of the Seller and, to the Seller's Knowledge, parties thereto in accordance with its terms.  Each Material Contract is in full force and effect and neither the Seller nor, to the Seller's Knowledge, any other party thereto, is in

material breach of or default under (or is alleged to be in material breach of or default under), or has provided or received any notice of any intention to terminate, any Material Contract and, to the Seller's Knowledge, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. Complete and correct copies of each Material Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been made available to the Buyer. There are no disputes pending or, to the Seller's Knowledge, threatened under any Material Contract that is an Assumed Contract.

3.15.   No Brokers.  Neither the Seller nor any of its Affiliates or Representatives has any Liability of any kind to, or is subject to any claim of, any broker, finder or agent in connection with the Contemplated Transactions other than those which will be borne by the Seller.

3.16.   No Other Representations and Warranties. Except for the representations and warranties contained in this Article III (including the related portions of the Disclosure Schedules), neither the Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of the Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Business and the Acquired Assets furnished or made available to the Buyer and its Representatives (including any information, documents or material delivered or made available to Buyer, management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Business, or any representation or warranty arising from statute or otherwise in law.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby represents, warrants and agrees that the statements contained in this Article IV are correct and complete as of the date hereof.

4.1.   Organization.   The Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New Hampshire.

4.2.   Authorization of Transaction.  The Buyer has the legal right and authority to enter into this Agreement and the other Transaction Documents and to perform its obligations hereunder and thereunder.  The execution, delivery and performance by the Buyer of this Agreement and the other Transaction Documents have been duly authorized by all necessary limited liability company, corporate, partnership or trust power and authority, as applicable, action on the part of the Buyer.  This Agreement and the other Transaction Documents have been duly executed and delivered by the Buyer.  This Agreement is, and each of the Transaction Documents to be delivered hereunder have been, executed and delivered by the Buyer and constitute a valid and legally binding obligation of the Buyer, enforceable against the Buyer in accordance with their respective terms, subject to the Enforceability Exceptions.

4.3.   Noncontravention.  Neither the execution and delivery by the Buyer of this Agreement nor the other Transaction Documents, nor the consummation by the Buyer of the

Contemplated Transactions, will (a) conflict with or violate any provision of the Organizational Documents of the Buyer, (b) require on the part of the Buyer any notice to or filing with, or any permit, authorization, consent or approval of, any Governmental Authority or any other Person, firm, or corporation, (c) violate any Governmental Order applicable to the Buyer or any of its properties or assets or (e) require any consent under, constitute (with or without notice or lapse of time or both) a default under, result in any breach of, or give any Person any rights of termination, acceleration or cancellation of, any contract to which the Buyer is bound. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to the Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

4.4.    <u>No Brokers</u>.  The Buyer has no Liability of any kind to, or is subject to any claim of, any broker, finder or agent in connection with the Contemplated Transactions for which the Seller would be liable.

4.5.    <u>Legal Proceedings</u>. There are no actions, suits, claims, investigations or other legal proceedings pending or, to Buyer's knowledge, threatened against or by the Buyer or any Affiliate of the Buyer that challenge or seek to prevent, enjoin or otherwise delay the Contemplated Transactions.

4.6.    <u>Independent Investigation</u>. The Buyer has conducted its own independent investigation, review and analysis of the Business and the Acquired Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of the Seller for such purpose. The Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, the Buyer has relied solely upon its own investigation and the express representations and warranties of the Seller set forth in <u>Article III</u> (including related portions of the Disclosure Schedules); and (b) neither the Seller nor any other Person has made any representation or warranty as to the Seller, the Business, the Acquired Assets or this Agreement, except as expressly set forth in <u>Article III</u> (including the related portions of the Disclosure Schedules).

**ARTICLE V**
**COVENANTS**

The Parties agree to the following covenants:

5.1.    <u>Confidentiality</u>.  The Seller acknowledges that the success of the Business after the Closing depends upon the continued preservation of the confidentiality of certain information possessed by the Seller, that the preservation of the confidentiality of such information by the Seller is an essential premise of the bargain between the Seller, on the one hand, and the Buyer on the other hand, and that the Buyer would be unwilling to enter into this Agreement in the absence of this <u>Section 5.1</u>.  Accordingly, the Seller hereby agrees with the Buyer that the Seller will not, and that the Seller will use reasonable efforts to cause its Representatives not to, for a period of two years following the Closing Date, directly or indirectly, without the prior written consent of the Buyer, disclose or use, any confidential or proprietary information involving or

relating to the Business or the Acquired Assets; provided, however, that the information subject to the foregoing provisions of this sentence will not include any information generally available to, or known by, the public (other than as a result of disclosure in violation hereof); and provided, further, that the provisions of this Section 5.1 will not prohibit any retention of copies of records or disclosure (i) required by any applicable Legal Requirement including, without limitation, compliance with all federal and state securities and financial reporting requirements or (ii) made in connection with the enforcement of any right or remedy relating to this Agreement or the Contemplated Transactions or (iii) made in any legal action between Seller and Its Affiliates and Buyer and its Affiliates regarding the actions of such parties prior to Closing.

The Buyer and the Seller shall hold in confidence: (i) all documents and information obtained from each other, their employees, agents and independent contractors; (ii) the nature, terms and content of this Agreement and all discussions between the Buyer and the Seller regarding the Contemplated Transactions and the negotiation of such, whether prior to or after the execution of this Agreement; and (iii) the fact that the Seller and the Buyer have entered into this Agreement (all of the above shall collectively be referred to in this Agreement as ("Confidential Information"), and shall not disclose or convey any of such Confidential Information to any other Person; provided, however, that the Buyer and the Seller may disclose Confidential Information: (a) to such of their Representatives, potential lenders, employees, attorneys, accountants and financial advisors as is reasonable to facilitate consummation of the Contemplated Transactions; (b) to the extent any such disclosure is required by Law; (c) to any Landlord and other third parties as necessary to facilitate obtaining such parties' consent to the transfer of Acquired Assets and to enter into any sublease or lease at the option of the Buyer under this Agreement; (d) the Buyer may disclose the existence of the Confidential Information as it deems prudent for purposes of public company disclosures and reporting and (e) the Seller and the Buyer and their Affiliates may disclose the Confidential Information in any legal action between Seller and Its Affiliates and Buyer and its Affiliates regarding the actions of such parties prior to Closing.

5.2.    Further Assurances.  From and after the Closing Date, upon the request of either the Seller or the Buyer, each of the Parties hereto will do, execute, acknowledge and deliver all such further acts, assurances, notices of assignment, deeds, assignments, transfers, conveyances and other instruments and papers as may be reasonably required or appropriate to carry out the Contemplated Transactions.  The Seller will refer all customer inquiries relating to the Business to the Buyer from and after the Closing.

5.3.    Clearances; Transfer Taxes.

(a)    All income tax incurred in connection with this Agreement and the Contemplated Transactions shall be borne by the Seller. Any and all value added Tax incurred in connection with the Acquired Assets and other payment items provided in this Agreement shall be borne and paid by the Buyer.  The Party responsible under applicable Law for filing any Tax Return with respect to such value added Taxes shall timely file such Tax Return.

(b)    The Seller and the Buyer shall immediately after the Closing Date (i) terminate all utility services agreements and (ii) sign up for new utility services agreements. After the Closing, all utility services agreements shall be in the name of the Buyer.

5.4.    Seller's Accounts Receivables.  Following the Closing, the Seller shall be solely responsible for collection of Seller's Accounts Receivable and Buyer shall reasonably cooperate with Seller in connection therewith.

## ARTICLE VI
## INDEMNITY

6.1.    Indemnification by the Seller.

(a)    Indemnification.  Subject to the limitations set forth in this Section 6.1, the Seller shall indemnify, defend and hold harmless the Buyer from and against and in respect of any and all Actions, losses, damages, fees, costs (including reasonable costs of investigation, defense and enforcement of this Agreement) whether or not involving a Third Party Claim (collectively, "Losses"), that the Buyer may incur or suffer as a result of, arising out of or directly or indirectly relating to:

(1)    any breach or violation of any covenant or agreement of the Seller pursuant to this Agreement;

(2)    breach of, or inaccuracy in, any representation or warranty made by the Seller in this Agreement; or

(3)    any Excluded Liability.

(b)    Limitations on Indemnification.  The Seller will have no obligation to indemnify the Buyer pursuant to Section 6.1(a) unless the aggregate amount of all such Losses incurred or suffered by the Buyer exceeds One Hundred Thirty Eight Thousand Dollars ($138,000) (the "Indemnity Deductible"), at which point the Seller will indemnify the Buyer for all Losses in excess of the Indemnity Deductible up to the Indemnity Cap; provided, however, the maximum total amount of Losses that may be recovered by the Buyer under Section 6.1(a) will be Five Hundred Thousand Dollars ($500,000) (the "Indemnity Cap").

6.2.    Indemnification by the Buyer.

(a)    Indemnification.  Subject to the limitations set forth in this Section 6.2, the Buyer shall indemnify, defend, and hold harmless the Seller and the Representatives and Affiliates of Seller (each, a "Seller Indemnified Person"), from and against and in respect of any and all Losses that the Seller Indemnified Persons may incur or suffer as a result of, arising out of or directly or indirectly relating to:

i.    any breach or violation of any covenant or agreement of the Buyer pursuant to this Agreement;

ii.    any breach of, or inaccuracy in, any representation or warranty made by the Buyer in this Agreement;

iii.    any Assumed Liability.

6.3.    Time for Claims.    No claim may be made or suit instituted seeking indemnification pursuant to Sections 6.1 or 6.2 for any claim unless a written notice describing such claim in reasonable detail in light of the circumstances then known to the Indemnified Party, is promptly provided to the Indemnifying Party:

(a)    at any time within thirty (30) days after the expiration of the applicable statute of limitations in the case of fraud or any breach or violation of any covenant in this Agreement or any Excluded Liability or Assumed Liability (as applicable); and

(b)    at any time prior to the date that is six (6) months following the Closing Date in the case of any breach of, or inaccuracy in, any other representation and warranty in this Agreement.

No claim for indemnification will be barred for failure to provide prompt notice, except to the extent that the failure to provide prompt notice results in actual and material prejudice to the Indemnifying Party.

6.4.    Third Party Claims.

(a)    Notice of Claim.    If any third party notifies an Indemnified Party with respect to a Third Party Claim that may give rise to an Indemnification Claim against an Indemnifying Party under this Article VI, then the Indemnified Party will promptly give written notice to the Indemnifying Party; provided, however, that no delay on the part of the Indemnified Party in notifying the Indemnifying Party will relieve the Indemnifying Party from any obligation under this Article VI, except to the extent such delay actually and materially prejudices the Indemnifying Party;

(b)    Assumption of Defense, etc.    Subject to the following sentence, the Indemnifying Party will be entitled to control the defense of any Third Party Claim that is the subject of a notice given by the Indemnified Party pursuant to Section 6.1 or Section 6.2, as applicable.  In addition, the Indemnifying Party will have the right to defend the Indemnified Party against the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party so long as (i) the Indemnifying Party gives written notice to the Indemnified Party within thirty (30) calendar days after receipt of the Indemnified Party's notice of the Third Party Claim that the Indemnifying Party will indemnify the Indemnified Party from and against the entirety of any and all Losses the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim, (ii) the Indemnifying Party provides the Indemnified Party with the name and experience of its counsel and the Indemnified Party consents to such counsel, which shall not be unreasonably withheld, conditioned or delayed, (iii) the Third Party Claim involves money damages and is not reasonably expected to result in an injunction or other equitable relief against the Indemnified Party as a material remedy, (v) the Indemnified Party has not been advised by counsel that an actual conflict exists between the Indemnified Party and the Indemnifying Party in connection with the defense of the Third Party Claim, (vi) the Third Party Claim does not relate to or otherwise arise in connection with any criminal or regulatory enforcement Action on the part of the Indemnified Party, and (vii) the Indemnifying Party conducts the defense of the Third Party Claim actively and

25

diligently.  The Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim;

(c)     Limitations on Indemnifying Party.   The Indemnifying Party will not consent to the entry of any judgment or enter into any compromise or settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (such consent not to be unreasonably withheld, conditioned or delayed) unless such judgment, compromise or settlement (i) provides for the payment by the Indemnifying Party of money as sole relief for the claimant, (ii) results in the full and general release of the Buyer or the Seller Indemnified Persons, as applicable, from all liabilities arising or relating to, or in connection with, the Third Party Claim and (iii) involves no finding or admission of any violation of Legal Requirements or the rights of any Person and no material effect on any other claims that may be made against the Indemnified Party;

(d)     Indemnified Party's Control.   If the Indemnifying Party (i) does not deliver the notice contemplated by clause (a), (ii) is not permitted to defend the Indemnified Party against the Third Party Claim pursuant to the terms of Section 6.4(b) hereof, or (iii) otherwise at any time fails to conduct the defense of the Third Party Claim actively and diligently after thirty (30) days advance written notice from the other party, and the Indemnified Party has provided written notice to the Indemnifying Party of its intention to assume control of the Third Party Claim, the Indemnified Party may defend, and may consent to the entry of any judgment or enter into any compromise or settlement with respect to, the Third Party Claim in a reasonable manner it may deem appropriate; provided, however, that the Indemnifying Party will not be bound by the entry of any such judgment consented to, or any such compromise or settlement effected, without its prior written consent (which consent will not be unreasonably withheld, conditioned or delayed); If such notice is given on a timely basis and the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently but any of the other conditions in Section 6.4(b) is or becomes unsatisfied, the Indemnified Party may defend, and may consent to the entry of any judgment or enter into any compromise or settlement with respect to, the Third Party Claim; provided, however, that the Indemnifying Party will not be bound by the entry of any such judgment consented to, or any such compromise or settlement effected, without its prior written consent (which consent will not be unreasonably withheld, conditioned or delayed).

6.5.   Escrow Agreement.


(a)     Upon Closing, the Buyer shall deposit the Escrow Amount and the Escrow VAT Amount with the Escrow Agent (together, the "Escrow Fund") to hold pursuant to the terms of the Escrow Agreement.

6.6.   Tax Treatment. Unless otherwise required by Law, the Parties will treat all indemnification payments under this Agreement as adjustments to the Purchase Price for all Tax purposes.

6.7.   <u>Exclusive Remedies</u>.  The parties acknowledge and agree that their sole and exclusive remedy with respect to any and all claims for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this ARTICLE VI. In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates and each of their respective Representatives arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this ARTICLE VI.

**ARTICLE VII**
**MISCELLANEOUS**

7.1.   <u>Notices</u>.   All notices, requests, demands, claims and other communications required or permitted to be delivered, given or otherwise provided under this Agreement must be in writing and must be delivered, given or otherwise provided:

(a)   by hand (in which case, it will be effective upon delivery); or

(b)   by overnight delivery by a nationally recognized courier service (in which case, it will be effective on the Business Day after being deposited with such courier service);

in each case, to the address listed below:

If to the Seller at:

JEG-United, LLC
c/o Tom Bock
2800 Southampton Road
Philadelphia, PA 19154
Email: TBock@ernestbock.com

and

JEPF México Holdings, LLC
3839 Bee Caves Road, Suite 205
Austin, TX 78746
Attention: Jeff Ezell
Email: Jeff@jlmfinancialinvestments.com

with a copy to:

Faegre Drinker Biddle & Reath LLP
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996

27

Attention:  Neil K. Haimm and Remy Nshimiyimana
Emails:  Neil.Haimm@faegredrinker.com; Remy.Nshimiyimana@faegredrinker.com


If to the Buyer, to it at:

Planet Fitness Holdings, LLC
4 Liberty Lane West
Hampton, NH 03842
Attention:  General Counsel


Each of the Parties to this Agreement may specify different address or number by giving notice in accordance with this <u>Section 7.1</u> to each of the other Parties hereto.

7.2.    <u>Successors and Assigns; No Third-Party Beneficiary</u>.   Subject to the immediately following sentence, this Agreement will be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, each of which such successors and permitted assigns will be deemed to be a party hereto for all purposes hereof.  No Party may assign, delegate or otherwise transfer either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Parties; <u>provided</u>, <u>however</u>, that the Buyer may (a) assign any or all of its rights and interests hereunder to one or more of its Affiliates or to any provider of financing as collateral security and (b) designate one or more of its Affiliates to perform its obligations hereunder, in each case, so long as the Buyer is not relieved of any Liability hereunder.  Except as expressly provided herein, including but not limited to, in <u>Sections 6.1</u> and <u>6.2</u> with respect to the Buyer and Seller Indemnified Persons, this Agreement is for the sole benefit of the Parties and their permitted successors and assignees and nothing herein expressed or implied will give or be construed to give any Person, other than the Parties and such successors and assignees, any legal or equitable rights hereunder, including any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

7.3.    <u>Amendments and Waivers</u>.   No amendment or waiver of any provision of this Agreement will be valid and binding unless it is in writing and signed, in the case of an amendment, by the Buyer and the Seller, or in the case of a waiver, by the Party against whom the waiver is to be effective.  No waiver by any Party of any breach or violation or, default under or inaccuracy in any representation, warranty or covenant hereunder, whether intentional or not, will be deemed to extend to any prior or subsequent breach, violation, default of, or inaccuracy in, any such representation, warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.  No delay or omission on the part of any Party in exercising any right, power or remedy under this Agreement will operate as a waiver thereof.

7.4.    <u>Expenses</u>. Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the Contemplated Transactions

shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

7.5.     EACH ASSET AS-IS/WHERE-IS.  The Buyer acknowledges and agrees that except for the Buyer's obligation to deliver title to the Acquired Assets free and clear of all Encumbrances other than Permitted Liens pursuant to Section 2.1, the Acquired Assets are being sold and transferred to the Buyer "AS IS, WHERE IS," and, except as set forth in Section 3.7, the Seller and its Affiliates do not make, and expressly disclaim, any and all representations or warranties of any kind or nature, express or implied, as to the condition or quality of the Acquired Assets or the prospects (financial or otherwise) or risks of the Acquired Assets, or that Buyer will possess property to operate the Acquired Assets.  Without limiting the generality of the foregoing, the Seller and its Affiliates specifically disclaim any implied warranty of merchantability, usage, suitability, fitness for any particular purposes, workmanship or the absence of any defects (whether latent or patent). All Acquired Assets shall remain in their current location, and the Seller is under no obligation to physically deliver any of the Acquired Assets from their location to any other location.

7.6.     Entire Agreement.   This Agreement, together with the other Transaction Documents and any documents, instruments and certificates explicitly referred to herein, constitutes the entire agreement among the Parties hereto with respect to the subject matter hereof and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, with respect thereto.

7.7.     Counterparts.  This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute but one and the same instrument.  This Agreement will become effective when duly executed by each Party hereto.

7.8.     Severability.   Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  In the event that any provision hereof would, under applicable law, be invalid or unenforceable in any respect, each Party hereto intends that such provision will be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.

7.9.     Headings.   The headings contained in this Agreement are for convenience purposes only and will not in any way affect the meaning or interpretation hereof.

7.10.    Governing Law.  This Agreement, the rights of the Parties and all Actions arising in whole or in part under or in connection herewith, will be governed by and construed in accordance with the domestic substantive laws of the State of New Hampshire, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction. Notwithstanding the foregoing, Mexican public policy, tax and labor law shall apply in all sections where Mexican law has been referred to.

7.11.  <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  The Parties intend that each representation, warranty and covenant contained herein will have independent significance.  If any Party has breached or violated, or if there is an inaccuracy in, any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached or violated, or in respect of which there is not an inaccuracy, will not detract from or mitigate the fact that the Party has breached or violated, or there is an inaccuracy in, the first representation, warranty or covenant.

7.12.  <u>Jurisdiction; Venue; Service of Process</u>.

(a)  <u>Jurisdiction</u>.  Each of the Parties to this Agreement, by its execution hereof, (i) hereby agrees that all actions and proceedings arising out of or relating to this Agreement exclusively be heard and determined in the courts of the State of New Hampshire and any state or federal appellate court therefrom within the State of New Hampshire and the Parties hereto hereby irrevocably submit to the exclusive jurisdiction of such courts in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding, (ii) hereby waives to the extent not prohibited by applicable Legal Requirements, and agrees not to assert, by way of motion, as a defense or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that any such Action brought in one of the above-named courts should be dismissed on grounds of *forum non conveniens*, should be transferred or removed to any court other than one of the above-named courts, or should be stayed by reason of the pendency of some other Action (unless such other Action also involves a third party and was prior pending) in any other court other than one of the above-named courts or that this Agreement, any other Transaction Document or the subject matter hereof or thereof may not be enforced in or by such court and (iii) hereby agrees not to commence any such Action other than before one of the above-named courts.  Notwithstanding the previous sentence a Party may commence any Action in a court other than the above-named courts solely for the purpose of enforcing an order or judgment issued by one of the above-named courts.  EACH PARTY HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION ARISING IN WHOLE OR IN PART UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER TRANSACTION DOCUMENTS.

(b)  <u>Venue</u>.  Each of the Parties to this Agreement agrees that for any Action among any of the Parties relating to or arising in whole or in part under or in connection with this Agreement, any other Transaction Document or the Contemplated Transactions, such Party shall bring such Action in the state or federal courts of New Hampshire. Notwithstanding the previous sentence a Party may commence any Action in a court other than the above-named courts solely for the purpose of enforcing an order or judgment issued by one of the above-named courts.

(c)  <u>Service of Process</u>.  Each of the Parties to this Agreement hereby (i) consents to service of process in any Action among any of the Parties hereto relating to or arising

in whole or in part under or in connection with this Agreement, any other Transaction Document or the Contemplated Transactions in any manner permitted by New Hampshire law, (ii) agrees that service of process made in accordance with clause (i) or made by registered or certified mail, return receipt requested, at its address specified pursuant to Section 7.1, will constitute good and valid service of process in any such Action and (iii) waives and agrees not to assert (by way of motion, as a defense, or otherwise) in any such Action any claim that service of process made in accordance with clause (i) or (ii) does not constitute good and valid service of process.

7.13.   Certain Rules of Construction.   Except as otherwise explicitly specified to the contrary, (a) references to a section, exhibit or schedule means a section of, or schedule or exhibit to this Agreement, unless another agreement is specified, (b) the word "including" (in its various forms) means "including without limitation," (c) references to a particular statute or regulation include all rules and regulations thereunder and any predecessor or successor statute, rules or regulation, in each case as amended or otherwise modified from time to time, (d) words in the singular or plural form include the plural and singular form, respectively, (e) references to a particular Person include such Person's successors and assigns to the extent not prohibited by this Agreement, (f) unless otherwise specified "$" is in reference to U.S. dollars, and (g) the headings contained in this Agreement, in any exhibit or schedule to this Agreement and in the table of contents to this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the Buyer and the Seller have caused this Asset Purchase Agreement to be executed as of the date first written above.

**THE BUYER:**

PLANET FITNESS HOLDINGS, LLC


By:_____
Name:  Justin Vartanian
Title:  General Counsel & Corporate Secretary


**SELLER:**

JEG-MEXICO BUENO, SRL


By:_____
Name:
Title: