**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| Planet Fitness International Franchise,<br><br>       Plaintiff,<br><br>  v.<br><br>JEG-United, LLC<br><br>       Defendant. | **Case No. 1:20-cv-00693-LM** |

# APPENDIX
# OF PLAINTIFF PLANET FITNESS' AND COUNTERDEFENDANT RAY MIOLLA'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON RELEASE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| Planet Fitness International Franchise, <br><br> Plaintiff, <br><br> v. <br><br> JEG-United, LLC <br><br> Defendant. | **Case No. 1:20-cv-00693-LM** <br><br><br> **APPENDIX** |

# <u>INDEX TO APPENDIX</u>

Exhibit A (Affidavit of Alison Johnson) ...................................................... App. 001

Exhibit 1 (March 5, 2019 Side Letter Agreement) ....................................... App. 007

Exhibit 2 (March 5, 2019 Acknowledgement of Transfer Agreement) ...... App. 022

Exhibit 3 (March 5, 2019 Santa Catarina Franchise Agreement) ............... App. 031

Exhibit 4 (December 26, 2019 Omnibus Amendment to Planet Fitness Franchise

Agreements) ................................................................................................. App. 170

Exhibit 5 (December 26, 2019 General Release Agreement) ..................... App. 179

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

Planet Fitness International Franchise,

            Plaintiff,

      v.                                                **Case No. 1:20-cv-00693-LM**

JEG-United, LLC

            Defendant.

**AFFIDAVIT OF ALISON JOHNSON IN SUPPORT OF PLANET FITNESS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT ON RELEASE**

I, Alison Johnson, under penalty of perjury, do depose and state as follows:

1.      The statements made in this Affidavit are based upon my personal knowledge and upon a review of the business records of Planet Fitness International Franchise ("Planet Fitness") in matters for which I have corporate responsibility. I am an Associate General Counsel for Planet Fitness, and have been since March 2015. The documents identified by and attached to this Affidavit are corporate records of Planet Fitness prepared on or about the dates reflected on the documents described, and kept by Planet Fitness (or its affiliates) in the regular course of its business. This Affidavit is made in support of Planet Fitness' Motion for Partial Summary Judgment on Release.

2.      On March 5, 2019, Planet Fitness, JEG-United, LLC ("JEG United") and JEG-Mex, LLC entered into a Side Letter Agreement (the "Agreement") for the purpose of JEG-United developing fitness clubs under the Planet Fitness® brand in Mexico. App. 008.[1] JEG-United eventually developed and executed franchise agreements with Planet Fitness for five

---
[1] Citations to "App. _" refer to the Appendix attached to the underlying motion.

fitness clubs in Mexico, through its subsidiary and franchisee, JEG-Mexico Bueno, S de RL de CV ("JEG-Mexico Bueno").

3.     The Agreement expressly states that United PF Holdings, LLC is a parent company of JEG-United, owning 50% of its equity interests. App. 008. The Agreement further acknowledges that another related entity, JEG-PF Mexico, LLC owns the other 50% of JEG-United. *Id.*

4.     At the same time the Agreement was signed, and in furtherance of JEG-United's desire to develop new franchise agreements in Mexico, Planet Fitness, Defendant JEG-United, and former franchisee JEG-Mex, LLC and its individual owners also executed an Acknowledgement of Transfer Agreement on March 5, 2019. App. 022–30. Under that Agreement, Planet Fitness, as Franchisor, consented to the transfer of the existing Santa Catarina franchise from JEG-Mex, LLC to JEG-Mexico Bueno. App. 022–30. The documents state that the purpose of the Transfer Agreement, together with the March 5, 2019 Agreement, was to effect a sale to the new JEG-United franchisee and subsidiary, JEG-Mexico Bueno, and to execute a new franchise agreement for the Santa Catarina location. App. 23.

5.     The Agreement provides:

On the date of this letter, (a) United PF Holdings, LLC ("United PF") and JEG-PF Mexico, LLC ("JEG-PF"), which is owned, directly or indirectly, by Tom Bock, Kevin Kelly, and John Williams (such individuals referred to collectively as "JEG Group") will each, directly or indirectly, own fifty percent (50%) of the equity interests of JEG-United, LLC ("JEG-United")…

App. 008. John Williams signed the Agreement on behalf of both JEG-Mex, LLC and JEG-United, LLC. App. 014.

6.     Pursuant to the Agreement and the Acknowledgement of Transfer Agreement JEG-Mexico Bueno became the new franchisee under three Planet Fitness franchise agreements,

App. 003

for Planet Fitness® businesses in Santa Catarina, Monterrey and Guadalupe, Mexico. Those three franchise agreements were all executed on March 5, 2019. App. 031–169.[2]

7.     On August 29, 2019 and October 14, 2019, Planet Fitness and JEG-Mexico Bueno entered into two more Planet Fitness® franchise agreements in Apodaca and Coahuila, Mexico (collectively, the five 2019 franchise agreements between Planet Fitness and JEG-Mexico Bueno are hereinafter referred to as the "Franchise Agreements"). App 031–169.

8.     The Franchise Agreements state that JEG-United has a beneficial ownership in the franchisee, JEG-Mexico Bueno. App. 118–23.  Specifically, pursuant to Exhibit E to the Franchise Agreements, JEG-United is shown as the 100% owner of JEG-Mex, LLC, which is shown as the 99% owner of the new franchisee JEG-Mexico Bueno. App. 136–40.

9.     On December 26, 2019, in connection with another transfer of ownership requested by JEG-United and its parent, United PF Holdings, LLC,  JEG-Mexico Bueno, United PF Holdings, LLC and Planet Fitness entered into two more agreements.

10.     On December 26 2019, JEG-Mexico Bueno and Planet Fitness executed an Omnibus Amendment to the Franchise Agreements, which replaced Section 4 of Appendix E to the Franchise Agreements with an updated Ownership Addendum. App. 170–178; *see also* App. 136–40. Pursuant to the new Omnibus Amendment, JEG-Mex, LLC remained 99% owner of franchisee JEG-Mexico Bueno, and JEG-United remained the 100% owner of JEG-Mex, LLC. App. 174.

---

[2] For purposes of brevity, I have attached a copy of the March 5, 2019 Planet Fitness Franchise Agreement for the Santa Catarina location, to serve as an example of the Franchise Agreements and their terms and conditions. With the exception of the locations, the Franchise Agreements between Planet Fitness and JEG-Mexico Bueno for the five locations in Mexico are nearly identical, and contain the same material terms. Should the court require individual copies of each of the Franchise Agreements for the Monterrey, Guadalupe, Apodaca and Coahuila locations, I can provide them.

App. 004

11.     Second, on that same date, the Transferring Owner United PF Holdings, LLC, the

Franchisee, JEG-Mexico Bueno and the Franchisor, Planet Fitness, executed a required General

Release and Agreement (the "Release"). App. 179–84. To effect a transfer of an Owner's interest

in the Franchisee, the Franchise Agreements required the Franchisee and the Owner to release

the Franchisor from any and all claims, set forth in the Release as follows:

> **Release.** Franchisee and Transferring Owner, for themselves and their successors,
> predecessors, assigns, beneficiaries, executors, trustees, agents, representatives,
> employees, officers, directors, shareholders, partners, members, subsidiaries and
> affiliates (jointly and severally, the "Releasors"), irrevocably and absolutely
> release and forever discharge Franchisor and its successors, predecessors, assigns,
> beneficiaries, executors, trustees, agents, representatives, employees, officers,
> directors, shareholders, partners, members, subsidiaries and affiliates (jointly and
> severally, the "Releasees"), of and from all claims, obligations, actions or causes
> of action (however denominated), whether in law or in equity, and whether known
> or unknown, present or contingent, for any injury, damage, or loss whatsoever
> arising from any acts or occurrences occurring as of or prior to the date of this
> Release relating to the Franchise Agreements, the businesses operated under the
> Franchise Agreements, and/or any other previously existing agreement between
> any of the Releasees and any of the Releasors, including but not limited to, any
> alleged violations of any deceptive or unfair trade practices laws, franchise laws,
> or other local, municipal, state, federal, or other laws, statutes, rules or
> regulations, and any alleged violations of the Franchise Agreements or any other
> related agreement. The Releasors, and each of them, also covenant not to sue or
> otherwise bring a claim against any of the Releasees regarding any of the claims
> being released under this Release.

App. 180.

12.     As set forth in the attached agreements, JEG-United is a subsidiary and affiliate

of United PF Holdings, LLC, and an indirect affiliate of JEG-Mexico Bueno. App. 008, 118–23,

136–40, 174.

Case No. 1:20-cv-00693-LM

Pursuant to 28 USC §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 2, 2020

Signed: _Alison L. Johnson_

Alison Johnson (NH Bar #267906)
Planet Fitness World Headquarters
4 Liberty Lane West, Hampton, NH 03842

12499-002/#136

5

Exhibit 1



March 5, 2019

**<u>BY ELECTRONIC MAIL ONLY</u>**

JEG-United, LLC
7101 W Hwy 71, Suite U-2
Austin, Texas 78735
Attn: Trey Owen, trey@owencompany.com and Kevin Kelly, kevin.kelly@planetfitness.com

   Re: Side Letter Agreement

Dear Kevin and Trey:

Planet Fitness International Franchise ("International Franchisor") and JEG-MEX, LLC entered into a Side Letter Agreement on April 7, 2017 (the "April Side Letter"), a Second Side Letter Agreement on December 21, 2017 (the "December Side Letter" and, together with the April Side Letter, the "Existing Side Letters") and a Planet Fitness Franchise Agreement on August 21, 2017 in connection with the development and operation of a PLANET FITNESS business in Santa Catarina, Mexico. On the date of this letter, (a) United PF Holdings, LLC ("United PF") and JEG-PF Mexico, LLC ("JEG-PF"), which is owned, directly or indirectly, by Tom Bock, Kevin Kelly, and John Williams (such individuals referred to collectively as "JEG Group") will each, directly or indirectly, own fifty percent (50%) of the equity interests of JEG-United, LLC ("JEG-United") and (b) wholly owned subsidiaries of JEG-United are entering into three (3) Franchise Agreements with International Franchisor (the "Current Franchise Agreements") to operate PLANET FITNESS businesses in Mexico (the "Initial Businesses"). In connection with such transactions, we hereby agree as follows:

1. <u>No Impact on U.S. Agreements.</u> Planet Fitness Franchising LLC ("US Franchisor") and International Franchisor hereby agree that (a) based on the ownership structure set forth in the Current Franchise Agreements, JEG-United and its majority-owned subsidiaries thereof shall not be considered affiliates or related entities of any franchisees or area developers in which United PF or the JEG Group have an ownership interest that solely operate in the United States ("US Franchisees"), and (b) the joint ownership by United PF and JEG Group of JEG-United and any wholly owned subsidiaries thereof shall not cause (i) US Franchisees in which United PF has an ownership interest to be considered affiliates or related entities of JEG Group, or (ii) US Franchisees in which JEG Group has an ownership interest to be considered affiliates or related entities of United PF.  The agreement set forth in this Section 1:  (1) is intended to prevent any cross-defaults or impacts on right of first refusal rights between the US Franchisees and Mexico entities and between United PF and JEG Group by virtue of their partnership in Mexico; and (2) shall apply to all of the Current Franchise Agreements, and any other existing or future franchise agreements or area development agreements in which JEG-United, United PF, or JEG Group has an ownership interest.

2. <u>Potential for Future Agreements</u>. JEG-United and International Franchisor are currently in discussions regarding a potential Area Development Agreement (the "Potential ADA") for the

Monterrey, Mexico metropolitan area, ("Monterrey"), the municipal boundaries of Saltillo, Mexico ("Saltillo"), and the municipal boundaries of Torreón, Mexico (collectively, the "Potential Territory"), as further described in Exhibit A attached hereto. International Franchisor hereby agrees to continue with good faith negotiations with JEG-United on the Potential ADA until December 31, 2019, consistent with the non-binding summary of terms outlined on Exhibit B hereof.

3. <u>Exclusivity</u>. International Franchisor hereby agrees that, except for Non-Traditional Businesses (as defined in US Franchisor's current form of Area Development Agreement), it will not operate or license or franchise third parties to operate a PLANET FITNESS business physically located within (a) the Potential Territory, until the sooner of (i) the mutual end of negotiations for the Potential ADA or (ii) December 31, 2019 (the "Potential ADA Negotiation Period").

4. <u>Potential Additional One-Off Locations</u>. During the Potential ADA Negotiation Period, JEG-United may identify promising locations for developing additional PLANET FITNESS businesses within the Potential Territory. If International Franchisor, in its sole discretion, approves JEG-United's development of additional PLANET FITNESS businesses at such locations (the "Additional Businesses"), the first two (2) franchise agreements for such PLANET FITNESS businesses (the "Additional Franchise Agreements") will contain substantially the same terms as the Current Franchise Agreements.

5. <u>Variations Related to Mexico</u>.  International Franchisor acknowledges that certain interim policies, procedures, requirements, and standards ("Standards") with respect to PLANET FITNESS businesses in Mexico have not yet been incorporated into its Methods of Operation. International Franchisor confirms that it has permitted certain localization of its U.S. Standards for existing PLANET FITNESS businesses in Mexico and will continue to permit such localization until Standards for Mexico have been developed. Neither JEG-United's (i) compliance with such agreed localization nor (ii) reasonably necessary variation from applicable Standards, shall be a breach of any Current Franchise Agreement or Additional Franchise Agreement executed prior to the adoption of updated Standards for Mexico. International Franchisor agrees to use its reasonable efforts to develop Standards for Mexico.

6. <u>Right to Update Agreements</u>. If the Potential ADA is executed by the end of the Potential ADA Negotiation Period, and, if by such time, International Franchisor has updated its standard form of Franchise Agreement for the Country, JEG-United (and/or its subsidiaries) shall have the right, exercisable by written notice within thirty (30) days of executing the Potential ADA, to amend the Current Franchise Agreements and the Additional Franchise Agreements to conform them to such updated form.

7. <u>Put Option</u>. If the Potential ADA is not executed by the end of the Potential ADA Negotiation Period, JEG-United shall have the right, exercisable by written notice delivered to International Franchisor within thirty (30) days from the end of the Potential ADA Negotiation Period, to sell the Initial Businesses and the Additional Businesses (collectively, the "Mexico Businesses") to International Franchisor. Upon receipt of JEG-United's notice, International Franchisor shall have ninety (90) days to purchase the Mexico Businesses for a price equal to the book value of the Mexico Businesses. The book value of each Mexico Business shall be calculated as the shareholder's equity of such business as of the date of determination, computed in accordance with generally accepted accounting principles, less any goodwill and other intangible assets (including franchise rights) reported by such business on its balance sheet. International Franchisor shall be entitled to receive, and JEG-United and its owners agree to make, all customary representations and warranties given by the seller of the assets of a business or the

capital stock of an incorporated business, as applicable, including, without limitation, representations and warranties as to: (a) ownership and condition of and title to stock or other forms of ownership interest and/or assets, (b) liens and encumbrances relating to the stock or other ownership interest and/or assets; and (c) validity of contracts and the liabilities, contingent or otherwise, of the entity whose stock is being purchased.

8. <u>Tax Ruling Regarding Withholding on Certain Fees</u>. Franchisor, International Franchisor, and JEG-United, based upon input from counsel, believe that JEG-United (and/or its subsidiaries) is not required to make and remit any tax withholdings to any Mexican tax authorities related to the Business Service Fee ("Tax Question") in the applicable Planet Fitness franchise agreements. JEG-United (and/or its subsidiaries), as the potential withholding agent pursuant to the Mexican Income Tax Law, shall, in a reasonably prompt manner after the execution of the Current Franchise Agreements, seek an initial tax ruling from the appropriate Mexican tax authorities regarding the Tax Question. JEG-United shall seek input from Franchisor and its counsel in connection with seeking such initial tax ruling. In the event the appropriate Mexican tax authorities refuse to hear such a request from JEG-United (or its subsidiaries) or refuse to resolve the tax ruling request without participation of Franchisor, Franchisor shall then file, using the submission JEG-United had previously prepared, the tax ruling request before the Mexican tax authorities, in a reasonably prompt manner, seeking resolution to the Tax Question. JEG-United (or its subsidiaries) shall be responsible for the costs, fees, and expenses of Franchisor associated with Franchisor preparing and filing the initial request for the ruling from the appropriate Mexican tax authorities. Absent a material change in circumstances, and based upon the existing assumptions related to the Business Service Fee, JEG-United (and its subsidiaries) will not remit any tax withholdings to any Mexican tax authorities related to the Business Service Fee until such time as a determination regarding the Tax Question is made by the appropriate Mexican tax authorities. Once such a determination is made, JEG-United (and its subsidiaries), Franchisor, and International Franchisor agree to abide by the determination made by the appropriate Mexican tax authorities. If the Mexican tax authorities resolve that the tax withholding on the Business Service Fee must be made and remitted to the competent tax authorities, JEG-United or its subsidiaries shall make and remit the tax withholdings starting as of the first payment of the Business Service Fee regardless of whether Franchisor and/or Franchisee decide to appeal or file a tax lawsuit against the tax ruling issued by the Mexican tax authorities.

9. <u>Termination of Existing Side Letters</u>. The Existing Side Letters are hereby terminated.

10. <u>Effect of Default</u>. Sections 2, 3, 4, and 6 of this Side Letter Agreement shall terminate upon the unilateral termination by International Franchisor of any agreement between JEG-United or one of its subsidiaries (each, a "JEG Party") and International Franchisor or one of its affiliates due to a material breach of such agreement by a JEG Party.

11. <u>Scope of Side Letter</u>. This Side Letter Agreement does not license any trademark rights or grant any franchise or development rights.

12. <u>Confidential Information</u>. As JEG-United evaluates this franchising opportunity, International Franchisor may provide JEG-United with oral and written information about its business, business plans, personnel, finances, customers, vendors, suppliers or other matters (the "<u>Information</u>"). The Information also includes the terms of this Side Letter Agreement and the details of the negotiations in connection with this franchising opportunity. Therefore, JEG-United and all related persons and entities will (a) keep confidential and not disclose to any person any Information (other than disclosures to appropriate professional advisors and potential financing sources solely for purposes of evaluating this franchising opportunity), (b) not use or permit

anyone else to use any Information for any purpose other than evaluating this franchising opportunity, and (c) not use any Information for its benefit or to the detriment of International Franchisor.  The foregoing restrictions will apply equally to all Information provided before, on or after the date of this Side Letter Agreement, whether or not labeled "confidential," and JEG-United agrees to take reasonable steps to protect the confidentiality of Information consistent with these provisions.  These restrictions will not, however, restrict disclosure or use of Information, (y) which is now or becomes generally available to the public other than as a result of disclosure by JEG-United, or (z) which JEG-United obtains from sources other than International Franchisor without breach of any legal or contractual duties.  Further, these restrictions will not limit disclosures or uses of information to the extent required by applicable law, legal process or regulatory officials having jurisdiction over JEG-United.  Until International Franchisor has made a public communication regarding the execution of the Potential ADA (the "Initial Communication") JEG-United and International Franchisor shall coordinate with respect to any public communication regarding this franchising opportunity Any public communication regarding this franchising opportunity, by JEG-United prior to the Initial Communication is subject to International Franchisor's prior written approval, which it may grant or withhold in its sole discretion. Subsequent to the Initial Communication, public communications by JEG-United regarding this franchising opportunity shall be subject to the terms of Franchise Agreements and Area Development Agreement with International Franchisor.

13. <u>No Broker</u>.  Neither party has engaged a broker or an intermediary in connection with this franchising opportunity and International Franchisor is not responsible for any broker fees related hereto.

14. <u>Binding Effect</u>. This Side Letter Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns.

15. <u>Severability</u>. If any provision of this Side Letter Agreement is declared void or unenforceable, the other provisions of this Side Letter Agreement shall remain in full force and effect, unless the provisions must be deemed to be indissolubly connected to the void or unenforceable provision. If the other provisions remain valid, the parties shall endeavor to replace the void or unenforceable provision by a valid provision that reflects the parties' original intent to the greatest possible extent.

16. <u>Governing Law</u>. This Side Letter Agreement shall be governed by, and construed in accordance with, the law of the State of New Hampshire, without regard to principles of conflicts of law that would result in the laws of another state being applied. The parties agree that any legal proceeding relating to this Side Letter Agreement or the enforcement of any provision of this Side Letter Agreement shall be brought or otherwise commenced only in the State or Federal courts of the State of New Hampshire. The parties irrevocably submit to the jurisdiction of such courts and waive any objection they may have to either the jurisdiction of or venue in such courts.

17. <u>Assignment</u>. International Franchisor has the right to sell or assign, in whole or in part, its interests in this Side Letter Agreement, and any such sale or assignment shall inure to the benefit of any assignee or other legal successor to our interest.

18. <u>Entire Agreement/Amendment</u>. This Side Letter Agreement contains the entire agreement of the parties with respect to the subject matter hereof and shall not be amended except by the signed written agreement of each of the parties.

19. <u>Headings</u>. The headings of the Sections hereof are for convenience only and do not define, limit or construe the contents of such Sections.

20. <u>Counterparts and Electronic Records</u>. This Side Letter Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement. The execution of this Side Letter Agreement and related agreements by electronic means shall be legally binding and enforceable as an "electronic signature" and the legal equivalent of a handwritten signature. All disclosures, agreements, amendments, notices, and all other evidence of transactions between the parties hereto may be maintained in electronic form.

[Signature Page Follows]

PLANET FITNESS INTERNATIONAL FRANCHISE

By: _____

Name: Darren Riley

Title: Director

**EFFECTIVE DATE**:  March 5, 2019


PLANET FITNESS FRANCHISING LLC

By: _____

Name: Justin Vartanian

Title: General Counsel

Date:  March 5, 2019


Agreed and Accepted

JEG-UNITED LLC

By: _____

Name: John Williams

Title:  Chief Operating Officer

Date: _____


JEG-MEX LLC

By: _____

Name: John Williams

Title: Authorized Person

Date: _____

I, John Cullinane, Notary Public in and for the Cayman Islands, do hereby certify that

DARREN RILEY

appeared before me and executed this document, in witness where of I have subscribed my name and set and affixed my seal of office.

John Cullinane

Date: 5 / 3 / 19

My appointment expires: 31 January 20 20

PLANET FITNESS INTERNATIONAL FRANCHISE

By: _____

Name: Darren Riley

Title: Director

**EFFECTIVE DATE**: _____

PLANET FITNESS FRANCHISING LLC

By: _____

Name: Justin Vartanian

Title: General Counsel

Date: _____

Agreed and Accepted

JEG-UNITED LLC

By: _____

Name: John Williams

Title: Chief Operating Officer

Date: 3/5/19

JEG-MEX LLC

By: _____

Name: John Williams

Title: Authorized Person

Date: 3/5/19

**Exhibit A**

*Description of Potential Territory*

*Monterrey*



*Saltillo*



*Torreon*



**Exhibit B**

*Non-Binding Summary of Proposed Terms*

1.      The Potential ADA shall include, among other things, the following:

   a.  A conditional right of first refusal for any subsequent or renewal agreement within the Potential Territory upon successful completion of the Development Schedule (as hereinafter defined).
   b.  A conditional ROFO with respect to additional area development agreements in the following states: Baja California, Baja California Sur, Chihuahua, Coahuila, Durango, Nuevo León, Sinaloa, Sonora and Tamaulipas. Such ROFO will be conditioned upon, among other things, JEG-United's development history in Mexico and other standard operational, financial and legal qualifications.
   c.  The right for International Franchisor to open and operate, or grant third parties the right to operate, institutional or other non-traditional locations.

2.      <u>Development of Planet Fitness Locations</u>.  JEG-United shall be granted the right (and have the obligation) to open approximately thirty (30) (subject to revision based upon future discussions) PLANET FITNESS locations in the Territory in accordance with the terms and subject to the conditions set forth in the Potential ADA. International Franchisor and JEG-United will work in good faith to determine a mutually agreeable development schedule for the Potential ADA (the "Development Schedule"). The Development Schedule will be approximately eight (8) years in duration. There will be a simple cure period of between six (6) months and twelve (12) months and no US-style grace periods.

3.      <u>Royalties & Fees</u>.

   a.  The country fee will be waived in recognition of the amounts spent in connection with the opening of the first PLANET FITNESS location in Mexico.
   b.  The Potential ADA will include an area development agreement fee of Ten Thousand U.S. Dollars ($10,000) per development obligation, which is due and payable immediately upon execution of the Potential ADA.
   c.  The Franchise Agreements will be in our then-current standard form of franchise agreement for Mexico, except as modified by this Side Letter or subsequent agreement by the parties. Each such franchise agreement entered into within the first five (5) years of the execution of the Potential ADA shall include, among other things, the following:

   ▪ a franchise fee of Twenty Thousand U.S. Dollars (U.S. $20,000);

   ▪ advertising fees and required spending levels consistent with those set forth in Section 5 hereof; and

   ▪ royalties on Revenue (as defined in the Current Franchise Agreements) payable in U.S. Dollars based upon the following schedule:[1]

| Initial Royalty | Year 1-3 of FA | Years 4-6 | Years 7-10 |
|---|---|---|---|

---

[1] The years in the royalty table are calculated from the Commencement Date (defined below).

| Technical Assistance Fee | 2.25% | 2.75% | 3.25% |
|---|---|---|---|
| Trademark License Fee | 2.25% | 2.75% | 3.25% |

For the avoidance of doubt, JEG-United will make effective any applicable withholding tax on the above fees and will remit the <u>remaining</u> fees to International Franchisor thereafter.

Other fees may apply, consistent with other similarly situated franchisees in Mexico, as has been disclosed to JEG-United in the current Franchise Disclosure Document in use in Mexico.

4.    <u>Franchise Agreements</u>.  JEG-United and International Franchisor will work in good faith to mutually agree on a form franchise agreement for PLANET FITNESS locations developed pursuant to the Potential ADA, including the following:

a. A term that expires ten (10) years from the commencement of business operations (the "Commencement Date").
b. Twin Oaks and ABC Financial Systems are each approved point of sale vendors, provided that such vendors continue to meet International Franchisor's criteria for approved vendors.
c. Requirements and specifications related to equipment replacement and remodeling will be at least as favorable to JEG-United as in the U.S. franchise agreements.
d. Provisions related to International Franchisor's approval of a proposed transfer of ownership interests by International Franchisor will be substantially similar to those found in the Current Franchise Agreements.
e. Provisions related to International Franchisor's renewal of a Franchise Agreement will be substantially similar to the Current Franchise Agreements.
f. Provisions related to International Franchisor's right to receive "Vendor Revenue" will be substantially similar to the Current Franchise Agreements.
g. Provisions related to taxation issues will be substantially similar to those in the Current Franchise Agreements.
h. Provisions related to the use/approval of alternate vendors will be substantially similar as the Current Franchise Agreements.
i. Provisions limiting cross-defaults and impact on right of first refusals as contained in this Side Letter Agreement.
j. JEG-United will provide International Franchisor with financial statements as described in the Current Franchise Agreements.
k. JEG-United will present a three year business plan to International Franchisor on an annual basis.

5.    <u>Local & National Advertising Funds and Marketing Programs</u>.

a. JEG-United will pay a to be agreed amount into the Mexico Ad Fund ("MAF") and going forward may be required to contribute up to two percent (2%) of Revenue (as defined in the Current Franchise Agreements) into the MAF.  JEG-United will receive credit for documented amounts spent on usable and nationally relevant creative, to the extent it can demonstrate such amounts to International Franchisor's satisfaction.

b. JEG-United will initially spend nine percent (9%) of monthly Revenue (as defined in the Current Franchise Agreements) directly executing approved local advertising programs the ("<u>LAF Requirement</u>"). If, and to the extent, International Franchisor

requires monthly contributions to the MAF, such contributions will offset the LAF Requirement.

    c.   For each new PLANET FITNESS location developed pursuant to the Potential ADA, JEG-United will spend between Twenty Thousand U.S. Dollars ($20,000) and Thirty Thousand U.S. Dollars ($30,000) per month on pre-sale/grand opening marketing during the pre-sale/grand opening period, with such period to be designated by International Franchisor and to continue for no longer than twelve (12) months after the Commencement Date.

    d.   The Franchise Agreements shall include provisions requiring JEG-United to participate in and contribute funds to special marketing programs and campaigns that we develop and administer (or require you to develop and/or administer) from time to time, consistent with other similarly situated franchisees in Mexico, provided such participation and contributions are counted toward LAF and MAF contributions, as provided for in the Current Franchise Agreements.

6.    <u>Pricing</u>.    Initial pricing will be agreed by the parties before execution of the Potential ADA.

7.    <u>Equipment/Vendors</u>.    JEG-United shall utilize designated and/or approved vendors, as directed by International Franchisor. JEG-United acknowledges that International Franchisor may make a margin or rebate with respect to purchases of fitness equipment consistent with its operations in the U.S. JEG-United will coordinate shipping/freight and placement/installation with its vendors. JEG-United and International Franchisor shall collaborate with respect to import/export and distribution issues. International Franchisor shall exercise reasonable efforts to work with vendors on such issues in the best interests of the System as a whole.

8.    <u>Training & Support</u>.    Training is to be provided by International Franchisor at its headquarters and each party shall bear its own costs, unless otherwise mutually agreed. If International Franchisor and JEG-United mutually agree to hold training at JEG-United's location, JEG-United shall bear International Franchisor's reasonable travel expenses. International Franchisor will provide customary franchisee compliance, training and operational support to JEG-United. JEG-United shall bear the reasonable costs of any necessary translation work.

9.    <u>Guarantees</u>.  JEG-United or its subsidiary shall provide an entity-level guarantee for each Franchise Agreement, consistent with the Current Franchise Agreements. Such guarantor entity must own at least 98% of the fewer of (i) all PLANET FITNESS businesses in Mexico owned by JEG-United or (ii) five (5) open and operating PLANET FITNESS businesses in Mexico. If JEG-United or its subsidiary does not have signed leases for at least three (3) PLANET FITNESS businesses in Mexico by December 31, 2019, then, until such time as JEG-United or its subsidiary owns at least 98% of five (5) open and operating PLANET FITNESS businesses in Mexico, JEG-United or its subsidiary shall commit to maintain a minimum amount of committed capital, based on International Franchisor's financial qualification requirements, to fund JEG-United's Mexico operations, and must provide satisfactory evidence of such commitment upon request.

10.    <u>Noncompetition Agreement</u>.  In connection with the Potential ADA and the franchise agreements to be executed thereunder, JEG-United, its affiliates, and other individuals involved in the operations and/or management of JEG-United, as identified in our sole discretion, shall execute a noncompetition agreement pursuant to which each individual and affiliate will agree not to directly or indirectly compete with International Franchisor so long as such individual or affiliate holds any direct or

indirect ownership in a PLANET FITNESS location and for a period of two (2) years thereafter. The noncompetition agreement will contain such other terms and conditions as reasonably required by International Franchisor.

# Exhibit 2

## ACKNOWLEDGEMENT OF TRANSFER AGREEMENT

THIS ACKNOWLEDGEMENT OF TRANSFER AGREEMENT (this "**Agreement**") is made and entered into as of the Effective Date (as set forth on the signature pages hereto) by and among (i) the entity executing this Agreement as "Existing Franchisee" on the signature pages hereto under the heading "Existing Franchisee" (collectively, the "**Existing Franchisee**"), (ii) the individuals executing this Agreement as "Owners" on the signature pages hereto under the heading "Owners" (collectively, the "**Owners**"), (iii) the entity executing this Agreement as "Purchaser" on the signature pages hereto under the heading "Purchaser" (the "**Purchaser**"), (iv) the entity executing this Agreement as "New Franchisee" on the signature pages hereto (collectively, the "**New Franchisee**") (the Purchaser and the New Franchisee are referred to collectively as the "**Purchaser Entities**"), and (v) Planet Fitness International Franchise ("**Franchisor**").

## RECITALS

A.     The Existing Franchisee operates and/or has rights to a certain **PLANET FITNESS** business at the location listed on Schedule A hereto (the "**Location**") pursuant to a **PLANET FITNESS** Franchise Agreement (the "**Franchise Agreement**"), all as set forth on Schedule A hereto, which is hereby incorporated by reference. In connection with the Sale (as defined below), Franchisor and the Existing Franchisee intend to terminate the Franchise Agreement, along with any and all guarantees in favor of Franchisor and/or its affiliates (collectively, the "**Terminated Agreements**").

B.     The Existing Franchisee and/or Owners have entered into a definitive agreement with the Purchaser pursuant to which Existing Franchisee and/or Owners will sell the **PLANET FITNESS** business at the Location pursuant to the Terminated Agreements (collectively, the "**Business**"), pending the approval of Franchisor (the "**Sale**").

C.     Franchisor, Existing Franchisee, Owners and Purchaser Entities desire to effectuate the Sale by terminating the Terminated Agreements and entering into (i) a side letter agreement (the "**Side Letter Agreement**"), and (ii) a new franchise agreement (the "**New Franchise Agreement**"), between Franchisor and the Purchaser Entities for the Location (the Side Letter Agreement and New Franchise Agreements collectively, the "**New Agreements**"), upon consummation of the Sale, subject to the terms herein.

## AGREEMENT

NOW, THEREFORE, the parties hereto, intending to be legally bound, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby agree as follows:

1.     <u>Consent to Sale</u>. Subject to the applicable Purchaser Entities' execution of the New Agreements, Existing Franchisee's and Owners' execution of a general release, in form satisfactory to Franchisor, and Franchisor's receipt of the fees set forth in Section 2 hereof, Franchisor consents to the Sale and, solely with respect to the Sale, waives its rights of first refusal under the *Right Of First Refusal* section of each of the Terminated Agreements.

2.     <u>Transfer Fees & Outside Legal Fees</u>. Franchisor's approval of the Sale shall be contingent upon the Existing Franchisee's payment to Franchisor on or before the Effective Date of (i) the transfer fees described in the Franchise Agreement, which total Twenty-Five Thousand Dollars ($25,000) in aggregate in respect of the Sale, to be paid by the Existing Franchisee to the Franchisor, and (ii) Franchisor's reasonable out-of-pocket expenses and external legal and administrative costs in connection with the Sale, which total Zero Dollars ($0). If Existing Franchisee is required to deduct any non-resident withholding tax from the transfer fees, then the amount payable shall be increased by such amount as is necessary to make the actual amount received (after such withholding tax and after any additional taxes on account of such additional payment) equal to the amount that would have been received had no withholding been required. In that case, Existing Franchisee shall pay the amount required to be withheld to the applicable taxing authority and shall promptly deliver to Franchisor receipts of applicable governmental authorities showing that all taxes were properly withheld in compliance with applicable legal requirements in Mexico. Existing

Franchisee acknowledges that this Agreement contemplates that Franchisor will not be responsible for such taxes.

3.   Termination. Except as set forth in this Agreement and subject to the terms herein, the Existing Franchisee and Franchisor acknowledge and agree that, as of Effective Date, the Terminated Agreements and the mutual rights and obligations contained therein, the guarantees in favor of Franchisor and/or its affiliates contained therein, as well as any other rights that Existing Franchisee or Owners claim to hold for the right to use the **PLANET FITNESS** System and Marks pursuant to the Terminated Agreements (the "**Related Rights**"), are terminated, with the exception of any continuing obligations of the Existing Franchisee and Owners pursuant to the terms of the Terminated Agreements that by their nature survive termination, including, but not limited to, the obligations regarding Non-Competition, Payment of Amounts Owed, Marks, Confidential Information, and Indemnification; provided, however, that the foregoing shall not limit or affect the rights of the Purchaser Entities pursuant to the New Agreements.

4.   Representations as to Ownership and Authority.

A.   The Owners represent and warrant to Franchisor that (i) the ownership information provided to Franchisor in the Terminated Agreements was current, complete and accurate in all material respects, and (ii) the parties signing this Agreement on behalf of the Owners and the Existing Franchisee are each duly authorized to do so and have the authority necessary to bind the Owners and the Existing Franchisee.

B.   The Purchaser Entities represent and warrant to Franchisor that (i) the ownership information provided to Franchisor in the New Agreements is current, complete and accurate in all material respects, and (ii) the parties signing this Agreement on behalf of the Purchaser Entities are each duly authorized to do so and have the authority necessary to bind the Purchaser Entities.

5.   **INDEMNIFICATION. THE EXISTING FRANCHISEE, OWNERS, AND THE PURCHASER ENTITIES, ON A JOINT AND SEVERAL BASIS WITH RESPECT TO SUBCLAUSE (II) BELOW AND ON A SEVERAL AND NOT JOINT BASIS WITH RESPECT TO SUBCLAUSE (I) BELOW, FOR THEMSELVES, AND THEIR RESPECTIVE HEIRS, SUCCESSORS AND ASSIGNS (EXCLUDING, SOLELY WITH RESPECT TO THE EXISTING FRANCHISEE AND OWNERS, THE PURCHASER ENTITIES), EACH AGREE TO INDEMNIFY AND HOLD HARMLESS FRANCHISOR AND ITS PREDECESSORS, SUCCESSORS, PARENTS, SUBSIDIARIES, ASSIGNS, AFFILIATES, DIRECTORS, OFFICERS, OWNERS, AGENTS, AND EMPLOYEES, AGAINST ANY AND ALL LIABILITIES, DAMAGES, ACTIONS, CLAIMS, COSTS (INCLUDING REASONABLE ATTORNEYS' FEES), OR EXPENSES OF ANY NATURE ("LOSSES") RESULTING, DIRECTLY OR INDIRECTLY, FROM ANY OF THE FOLLOWING: (I) ANY MISREPRESENTATION OR BREACH OF WARRANTY BY AN EXISTING FRANCHISEE, OWNER OR PURCHASER ENTITY UNDER THIS AGREEMENT AND (II) ANY CLAIM, SUIT, OR PROCEEDING INITIATED BY OR FOR THE EXISTING FRANCHISEE, OWNERS, THE PURCHASER ENTITIES, OR A THIRD PARTY, NOW OR IN THE FUTURE, WHICH ARISES OUT OF THE SALE. THE OWNERS AND THE PURCHASER ENTITIES HEREBY AGREE TO PERFORM THE INDEMNIFICATION OBLIGATIONS OF THE EXISTING FRANCHISEE UNDER THE TERMINATED AGREEMENTS (THE "EXISTING INDEMNITY") AND, TOGETHER WITH THE EXISTING FRANCHISEE, SHALL BE JOINTLY AND SEVERALLY LIABLE THEREUNDER. FRANCHISOR ACKNOWLEDGES THAT TO ITS ACTUAL KNOWLEDGE, AS OF THE DATE HEREOF, FRANCHISOR IS NOT AWARE OF ANY INDEMNIFIABLE LOSSES UNDER THE EXISTING INDEMNITY.**

6.   Notices. All notices or other communications hereunder shall be in writing (which writing may include email) and mailed, sent or delivered to the respective parties hereto at or to their respective addresses or email addresses set forth below, or at or to such other address or email address as shall be designated by any party in a written notice to the other parties hereto. All such notices and other communications shall be deemed to be delivered when (i) delivered by hand with a signed receipt upon delivery; (ii) sent by United

States mail, prepaid postage, certified mail upon the earlier of the date of receipt or five (5) business days after deposit in the mail, first class; or (iii) sent by recognized overnight courier upon the date of delivery.

If to Franchisor:

Planet Fitness International Franchise
4 Liberty Lane West
Hampton, NH 03842
<u>Attention</u>: General Counsel

If to the Existing Franchisee or Owners:

Kevin Kelly
12950 N 119th Street
Scottsdale, AZ 85259
Email: Kevin.Kelly@planetfitness.com

w/ a copy to:

Drinker Biddle & Reath LLP
One Logan Square, Ste. 2000
Philadelphia, PA 19103 6996
Attention:  Neil K. Haimm
Email:  Neil.Haimm@dbr.com

If to the Purchaser Entities:

JEG-United LLC
7101 W Hwy 71, Suite U-2
Austin, Texas 78735

w/ a copy to:

Dady & Gardner, P.A.
80 South Eighth Street
5100 IDS Center
Minneapolis, MN 55402-2204
Attention: Mark Dady
Email:  mdady@dadygardner.com

7.   <u>Binding Effect</u>. This Agreement shall be binding upon, inure to the benefit of and be enforceable by the Existing Franchisee, Owners, the Purchaser Entities and Franchisor and their respective successors and assigns.

8.   <u>Severability</u>. If any provision of this Agreement is declared void or unenforceable, the other provisions of this Agreement shall remain in full force and effect, unless the provisions must be deemed to be indissolubly connected to the void or unenforceable provision. If the other provisions remain valid, the parties shall endeavor to replace the void or unenforceable provision by a valid provision that reflects the parties' original intent to the greatest possible extent.

9.   <u>Governing Law</u>. This Agreement shall be governed by, and construed and construed exclusively under the laws of the United Mexican States.  The parties agree that any legal proceeding relating to this Agreement or the enforcement of any provision of this Agreement shall be brought or otherwise commenced only in the State or Federal courts of the State of New Hampshire. Notwithstanding the foregoing, where the action includes or consists of a claim under franchise legislation of a state or district that requires venue in such jurisdiction for a dispute hereunder, then such action shall be commenced in the state or district in which

the franchised business is located. The parties irrevocably submit to the jurisdiction of such courts and waive any objection they may have to either the jurisdiction of or venue in such courts.

10.     Attorneys' Fees. The prevailing party in any legal proceeding to enforce the terms of this Agreement is entitled to recover its reasonable attorneys' fees and costs from the non-prevailing party.

11.     Entire Agreement/Amendment. This Agreement, including the exhibits and schedules attached hereto and the agreements contemplated hereby, contain the entire agreement of the parties with respect to the subject matter hereof and shall not be amended except by the signed written agreement of each of the parties.

12.     Definitions. All capitalized terms not defined herein have the meaning given to them in the Franchise Agreements and New Agreements (to the extent defined therein).

13.     **WAIVER OF PUNITIVE DAMAGES, JURY TRIAL AND CLASS ACTIONS. EXCEPT WITH RESPECT TO CLAIMS PURSUANT TO SECTION 5 AND CLAIMS BY FRANCHISOR FOR UNAUTHORIZED USE OF THE MARKS OR UNAUTHORIZED USE OR DISCLOSURE OF ANY CONFIDENTIAL INFORMATION, EXISTING FRANCHISEE, OWNERS, THE PURCHASER ENTITIES AND FRANCHISOR WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW (A) ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE OR EXEMPLARY DAMAGES AND AGREE THAT, IN THE EVENT OF A DISPUTE BETWEEN SUCH PARTIES, THE PARTY MAKING A CLAIM WILL BE LIMITED TO EQUITABLE RELIEF AND TO RECOVERY OF ANY ACTUAL DAMAGES IT SUSTAINS, (B) TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, AND (C) THEIR RESPECTIVE RIGHTS TO BRING AGAINST ANOTHER PARTY OR ANY AFFILIATE OF ANOTHER PARTY ANY CLAIMS DENOMINATED AS A CLASS ACTION, CONSOLIDATED ACTION, OR JOINT ACTION, WHETHER OR NOT PERMITTED UNDER APPLICABLE COURT RULES. EACH PARTY ACKNOWLEDGES THAT SUCH PARTY HAS HAD A FULL OPPORTUNITY TO CONSULT WITH COUNSEL CONCERNING THIS WAIVER, AND THAT THIS WAIVER IS INFORMED, VOLUNTARY, INTENTIONAL, AND NOT THE RESULT OF UNEQUAL BARGAINING POWER.**

14.     Headings. The headings of the Sections hereof are for convenience only and do not define, limit or construe the contents of such Sections.

15.     Counterparts and Electronic Records. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement. The execution of this Agreement and related agreements by electronic means shall be legally binding and enforceable as an "electronic signature" and the legal equivalent of a handwritten signature. All disclosures, agreements, amendments, notices, and all other evidence of transactions between the parties hereto may be maintained in electronic form.

**[*Remainder of page intentionally blank; signature pages follow*]**

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement effective as of the Effective Date.

**EXISTING FRANCHISEE:**

JEG-MEX, LLC

By: _____
    (Authorized Representative)
Name: _____
Title:   Authorized Person
Dated:     3/5/19

**OWNERS:**

_____
Name: Tom Bock, Individually

_____
Name: Kevin Kelly, Individually

_____
Name: John Williams, Individually

*[Additional signature pages follow]*

**NEW FRANCHISEE:**

JEG-MEXICO BUENO, S de RL de CV

By: _____
    (Authorized Representative)
Name: _____
Title: _ Legal Representative _
Dated: _____

**PURCHASER:**

JEG-UNITED LLC

By: _____
    (Authorized Representative)
Name: _____
Title: _ Chief Operating Officer _
Dated: _____

*[Additional signature page follows]*

*Signature Page to Acknowledgment of Transfer Agreement*

**FRANCHISOR:**

PLANET FITNESS INTERNATIONAL FRANCHISE

By: _____

Print Name:  Darren Riley

Title:  Director

**EFFECTIVE DATE**: _____March 5, 2019_____

I, John Cullinane, Notary Public in and
for the Cayman Islands, do hereby certify that

DARREN RILEY

appeared before me and executed this
document, in witness where of I have
subscribed my name and set and affixed my
seal of office.

John Cullinane
Date:    5 / 3 / 19
My appointment expires: 31 January 20 20

*Signature Page to Acknowledgment of Transfer Agreement*

**SCHEDULE A**

**FRANCHISE AGREEMENTS**

|   | Existing Franchisee Entity | Club Address | Effective Date |
|---|---|---|---|
| 1. | JEG-MEX LLC | 899-A Avenida Manuel J. Clouthier, 66120 Santa Catarina, Nuevo León, Mexico | August 21, 2017 |

# Exhibit 3

**PLANET FITNESS®**

**FRANCHISE AGREEMENT**

**(MEXICO)**

1. PREAMBLES, ACKNOWLEDGMENTS AND REPRESENTATION. .................................................1

    1.1 **PREAMBLES** .................................................................................................................1
    1.2 **ACKNOWLEDGMENTS** ...............................................................................................1
    1.3 **REPRESENTATION** .....................................................................................................2
    1.4 **CERTAIN DEFINITIONS** ............................................................................................2

2. YOUR ORGANIZATION AND MANAGEMENT. ........................................................................6

    2.1 **ORGANIZATIONAL DOCUMENTS** ..........................................................................6
    2.2 **DISCLOSURE OF OWNERSHIP INTERESTS** ..........................................................7
    2.3 **RESPONSIBLE OWNER/MANAGEMENT OF BUSINESS** ......................................7
    2.4 **OWNERSHIP GROUP** .................................................................................................8
    2.5 **FACILITY ORGANIZATION** ......................................................................................8

3. GRANT OF RIGHTS. .....................................................................................................................8

    3.1 **GRANT OF FRANCHISE** ............................................................................................8
    3.2 **OUR RESERVATION OF RIGHTS** ............................................................................8

4. LOCATION SELECTION, LEASE OR PURCHASE OF LOCATION AND LOCATION
DEVELOPMENT. ...........................................................................................................................9

    4.1 **LOCATION SELECTION AND APPROVAL** ............................................................9
    4.2 **PURCHASE OR LEASE OF THE LOCATION** ..........................................................9
    4.3 **RESERVED AREA OF THE LOCATION** .................................................................10
    4.4 **LOCATION DEVELOPMENT** ..................................................................................10
    4.5 **YOUR OBLIGATIONS** ..............................................................................................11
    4.6 **FIXTURES, FURNISHINGS, EQUIPMENT AND SIGNS** ......................................12
    4.7 **START-UP INVENTORY, FURNITURE, FIXTURES, SOFTWARE, EQUIPMENT AND
SUPPLIES** ...................................................................................................................12
    4.8 **BUSINESS COMMENCEMENT** ..............................................................................14
    4.9 **COMMENCEMENT DEADLINE** ..............................................................................14
    4.10 **PRE-SALE/GRAND OPENING MARKETING** .... **ERROR! BOOKMARK NOT DEFINED.**
    4.11 **OPENING ASSISTANCE** ............................................................................................14

5. FEES. .............................................................................................................................................14

    5.1 **INITIAL FRANCHISE FEE** .......................................................................................14
    5.2 **CONTINUING FEES** .................................................................................................14
    5.3 **DESIGNATED ACCOUNT AND AUTHORIZED EFT** ............................................15
    5.4 **INTEREST ON LATE PAYMENTS** ..........................................................................15
    5.5 **APPLICATION OF PAYMENTS** ..............................................................................15
    5.6 **PREFERRED VENDOR PAYMENTS** ......................................................................15
    5.7 **TECHNOLOGY FEE** ..................................................................................................16
    5.9 **INSPECTION AND COMPLIANCE REIMBURSEMENT** .......................................16
    5.11 **ACQUISITION FEE** ...................................................................................................16
    5.12 **EFT ALTERNATIVE** ..................................................................................................16
    5.13 **CURRENCY CONTROL RESTRICTIONS** ..............................................................16

6. TRAINING, ASSISTANCE, AND METHODS OF OPERATION. ...............................................18

    6.1 **TRAINING** ..................................................................................................................18
    6.2 **REFRESHER TRAINING** ..........................................................................................18
    6.3 **GENERAL GUIDANCE** .............................................................................................18
    6.4 **ON-SITE CONSULTATION AND ADDITIONAL GUIDANCE** ..............................19
    6.5 **OPERATIONS MANUAL** ..........................................................................................19
    6.6 **COMPLIANCE WITH METHODS OF OPERATION** ...............................................20
    6.7 **WORKS MADE-FOR-HIRE** ......................................................................................21
    6.8 **GENERAL CONDUCT** ..............................................................................................21
    6.9 **APPROVED SUPPLIER PAYMENTS** .................. **ERROR! BOOKMARK NOT DEFINED.**

| | | |
|---|---|---|
| **6.10** | **DATA SECURITY** | 21 |
| 7. | MARKS | 22 |
| **7.1** | **OWNERSHIP AND GOODWILL OF MARKS** | 22 |
| **7.2** | **LIMITATIONS ON YOUR USE OF MARKS** | 22 |
| **7.3** | **TRADEMARK ACTIONS AND CLAIMS** | 23 |
| **7.4** | **DISCONTINUANCE OF USE OF MARKS** | 23 |
| **7.5** | **SUMMARY OF FRANCHISE AGREEMENT** | 23 |
| 8. | CONFIDENTIAL INFORMATION | 24 |
| **8.1** | **CONFIDENTIAL INFORMATION** | 24 |
| **8.2** | **FOR BUSINESS USE ONLY** | 24 |
| **8.3** | **IDEAS, CONCEPTS, TECHNIQUES OR MATERIALS** | 25 |
| 9. | PLANET FITNESS METHODS OF OPERATION | 25 |
| **9.1** | **COMPLIANCE WITH METHODS OF OPERATION** | 25 |
| **9.2** | **PROVISIONS OF THIS AGREEMENT** | 27 |
| **9.3** | **MODIFICATION OF METHODS OF OPERATION** | 27 |
| **9.4** | **CONDITION OF YOUR BUSINESS** | 27 |
| **9.5** | **UNIFORM IMAGE** | 28 |
| **9.6** | **PURCHASE OF OTHER PRODUCTS** | 28 |
| **9.7** | **COMPLIANCE WITH LAWS** | 29 |
| **9.8** | **PERSONNEL** | 29 |
| **9.9** | **INSURANCE** | 29 |
| **9.10** | **QUALITY CONTROL** | 30 |
| **9.11** | **PRICING POLICIES** | 30 |
| **9.12** | **MEMBER DUES POLICIES** | 30 |
| **9.13** | **RECIPROCAL MEMBERSHIP** | 30 |
| **9.14** | **MEMBER TRANSFER POLICY** | 30 |
| **9.15** | **DESIGNATED FRANCHISE PORTAL** | 30 |
| 10. | MARKETING | 31 |
| **10.1** | **NATIONAL ADVERTISING FUND** | 31 |
| **10.2** | **ACCOUNTING** | 31 |
| **10.3** | **NO PROPORTIONALITY** | 32 |
| **10.4** | **DEFERRALS OR REDUCTIONS** | 32 |
| **10.5** | **LOCAL ADVERTISING** | 32 |
| **10.6** | **ADVERTISING COOPERATIVES** | 33 |
| **10.7** | **SPECIAL MARKETING PROGRAMS** | 34 |
| **10.8** | **PARTICIPATION IN INTERNET WEB SITES OR OTHER ON-LINE COMMUNICATIONS** | 35 |
| **10.9** | **TRUTHFUL ADVERTISING, MARKETING AND PROMOTION** | 35 |
| **10.10** | **OUR RESERVATION OF RIGHTS REGARDING MARKETING EXPENDITURES AND DISTRIBUTION** | 35 |
| 11. | RECORDS, REPORTS AND FINANCIAL STATEMENTS | 36 |
| **11.1** | **RECORDS** | 36 |
| **11.2** | **PERIODIC REPORTS** | 36 |
| **11.3** | **VERIFICATION** | 36 |
| 12. | INSPECTIONS AND AUDITS | 37 |
| **12.1** | **OUR RIGHT TO INSPECT THE BUSINESS** | 37 |
| **12.2** | **COOPERATION** | 37 |
| **12.3** | **OUR RIGHT TO AUDIT** | 37 |
| **12.4** | **PRIVACY LAWS** | 38 |

13. TRANSFER. ....................................................................................................................38
  13.1 **BY US** ...............................................................................................................38
  13.2 **BY YOU** ...........................................................................................................38
  13.3 **CONDITIONS FOR APPROVAL OF TRANSFER** ................................38
  13.4 **TRANSFER TO A WHOLLY OWNED CORPORATION** .....................40
  13.5 **TRANSFER UPON YOUR DEATH OR DISABILITY** ..........................41
  13.6 **OPERATION UPON YOUR DEATH OR DISABILITY** ........................41
  13.7 **BONA FIDE OFFERS** ....................................................................................41
  13.8 **OUR RIGHT OF FIRST REFUSAL** ............................................................42
  13.9 **NON-EXERCISE** ...........................................................................................42

14. EXPIRATION OF THIS AGREEMENT ......................................................................42
  14.1 **ACQUISITION OF A SUCCESSOR FRANCHISE** ................................42

15. TERMINATION OF AGREEMENT ..............................................................................44
  15.1 **BY YOU** ...........................................................................................................44
  15.2 **IMMEDIATE TERMINATION** ..................................................................44
  15.3 **TERMINATION UPON NOTICE** ..............................................................45
  15.4 **OUR RIGHT TO OPERATE THE BUSINESS** .......................................47
  15.5 **ALTERNATIVES TO TERMINATION** ....................................................47

16. OUR AND YOUR RIGHTS AND OBLIGATIONS UPON TERMINATION OR EXPIRATION OF THIS AGREEMENT. ...................................................................48
  16.1 **PAYMENT OF AMOUNTS OWED TO US** .............................................48
  16.2 **MARKS** ............................................................................................................48
  16.3 **DE-BRANDING** .............................................................................................50
  16.4 **CONFIDENTIAL INFORMATION; DOMAIN NAMES** .......................51
  16.5 **IN-TERM COVENANT NOT TO COMPETE** ........................................51
  16.6 **POST-TERM COVENANT NOT TO COMPETE** ...................................51
  16.7 **REASONABLE SCOPE OF COVENANTS** .............................................52
  16.8 **REDUCTION OF SCOPE OF COVENANTS** ..........................................52
  16.9 **COVENANT NOT TO COMPETE UPON EXERCISE OF RIGHT OF FIRST REFUSAL**52
  16.10 **COMMENCEMENT BY ORDER** ............................................................52
  16.11 **OUR RIGHT TO PURCHASE ASSETS OF THE BUSINESS** ..............52
  16.12 **CONTINUING OBLIGATIONS** ..............................................................54
  16.13 **FUTURE ROYALTIES** ...............................................................................54

17. SECURITIES OFFERINGS. ..........................................................................................54
  17.1 **SECURITIES OFFERINGS** .........................................................................54

18. RELATIONSHIP OF THE PARTIES AND INDEMNIFICATION. ............................55
  18.1 **INDEPENDENT CONTRACTORS** ...........................................................55
  18.2 **NO LIABILITY FOR ACTS OF OTHER PARTY** ................................55
  18.3 **TAXES** .............................................................................................................55
  18.4 **INDEMNIFICATION** ...................................................................................56
  18.5 **MITIGATION NOT REQUIRED** ...............................................................57

19. ENFORCEMENT AND MISCELLANEOUS MATTERS. ...........................................57
  19.1 **SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS** .....57
  19.2 **LESSER COVENANT ENFORCEABLE** ...................................................58
  19.3 **GREATER NOTICE** .....................................................................................58
  19.4 **WAIVER OF OBLIGATIONS** ....................................................................58
  19.5 **NON-WAIVER** ..............................................................................................58
  19.6 **FORCE MAJEURE** .......................................................................................59
  19.7 **EXTEND PERFORMANCE** ........................................................................59

**19.8**    **OUT-OF-STOCK AND DISCONTINUED** ......................................................... 59
**19.9**    **COSTS AND ATTORNEYS' FEES** .................................................................... 59
**19.10**   **YOU MAY NOT WITHHOLD PAYMENTS DUE TO US** ............................... 59
**19.11**   **RIGHTS OF PARTIES ARE CUMULATIVE** ............................................... 59
**19.12**   **DISPUTE RESOLUTION** ................................................................................. 59
**19.13**   **GOVERNING LAW** .......................................................................................... 62
**19.14**   **CONSENT TO JURISDICTION** ..................................................................... 62
**19.15**   **WAIVER OF PUNITIVE DAMAGES, JURY TRIAL AND CLASS ACTIONS** .. 62
**19.16**   **BINDING EFFECT** ........................................................................................... 63
**19.17**   **LIMITATIONS OF CLAIMS** ........................................................................... 63
**19.18**   **CONSTRUCTION** ............................................................................................ 63
**19.19**   **WITHHOLD APPROVAL** ............................................................................... 63
**19.20**   **HEADINGS** ....................................................................................................... 63
**19.21**   **JOINT AND SEVERAL OWNERS' LIABILITY** ......................................... 63
**19.22**   **ANTI-TERRORISM LAWS** ............................................................................ 63
**19.23**   **RIGHT TO INFORMATION** .......................................................................... 64
**19.24**   **MULTIPLE COPIES AND ELECTRONIC RECORDS** ............................... 64
**19.25**   **ENTIRE AGREEMENT BETWEEN THE PARTIES** ................................... 64
**19.26**   **AREA DEVELOPMENT AGREEMENT ADDENDUM** ............................... 64
**19.27**   **NO COMMERCIAL AGENCY** ....................................................................... 64
**19.28**   **ANTI-CORRUPTION** ...................................................................................... 64
**19.29**   **ENGLISH LANGUAGE** .................................................................................. 65
**19.30**   **ACKNOWLEDGMENT** .................................................................................... 65
**19.31**   **GOVERNMENTAL APPROVALS** ................................................................. 65
**19.32**   **FRANCHISEE DULY ORGANIZED** ............................................................ 66
**19.33**   **AUTHORITY TO EXECUTE AGREEMENT** ............................................... 66
**19.34**   **NO CONSENT OR FURTHER ACTION REQUIRED** .................................. 66
**19.35**   **MEXICO SPECIFIC PROVISIONS** ............................................................... 66
**20.**     NOTICES AND PAYMENTS. ............................................................................... 67
**20.1**    **NOTICES** .......................................................................................................... 67
**20.2**    **PAYMENTS** ..................................................................................................... 68

APPENDIX A          LIST OF MARKS
APPENDIX B-1        OWNERS' PERSONAL GUARANTY OF FRANCHISEE'S
                    OBLIGATIONS
APPENDIX B-2        AFFILIATE GUARANTY OF FRANCHISEE'S OBLIGATIONS
APPENDIX C          OWNER PERSONAL COVENANTS REGARDING CONFIDENTIALITY
                    AND NON-COMPETITION
APPENDIX D          ASSUMPTION OF JOINT OBLIGATION AGREEMENT
APPENDIX E          OWNERSHIP ADDENDUM
APPENDIX F          SILENT INVESTORS
APPENDIX G          ADDENDUM TO LEASE
APPENDIX H          SUMMARY OF FRANCHISE AGREEMENT
APPENDIX I          AREA DEVELOPMENT AGREEMENT ADDENDUM

ACKNOWLEDGEMENT ADDENDUM

**PLANET FITNESS®**
**FRANCHISE AGREEMENT**
**(INTERNATIONAL)**

**THIS FRANCHISE AGREEMENT** (the "Agreement") is made and entered into as of the Effective Date (as defined herein) by and between Planet Fitness International Franchise, an exempted company formed under the laws of the Cayman Islands, with a mailing address at 190 Elgin Avenue, George Town, Grand Cayman KY1-9005 (referred to in this Agreement as "Franchisor", "we," "us" or "our"), and the Franchisee listed on the signature page hereto (referred to in this Agreement as "Franchisee", "you," or "your").

1.     **PREAMBLES, ACKNOWLEDGMENTS AND REPRESENTATION.**

1.1     **PREAMBLES.**   This Agreement governs your ownership and operation of one (1) **PLANET FITNESS** business offering fitness training facility services, including exercise machines and free weights, fitness training services, tanning services, and related services and ancillary merchandise as we may authorize from time to time. These businesses operate under the **PLANET FITNESS** name and under business formats, methods, procedures, designs, layouts, standards and specifications that we developed for use in the United States, all of which we may improve, further develop or otherwise modify from time to time.  We use, promote and license certain trademarks, service marks and other commercial symbols in the operation of **PLANET FITNESS** businesses**,** including the **PLANET FITNESS** trademarks and service marks and associated logos. We have a license from our affiliate, PFIP International ("Trademark Owner") to use the Marks and to sublicense the Marks to franchisees. We grant franchises to persons who meet our qualifications and are willing to undertake the investment and effort required to own and operate a **PLANET FITNESS** business offering the products and services we authorize and approve and utilizing our business formats, methods, procedures, signs, designs, layouts, equipment, standards and specifications and the Marks. You have indicated to us by your actions and statements that you desire a franchise to own and operate a **PLANET FITNESS** business in a designated location within the country of Mexico ("Country").

1.2     **ACKNOWLEDGMENTS.**   You acknowledge that you have read this Agreement and, if applicable, our Franchise Disclosure Document for the Country ("FDD") and understand and accept the terms, conditions and covenants contained in this Agreement as being reasonably necessary to maintain our high standards of quality and service and the uniformity of those standards at each **PLANET FITNESS** business and thereby to protect and preserve the goodwill of the Marks. You acknowledge that you have conducted an independent investigation of the business venture contemplated by this Agreement and recognize that, like any other business, the nature of the business conducted by a **PLANET FITNESS** business may evolve and change over time, that an investment in a **PLANET FITNESS** business involves business risks and that your business abilities and efforts are vital to the success of the venture.  You acknowledge and agree that we and you are and will be independent contractors and that nothing in this Agreement is intended to make either you or us a general or special agent, joint venturer, commercial agent, partner or employee of the other for any purpose.  You agree to always indicate your status as an independent contractor and franchisee on any document or information released by you in connection with the BUSINESS.  Further, you will display the following notice in a prominent place at the BUSINESS:  ***"This Planet Fitness is a franchise of Planet Fitness International Franchise and is independently owned and operated."***  Any information you acquire from other **PLANET FITNESS** franchisees or third party vendors relating to the sales, profits or cash flows of other **PLANET FITNESS** businesses does not constitute information obtained from us, nor do we make any representation as to the accuracy of any such information. You acknowledge that, in all of their dealings with you, our officers, directors, employees and agents act only in a representative, and not in an individual, capacity. All business dealings between you and such persons as a result of this Agreement are solely between you and us. You further acknowledge that we have advised you to seek franchise counsel to review and evaluate this Agreement.

1.3  **REPRESENTATION.**  You represent to us, as an inducement to our entry into this Agreement, that all statements you have made and all materials you have submitted to us in connection with your purchase of the franchise are accurate and complete and that you have made no misrepresentations or material omissions in obtaining the franchise. We have approved of your purchasing a franchise in reliance upon all of your representations.  We reserve the right to terminate this Agreement if you made any material representation to us that was false or there were any material omissions in information provided to us in inducing us to enter into this Agreement with you.

1.4  **CERTAIN DEFINITIONS.**  The terms listed below have the meanings which follow them and include the plural as well as the singular. Other terms are defined elsewhere in this Agreement in the context in which they arise.

"Accounting Period" - Each time period during the term of this Agreement, as established by our Method of Operations, for reporting of Revenue and other monies due hereunder.

"ADA" – Defined in Article 2.4.

"Ad Fee" - Defined in Article 10.1.

"Affiliate" - Any person or entity that directly or indirectly owns or controls the referenced party, that is directly or indirectly owned or controlled by the referenced party, or that is under common control with the referenced party. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction, of the management and policies of an entity, whether through ownership of voting securities, by contract or otherwise.

"ALMP" – Defined in Article 10.5.

"Approved Operator" – Defined in Article 2.3

"Approved Supplier" - Any supplier, including us, an Affiliate of ours or an independent third party, whom we authorize to act as an approved supplier of services or goods.

"Billing Day" – Each day that we designate in our Method of Operations that we or our authorized designee are authorized by you to withdraw via electronic funds transfer from your Designated Bank Account all Continuing Fees and other amounts then due to us under the terms of this Agreement.

"Black Card" – Our then-current black card membership in effect from time to time as described in the Operations Manual.

"BUSINESS" - The **PLANET FITNESS** business operated by you at the Location under the terms of this Agreement.

"Business Commencement Date" – The date on which the Location is first open to members for business, excluding pre-sale marketing and other similar pre-opening activities.

"Business Data" – Defined in Article 11.4.

"Capital Modifications" – Defined in Article 9.3.

"Competitive Business" - Any men's, women's, children's, or co-ed fitness, exercise, athletic, or wellness facility of any kind, including, but not limited to, a health club, gym, physical fitness club, personal training studio, weight loss, weight training or resistance training studio, or aerobics center (other than a **PLANET FITNESS** business).  Notwithstanding the foregoing definition, the parties acknowledge and agree that a med-spa business is not a "Competitive Business."

"Confidential Information" - Defined in Article 8.1.

"Construction Development Plan" – Defined in Article 4.4.

"Continuing Fees" – Defined in Article 5.2.

"Corporation or Partnership" - The term "corporation or partnership" as used herein to describe your business entity shall, if applicable, include reference to your formation as a limited liability company, limited liability partnership, or any other type of limited liability entity.

"Country" – Defined in Article 1.1.

"Cyber Event" – Defined in Article 6.9.

"Designated Bank Account" – Defined in Article 5.3.

"Designated Franchise Portal" – Our online portal or portals that provide information, resources, and support to **PLANET FITNESS** franchisees and their **PLANET FITNESS** businesses.

"Effective Date" – The date that we enter into this Agreement as noted on the signature page.

"EFT" – The term "EFT" means the electronic transfer of funds (including without limitation from a credit card, debit card, or bank account or any payment method associated with a credit card, debit card, or bank account) and payment by check or any other means (including without limitation any other current or future form of pre-authorized payment).

"EFT Dues Draft" - The membership related fees for the BUSINESS that are due and payable to you by or on behalf of your members through authorized EFT withdrawals, regardless of the amount of membership fees you actually collect.

"FDD" – Franchise Disclosure Document, as defined in Article 1.2.

"Immediate Family" - Spouse, parents (including step parents), siblings (including half siblings), and children (including step children), whether natural or adopted.

"Internet" - All communications between computers and between computers and television, telephone, facsimile and similar communications devices, including the World Wide Web, proprietary online services, E-mail, news groups and electronic bulletin boards, including but not limited to all forms of social media developed during the Term of this Agreement.

"LAF" - Local Advertising Funds, as defined in Article 10.5.

"Location" - Ubicado en: Plaza Clouthier Avenida Manuel J. Clouthier 899-A Colonia Mártires de Cananea Santa Catarina, Nuevo León C.P. 66120.  If no site is approved at the time this Agreement is signed, this Agreement will be updated and amended when a location has been designated by you and approved by us. The location must be designated and leased, subleased, or purchased by the deadline provided in Article 4.2. If the address for the Location changes due to the designation of a new address for or renumbering of the premises, without any change to the physical location of the premises, you may update the address of the Location by providing written notice to us. Such notice may be delivered by electronic transmission, without subsequent physical delivery, provided that we confirm receipt.

"Marks" - The current and future tradenames, trademarks, service marks and trade dress used to identify the services and/or products offered by **PLANET FITNESS** businesses, including the mark

"PLANET FITNESS" and the distinctive building design and color scheme of **PLANET FITNESS** businesses.

"Material Offense" – Defined in Article 15.3.6.

"Methods of Operation" - The Operations Manual we provide to you containing mandatory and suggested specifications, standards, operating procedures and rules that we have developed for use in the United States and that we prescribe from time to time for the operation of a **PLANET FITNESS** business and any other information we provide to you during the Term of the Agreement relating to your operation of the franchise business or to any other of your obligations under this Agreement and related agreements.

"NAF" - Our National Advertising Fund, as defined in Article 10.1.

"NAF Contribution" – Defined in Article 15.3(1)(b).

"Operations Manual" – The term "Operations Manual" means the confidential **PLANET FITNESS** Methods of Operation, which may include, without limitation, any information, documents and materials that describe our mandatory and suggested standards, specifications, marketing strategies and policies, and operating procedures relating to the development and operation of **PLANET FITNESS** businesses and your obligations under this Agreement, as well as all other written materials, documents or information that we designate as a Method of Operation or specifically as part of the Operations Manual.  The term "Operations Manual" also includes alternative or supplemental means of communicating such information by other media which specifically reference that they are to be considered part of the Operations Manual, including, but not limited to, bulletins, newsletters, emails, audio and video files, and other similar items posted on the Designated Franchise Portal. The Operations Manual (and each component thereof) constitutes a confidential trade secret and will remain our property.

"Owner" – Each person that has any direct or indirect legal or beneficial ownership interest in you, if you are a business corporation, partnership, limited liability company or other legal entity.  Each Owner that has ten percent (10%) or greater interest in you, if you are a business corporation, partnership, limited liability company or other legal entity, must sign Appendix B-1 to this Agreement (Owners' Personal Guaranty of Franchisee's Obligations) and Appendix D to this Agreement (Assumption of Joint Obligation Agreement). However, if we are entering into this Agreement totally or partially based on the financial qualifications, experience, skills or managerial qualifications of any person or entity who directly or indirectly owns ten percent (10%) or less interest in the franchisee, we have the right to designate that person as an Owner who must sign Appendix B-1 and Appendix D to this Agreement.  In addition, if the franchisee is a partnership entity, then each person or entity who, now or hereafter is or becomes a general partner is deemed an Owner who must sign Appendix B-1 and Appendix D, regardless of the percentage ownership interest.  If the franchisee is one or more individuals, each individual is an Owner.  Each franchisee must have at least one Owner.  Your Owner(s) is/are identified on Appendix E to this Agreement.  Every time we approve a change in the persons or entities who are your Owners (as required under Article 13.2 hereof), you must, within seven (7) calendar days from the date of such change, cooperate with us in amending Appendix E.  As used in this Agreement, any reference to Owner includes all Owners.

Notwithstanding the foregoing, if JEG-Mex, LLC, directly or indirectly, owns at least 98% of your and your affiliates' **PLANET FITNESS** businesses in the Country, then JEG-Mex, LLC shall be the approved affiliate entity, or if an affiliate entity that we approve in our reasonable discretion, maintains a majority interest in at least five (5) **PLANET FITNESS** businesses in the Country which are open and operating; such approved affiliate entity or another affiliate entity that we approve in our sole discretion, may sign Appendix B-2 to this Agreement (Affiliate Guaranty of Franchisee's Obligations) in lieu of your Owners signing Appendix B-1 to this Agreement (Owners' Personal Guaranty of Franchisee's Obligations).

"Ownership Group" - Defined in Article 2.4.

"Personnel" - All persons employed by you in connection with the development, management or operation of your BUSINESS, including persons in general and district management positions for your **PLANET FITNESS** BUSINESS, crew trainers, unit general and assistant managers, shift supervisors, hourly employees and all other persons who work in or for your BUSINESS.

"Preferred Vendor" - Any supplier of goods or services to your BUSINESS that we designate under our Methods of Operation as a "Preferred Vendor."

"Pre-Sale" - Defined in Article 4.9.

"Pre-Sale/Grand Opening Marketing Expense" - Defined in Article 4.8.

"Pre-Sale/Grand Opening Marketing Period" - Defined in Article 4.8.

"Pre-Sale/Grand Opening Marketing Plan" - Defined in Article 4.8.

"Publicly-Held Entity" – is any entity whose shares are traded in any international, national, or regional securities exchange or through any international, national, or regional securities association.

"POS" – Point of Sale, as defined in Article 4.6.

"Relocation" – The moving of the Location for the BUSINESS and developing a new **PLANET FITNESS** business in close proximity at a new location, approved by us, and transferring all members from the BUSINESS to the new **PLANET FITNESS** business. A Relocation may include a consolidation of two **PLANET FITNESS** businesses operated by you for business reasons if approved by us in our sole business judgment.

"Reserved Area" - Defined in Article 4.3.

"Responsible Owner" – Defined in Article 2.3.

"Revenue" – All non-membership revenue generated from the sale or provision of all products and services at, from, or in connection with the operation of the **PLANET FITNESS** business, exclusive of Revenue Adjustments and any federal, state or municipal tax deductions or offsets, and whether cash, credit or electronic payment, including, without limitation, the sale of merchandise, refreshments, tanning, and training services. Revenue also includes the total receipts from all membership related fees that are received by you (not reduced by transaction fees, interchange costs, or the cost of acceptance and processing of such fees or any other expenses), exclusive of federal, state, or municipal taxes applicable to membership related fees, including, but not limited to, pre-paid membership fees, monthly and annual membership fees, enrollment fees, late fees, third-party collections, service fees, and other ancillary fees, whether collected daily, monthly, paid-in-full, or otherwise and specifically including any payments by or on behalf of members by any third party (including health plan or employer reimbursement programs and similar reimbursement programs) exclusive of Revenue Adjustments.

"Revenue Adjustments" – Any adjustment to revenue that we designate in our Methods of Operations including, but not limited to, retail returns, membership refunds, chargebacks and disputed transactions.

"Silent Investor" - All individuals and/or entities identified in Appendix F.

"System" - The business methods, designs and arrangements for developing and operating **PLANET FITNESS** businesses that we have developed for use in the United States, which include

the Marks, building design and layouts, equipment, training, and certain operating and business standards and policies, all of which we may improve, further develop or otherwise modify from time to time.  The System shall include any adaptations we approve in writing for use in the Country.

"Business Service Fee" – The nonrefundable, continuing fees you must pay us in consideration of the training, assistance and services which we will provide you during the Term.

"Technology Fee" – Defined in Article 5.7.

"Telephone Companies" – Defined in Article 16.2.

"Telephone Numbers" – Defined in Article 16.2.

"Term" – Defined in Article 3.1.

"Trademark License Fee" – The nonrefundable, continuing fees you must pay us in consideration of your use of our Marks during the Term.

 "Transfer" - The voluntary, involuntary, direct or indirect sale, assignment, transfer, license, sublicense, sublease, collateral assignment, grant of a security, collateral or conditional interest, inter-vivos transfer, testamentary disposition or other disposition of this Agreement, any interest in or right under this Agreement, or any form of ownership interest in you or the assets, revenues or income of your BUSINESS including: (1) any transfer, redemption or issuance of a legal or beneficial ownership interest in the capital stock of, or a partnership interest in, you or of any interest convertible to or exchangeable for capital stock of, or a partnership interest in, you; (2) any merger or consolidation between you and another entity, whether or not you are the surviving corporation; (3) any transfer in, or as a result of, a divorce, insolvency, corporate or partnership dissolution proceeding or otherwise by operation of law; (4) any transfer upon your death or the death of any of your Owners by will, declaration of or transfer in trust or under the laws of intestate succession; or (5) any foreclosure upon your BUSINESS or the transfer, surrender or loss by you of possession, control or management of your BUSINESS.

"Third-Party Transfer" – A proposed Transfer to any party that is not one of your Owners or an entity solely owned by one or more of your Owners. The following Transfers are not considered Third-Party Transfers: (i) a Transfer to an entity that is controlled by one or more of your Owners solely for estate planning purposes or (ii) a Transfer to an Immediate Family member of one of your Owners of a non-controlling interest in you, which is not one of a series of proposed Transfers which, in the aggregate, would constitute or result in the transfer of a controlling interest in you.

"Vendor Revenue" – Defined in Article 5.13(1)(a).

"White Card"- Our then-current white card membership in effect from time to time as described in the Operations Manual.

## 2.    YOUR ORGANIZATION AND MANAGEMENT.

2.1    **ORGANIZATIONAL DOCUMENTS**.  If you are, or at any time become a corporation, limited liability company, partnership, or other legal entity, you and each of your Owners agree and represent that:

(1)    you are duly organized and validly existing under the laws of the jurisdiction of your organization, and, that you are duly qualified to transact business in the jurisdiction in which your BUSINESS is located;

(2)  you have the authority to execute and deliver this Agreement (including without limitation, the ownership information contained in Appendix E hereto) and to perform your obligations hereunder;

(3)  your activities are restricted to those necessary solely for the development, ownership and operation of a **PLANET FITNESS** business in accordance with this Agreement and in accordance with any other agreements entered into with us or any of our Affiliates;

(4)  you shall, within five (5) business days of our request, provide us with copies of the articles or certificate of incorporation, partnership agreement or other organizational documents and such documents recite that the issuance, transfer or pledge of any direct or indirect legal or beneficial ownership interest is restricted by the terms of this Agreement; and

(5)  all certificates representing direct or indirect legal or beneficial ownership interests in you now or hereafter issued must bear a legend in conformity with applicable law reciting or referring to such restrictions.

2.2  **DISCLOSURE OF OWNERSHIP INTERESTS.**  You and each of your Owners represent, warrant and agree that the attached Appendix E is current, complete and accurate. You agree that, subject to Article 13 requirements regarding proposed Transfers, any proposed updates to Appendix E will be furnished promptly to us, so that Appendix E (as so amended) is at all times current, complete and accurate. Unless your approved affiliate has signed Appendix B-2 to this Agreement (Affiliate Guaranty of Franchisee's Obligations), each person who is or becomes an Owner of ten percent (10%) or more of an interest in you must sign Appendix B-1 to this Agreement (Owners' Personal Guaranty of Franchisee's Obligations), undertaking to be bound jointly and severally by the terms of this Agreement and Appendix D to this Agreement (Assumption of Joint Obligation Agreement), undertaking to guaranty the obligations contained in this Agreement. Each person who is or becomes an Owner, with the exception of Silent Investors, must execute an agreement in the form we prescribe, undertaking to be bound by the confidentiality and non-competition covenants contained in this Agreement, the current form of which is attached hereto as Appendix C.   Each Owner signing such Appendices must be an individual acting in such Owner's individual capacity.  In addition, if you have one or more Silent Investors, each such Silent Investor must be listed on Appendix F, which is hereby incorporated by reference.

2.3  **RESPONSIBLE OWNER/MANAGEMENT OF BUSINESS.**  If you are, or at any time become, a business corporation, partnership, limited liability company or other legal entity, you must designate in Appendix E as the "Responsible Owner" an individual approved by us. Your Responsible Owner must be an Owner and must have the authority to, and must, in fact, actively direct your business affairs related to the BUSINESS. Your Responsible Owner must have the authority to accept all official notices from us and, when signing on your behalf, to legally bind you with respect to all contracts and commercial documents related to the BUSINESS. Your Responsible Owner must have completed our training program to our satisfaction. You (or your Responsible Owner) may request our approval of an operator that has completed our training program to our satisfaction (an "Approved Operator") to whom you may delegate your obligations to develop and operate your BUSINESS. Such a request must be made in writing, and you must cooperate with us to provide all information we reasonably request to approve or reject the proposed individual. Such approval shall be given in our sole discretion. If we approve an Approved Operator, you must amend Appendix E to include that individual, and require that the Approved Operator sign Appendix C (Owner's Personal Covenants Regarding Confidentiality and Non-Competition). We shall have no responsibility, liability or obligation to any party to any such arrangement, agreement or contract, or any amendments thereto, made under this Article on account of our approval thereof or otherwise, and you agree to indemnify and hold us harmless with respect thereto. You must notify us of any proposed change of the Responsible Owner or Approved Operator and receive our written approval prior to such change. If such change results

from the death or incapacitation of the Responsible Owner or Approved Operator, you must submit a new proposed Responsible Owner or Approved Operator within thirty (30) days after such death or incapacitation. You and your Approved Operator (or if there is no Approved Operator, the Responsible Owner) shall exert your best efforts to the development and operation of your BUSINESS and all other **PLANET FITNESS** businesses you own; and absent our prior approval may not engage in any other business or activity, directly or indirectly, which requires you or such individual to have substantial management responsibility or substantial time commitments or otherwise may conflict with your obligations hereunder. Your BUSINESS at all times must be managed by you (or your Responsible Owner or Approved Operator) or by an on-site general or assistant manager or a shift supervisor who has completed the appropriate training programs.

2.4 **OWNERSHIP GROUP.** If you or one of your Affiliates have entered into an Area Development Agreement ("ADA") with us and are entering into this Agreement pursuant thereto, you represent and warrant that the Area Developer's Ownership Group (as defined in the Area Development Agreement) has, directly or indirectly, 51% or more ownership interest in you, and voting control over you. Furthermore, you acknowledge and agree that we have the right to approve, in advance, your ownership structure.

2.5 **FACILITY ORGANIZATION.** Your BUSINESS must be staffed by at least one (1) trained general manager and appropriate numbers of assistant managers, shift supervisors, and personnel so that all shifts are staffed by at least one assistant manager or shift supervisor.

3. **GRANT OF RIGHTS.**

3.1 **GRANT OF FRANCHISE.** You desire a franchise to own and operate a **PLANET FITNESS** business in the Country. Subject to the terms of and upon the conditions contained in this Agreement, we hereby grant you a franchise (the "Franchise") to operate a **PLANET FITNESS** business solely at the Location, and a license to use the Marks and the System in the operation thereof, for a term commencing on the Effective Date and expiring on the tenth (10th) anniversary of the Business Commencement Date ("Term") unless sooner terminated in accordance with Article 15 hereof. Upon your written request to us received no later than three (3) months after the Business Commencement Date and in substance acceptable to us on the form made available to you, we will, in our reasonable discretion, agree to grant you in writing an extension of the Term of up to nine (9) months, or a reduction of the Term of up to two (2) years, to match the expiration of your lease term. This Agreement grants to you a "site only" Franchise for a single **PLANET FITNESS** business, which means that you receive no protected, territorial or other rights beyond the physical premises of the Location. We and our affiliates have the unlimited right to compete with you and license others to compete with you. You may not operate the BUSINESS from any site other than the Location without our prior written consent. If we consent to the BUSINESS' Relocation, we have the right to charge you a Five Thousand U.S. Dollar (US$5,000) relocation fee, payable prior to the Relocation. In the event of an approved Relocation, the Term shall remain unaffected. You shall operate your BUSINESS throughout the Term, except as otherwise specifically provided for herein. Notwithstanding the foregoing, if you sign an ADA with us, you will receive limited protection from competition in a specified geographic area, as outlined in the ADA.

3.2 **OUR RESERVATION OF RIGHTS.** Except as otherwise expressly provided in this Agreement, we and all of our Affiliates (and our and their respective licensees, successors and assigns, by purchase, merger, consolidation or otherwise) retain all of our rights with respect to the Marks, the System and **PLANET FITNESS** businesses anywhere in the world, and the right to engage in any business whatsoever, including the right to:

(1) operate, and grant to others the right to operate, **PLANET FITNESS** businesses at such locations and on such terms and conditions as we deem appropriate;

(2)   offer to sell, or sell and distribute, any products or services under any tradenames, trademarks, service marks or trade dress, including the Marks, through any distribution channels or methods, which may include, without limitation, retail stores, wholesale, and the Internet (or any other existing or future form of electronic commerce);

(3)   operate, and grant to others the right to operate, fitness facilities, gyms, health related establishments, and any other business(es) whatsoever identified by tradenames, trademarks, service marks or trade dress, other than the Marks, pursuant to such terms and conditions as we deem appropriate which may include locations in close proximity to your **PLANET FITNESS** location;

(4)   develop or become associated with other concepts (including dual branding or other franchise systems), whether or not using the **PLANET FITNESS** System, brand or Marks, and award franchises under these other concepts for locations anywhere;

(5)   acquire, be acquired by, merge, affiliate with or engage in any transaction with other businesses (whether competitive or not), with units located anywhere or business conducted anywhere.  These transactions may include arrangements involving competing businesses or outlets and dual branding or brand conversions.  You must participate at your expense in any conversion as instructed by us; and

(6)   enter into agreements or arrangements with other local, regional, national or international companies or organizations by which we offer memberships or other products and services to the personnel, customers or members of such companies or organizations on commercially reasonable terms (including, but not limited to, fee structures and reimbursement arrangements) that may be different from our then-current membership offerings. You must participate in and honor the terms of such partnerships upon being notified thereof.

4.   **LOCATION SELECTION, LEASE OR PURCHASE OF LOCATION AND LOCATION DEVELOPMENT.**

4.1   **LOCATION SELECTION AND APPROVAL.**  You acknowledge that, it is your responsibility (with or without our assistance) to find and submit to us for our approval a location for your BUSINESS.  You acknowledge and agree that our recommendation or approval of the Location, and any information regarding the Location communicated to you regarding our standard site selection criteria for **PLANET FITNESS** businesses, do not constitute a representation or warranty of any kind, express or implied, as to the suitability of the Location for a **PLANET FITNESS** business or for any other purpose. Our recommendation or approval of the Location indicates only that we believe that the Location falls within the acceptable criteria for locations that we have established as of the time of our recommendation or approval of the Location.  You acknowledge and agree that your selection of the Location is based on your own independent investigation of the suitability of the Location. We do not endorse any predictive analysis as to the potential financial performance of the Location nor do we make any representation or warranty as to the accuracy of any such predictive analysis or the accuracy of any underlying information on which such predictive analysis may be based.  We have the right to grant or withhold approval of any proposed location in our business judgment.

4.2   **PURCHASE OR LEASE OF THE LOCATION.**  If this Agreement is being executed pursuant to an ADA with us, you must lease, sublease or purchase the Location within three (3) months after signing this Agreement. If this Agreement is not being executed pursuant to an ADA with us, you must lease, sublease or purchase the Location within six (6) months after signing this Agreement. Your failure to lease, sublease or purchase the Location within this timeframe constitutes grounds for termination of this Agreement under Article 15.3 and the loss of your non-

refundable Initial Franchise Fee.  We have the right, but not the obligation, to review the terms of any lease, sublease, lease renewal, or purchase contract for the Location, and you agree to deliver a copy to us for our review before you sign it. You agree that any lease, sublease or lease renewal for the Location must, in form and substance satisfactory to us, include all of the provisions set forth on Appendix G (Addendum to Lease) attached hereto. You may not execute a lease, sublease, lease renewal, purchase contract or any modification thereof for the Location without our approval. Our approval of the lease, sublease, lease renewal, or purchase contract does not constitute a warranty or representation of any kind, express or implied, as to its fairness or suitability or as to your ability to comply with its terms. We do not, by virtue of approving the lease, sublease, lease renewal, or purchase contract, assume any liability or responsibility to you or to any third parties. Such approval indicates only that we believe that the Location and certain terms of the lease, sublease, lease renewal, or purchase contract fall within the acceptable criteria we have established as of the time of our approval. You further acknowledge that we have advised you to seek legal counsel to review and evaluate the lease, sublease, lease renewal or purchase contract. You must deliver a copy of the fully signed lease, sublease, lease renewal, or purchase contract to us within five (5) days after its execution.

4.3     **RESERVED AREA OF THE LOCATION.**  You acknowledge and agree that, at any time during the Term of the Agreement and upon our reasonable written request, you must lease or sublease to us, our Affiliate, or our designee, at the then-current fair market rate in your geographic area for like-leased real estate space, a portion of the total square footage of the Location that shall not exceed ten (10%) percent of the total square footage of the Location (the "Reserved Area"). You acknowledge and agree that we, our Affiliate, or our designee may use the Reserved Area in any reasonable manner we deem to be appropriate, provided however, that our, our Affiliate's, or our designee's use of the Reserved Area shall not materially alter your fundamental rights under this Agreement. Further, you acknowledge and agree that we or our Affiliate have the unrestricted right to sublease the Reserved Area to a third party designee. You acknowledge and agree that any lease or sublease for the Location must reference, in form and substance satisfactory to us, our right to sublease the Reserved Area.  Notwithstanding anything contained herein to the contrary: (a) we will pay you the pro rata portion of the actual rental amount paid by you to the landlord under the master lease (or the pro rata portion of the mortgage payment paid by you, as applicable) for the space that we actually occupy; and (b) in no event will the Reserved Area be used to offer, sell or provide personal training services. If we ever exercise our rights pursuant to this Article 4.3, you and we agree to (a) use your and our best reasonable commercial efforts to agree on a location that will fulfill both our business interests in exercising our rights under this Article 4.3, and your interests as owners and operators of the Location; (b) negotiate and reach a reasonable arrangement to share in the revenues generated from our use, or our designee's use, of the Reserved Area; and (c) indemnify you from any losses or damages arising from our use, or our designee's use, of the Reserved Area to the extent that such loss or damage is caused by such use.

4.4     **LOCATION DEVELOPMENT.**  You are solely responsible for developing the BUSINESS, for all expenses associated with it and for compliance with the requirements of any applicable federal, state, or municipal laws, codes or regulations, including those governing public accommodations for persons with disabilities. We will furnish you with mandatory specifications and layouts for a **PLANET FITNESS** business, including requirements for dimensions, design, image, interior layout, decor, fixtures, equipment, signs, furnishings and color scheme and other suggestions. The mandatory specifications and layouts we provide will not contain the requirements of any federal, state, or municipal laws, codes or regulations. You are obligated to have prepared, at your expense, all required construction plans and specifications to suit the shape and dimensions of the Location and to ensure that such plans and specifications comply with all applicable federal, state, or municipal laws, codes, regulations, ordinances, building codes and permit requirements, including all applicable Mexican Official Standards (Normas Oficiales Mexicanas – NOMs), and with lease requirements and restrictions.  You acknowledge that design quality is important to us. We reserve the right to require that you use our (1) designated third party project management company to prepare all project management plans for the BUSINESS, and (2) designated architect

to prepare all architectural plans and drawings (together with project management plans, "Construction Development Plans") for the BUSINESS.  You must submit all Construction Development Plans, including design specifications, to us for our prior, written approval before starting to develop the Location.   In the event that you do not use our designated architect to prepare all architectural plans and drawings for the BUSINESS, you must pay us a Construction Development Plan review fee of Four Thousand U.S. Dollars (US$4,000) at the time you submit your initial set of architectural plans or drawings to us.  At our request, you must submit all revised or "as built" plans and specifications. Our review and approval of your Construction Development Plans is not designed to assess compliance with federal, state, or municipal laws and regulations, as compliance with such laws is your sole responsibility. All development and any signage must be in accordance with the Construction Development Plans and specifications we have approved and must comply with all applicable laws, ordinances, local rules and regulations. We will furnish such guidance to you in developing the Location as we deem appropriate. We do not, by approving your Construction Development Plans or specifications or inspecting the Location, assume any liability or responsibility to you or to any third parties. Such approvals and inspections shall be solely for the purpose of assuring compliance with our standards and shall not be construed as any express or implied representation or warranty that your BUSINESS complies with any applicable laws, codes or regulations (including any federal, state, or municipal law or ordinance regulating standards for the access to, use of, or modifications of buildings for any by persons whose disabilities are protected by law) or that the construction thereof is sound or free from defects. All prototype and modified Construction Development Plans and specifications for your BUSINESS remain our sole and exclusive property, and you may claim no interest therein. You shall sign and execute any assignments, consents, and documents required or convenient to evidence that we have all right, title, and interest with respect to any modified plans or specifications.  You must start construction of your BUSINESS within one hundred eighty (180) days after you have leased, subleased or acquired the Location, unless a longer period of time is approved by us. You must employ a general contractor acceptable to us. You must procure all applicable construction insurance in amounts and coverages acceptable to us. You must complete construction of your BUSINESS within one hundred and eighty (180) days after the start of construction, provided, however, that if you demonstrate to us that you are working in good faith and earnestly toward this end, we may grant you an extension beyond the applicable timeframe described above. You must provide us with weekly progress reports during construction in a format acceptable to us. We have the right to visit and inspect, the site during the construction phase. Such visits shall be at our expense, except for visits made upon your request, which shall be at your expense. The requirement to complete construction of your BUSINESS includes obtaining all required construction and occupancy licenses and permits, developing the Location (including all outdoor features and landscaping of the Location, if applicable), installing all required fixtures, furnishings, equipment and signs, and doing all other things as may be required pursuant to this Agreement or by practical necessity to have your Location ready to open for business. Your BUSINESS may not be opened for business until we have notified you that your BUSINESS meets our requirements for opening. Notwithstanding anything to the contrary contained in this Article 4.4., you shall not be deemed to be in breach of this Article 4.4. if your failure to start construction, finish construction or open your BUSINESS as above provided results solely from windstorms, rains, floods, hurricanes, earthquakes, typhoons, tornados, mudslides, fires or other natural disasters. Any delay resulting from any of such causes shall extend performance accordingly, in whole or in part, as may be reasonable, except that no such cause, alone or in combination with other causes, shall extend performance more than ninety (90) days without our prior written consent, which consent may be withheld in our reasonable business judgment.

**4.5**     **YOUR OBLIGATIONS.**  You agree, at your own expense, to do the following with respect to developing the BUSINESS at the Location:

(1)       secure all financing required to develop and operate the BUSINESS;

(2)       obtain all permits and licenses required to construct and operate the BUSINESS;

(3)     construct all required improvements to the Location and decorate the BUSINESS in compliance with plans and specifications we have approved, and which comply with all governmental requirements;

(4)     purchase or lease and install all required fixtures, furniture, equipment, furnishings and signs required for the BUSINESS; and

(5)     purchase an initial inventory of authorized and approved products, materials and supplies.

**4.6     FIXTURES, FURNISHINGS, EQUIPMENT AND SIGNS.**  You agree to use in developing and operating the BUSINESS only those fixtures, furnishings, equipment (including cash registers and/or point of sale ("POS") systems, telecopiers and computer hardware and software) and signs that we have approved for **PLANET FITNESS** businesses as meeting our specifications and standards for quality, design, appearance, function and performance. You agree to place or display at the Location (interior and exterior) only such signs, emblems, lettering, logos and display materials that we approve from time to time.  You will pay the then-current price in effect for all such purchases you make from us and/or our Affiliates.  You agree to purchase or lease approved brands, types or models of fixtures, furnishings, equipment and signs only from suppliers we have designated or approved (which may include or be limited to us and/or our Affiliates).  You will pay the then-current price in effect for all such purchases you make from us and/or our Affiliates. You agree, at your own expense, to upgrade all cash registers and/or POS systems, computer hardware and software, as necessary, in order to bring the BUSINESS into compliance with our Methods of Operation. You acknowledge and agree that from time to time, we may modify the list of approved types, brands, models and/or suppliers, and you may not, after receipt of notice of such modification, reorder any type, brand or model, or from any supplier, which is no longer approved.  If you propose to purchase any fixtures, furniture, equipment, signs or supplies of a type, brand or model that is not currently approved, or propose to purchase an approved type, brand, or model of fixtures, furniture, equipment, signs, or supplies from a supplier, that we have not previously approved, you must notify us in advance of any purchase and submit to us such information as we may request.  We may impose reasonable inspection and supervision fees on Approved Suppliers to cover our costs.  You may, at any time, propose to us changes to our specifications to adapt such specifications to the laws, customs, and market characteristics applicable to your Country.  We will use our best efforts to review such proposed changes within sixty (60) days of your submission to us of such information and documentation as we may require.  You shall not change any of our specifications without our prior written consent.  You shall sign and execute any assignments, consents, and documents required or convenient to evidence that we have all right, title, and interest with respect to any change, amendment, or improvement of the System proposed by you. For vendors or equipment, products and services that require our approval, you may propose for our approval local vendors that can meet our required specifications. We will review and consider such vendors based on objective criteria and the best interests of the System as a whole.

**4.7     START-UP INVENTORY, FURNITURE, FIXTURES, SOFTWARE, EQUIPMENT AND SUPPLIES.**  Subsequent to your execution of this Agreement and prior to your commencement of operations hereunder, we will give you lists of the start-up inventory, furniture, fixtures, software, equipment and supplies that we have developed for use in the United States and we require you to obtain prior to commencing operations hereunder.  You will establish independent commercial relationships with our Approved Suppliers for specific items.  You will establish independent commercial relationships with other suppliers for the goods and services for which we only provide specifications. Our list of Approved Suppliers and specifications for goods and services will be set forth in the Operations Manual or in other materials we give you from time to time.

**4.8     PRE-SALE/GRAND OPENING MARKETING.** You agree to conduct pre-sale and grand opening marketing for the BUSINESS.

(1) You agree to collaborate with your area marketing manager on developing a plan for your pre-sale and grand opening marketing, which shall contain your proposed marketing tactical mix, targeting, promotional calendar, and budget (collectively, the "Pre-Sale/Grand Opening Marketing Plan"). You shall submit a draft of the Pre-Sale/Grand Opening Marketing Plan to your area marketing manager for approval no less than thirty (30) days before you commence your Pre-Sale described in Article 4.9. Our approval, which shall be based on whether the Pre-Sale/Grand Opening Marketing Plan complies with brand standards and our Methods of Operations, shall not be unreasonably withheld, conditioned or delayed. We will either approve or disapprove the Pre-Sale/Grand Opening Marketing Plan within fourteen (14) days of you submitting the Pre-Sale/Grand Opening Marketing Plan, and, in the case of our disapproval, we will provide feedback on the plan submitted. You may not commence Pre-Sale until your Pre-Sale/Grand Opening Marketing Plan has been approved. If there is a material delay in the commencement of BUSINESS operations, the Pre-Sale/Grand Opening Marketing Plan must, upon our request, be resubmitted for our re-approval.

(2) The pre-sale/grand opening marketing period begins no less than forty-five (45) days immediately preceding the date that you intend to commence BUSINESS operations, and it may last as long as twelve months (12) months after commencing BUSINESS operations ("Pre-Sale/Grand Opening Marketing Period"). You must spend an amount set by us, which must be no less than the equivalent in local currency of the Country of Twenty Thousand U.S. Dollars ($20,000) per every thirty (30) days and may be up to the equivalent in local currency of the Country of Thirty Thousand U.S. Dollars ($30,000) per every thirty (30) days, until six (6) months after commencing BUSINESS operations, and up to the equivalent in local currency of the Country of Twenty Thousand U.S. Dollars ($20,000) per every thirty (30) days for the remainder of the Pre-Sale/Grand Opening Marketing Period on your pre-sale/grand opening marketing obligations (the "Pre-Sale/Grand Opening Marketing Expense"), provided that you will not be in default of this Agreement if you substantially comply with this Pre-Sale/Grand Opening Marketing Expense requirement and cure any default of this provision within thirty (30) days of our written notice to you. We will determine, after consultation with you, the amount of the Pre-Sale/Grand Opening Marketing Expense and the length and start date of the Pre-Sale/Grand Opening Marketing Period based upon the location of the BUSINESS, demographics and other factors. Such pre-sale/grand opening marketing (i) will utilize only marketing and public relations programs and media and advertising materials we have approved, and (ii) will not include interior or exterior signage, preparing the physical location of the Pre-Sale described in Article 4.9, the start-up inventory, furniture, fixtures, software, equipment and supplies we require you to obtain prior to commencing operation of the BUSINESS. Notwithstanding anything contained in this Agreement to the contrary, upon written request from you, we may, in our sole discretion, reduce the length of the Pre-Sale/Grand Opening Marketing Period and the monetary amount of the Pre-Sale/Grand Opening Marketing Expense actually required to be committed during the Pre-Sale/Grand Opening Marketing Period, based on, among other things, market saturation and the existence of any Cooperative (if one exists in your region).

4.9 **MEMBERSHIP PRE-SALE.** In conjunction with your pre-sale and grand opening marketing described in Article 4.8, you agree to begin selling memberships online and at a physical location, unless we otherwise approve, at least forty-five (45) days immediately preceding the date that you intend to commence BUSINESS operations ("Pre-Sale"). You may not begin Pre-Sale until (1) we have approved your Pre-Sale/Grand Opening Marketing Plan and (2) you have complied with your obligations under this Agreement and under our Methods of Operations that are required to be completed prior to Pre-Sale, including, but not limited to, training requirements and development of the BUSINESS in accordance with our specifications and standards.

**4.10** **BUSINESS COMMENCEMENT.** You agree not to commence operation of the BUSINESS until:

    (1)    we approve the BUSINESS as developed in accordance with our specifications and standards;

    (2)    preopening training has been completed by you, your Responsible Owner, your Approved Operator, and/or your employees to our satisfaction as provided in Article 6.1;

    (3)    you have given us a copy of your lease, sublease or purchase contract for the Location;

    (4)    the Initial Franchise Fee and all other amounts then due to us have been paid;

    (5)    you have conducted Pre-Sale for at least forty-five (45) days, unless we otherwise approve, and have complied in all material respects with your approved Pre-Sale/Grand Opening Marketing Plan;

    (6)    we have been furnished with copies of all insurance policies required by this Agreement, or such other evidence of insurance coverage and payment of premiums as we request or accept; and

    (7)    you have obtained all required permits, licenses and certifications for operating the BUSINESS, and the Location is in compliance with all applicable laws, rules and regulations.

**4.11** **COMMENCEMENT DEADLINE.** You agree to commence BUSINESS operations within three hundred and thirty (330) days after the execution of this Agreement, or, in the case of a ground-up build, four hundred and fifty (450) days after the execution of this Agreement, and, in either case, within five (5) days after we notify you that the conditions set forth in this Article have been satisfied. If you lease, sublease, or purchase the Location and are working in good faith in a commercially reasonable manner toward commencing BUSINESS operations, we may, in our sole discretion, grant you additional time to commence BUSINESS operations.

**4.12** **OPENING ASSISTANCE.** If you (or any of your affiliates) have not previously owned or operated a **PLANET FITNESS** business, we may provide you with such opening operational assistance as we deem appropriate to assist you in starting your operations, including on-site opening assistance for not more than five (5) days, as scheduled by us. We also may offer additional opening assistance for a fee.

**5.** **FEES.**

**5.1** **INITIAL FRANCHISE FEE.** You agree to pay us a nonrecurring and nonrefundable initial franchise fee in the amount of Twenty Thousand U.S. Dollars (US$20,000), that shall be due when you execute the Agreement ("Initial Franchise Fee").

**5.2** **CONTINUING FEES.** You agree to pay us nonrefundable Business Service Fees and Trademark License Fees via EFT.

    (1)    The Business Service Fee will be equal to one and eight hundred eighteen thousandths percent (1.818%) of the Revenue for the BUSINESS.

(2)     The Trademark License Fee will be equal to one and eight hundred eighteen thousandths percent (1.818%) of the Revenue for the BUSINESS.[1]

From the total fees stated in subsections (1 and 2) above, you will deduct and remit to the appropriate tax authorities the tax withholdings, if required pursuant to a tax ruling issued by the Mexican tax authorities or applicable law and provide us with timely corresponding withholding notice.

We refer to the Business Service Fees and Trademark License Fees in this Agreement as the "Continuing Fees."  We will collect the Continuing Fees each Billing Day, pursuant to our Methods of Operation, via the EFT initiated by us or by a third party authorized by us from the EFT Dues Draft, designated bank account identified in Article 5.3 below, or by such other means as we may authorize and approve.  We reserve the right to designate another method of payment or time frame for payment upon written notice to you.

Notwithstanding anything to the contrary, you will remit payment of the Business Service Fee to one of our subsidiaries or affiliates based in the United States of America, which we have the right to designate, provided such subsidiary or affiliate is the same legal entity which will provide the business services related to the Business Service Fee.

5.3     **DESIGNATED BANK ACCOUNT AND AUTHORIZED EFT.** Prior to the opening of the **PLANET FITNESS** BUSINESS, and as a condition thereof, you shall establish a designated bank account ("Designated Bank Account") from which we or our authorized designee shall be authorized to withdraw in any manner which we prescribe, which may include wire transfer, any amounts due to us, our Affiliates or any Preferred Vendor related to the BUSINESS or this Agreement, including, without limitation, Continuing Fees, LAF fees, Ad Fees, training fees, consultation fees, or any other fees or monies payable by you and related to the BUSINESS or this Agreement.  We have the right to review your sales numbers on a daily basis. Each Billing Day, we or our authorized designee shall calculate the Continuing Fees due for the most recent Accounting Period and withdraw such amount, along with any other amounts then due and owing under this Agreement, including, without limitation, LAF fees, Ad Fees, training fees, consultation fees, or any other fees or monies, directly from the EFT Dues Draft or the Designated Bank Account. All costs and expenses of establishing and maintaining such Designated Bank Account, including transaction fees and wire transfer fees, shall be paid by you. You agree to maintain at all times sufficient funds in the Designated Bank Account for such withdrawals.   We reserve the right to designate another method of payment or time frame for payment upon written notice to you.

5.4     **INTEREST ON LATE PAYMENTS.**  All amounts which you owe us and do not pay us when due will bear interest after their due date at the lesser of: (a) the highest contract rate of interest permitted by law; or (b) eighteen (18%) percent per annum. You acknowledge that this Article does not constitute our agreement to accept any payments after they are due or our commitment to extend credit to, or otherwise finance your operation of, the BUSINESS.

5.5     **APPLICATION OF PAYMENTS.**  Notwithstanding any designation you might make, we have the right to apply any of your payments to any of your past due indebtedness to us. You acknowledge and agree that we have the right to set off any amounts you or your owners owe us against any amounts we might owe you or your owners.

5.6     **PREFERRED VENDOR PAYMENTS.**  You acknowledge and agree that in order to insure quality and consistency at all **PLANET FITNESS** businesses, we may require that you obtain

---

[1] This royalty rate will apply to up to the first five PLANET FITNESS businesses (incl. Santa Catarina) with leases signed by December 31, 2019.

goods or services from certain designated suppliers. Pursuant to our Methods of Operation, we may identify certain suppliers that may include or be limited to us, or any affiliate, as a Preferred Vendor. You hereby acknowledge and agree that designated suppliers may periodically share your account information with us, and in the event we receive notice from any Preferred Vendor that you are over sixty (60) days past due on any payment to such Preferred Vendor, and you have not provided any notice to the Preferred Vendor disputing such overdue amount prior to our receipt of notice from the Preferred Vendor concerning any such past due amount, you hereby authorize us to make payment on your behalf of any such overdue amount to the Preferred Vendor.

**5.7**     **TECHNOLOGY FEE.**   You agree to pay us a one-time, non-recurring technology fee (the "Technology Fee") for each customer transaction that we facilitate on your behalf that identifies your Location as the principle location for the customer membership. Such transactions may include online membership applications, membership transfers, membership upgrades, balance payments for declined transactions, and such future technology services that we may provide for your members. The Technology Fee shall be in an amount we shall specify to you under our Methods of Operation up to Five U.S. Dollars (US$5.00), and we may reasonably amend such fee schedules from time to time during the Term of the Agreement, in our business judgment. The Technology Fee shall be payable on each Billing Day in the same manner as the Continuing Fees due hereunder. For the avoidance of doubt, the Technology Fee shall not apply to members' timely payment of monthly and annual membership fees or retail purchases and is not an ongoing monthly fee. The Technology Fee applies to applicable customer transactions we facilitate which may occur from time to time, as more specifically set forth in the Operations Manual.

**5.8**     **INSPECTION AND COMPLIANCE REIMBURSEMENT.**   You agree to reimburse us for our actual costs if, after an inspection of your **PLANET FITNESS** business, we determine (in our business judgment) that additional follow up inspections or assessments are required. Our actual costs may include (but are not necessarily limited to) travel, meal and hourly wage expenses.

**5.9**     **ACQUISITION FEE.**   In the event that you acquire an existing fitness business and convert such business to the **PLANET FITNESS** brand as a BUSINESS hereunder or acquire a membership list of another such business for use in connection with this BUSINESS, you shall be required to pay us the greater of $25,000 and our reasonable out-of-pocket expenses, including external legal and administrative costs we incur in connection with such acquisition (of a fitness business or membership list) or, if part of the acquisition of more than one existing fitness business, $10,000 for each fitness business or membership list being acquired, plus our reasonable out-of-pocket expenses.

**5.10**    **EFT ALTERNATIVE.**   For any payments to us that cannot be made using EFT as described in Articles 5.2 and 5.3 above, and for any other payments required to Franchisor or its affiliates hereunder, such payments must be wire-transferred to a bank account designated by us in writing ("Bank Account"), which, at our election, may be located in the United States. Except as otherwise specified in this Agreement, calculation of amounts payable to Franchisor under this Agreement shall be converted from local currency to United States dollars at the electronic transfer selling rate for United States dollars quoted by Citibank N.A. or by another internationally recognized bank designated by us, which is of equivalent size and reputation, for such local currency on the date payment is made. You will bear the cost of conversion to U.S. dollars and remittance of payments to the Bank Account. You shall, at your own cost, make application for, and obtain, any necessary permissions, approvals, or other authorization needed in order to make timely payment to the Bank Account in accordance with the provisions of this Agreement.

**5.11**    **CURRENCY CONTROL RESTRICTIONS.** In the event that any governmental authority having jurisdiction in the Country imposes restrictions on the transfer of funds or currency to places outside of the Country, we, in our reasonable business judgment, will have the option to require that you deposit all payments required under this Agreement to a Designated Bank Account in the Country, and that payment of such accumulated amounts be made to us, pursuant

to the terms of this Article 5, as soon as possible after any such currency restriction is no longer in effect.

**5.12**  **EFT AUTHORIZATION**. You hereby authorize us to withdraw via EFT or any other manner we prescribe the amounts owed described in Articles 5.2, 5.3, 5.6, 5.7. 5.9, 5.14, 6.6, 9.4, 9.12, 10.1, 10.5, and 15.5(2) hereof from (1) the EFT Dues Draft, as collected and settled by your payment processor or by such other means as we may specify and/or (2) your Designated Bank Account, as described by such identifying information that you provide in response to our request. You shall execute such documents as we require from time to time for such purpose.

**5.13**  **CONSIDERATION FROM VENDORS**.

(1)

    (a)  we and our affiliates may, from time to time, (i) receive commissions or other consideration from certain System suppliers in connection with your purchases of goods, products, services and equipment, and (ii) receive or derive commission, revenue, or other similar payments or consideration, directly or indirectly, in connection with your purchase or use of goods, products, services, and equipment (collectively, "Vendor Revenue"). Notwithstanding the preceding sentence or anything else to the contrary, we hereby agree that we and our affiliates will only derive Vendor Revenue with respect to:

        (i)  the sale and placement of fitness equipment, whether sold or placed by us or by a third party;

        (ii)  goods, products and services sold directly to you by a vendor in which we have a material ownership interest (whether by acquisition, joint venture or otherwise), provided such goods, products and services are sold to you for no greater than fair market value (which shall mean the total landed price, *i.e.*, include shipping costs, customs, taxes, etc.) and the margin on the goods, products, and services sold to you are reasonable, in accordance with industry standards, if any; or

        (iii)  goods, products and services we can require or permit you to purchase in connection with your **PLANET FITNESS** business which are directly revenue-generating to your **PLANET FITNESS** business (*i.e.*, not giveaway goods, products or services for which no incremental revenue may be earned by you) and you are not otherwise required to pay Continuing Fees on the revenue directly generated from such goods, products or services.

    (b)  Notwithstanding this limitation on our ability to earn Vendor Revenue, we reserve the right to earn Vendor Revenue (in addition to the Vendor Revenue earned pursuant to (i), (ii), or (iii) above) on certain goods, products and services we may identify in the future if, and to the extent, one hundred percent (100%) of such Vendor Revenue (excluding Vendor Revenue earned pursuant to (i), (ii), or (iii) above) is contributed directly to the NAF, if established, or else to marketing efforts in the Country ("NAF Contribution"), provided (i) the NAF Contribution is not derived from otherwise available price reductions on such goods, products or services (e.g., vendor offers marketing funds to us but is unable or unwilling to further reduce price), or (ii) we determine, in our commercially reasonably discretion, that the price reductions on such goods, products or services on a per **PLANET FITNESS** Business basis are *de minimis*.

(2)     You agree to purchase goods, products and services for the **PLANET FITNESS** Business in the manner set forth in our Operations Manual, which may include, among other requirements, the obligation to place all such orders (to the extent reasonably practicable) via our Designated Franchise Portal or another system and to specify the **PLANET FITNESS** location for which you are placing an order.

**5.14     PAYMENTS TO AFFILIATES**. We may require you to pay amounts owed to us under this Agreement directly to any of our affiliates that perform our obligations to you on our behalf.

**6.     TRAINING, ASSISTANCE, AND METHODS OF OPERATION.**

**6.1     TRAINING.**  Before the BUSINESS begins operating, we will furnish in the English language initial training on the operation of a **PLANET FITNESS** business to you (or, if you are a corporation or partnership, your Responsible Owner and Approved Operator), and up to two (2) additional Owners or managers you elect to enroll in the training program, that we approve. Initial training consists of a minimum of two (2) working days of training for you (or your Responsible Owner), and your Owners or managers to be furnished at our training location in the United States or at an operating **PLANET FITNESS** business.  You (or your Responsible Owner), and your Owners or managers are required to complete the initial training to our satisfaction. If you are an existing franchisee and you have previously completed our initial training program, you will not be required to attend the initial training program again, however, we may require that certain of your management-level employees and that any new general manager complete the initial training program. You also are required to participate in all other activities required to operate the BUSINESS. Although we will furnish initial training to you (or your Responsible Owner and Approved Operator), and up to two (2) additional Owners or managers at no additional fee or other charge, you will be responsible for all travel and living expenses and compensation which you (or your Responsible Owner and Approved Operator) and your Owners and managers incur in connection with training. If we determine that you (or your Responsible Owner and Approved Operator) are unable to complete initial training to our satisfaction, we have the right to terminate (rescind) this Agreement pursuant to Article 15 hereof.  At our option, we may allow vendors or other designees to provide certain training to you.

**6.2     REFRESHER TRAINING.**  We may require you (or your Responsible Owner and Approved Operator) and/or previously trained and experienced management-level employees to attend periodic refresher training courses in the English language in the United States at such times and locations that we designate, and we may charge reasonable fees for such courses. At our option, we may allow vendors or other designees to provide certain training to you.  We also may require you to pay us fees for training additional employees or your new employees hired after your BUSINESS commences operations.

**6.3     GENERAL GUIDANCE.**  We may advise you from time to time regarding operating issues concerning the BUSINESS disclosed by reports you submit to us or on-site inspections we make from time to time.  Such guidance may be furnished in our Operations Manual, bulletins, newsletters, emails or other written materials and/or during telephone consultations and/or consultations at our office or the BUSINESS.  In addition, we may furnish guidance to you with respect to:

(1)     standards, specifications and operating procedures and methods utilized by the BUSINESS;

(2)     purchasing required fixtures, furnishings, equipment, signs, products, materials and supplies;

(3)     advertising and marketing programs;

(4)      administrative, bookkeeping and accounting procedures; and

(5)      use of authorized and approved computer systems.

6.4      **ON-SITE CONSULTATION AND ADDITIONAL GUIDANCE.**  During the Term of this Agreement, additional guidance may be provided in any of the following ways:

(1)      Internet and telephone consultation during such times as are outlined in the Operations Manual;

(2)      wholesaling services whereby we may ourselves act as an approved or designated source for products, merchandise, accessories, fixtures, furnishings, equipment, signs, etc.;

(3)      manufacturing services whereby we may manufacture, package and ship products, merchandise, accessories, fixtures, furnishings, equipment, signs, etc. to you;

(4)      ongoing marketing programs to fulfill our obligations in Article 10 of this Agreement;

(5)      meetings, seminars or conventions whereby we may get together with you and other **PLANET FITNESS** franchisees for business or social purposes;

(6)      research and development regarding Methods of Operation; and/or

(7)      at your request, we may furnish additional guidance and assistance and, in such a case, may charge the *per diem* fees and charges we establish from time to time. If you request, or if we require, additional or special training, all of the expenses that we incur in connection with such training, including *per diem* charges and travel and living expenses for our personnel, will be your responsibility.

6.5      **OPERATIONS MANUAL.**

(1)      During the Term of this Agreement, we will allow you to use one (1) copy of our Operations Manual, that we have developed for use in the United States consisting of such materials (possibly including, but not limited to, audio tapes, videotapes, magnetic media, computer software and written materials) that we furnish to franchisees from time to time for use in operating a **PLANET FITNESS** business in the United States.  The Operations Manual contains mandatory and suggested specifications, standards, operating procedures and rules that we prescribe from time to time for the operation of a **PLANET FITNESS** business and information relating to your other obligations under this Agreement and related agreements ("Methods of Operation").

(2)      Within ninety (90) days from your receipt of the Operations Manual, or any update thereof, you will prepare a translation of the Operations Manual into the language of the Country, at your expense, and shall promptly submit such translation to us for our written approval.  You shall ensure that the translation work is accurate, compliant with all applicable laws and consistent with the **PLANET FITNESS** System. Any and all translation work will be considered work made for hire and we will be the exclusive owners of all rights, title, and interest, including all copyright and any other intellectual property right, in and to all past, present and future translation work. You may, at any time, propose to us changes in the Operations Manual to adapt the Operations Manual to the laws, customs, and market characteristics of the Country.  We will use our best efforts to review such proposed translation and any proposed adaptations within ninety (90) days of your submission.  We have the right to have a translator review the translation or have you translate such changes and proposed translation and adaptations into the English language. You will not be responsible for any costs or expenses we incur in having our

designated translator review the proposed translation. You may not use the translated Operations Manual or adapted Operations Manual without our prior written approval. You will pay all costs and expenses in translating and adapting the Operations Manual for use in the Country.  We will be the exclusive owner of all rights pertaining to any translation or adaptation of the Operations Manual, and you agree to sign and execute whatever documents may be necessary for said purposes.  All requirements of this Agreement related to the Operations Manual (including without limitation, ownership) shall apply to both the English version of the Operations Manual and any such translated and/or adapted Operations Manual.

(3) You acknowledge and agree to indemnify and hold us harmless against any and all costs, damages and losses as a result of any claim by a third party arising out of use of the translation work in connection with the operation of the Franchised Business. For clarity, you shall not be required to indemnify or hold us harmless from any claims raised by any third party arising out of or related to use of the translated work in connection with the operation of any other **PLANET FITNESS** franchised business.

(4) The Operations Manual may be modified from time to time to reflect changes in the law, marketplace or Methods of Operation.  You agree to keep your copy of the Operations Manual current and in a secure location at the BUSINESS. In the event of a dispute relating to its contents, the master copy of the Operations Manual we maintain at our principal office or on our secure intranet will be controlling.  You may not at any time copy, duplicate, download, record or otherwise reproduce any part of the Operations Manual without our express written permission.

(5) You acknowledge and agree that in the future, the Operations Manual and other System communications may only be available on the Internet, the Designated Franchise Portal, our intranet system or other online or computer data transfer communications.  The Operations Manual (and each translation and component thereof) and Methods of Operations, as amended from time to time, and as translated and adapted by you for use in Mexico, is an integral part of this Agreement and constitutes an industrial secret under Article 82 of the Industrial Property Law of Mexico.  You agree that these requirements are reasonable and necessary to preserve the identity, reputation, value and goodwill of the system.

(6) If any instruction provided in the Operations Manual violates any rule, law, or regulation, you agree to immediately inform us of such rule, law, or regulation. Non-compliance with the Operations Manual pursuant to this Article 6.5(6) and Article 9.7 will not constitute a default under this Agreement.

**6.6** <u>**COMPLIANCE WITH METHODS OF OPERATION.**</u>  You acknowledge and agree that your operation and maintenance of the BUSINESS in accordance with our Methods of Operation is essential to preserve the goodwill of the Marks and all **PLANET FITNESS** businesses. Therefore, at all times during the Term of this Agreement, you agree to operate and maintain the BUSINESS strictly in accordance with our Methods of Operation, as we periodically modify and supplement them during the Term of this Agreement.  Further, if you fail to cure any default under this Agreement that relates (in whole or in part) to the Methods of Operation after receiving written notice of such default and after the expiration of any applicable cure period, then without waiving any of our rights under Article 15 herein, we may, in our business judgment, provide you with written notice that we have temporarily elected not to terminate (rescind) this Agreement and allow you additional time to cure the default(s), provided that you pay to us via EFT, during the additional cure period from the Designated Bank Account, EFT Dues Draft, or otherwise as specified in our written notice, an additional two percent (2%) of the Revenue of the BUSINESS, as provided in Article 15.5 hereof.  Our collection of the two percent (2%) fee and temporary extension of the applicable cure period does not waive our right to require your full compliance with this Agreement.

6.7     **WORKS MADE-FOR-HIRE.**   All ideas, concepts, procedures, techniques or processes concerning the **PLANET FITNESS** BUSINESS, whether or not protectable intellectual property and whether created by or for you or your owners or employees, must be promptly disclosed to us and will be deemed to be our sole and exclusive property, part of the System, and works made-for-hire for us.   To the extent any item does not qualify as a "work made-for-hire" for us, you will assign ownership of that item, and all related rights to that item, to us and must take whatever action (including signing an assignment agreement, consent, or other documents) we request to show our ownership or to help us obtain intellectual property rights in the item.   You hereby waive all moral rights in and to any such items or improvements.

6.8     **GENERAL CONDUCT.**   You will not, and will not allow your employees to, engage in conduct that, in our sole determination, may result in or tends to (a) degrade, offend, shock or insult the community, (b) ridicule public morals or decency, or (c) prejudice us, our affiliates, the Marks or the System generally.   Notwithstanding the foregoing, the above requirement is not intended to prohibit or restrict any activity which prohibition or restriction violates your employees' lawful right to engage in protected concerted activity.

6.9     **DATA SECURITY.**   You shall use your best efforts to protect your customers against a cyber-event including, without limitation, a data breach or other identity theft or theft, misuse, or disposal of personal or healthcare information (collectively, a "Cyber Event"). If a Cyber Event occurs, regardless of whether such event affects only the BUSINESS, we reserve the right to perform and/or control all aspects of the response to such event including, without limitation, the investigation, containment and resolution of the event and all communications with the franchise system, vendors and suppliers, members, law enforcement agencies, regulatory authorities, and the general public. Our control of the response may potentially affect or interrupt operations of the BUSINESS but does not create any additional rights for you, entitle you to damages or relieve you of your indemnification obligations pursuant to Article 18.4. You shall pay us an amount equal to our out of pocket costs and expenses incurred in responding to and remedying any Cyber Event due to any Cyber Event caused by you, your agents or your employees. Notwithstanding our right to perform and/or control all aspects of the response to a Cyber Event, we agree to make commercially reasonable efforts to coordinate such response with you and your insurance carrier(s) and to cooperate with your insurance carrier(s) regarding insurance coverage of such Cyber Event to the extent reasonably practicable under the circumstances. You shall at all times be compliant with (a) the Payment Card Industry Data Security Standards ("PCI DSS"), (b) Ley Federal de Protección de Datos Personales en Posesión de los Particulares, (c) the NACHA ACH Security Framework, (c) Payment Rules (as defined below), (d) regional, national, and local laws and regulations relating to data and personal privacy, data security and security breaches and (e) our security policies and guidelines, all as may be amended from time to time (collectively, "Data Security Safeguards"). We may designate certain third-party consultant(s) to administer our data security program and evaluate your compliance with the aforementioned standards. You are required to meet promptly the reasonable requirements of the designated consultant(s) and maintain those certifications of compliance that we deem appropriate in our reasonable discretion. For purposes of this Agreement: "Payment Rules" means the operating rules and regulations of Payment Processors and any applicable Payment Network, as in effect from time to time; "Payment Processors" means all credit card, debit card and/or ACH processors whose services we may require you to utilize, as well as payment gateway service providers; and "Payment Network" means Visa, MasterCard, and any credit or debit card network issuing credit or debit cards or their duly authorized entities, agents, or affiliates, together with NACHA. You are expected to obtain advice from appropriate legal and security consultants to ensure that you operate your **PLANET FITNESS** business at all times in full compliance with the Data Security Safeguards.

6.10    **TECHNOLOGY.**   In addition to the requirements in Articles 4.6 and 4.7, you agree to purchase or lease, at your expense, such computer hardware, software, POS systems, related accessories, network accessories, peripheral equipment, and services as we may specify for the purpose of, among other functions, recording financial and customer data, communicating with us, and operating your **PLANET FITNESS** business.   You agree, at your expense, to establish the

information technology infrastructure and processes that we require regarding, without limitation, your computers systems, payment systems, customer systems, internal and external networks, mobile devices, and any other network access points.  You agree, at your expense, to purchase such installation and support services as we may reasonably require, to keep all equipment, systems, and devices in good maintenance and repair, and to promptly update or install such additions, changes, modifications, substitutions or replacements as we direct.  You agree that you will comply strictly with our standards and specifications for all equipment and processes associated with your computer systems and technology.  Finally, you acknowledge and agree that changes to technology are dynamic and not predictable within the term of this Agreement.  In order to provide for inevitable but unpredictable changes to technological needs and opportunities, and to protect against new and emerging technological risks, you and we agree that we shall have the right to establish, through our Methods of Operations, reasonable new standards and initiatives for the implementation of technology in the System; and you agree that you shall abide by those reasonable new standards established by us, at your expense.  You further acknowledge and agree that such new standards and initiatives may require an investment in, without limitation, new hardware, software, training, procedures, vendors, and/or services. We agree that the requirements in this Article 6.10 and the standards and specifications referenced hereunder also are applicable to the **PLANET FITNESS** businesses owned by our Affiliates and by us.

7. <u>**MARKS.**</u>

7.1 <u>**OWNERSHIP AND GOODWILL OF MARKS.**</u>  Your right to use the Marks is derived solely from this Agreement and limited to your operation of the BUSINESS pursuant to and in compliance with this Agreement and Methods of Operation, which we prescribe from time to time during the Term. Your unauthorized use of the Marks may be a material breach of this Agreement and an infringement of our rights in and to the Marks. You acknowledge and agree that your usage of the Marks and any goodwill established by such use will be exclusively for our and our Affiliates' benefit and that this Agreement does not confer any goodwill or other interests in the Marks upon you (other than the right to operate the BUSINESS in compliance with this Agreement). All provisions of this Agreement applicable to the Marks apply to any additional proprietary trademarks and service marks and commercial symbols we authorize you to use. You will not represent in any manner that you have any ownership in the Marks or the right to use the Marks except as provided in the Agreement and in the Operations Manual.  You understand and acknowledge that the Trademark Owner has applied in the Country for registration of the Marks listed in Appendix A hereto and has taken and will take all steps reasonably necessary to preserve and protect the ownership of the Marks.  You further acknowledge that, unless otherwise indicated in Appendix A, the Marks listed in Appendix A are not yet registered in the Country and that neither we nor the Trademark Owner shall be liable to you for any failure to obtain such registration. For the avoidance of doubt, you may not authorize any third party to use the Marks in any manner whatsoever without our prior express written approval, except pursuant to and in compliance with this Agreement and Methods of Operation.

7.2 <u>**LIMITATIONS ON YOUR USE OF MARKS.**</u>  You agree to use the Marks as the sole identification of the BUSINESS, except that you agree to identify yourself as the independent owner and operator thereof in the manner we prescribe. You may not use any Marks as part of any corporate or legal business name or as part of an Internet domain name, mobile application or Internet e-mail address or with any prefix, suffix or other modifying words, terms, designs or symbols (other than logos licensed to you hereunder), or in any modified form, nor may you use any Marks in connection with the performance or sale of any unauthorized services or products or in any other manner we have not expressly authorized in writing.  You will not apply, in any country, or cause any third party to apply, or assist, directly or indirectly, any third party to apply, in any country, for registration of any trademark which is the same as, or confusingly similar to, any of the Marks.  No Marks may be used in any advertising concerning the transfer, sale or other disposition of the BUSINESS or an ownership interest in you. You agree to display the Marks in the manner we prescribe at the BUSINESS, on supplies or materials we designate and in connection with forms and advertising and marketing materials. You agree to give such notices of

trademark and service marks registrations; i.e., "®", "™", as we specify and to obtain any fictitious or assumed name registrations required under applicable law.   Immediately upon termination or expiration, without your acquisition of a successor franchise, of this Franchise Agreement, you agree to take such action and sign whatever documents as may be required to cancel (a) all fictitious or assumed names or equivalent registrations relating to your use of any Marks, and (b) the recording of the Summary of Franchise Agreement referred to in Article 7.5 hereof.

7.3     **TRADEMARK ACTIONS AND CLAIMS.**  You agree to notify us immediately of any apparent infringement or challenge to your use of any Marks, or of any claim by any person of any rights in any Marks, and agree not to communicate with any person other than us, our attorneys and your attorneys in connection with any such infringement, challenge or claim. We have the sole right to take such action as we deem appropriate and the right to control exclusively any litigation, any proceeding in any Country trademark office or any other administrative proceeding arising out of any such infringement, challenge or claim or otherwise relating to any Marks. We have the right, but not the obligation, to take action against uses by others that may constitute infringement of the Marks.  You agree to sign any and all instruments and documents, render such assistance and do such acts and things as, in the opinion of our attorneys, may be necessary or advisable to protect and maintain our interests in any litigation, proceeding in any Country trademark office, or other proceeding or otherwise to protect and maintain our interests in the Marks, including, but not limited to, becoming a nominal party to any legal action.

7.4     **DISCONTINUANCE OF USE OF MARKS.**  If it becomes advisable at any time for us and/or you to modify or discontinue the use of any Marks and/or use one or more additional or substitute trademarks or service marks, you agree to comply with our directions within a reasonable time after receiving notice thereof. We will not be obligated to reimburse you for any expenses or loss of revenue attributable to any modified or discontinued Marks or for any expenditures you make to promote a modified or substitute trademark or service mark.

7.5     **SUMMARY OF FRANCHISE AGREEMENT.**   You agree to execute the Summary of Franchise Agreement attached to this Agreement as Appendix H in both Spanish and English concurrently with the signing of this Agreement for the purpose of registering you as an authorized user of the Marks with the Mexican Institute of Industrial Property (Instituto Mexicano de la Propiedad Industrial) ("IMPI") or other successor governmental authority and evidencing compliance with articles 142 and 142-Bis of the Mexican Industrial Property Law.  In the event of any inconsistency, the terms of this Agreement shall control in all respects over the terms of the Summary of Franchise Agreement, which shall be ancillary to this Agreement.  You also agree to cooperate with us to register you as an authorized user of the Marks with IMPI or such other successor governmental authority and to cancel such registration upon demand by us or upon termination or expiration of this Agreement.  You agree to reimburse us for our actual costs and expenses associated with such registration.  You hereby authorize us to take any other action necessary or convenient in connection with the registration and cancellation of the Summary of Franchise Agreement before IMPI, in accordance with Articles 136, 142 and all other applicable provisions of the Mexican Industrial Property Law, Article 10 and other applicable Articles of the Regulations to such law.   You agree to execute an irrevocable special power of attorney substantially in the form attached to the Summary of Franchise Agreement, authorizing us and/or our designees to register the Summary of Franchise Agreement and to cancel said registration with the IMPI upon termination for any reason or expiration of this Agreement or upon demand by us.

7.6     **INDEMNIFICATION OF FRANCHISEE.** We agree to indemnify you against, and to reimburse you for, all damages for which you are held liable in any proceeding arising out of your authorized use of any Mark pursuant to and in compliance with this Agreement and, except as provided herein, for all costs you reasonably incur in defending any such claim brought against you, provided you have timely notified us of such claim and provided further that you and your owners and affiliates are in compliance with this Agreement and all other agreements for the Country entered into with us or any of our Affiliates. We are entitled to prosecute, defend and/or

settle any proceeding arising out of your use of any Mark pursuant to this Agreement and, if we undertake to prosecute, defend and/or settle any such matter, we have no obligation to indemnify or reimburse you for any fees or disbursements of any legal counsel retained by you.

**8.      CONFIDENTIAL INFORMATION.**

**8.1      CONFIDENTIAL INFORMATION.**  We possess (and will continue to develop and acquire), and may disclose to you, certain confidential information, trade secrets, and industrial secrets (the "Confidential Information") relating to the development and operation of **PLANET FITNESS** businesses, which may include (without limitation):

(1)      location selection criteria and plans and specifications for the development of **PLANET FITNESS** businesses;

(2)      methods, formats, specifications, standards, systems, procedures, the Operations Manual, any other proprietary materials, the sales and marketing techniques used, and knowledge of and experience in developing and operating **PLANET FITNESS** businesses;

(3)      sales, marketing and advertising programs and techniques for **PLANET FITNESS** businesses;

(4)      knowledge of specifications and pricing for and suppliers of certain fixtures, furnishings, equipment, products, materials and supplies;

(5)      knowledge of the operating results and financial performance of **PLANET FITNESS** businesses other than the BUSINESS;

(6)      information concerning the specific selection and development of potential future **PLANET FITNESS** business locations by third parties;

(7)      methods of training and management relating to **PLANET FITNESS** businesses;

(8)      computer system and software programs used or useful in **PLANET FITNESS** businesses; and

(9)      any and all other information related to the BUSINESS or **PLANET FITNESS** businesses generally that is labeled proprietary or confidential.  This includes, without limitation, all customer and membership lists and information for the BUSINESS and **PLANET FITNESS** businesses generally.

**8.2      FOR BUSINESS USE ONLY.**  We will disclose our Confidential Information to you solely for your use in the operation of your BUSINESS. The Confidential Information is proprietary and includes our trade secrets and industrial secrets.  During the Term and thereafter: (a) you and your Owners may not use the Confidential Information in any other business or capacity (you and your Owners acknowledge such use is an unfair method of competition); (b) you and your Owners must exert your best efforts to maintain the confidentiality of the Confidential Information; (c) you and your Owners may not make unauthorized copies of any portion of the Confidential Information disclosed in written, electronic or other form; and (d) you and your Owners must implement all reasonable procedures we prescribe from time to time to prevent unauthorized use or disclosure of the Confidential Information, including the use of nondisclosure agreements with your Owners, officers, directors, managers, assistant managers and shift supervisors, and you and your Owners must deliver such agreements to us upon request. At the end of the Term, you and your Owners must deliver to us all Confidential Information in your possession. Your restrictions on disclosure and use of Confidential Information do not apply to information or techniques which are or become generally known in the fitness industry in the Country (other than through your own

disclosure), provided you obtain our prior written consent to such disclosure or use. You acknowledge and agree that you will not acquire any interest in Confidential Information, other than the right to utilize Confidential Information disclosed to you in operating the BUSINESS during the Term of this Agreement, and that that the use or duplication of any Confidential Information in any other business will constitute an unfair method of competition and a violation of this Agreement. You acknowledge you are aware that (i) the Confidential Information may relate to publicly traded securities, and (ii) the restrictions imposed by applicable securities laws restrict trading in securities while in possession of material non-public information and on communication of such information when it is reasonably foreseeable that the recipient is likely to trade such securities, in reliance on such information. You and your Owners agree not to trade, either directly or through other persons or entities, based on Confidential Information in a manner that would violate the securities law of any applicable jurisdiction including, without limitation, the United States securities laws, provided, however, that a breach of this provision shall be subject to the right to cure set forth in Article 15.3.6. You agree that the breach by you of your confidentiality obligations assumed herein shall require you to pay us a conventional penalty of One Thousand U.S. Dollars (US $1,000) for each day that you or any other related party is in violation of this provision, provided that the duration of which the aforementioned penalty is assessed shall be commercially reasonable based on the severity and magnitude of the breach, in addition to such other remedies we may have, including the right to injunctive relief or to terminate (rescind) this Agreement through simple written notice, without responsibility, and without the need to obtain an arbitral or judicial resolution.

8.3     **IDEAS, CONCEPTS, TECHNIQUES OR MATERIALS.** All processes, ideas, concepts, methods, techniques or materials relating to a **PLANET FITNESS** business, whether or not constituting protectable intellectual property, and whether created by or on behalf of you or your Owners in connection with the development or operation of your BUSINESS, will be promptly disclosed to us. If we adopt any of them as part of the System, they will be deemed to be our sole and exclusive property and part of the System and deemed to be works made for hire for us and you hereby waive all moral rights in such processes, ideas, concepts, methods, techniques and materials. You and your Owners agree to sign whatever assignment or other documents we may request from time to time to evidence our ownership or to assist us in securing intellectual property rights in such processes, ideas, concepts, methods, techniques or materials.

## 9.     PLANET FITNESS METHODS OF OPERATION.

9.1     **COMPLIANCE WITH METHODS OF OPERATION.** You acknowledge that each and every aspect of the interior and exterior appearance, layout, decor, services and operation of your BUSINESS is important to protect our reputation and goodwill and to maintain uniform operating standards under the Marks. Any required standards exist to protect our interest in the **PLANET FITNESS** system and the Marks, and are not for the purpose of reserving or establishing any control, or the duty to take control, over those matters that are clearly reserved to you, which include employment matters. You agree to comply with all mandatory specifications, standards and operating procedures, as modified from time to time (whether contained in the Operations Manual or any other communication) relating to the appearance, function, cleanliness or operation of a **PLANET FITNESS** business, including:

(1)     design, layout, decor, appearance and lighting; periodic maintenance, cleaning, pest control and sanitation; periodic remodeling; replacement of obsolete or worn out leasehold improvements, fixtures, furnishings, equipment and signs; periodic painting; and use of interior and exterior signs, emblems, lettering and logos and the illumination thereof;

(2)     types, models and brands of required fixtures, furnishings, equipment, signs, materials and supplies;

(3)     required or authorized products and product categories;

(4)      designated or Approved Suppliers (which may be limited to or include us) of fixtures, furnishings, equipment, signs, products, materials, supplies, and services;

(5)      terms and conditions of the sale and delivery of, and terms and methods of payment for products, materials, supplies and services including direct labor, that you obtain from us, our Affiliates or others;

(6)      sales, marketing, advertising and promotional programs and materials and media used in such programs, including mandatory sales and promotions;

(7)      use and display of the Marks;

(8)      compliance with **PLANET FITNESS** philosophy and mission including, without limitation, compliance with the Judgement Free Zone® philosophy and unlimited free group and other fitness instruction, provided that if such other fitness instruction has a substantial negative impact on the operating results of the BUSINESS we will review and consider (in consultation with the franchise advisory council) discontinuing or making optional such other fitness instruction;

(9)      minimum staffing levels for the BUSINESS and matters relating to managing the BUSINESS; operational training, dress and appearance for both management and hourly employees; and sale procedures and customer service;

(10)     days and hours of operation of the BUSINESS;

(11)     participation in market research and testing and product and service development programs;

(12)     acceptance of credit cards, other payment systems and check verification services;

(13)     bookkeeping, accounting, data processing and record keeping systems and forms; methods, formats, content and frequency of reports to us of sales, revenue, financial performance and condition; and furnishing tax returns and other operating and financial information to us;

(14)     types, amounts, terms and conditions of insurance coverage required to be carried for the BUSINESS and standards for underwriters of policies providing required insurance coverage; our protection and rights under such policies as an additional named insured; required or impermissible insurance contract provisions; assignment of policy rights to us; periodic verification of insurance coverage that must be furnished to us; our right to obtain insurance coverage for the BUSINESS at your expense if you fail to obtain required coverage; our right to defend claims; and similar matters relating to insured and uninsured claims;

(15)     complying with applicable laws; obtaining required licenses and permits; adhering to good business practices; observing high standards of honesty, integrity, fair dealing and ethical business conduct in all dealings with customers, suppliers and us; and notifying us if any action, suit or proceeding is commenced against you or the BUSINESS; and

(16)     regulation of such other aspects of the operation and maintenance of the BUSINESS including, but not limited to, maximum and minimum prices charged for products and services offered through the BUSINESS, that we determine from time to time to be useful to preserve or enhance the efficient operation, image or goodwill of the Marks and **PLANET FITNESS** businesses.

For the avoidance of doubt, mandatory specifications, standards and operating procedures do not include the terms and conditions of employment for your employees. They also do not include personnel policies or procedures, which **PLANET FITNESS** may make available for franchisees' optional use. You alone will determine to what extent, if any, these policies and procedures might apply to your **BUSINESS.**

9.2     **PROVISIONS OF THIS AGREEMENT.**   You agree that the Methods of Operation prescribed from time to time in the Operations Manual, or otherwise communicated to you in writing or other tangible form, shall be binding on you under this Agreement. All references to this Agreement include all Methods of Operation as periodically modified, and as adapted or translated.

9.3     **MODIFICATION OF METHODS OF OPERATION.**   We may periodically modify Methods of Operation, which may accommodate country-specific, regional, or local variations as we determine, and any such modifications may obligate you to invest additional capital in the BUSINESS ("Capital Modifications") and/or incur higher operating costs; provided, however, that such modifications will not alter your fundamental status and rights under this Agreement. We will not obligate you to make any Capital Modifications when such investment cannot, in our reasonable judgment, be amortized during the remaining Term of this Agreement, unless we agree to extend the Term of this Agreement so that such additional investment, in our reasonable judgment, may be amortized, or unless such investment is necessary in order to comply with applicable laws.

9.4     **CONDITION OF YOUR BUSINESS.**   You must maintain your BUSINESS's condition and appearance so that it is attractive, clean and efficiently operated in accordance with the Operations Manual. You agree to maintain your BUSINESS's condition and appearance and to make such modifications and additions to its layout, decor, operations, and general theme as we require from time to time, including replacement of worn-out or obsolete fixtures, equipment, furniture, and signs, repair of the interior and exterior and appurtenant parking areas, and periodic cleaning and redecorating. You may not make any material modification to the BUSINESS premises, including but not limited to, expansions or reductions in size, without our prior, written consent. If at any time the general state of repair, appearance or cleanliness of your BUSINESS, or its fixtures, equipment, furniture, or signs, does not meet our standards, we may notify you and specify the action you must take to correct such deficiency. If, within ten (10) days after receiving such notice, you fail or refuse to initiate and thereafter continue in good faith and with due diligence a *bona fide* program to complete such required maintenance, we have the right (in addition to our rights under Article 13), but not the obligation, to enter the Location and do (or contract a third party to do) such maintenance on your behalf and at your expense. Following completion of such maintenance, we will withdraw from your EFT Dues Draft or your Designated Bank Account an amount equal to the actual cost of the maintenance plus any administrative costs we actually incur.

(1)     We reserve the right to require you to replace and update at your BUSINESS: (a) all cardio equipment not more often than every five (5) years, as we determine, in our reasonable discretion, based on usage and brand standards, and (b) all other exercise equipment not more often than every seven (7) years, as we determine, in our reasonable discretion, based on usage and brand standards, and as further specified in the Operations Manual or otherwise in writing from time to time. You must also periodically upgrade and/or remodel your BUSINESS premises pursuant to our plans and specifications, provided, however, that with the exception of signage, we will not require substantial remodeling more often than every five (5) years. We will advise you at least six (6) months prior to requiring any substantial remodeling or replacement of your exercise or other equipment. If we require you to substantially remodel or substantially replace your exercise or other equipment in the last two (2) years of the Term, and you comply with our requirements, we will not require a substantial remodel of those areas substantially remodeled to our standards and with our approval, or substantial replacement of equipment that has been replaced to our standards and with our approval as a requirement for a successor franchise agreement with you, as described in Article 14.1 hereof. For clarity, replacement or takedown of construction or other items that were in violation of

our specifications and brand standards when installed is not considered a remodel. If you have upgraded your cardio equipment and all other equipment as required during the Term of this Agreement, we agree not to require replacement of equipment or substantial remodeling in the last two (2) years of this Agreement, if you have notified us that you do not intend to acquire a successor franchise. All equipment and signage that is replaced or otherwise taken out of service is subject to our then-current de-branding requirements.

(2)     If your BUSINESS is damaged or destroyed by fire or other casualty, you must initiate within thirty (30) days (and continue until completion) all repairs or reconstruction to restore your BUSINESS to its original condition. If, in our reasonable judgment, the damage or destruction is of such a nature that it is feasible, without incurring substantial additional costs, to repair or reconstruct your BUSINESS in accordance with the then-standard **PLANET FITNESS** layout and decor specifications, we may require you to repair or reconstruct your BUSINESS in accordance with those specifications. You may not make any alterations to your BUSINESS, nor any replacements, relocations or alterations of fixtures, equipment, furniture or signs, without our written approval. We have the right at your expense to rectify any replacements, relocations or alterations not previously approved by us.

9.5     **UNIFORM IMAGE.**  You agree that your BUSINESS will offer for sale such services, products, and merchandise related to the **PLANET FITNESS** concept that we determine from time to time to be appropriate for your BUSINESS. You further agree that your BUSINESS will not, without our written approval, offer any services or products (including promotional items) not then authorized by us. Your BUSINESS may not be used for any purpose other than the operation of a **PLANET FITNESS** business in compliance with this Agreement. You agree that your BUSINESS will offer courteous and efficient service and a pleasant ambiance, consistent with your acknowledgements in Article 1.2. hereof.  You may offer personal training only if permitted by our then-current personal training policies or as we otherwise approve in writing.

9.6     **PURCHASE OF OTHER PRODUCTS.**  You acknowledge and agree that the reputation and goodwill of **PLANET FITNESS** businesses are based on, and can be maintained only by, the sale of distinctive high quality services and ancillary merchandise. Therefore, you agree that your BUSINESS will use and/or offer for sale only such services, merchandise, uniforms, forms, labels and other supplies that conform to our specifications and quality standards and/or are purchased from suppliers approved by us (which may include or be limited to us and/or any of our Affiliates).  You acknowledge that we or our affiliate are and may be the sole supplier for fitness equipment or other products.  We may modify the list of approved brands and/or suppliers from time to time. After notice of such modification, you may not re-order any brand or reorder from any supplier which is no longer approved.  If you propose to use any brand and/or supplier which is not then approved by us, you must first notify us and submit sufficient information, specifications and samples concerning such brand and/or supplier so that we can decide whether such brand complies with our specifications and standards and/or such supplier meets our Approved Supplier criteria.  We have the right to charge reasonable fees to cover our costs. We will notify you of our decision within a reasonable period of time. We may prescribe procedures for the submission of requests for approval and impose obligations on suppliers, which we may require to be incorporated in a written agreement. We may impose limits on the number of suppliers and/or brands for any of the foregoing items including designating us or an affiliate as a sole supplier. You must maintain at all times an inventory of approved merchandise related to the **PLANET FITNESS** concept sufficient in quantity, quality and variety to realize your BUSINESS's full potential. We may conduct market research to determine consumer trends and salability of new services and products. You agree to cooperate by participating in our market research programs; by test marketing new services and merchandise in your BUSINESS and providing us timely reports and other relevant information regarding such market research. You must purchase a reasonable quantity of such test products and make a reasonable effort to sell them.

9.7    **COMPLIANCE WITH LAWS.**  You must maintain in force in your name all required licenses, permits and certificates relating to the operation of your BUSINESS.  You must operate your BUSINESS in full compliance with all applicable Mexican Official Standards (Normas Oficiales Mexicanas – NOMs), including those applicable to safety, hygiene, and health, as well as any other applicable laws, ordinances and regulations.  You must notify us in writing immediately upon the commencement of any legal or administrative action, or the issuance of an order of any court, agency or other governmental instrumentality, which may adversely affect the development, occupancy or operation of your BUSINESS or your financial condition; or the delivery of any notice of violation or alleged violation of any law, ordinance or regulation, including those relating to health or sanitation at your BUSINESS. Within 10 days after the commencement of any action or the delivery of any such notice, you must provide us with a copy of the notice or the papers commencing the action, along with an English translation thereof.  All of your advertising and promotional materials must be completely factual and must conform to the highest standards of ethical advertising. In all dealings with us, as well as your customers, suppliers, lessors and the public, you must adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. You agree to refrain from any business or advertising practice which may be injurious to our business, to the business of other **PLANET FITNESS** businesses or to the goodwill associated with the Marks.

9.8    **PERSONNEL.  PLANET FITNESS** neither dictates nor controls labor or employment matters for franchisees and/or their employees.  **PLANET FITNESS** does not retain any reserved authority to control the terms and conditions of employment for franchisees and/or their employees.  You are responsible for taking such measures as are needed to ensure that your employees understand and acknowledge that they are not employees of **PLANET FITNESS,** including without limitation, requiring your employees to sign a written acknowledgement that you are an independently owned and operated franchisee and their employer in a form we specify in the Operations Manual or otherwise in writing from time to time. You are solely responsible for all employment decisions with respect to your personnel, including hiring, firing, scheduling, compensation, training, supervision and discipline, and regardless whether you receive advice from us on any of these subjects. Should you receive any such advice from us, you alone will determine to what extent, if any, you will implement our suggestions.

9.9    **INSURANCE.**  You must procure and maintain in force from an insurance company with an "A-" or better rating by AM Best and a Financial Rating of "VIII" or better primary insurance coverage as follows: commercial general liability insurance (including coverage for any consolidated claims against us and our Affiliates); Special Form property insurance, including fire and extended coverage, vandalism and malicious mischief insurance for one hundred percent (100%) of the replacement value of your BUSINESS and its contents; and such other insurance policies, such as business interruption insurance, abuse and molestation insurance, tanning insurance, employment practices liability insurance, automobile insurance, unemployment insurance, cyber liability insurance, excess umbrella insurance and workers' compensation insurance (if applicable the Country) as we specify from time to time and as required by law.  For any interruption in the operation of the BUSINESS due to a security breach, whether or not you have sufficient insurance coverage, you shall continue to pay us, during such period of interruption, Continuing Fees based on the average monthly Continuing Fees paid by you during the twelve (12) months immediately preceding the period of interruption.  For any interruption in the operation of the BUSINESS for any other reason, you shall continue to pay us, during such period of interruption, Continuing Fees based on the average monthly Continuing Fees paid by you during the twelve (12) months immediately preceding the period of interruption.  Your insurance must also cover identity theft and theft of personal information, including the costs of notifying members whose information has been compromised. All insurance policies must be issued by carriers approved by us (as set forth in the Operations Manual or otherwise in writing); contain such types and minimum amounts of coverage, exclusions and maximum deductibles as we prescribe in our current Operations Manual or otherwise in writing from time to time; name us and our Affiliates, through a blanket additional insured endorsement, as additional insureds; provide for thirty (30) days prior written notice for any reduction in insurance limits, downgraded insurance paper or, cancellation or expiration of

such policy; and include such other provisions as we may require from time to time.    At our request, you must furnish us with a Certificate of Insurance on an annual basis. We reserve the right to request schedules of insurance and/or insurance policy copies to review for compliance. You will have a reasonable period of time, and in no event less than thirty (30) days, within which to comply with any changes in our insurance coverage requirements.  If you fail or refuse to maintain any required insurance coverage, or to furnish satisfactory evidence thereof, we, at our option and in addition to our other rights and remedies hereunder, may obtain such insurance coverage on your behalf. If we do so, you must fully cooperate with us in our effort to obtain such insurance policies and pay us any costs and premiums we incur.  Your obligation to maintain insurance coverage is not diminished in any manner by reason of any separate insurance we may choose to maintain, nor does it relieve you of your indemnification obligations under this Agreement.

9.10 **QUALITY CONTROL.**  We have the right to establish "quality control" programs, such as a "secret shopper" program, a customer satisfaction measurement program, and/or a "customer intercept" program, to ensure the highest quality of service and products in all **PLANET FITNESS** businesses. You shall participate in any such quality control programs, and bear your pro-rata share, as determined by us, of the costs of any such program.

9.11 **PRICING POLICIES.**  We reserve the right to establish prices at any time for the products and services you sell, both minimum and maximum, subject to applicable law.

9.12 **MEMBER DUES POLICIES.**  Subject to applicable law, you shall require at least ninety percent (90%) of your members to pay their membership dues on a monthly basis by EFT and shall not permit more than ten percent (10%) of your members during any month to be paid-in-full members.  Subject to applicable law, all memberships other than White Card memberships shall be paid on a monthly basis and may never be paid-in-full.  All rates, discounts, and promotions are subject to our prior written approval.

9.13 **RECIPROCAL MEMBERSHIP.**  You must participate fully in any reciprocal access program (currently the Black Card program, as we may modify from time to time) and/or customer loyalty program(s) we may establish (collectively, "Reciprocal Membership"), in accordance with the policies and procedures set forth in the Operations Manual, through communications from us and as modified from time to time.  You agree and acknowledge that for any reciprocal usage by **PLANET FITNESS** members of other franchisees and us or when a person redeems any membership benefits or other customer loyalty program benefits at your BUSINESS, you are not entitled to reimbursement for membership fees or the cost of goods or services provided to the member as a reciprocal access member or under any customer loyalty program.  Currently, reciprocal access members of other **PLANET FITNESS** franchise locations within the Country have access to your location up to ten (10) times per month and your reciprocal access members will each have access to other locations within the Country up to ten (10) times per month. We reserve the right to require you to charge reciprocal access members of other **PLANET FITNESS** franchise locations visiting a club outside of the Country in which said member's home is located a day-fee ("Country Fee") in an amount we deem reasonable in our business judgment. We reserve the right to require you to charge visiting members a day-fee (in addition to any other Country Fee) in an amount we deem reasonable in our business judgment.

9.14 **MEMBER TRANSFER POLICY.**  You agree to comply with the member transfer policy within the Country as we establish from time to time.  You acknowledge and agree that upon a transfer, the member's ongoing monthly dues and annual fees shall be transferred to the new location. If a membership is prepaid and is permitted to transfer pursuant to the member transfer policy, you agree to service the remaining prepaid term.

9.15 **DESIGNATED FRANCHISE PORTAL.**  You agree to actively use and monitor our then current designated franchise portal ("Designated Franchise Portal") in connection with the development and operation of your BUSINESS. You shall be deemed to be "actively using and

monitoring" the Designated Franchise Portal if you, or any of your Owners, Responsible Owners, Approved Operators, and/or managers log in to the Designated Franchise Portal at least once per week.

10.    **MARKETING.**

10.1    **NATIONAL ADVERTISING.**    Recognizing the value of advertising and marketing to the goodwill and public image of **PLANET FITNESS** businesses and the **PLANET FITNESS** brand, we reserve the right to establish and administer a National Advertising Fund in Mexico ("NAF") for the creation and development of marketing, advertising and related programs and materials, including electronic, print and Internet media as well as the planning and purchasing of national and/or regional network advertising to promote and enhance the **PLANET FITNESS** brand in such manner and media as we determine. If we establish a NAF, you agree to contribute to the NAF such percent of the Revenue that we prescribe from time to time (the "Ad Fee"), payable on each Billing Day via EFT in the same manner as the Continuing Fees due hereunder. Until such time that we establish a NAF, you shall independently spend the Ad Fee for the creation and development of marketing, advertising and related programs and materials, as well as the planning and purchasing of national and/or regional network advertising to promote and enhance the **PLANET FITNESS** brand, subject to our prior approval. We reserve the right to change the Ad Fee percentage on thirty (30) days' written notice to you, subject to a cap of nine percent (9%); provided, however, that any increase in the Ad Fee percentage above two percent (2%) shall be accompanied by a corresponding reduction in the required percentage of Local Advertising Fund expenditures required under Article 10.5 hereof. We will direct all programs financed by the NAF and retain the right to determine the creative concepts materials and endorsements used therein and the geographic market and media placement and allocation thereof. You agree that the NAF may be used to pay the costs of preparing and producing video, audio and written advertising materials; website design, development and updating; electronic advertising efforts, including search engine optimization and social media networks and related platforms; administering national, international, regional and multiregional advertising programs; including, without limitation, purchasing direct mail and other media advertising; administrative and other costs associated with all NAF efforts; and employing advertising, promotion and marketing agencies to assist therewith and supporting public relations, market research and other advertising promotion and marketing activities and amounts expended pursuant to Article 10.2. below. The NAF will furnish you with samples of advertising, marketing formats, promotional formats and other materials at no additional cost to you when we deem appropriate. Multiple copies of such materials will be furnished to you at our direct cost of producing them plus any related shipping, handling and storage charges. We will seek the advice of owners of **PLANET FITNESS** businesses by formal or informal means with respect to the creative concepts and media used for programs financed by the NAF.  All marketing or other materials the NAF creates itself or has created for its use shall be owned by the NAF.  The final authority on all programs financed by the NAF will rest with us, and we will have sole decision making authority over all aspects of such programs, including national or regional media, creative, concepts, materials, endorsements, agencies and suppliers.

10.2    **ACCOUNTING**.  The NAF will be accounted for separately from our other funds and will not be used to defray any of our general operating expenses, except for such reasonable salaries, administrative costs, travel expenses and overhead as we may incur in activities related to the administration of the NAF and its programs including, without limitation, conducting market research, preparing advertising promotion and marketing materials, and collecting and accounting for contributions to the NAF. Commissions, rebates or other similar payments from suppliers of marketing or other materials or products may only be received by the NAF in accordance with Article 5.13. The NAF will have the right to negotiate and retain any commissions or marketing payments received from suppliers of any marketing or other materials or products.  We may spend, on behalf of the NAF, in any fiscal year, an amount that is greater or less than the aggregate contribution of all **PLANET FITNESS** businesses to the NAF in that year and the NAF may borrow from us or others to cover deficits or invest any surplus for future use. All interest earned

on monies contributed to the NAF will be used to pay advertising costs before other assets of the NAF are expended. We will prepare an annual statement of monies collected and costs incurred by the NAF within one hundred twenty (120) days following the close of the fiscal year, and furnish the statement for the prior fiscal year to you upon written request. We have the right to cause the NAF to be incorporated or operated through a separate entity at such time as we deem appropriate and such successor entity will have all of the rights and duties specified herein.

10.3   **NO PROPORTIONALITY.**   You acknowledge that the NAF is intended to maximize recognition of the Marks and patronage of **PLANET FITNESS** businesses. Although we will endeavor to utilize the NAF to develop advertising and marketing materials and programs and to place advertising that will benefit all **PLANET FITNESS** businesses in the Country, we undertake no obligation to ensure that expenditures by the NAF in or effecting any geographic area are proportionate or equivalent to the contributions to the NAF by **PLANET FITNESS** businesses operating in that geographic area. Nor are we under any obligation to ensure that any **PLANET FITNESS** business will benefit directly or in proportion to its NAF contributions paid to the NAF from the development of advertising and marketing materials or the placement of advertising. Except as expressly provided in this Article, we assume no direct or indirect liability or obligation to you with respect to collecting amounts due to, or maintaining, directing or administering the NAF. We do not act as trustee or in any other fiduciary capacity with respect to the NAF.

10.4   **DEFERRALS OR REDUCTIONS.**   We reserve the right to defer or reduce contributions of a **PLANET FITNESS** business franchisee and, upon thirty (30) days' prior written notice to you, to reduce or suspend your payment of contributions to the NAF and suspend operations of the NAF for one (1) or more periods of any length and to terminate (and if terminated to reinstate) the NAF. If the NAF is terminated, all unspent monies on the date of termination will be distributed to our franchisees in proportion to their respective contributions to the NAF during the preceding three (3) month period, and amounts required to be paid pursuant to Article 10.1. above shall be added to amounts required to be expended pursuant to Article 10.5. below.

10.5   **LOCAL ADVERTISING.**   In addition to the contributions you pay to the NAF and the Pre-Sale/Grand Opening Marketing Expense, and except as provided by Article 10.1 hereof, you agree to spend each quarter (any consecutive three month period approved by us) the greater of (a) the equivalent in the currency of the Country of Fifteen Thousand U.S. Dollars (US$15,000) or (b) seven percent (7%) of the Revenue for said quarter, for locally advertising and promoting your BUSINESS; provided, however, that except as provided by Article 10.1 hereof, you must spend each month at least the greater of Five Thousand U.S. Dollars (US$5,000) or three percent (3%) of the Revenue each month for locally advertising and promoting your BUSINESS.  These amounts spent on local advertising and promotion will be designated as Local Advertising Funds ("LAF"). In the event you and/or your affiliates own and operate multiple BUSINESSES in the same market area, as defined by us, and the LAF spending for those BUSINESSES are not separated, so long as the BUSINESSES spend an amount that would satisfy the LAF obligations for all of the BUSINESSES in the aggregate, you shall be deemed in compliance with this provision. Notwithstanding the foregoing sentence, we reserve the right to require you to spend the greater of Fifteen Thousand U.S. Dollars (US$15,000) or, except as provided by Article 10.1 hereof, seven percent (7%) of the amount that is the total in that quarter of the Revenue for the BUSINESS during (a) the Pre-Sale/Grand Opening Marketing Period, (b) your BUSINESSES' first year of operation and (c) if, in our reasonable business judgment, hyper-marketing  for the BUSINESS is necessary due to market conditions (for example, competition or a relocation of the BUSINESS). At our request, you shall furnish us with copies of invoices and other documentation evidencing your compliance with this Article 10.5, translated into English.  If, in our business judgment we determine that you are under-performing or not spending the LAF on appropriate media placement, we may collect the LAF from you and administer it on your behalf.  Moreover, if we determine, at some later date, that you have spent an amount less than five percent (5%) of the Revenue during the then most recently completed two (2) calendar quarters for locally advertising and promoting your BUSINESS, we may, after providing you with written notice and a ninety

(90) day opportunity to cure, (1) collect LAF contributions from the EFT Dues Draft directly and administer it on your behalf and (2) withdraw from your EFT Dues Draft or your Designated Bank Account an amount equal to the administrative costs we actually incur, based on a reasonable allocation of personnel salaries, benefits, and overhead for the time spent by our employees to administer the LAF on your behalf.   If you believe that your BUSINESS should not be required to spend the LAF at the levels specified above, you may request approval for an alternative local marketing plan with a lower proposed LAF ("ALMP") by submitting a proposed ALMP and specifying the reasons therefor, for approval by us. We will use our best efforts to respond to such request within sixty (60) days of your request and such decision, in our reasonable business discretion, will be based on such factors as market saturation, competition and participation in an approved Cooperative, among other factors. If such ALMP is approved by us in writing, your compliance with the ALMP shall constitute compliance with this Article 10.5. For the avoidance of doubt, the approval of an ALMP shall not grant you an automatic right to any future ALMP. We or our designee may collect the LAF from you and other franchisees if, in our business judgment, we determine such conduct is appropriate. We reserve the right to use the LAF to hire an advertising agency to develop and administer a local advertising program on your behalf. We reserve the right to change the amount of the LAF you must spend or the method of its expenditure on thirty (30) days' written notice to you, with any increase to the required percentage of LAF spend being subject to a cap of nine percent (9%); provided, however, that any increase in the LAF percentage above seven percent (7%) shall be accompanied by a corresponding reduction in the Ad Fee percentage payable under Article 10.1.  LAF contributions that we collect will be payable each Billing Day for the immediately preceding Accounting Period together with the Continuing Fees due hereunder. Said funds may be electronically drafted from the Designated Bank Account or EFT Dues Draft. The LAF monies will be used to pay for the cost of implementing local marketing plans developed by you and approved by us or, if we collect LAF contributions from you, to pay the cost of any advertising agency we engage to assist you with local advertising efforts, or to reimburse you (up to an amount not to exceed the LAF contributions so collected) for the costs incurred by you in implementing local marketing plans developed by you and approved by us.  For these purposes, advertising expenditures include: (a) amounts contributed to advertising cooperatives; and (b) amounts spent by you for advertising media, such as television, radio, Internet, newspaper, billboards, posters, direct mail, collateral and promotional items, advertising on public vehicles (transit and aerial) and, if not provided by us, cost of producing approved materials necessary to participate in these media. At least two percent (2%) of your total monthly LAF advertising expenditures must be allocated directly to so-called "always on" and/or indirect marketing, as we further specify in our Operations Manual or otherwise in writing from time to time. Advertising expenditures do not include amounts spent for items which we, in our reasonable judgment, deem inappropriate for meeting the minimum advertising requirement, including permanent on-premises signs, promotional club expenses for items to be distributed onsite (such as T-shirts, pens, stickers, pizza, bagels, and member identification, but excluding other mandatory giveaway items), lighting, personnel salaries or administrative costs, transportation vehicles (even though such vehicles may display the Marks), Yellow Pages advertising, discounts, free offers and employee incentive programs. We reserve the right to modify the list of such advertising expenditures in the Operations Manual from time to time.  You must submit to us for our prior approval, a marketing plan and samples of all advertising and promotional materials not prepared or previously approved by us and which vary from our standard advertising and promotional materials. You may not use any advertising or promotional materials or programs that we have not approved. Unless we agree otherwise in writing, you must work with an advertising agency that is an Approved Supplier to administer your LAF spending.

10.6     **ADVERTISING COOPERATIVES.**  We have the right to establish, reconfigure, or approve local and/or regional advertising cooperatives for **PLANET FITNESS** businesses in your local or regional areas, covering such geographical areas as we may designate from time to time. You must participate in any such cooperative and its programs and abide by its by-laws. If your BUSINESS is within the territory of an existing Cooperative as of the Business Commencement Date, you agree to immediately become a member of the Cooperative. If a Cooperative applicable to your

BUSINESS is established during the Term of this Agreement, you agree to become a member no later than thirty (30) days after the date approved by us for the Cooperative to commence operation. The following provisions shall apply to each Cooperative:

(1)     Each Cooperative shall utilize a voting system approved by us.

(2)     Each Cooperative shall be organized and governed in a form and manner, and shall commence continuous operations on a date, approved in advance by us in writing. No changes in the by-laws or other governing documents of a Cooperative shall be made without our prior written consent.

(3)     Each Cooperative shall be organized for the exclusive purpose of administering advertising programs and developing, subject to our approval, promotional materials for use by the members in the Cooperative on a continuous, year-round basis.

(4)     No advertising or promotional plans or materials may be used by a Cooperative or furnished to its members without prior approval by us pursuant to Article 10.6(6) below.

(5)     You and each other member of the Cooperative shall contribute to the Cooperative, using a collection structure selected and established by us, the amount determined in accordance with the Cooperative's by-laws. Any **PLANET FITNESS** businesses owned by us or any of our Affiliates located in such designated local or regional area(s) will contribute to the Cooperative on the same basis. Contributions to such local and/or regional advertising cooperatives are credited towards the advertising expenditures required by Article 10.5; however, if we provide you and your Cooperative ninety (90) days' notice of a special promotion, including any regional promotions, you must participate in such promotion and pay to us any special promotion advertising fees assessed in connection therewith, beginning on the effective date of such notice and continuing until such special promotion is concluded. Any such special promotion advertising fees shall be in addition to, and not credited towards, the other advertising expenditures and commitments required of you by this Article 10.

(6)     All advertising and promotion by you and the Cooperatives shall be in such media and of such type and format as we may approve, shall be conducted in a dignified manner, and shall conform to such standards and requirements as we may specify. You or the Cooperative shall submit written samples of all proposed advertising and promotional plans and materials to us for our approval (except with respect to prices to be charged) at least thirty (30) days before their intended use, unless such plans and materials were prepared by us or have been approved by us to be used in your marketing area (as defined by us) within the previous twelve (12) months. Proposed advertising plans or materials shall be deemed to have been approved if they have not been disapproved by us within fifteen (15) business days after their receipt by us.

(7)     At our request, you shall furnish us with copies of such information and documentation evidencing your Cooperative contributions as we may require in order to evidence your compliance with this Article 10.6.

10.7   **SPECIAL MARKETING PROGRAMS.**   In addition to the Pre-Sale/Grand Opening Marketing Expense, you must participate in and contribute funds to special marketing programs and campaigns that we develop and administer from time to time; provided that in no event will your required contribution to the special marketing program equal more than the then-current collective required monthly NAF and LAF payments. If we require you to pay the special marketing program fee, we will reduce your NAF payment by a corresponding amount for the corresponding month. If the required special marketing program fee is greater than your NAF payment, then the excess shall reduce your LAF payment by a corresponding amount for the corresponding month.

**10.8**   **PARTICIPATION IN INTERNET WEB SITES OR OTHER ON-LINE COMMUNICATIONS.**  You must have internet access and an e-mail address.  You will use an e-mail address to send and receive e-mail and attachments on the Internet.  You may be required to invest in and implement new technology initiatives at your own expense, which may include, but will not be limited to, the Black Card program, acceptance of credit and debit cards, monitors, music, Internet TV broadcast, software management applications, surveillance system, e-learning, and software applications designed to better manage business functions and control costs.  We may designate the supplier you use for any goods and services associated with these initiatives. Further, you must, at your expense, participate in designated **PLANET FITNESS** web sites on the Internet or other on-line communications, including without limitation any intranet system we may develop in the future and third-party websites that we designate, unless we provide otherwise. You may not separately register any domain name or develop or operate any web sites or mobile applications containing any of the Marks or that will be used in connection with the BUSINESS without our written approval.  We determine the content and use of the web sites and have the sole right to establish the rules under which franchisees may or must participate in the web sites or separately use the internet or other on-line communications.  We retain all rights relating to the **PLANET FITNESS** web sites and may alter or terminate the web sites.  Your general conduct on the web sites or other authorized on-line communications, and specifically your use of the Marks or any advertising on the web sites or other authorized on-line communications (including the domain name and any other Marks we may develop as a result of participation in the web sites or other on-line communications), is subject to the provisions of this Agreement and the related standards and restrictions we specify from time to time in the Methods of Operation.  Without our consent, you may not use, reference or otherwise promote the Marks or System in connection with any current or future form of social media networks or platforms, including, without limitation, Facebook, Instagram, Twitter, LinkedIn, and so on, except in accordance with the related standards and restrictions we specify from time to time in the Methods of Operation. For any of your social media accounts (whether authorized or not) that utilize or promote the Marks or System, you shall, upon our request, either remove all references to the Marks and/or System or provide us with access to such social media accounts.

You shall not use or download any software on your computer unless it has been authorized by us in writing.  In the event that you use or download any unauthorized software, you shall be liable for all damages and problems caused by the unauthorized software in addition to the other remedies provided under this Agreement.  You acknowledge that certain information obtained through your participation in the **PLANET FITNESS** web sites may be considered Confidential Information, including access codes and identification codes.  Your right to participate in the **PLANET FITNESS** web sites or any intranet system we may develop or otherwise use the Marks or System on the internet or other on-line communicators terminates when this Agreement expires, without your acquisition of a successor franchise, or terminates.

**10.9**   **TRUTHFUL ADVERTISING, MARKETING AND PROMOTION.**   You agree that any advertising, promotion and marketing you conduct will be completely clear and factual and not misleading and conform to the highest standards of ethical marketing and the promotion policies which we prescribe from time to time. Samples of all advertising, promotional and marketing materials which we have not prepared or previously approved must be submitted to us for approval before you use them. If you do not receive written disapproval within fifteen (15) days after our receipt of such materials, we will be deemed to have given the required approval provided that such materials are otherwise in compliance with our Methods of Operation and this Agreement. You may not use any advertising or promotional materials that we have disapproved. We own the copyrights to anything so submitted, whether approved by us or not.

**10.10**   **OUR RESERVATION OF RIGHTS REGARDING MARKETING EXPENDITURES AND DISTRIBUTION.**  Notwithstanding anything to the contrary in Articles 10.1 and 10.5 above, we reserve the right, upon 30 days' written notice to you:

(1)     to require you to contribute a greater or lesser amount to the NAF and to expend a greater or lesser amount for the LAF than required in Articles 10.1 and 10.5, respectively, up to a total of nine percent (9%) of Revenue.

**10.11   NATIONAL OFFERS AND CAMPAIGNS.** Subject to applicable law, you must participate in all required national promotional offers we designate from time to time. You may be required to participate in a promotional offer that requires your donation to a charity, provided that 1) any **PLANET FITNESS** businesses owned by our Affiliates or by us in the Country also participate in such offer and 2) your required donations are limited to member enrollment (or then-equivalent) fees, or a portion thereof. During national promotional offers or national campaigns with paid search support, you may not purchase competing search terms.

**11.      RECORDS, REPORTS AND FINANCIAL STATEMENTS.**

**11.1     RECORDS.** You agree to establish and maintain at your own expense a bookkeeping, accounting and record keeping system conforming to the requirements and formats we prescribe from time to time. You agree to prepare and to maintain for three (3) years complete and accurate books, records (including invoices and records relating to your advertising expenditures) and accounts (using our then-current standard chart of accounts) for your BUSINESS, copies of all tax records related to your BUSINESS. All such books and records shall be kept at your principal address indicated on the first page of this Agreement, unless we otherwise approve. You must record all sales on the POS systems we designate. We may require you to use proprietary software and any other computer systems which we may prescribe from time to time and you agree to execute such agreements as we may require in connection therewith. You must provide such assistance as may be required to connect your computer system and technology with our network. We have the right, without prior notice to you, to retrieve such data and information from your computer system as we deem necessary or desirable, including the right to obtain such information from vendors, and you agree to fully cooperate with such efforts.

**11.2     PERIODIC REPORTS.** You must, upon receipt of written notice from us, furnish us:

(1)     within thirty (30) days after the end of each fiscal quarter, a quarterly balance sheet, income statement and statement of cash flow of your BUSINESS for such quarter, prepared in accordance with generally accepted accounting standards in the Country, reflecting any adjustments and accruals;

(2)     within ninety (90) days after the end of each fiscal year, a year-end balance sheet, income statement and statement of cash flow of your BUSINESS for such year, prepared in accordance with generally accepted accounting standards in the Country, reflecting all year-end adjustments and accruals; and

(3)     within thirty (30) days of our request, such other information as we may require from time to time, including sales data and labor cost reports and sales and income tax statements.  All such reports shall be provided in English and use our then-current standard chart of accounts.

**11.3     VERIFICATION.** You agree to verify and sign each report and financial statement in the manner we prescribe. We reserve the right to require that your annual financial statements be audited, at your expense, by an independent accountant approved by us, in accordance with generally accepted accounting standards in the Country. We reserve the right to publish or disclose information that we obtain under this Article in any data compilations, collections or aggregations that we deem appropriate so long as we do not disclose information relating to performance of your individual BUSINESS, unless such disclosure is required by law or order of a court. Moreover, we reserve the right, as often as we deem appropriate, including on a daily basis, to access the computer systems that you are required to maintain in connection with the operation of the BUSINESS and to retrieve all information relating to the BUSINESS's operations.

**11.4** **OWNERSHIP OF DATA.** All data pertaining to your BUSINESS, and all data you create or collect in connection with the System, or in connection with your operation of the BUSINESS (including, without limitation, data pertaining to or otherwise concerning your members) or otherwise provided by you (including, without limitation, data collected by, uploaded to, or downloaded from your computer or POS systems) ("Business Data") is and will be owned exclusively by us, and we will have the right to use such data in any manner that we deem appropriate without compensation to you. We hereby license use of such Business Data back to you for the Term of this Agreement, at no additional cost, solely for your use in connection with the BUSINESS, and subject to any limitations that we may impose in writing from time to time. You agree to make all such data accessible to us upon our request.  Notwithstanding the foregoing, you may, after the Term of this Agreement, keep and retain any and all Business Data and records related to the same to the extent required for tax, accounting, and legal purposes. We may, at our option, provide you with financial and other information derived from the System, including information contained in or resulting from information, data, materials, statements and reports related, directly or indirectly, to the BUSINESS.  You agree that you shall use any data or other information described in this Article 11.4 only in the manner that we direct, and subject to any and all restrictions or limitations that we may impose in writing from time to time.

**12.** **INSPECTIONS AND AUDITS.**

**12.1** **OUR RIGHT TO INSPECT THE BUSINESS.**  To determine whether you and the BUSINESS are complying with this Agreement and Methods of Operation, we and our designated agents have the right at any time during your operating hours, and without prior notice to you, to:

(1) inspect the BUSINESS;

(2) observe, photograph and videotape the operations of the BUSINESS for such consecutive or intermittent periods as we deem necessary;

(3) remove samples of any products, materials or supplies for testing and analysis;

(4) interview personnel and customers of the BUSINESS;

(5) inspect and copy any books, records (whether electronic or hard copy) and documents relating to your operation of the BUSINESS, including member and membership information; and

(6) retrieve such data and information from your computer system or computer systems which are licensed by you, such as the dues processing platform or accounting platform, including obtaining such information from third parties or vendors.

**12.2** **COOPERATION.**  You agree to cooperate with us fully in connection with any such inspections, observations, photographing, videotaping, product removal and interviews. You agree to present to your customers such evaluation forms that we periodically prescribe and to participate and/or request your customers to participate in any surveys performed by us or on our behalf.

**12.3** **OUR RIGHT TO AUDIT.**  We have the right at any time during your operating hours, and without prior notice to you, to inspect and audit, or cause to be inspected and audited, your (if you are a corporation or partnership) and the BUSINESS' business, bookkeeping and accounting records, sales and income tax records and returns and other records. You agree to cooperate fully with our representatives and independent accountants we hire to conduct any such inspection or audit. In the event such inspection or audit is made necessary by your failure to furnish reports, supporting records or other information as herein required, or to furnish such items on a timely basis, you agree to reimburse us for the reasonable cost of such inspection or audit, including, without limitation, the charges of attorneys and independent accountants and the travel expenses,

room and board and compensation of our employees. In the event an inspection or audit reveals that any payments have been understated in any report to us, then you shall immediately pay to us the amount understated upon demand, in addition to interest from the date such amount was due until paid, at the highest contract rate of interest permitted by law. If an inspection or audit discloses an understatement in any report of two (2%) percent or more, you shall, in addition to repayment of monies owed with interest, reimburse us for any and all costs and expenses connected with the inspection or audit, including, without limitation, the charges of attorneys and independent accountants and the travel expenses, room and board and compensation of our employees. The foregoing remedies are in addition to our other remedies and rights under this Agreement and applicable law.

12.4 **PRIVACY LAWS.** You agree to:  (1) abide by all applicable laws pertaining to the privacy of consumer, employee, and transactional information, including, without limitation, the Federal Law for Personal Data Collection Possessed By Private Persons  (and including, if applicable, laws implementing European Commission Directive 95/46/EC) (collectively, "the Privacy Laws"); (2) comply with privacy and data protection requirements set forth in the Methods of Operation; (3) notify us immediately in the event you discover any potential issues regarding your or our non-compliance under such Privacy Laws; (4) refrain from any action or inaction that may cause us or any of our Affiliates to violate any Privacy Laws; and (5) do and execute, or arrange to be done and executed, each act, document and thing necessary or desirable to keep us and our Affiliates in compliance with any Privacy Laws. You shall not publish, disseminate, implement, revise, or rescind a data privacy policy without our prior consent. , except as follows:  If there is a conflict between our standards and policies pertaining to Privacy Laws and actual applicable law, you shall:  (a) comply with the requirements of applicable law; (b) immediately give us written notice of said conflict; and (c) promptly and fully cooperate with our and our counsel in determining the most effective way, if any, to meet our standards and policies pertaining to Privacy Laws within the bounds of applicable law.  You acknowledge and agree that you are fully responsible for ensuring compliance with all laws in the Country, and you agree to indemnify us as set forth in Article 18.4 for any and all violations.

13. **TRANSFER.**

13.1 **BY US.** We have the right to sell or assign, in whole or in part, our interests in this Agreement, and any such sale or assignment will inure to the benefit of any assignee or other legal successor to our interests herein including, without limitation, master franchisee(s) in the Country we designate.

13.2 **BY YOU.** You understand and acknowledge that the rights and duties created by this Agreement are personal to you (or, if you are a corporation, partnership, or other entity, to your Owners) and that we have granted the Franchise to you in reliance upon our perceptions of your (or your Owners') individual or collective character, skill, aptitude, attitude, business ability, acumen and financial capacity. Accordingly, neither this Agreement (or any interest therein) nor any ownership or other interest in you or the BUSINESS, including any arrangement whereby you sell or pledge accounts receivable, EFT, or any other assets of the BUSINESS, may be transferred without our prior written approval. Any Transfer without such approval constitutes a breach of this Agreement and is void and of no effect. A Transfer of ownership, possession or control of the BUSINESS may be made only in conjunction with a Transfer of this Agreement.

13.3 **CONDITIONS FOR APPROVAL OF TRANSFER.** We will not unreasonably withhold our consent to a proposed Transfer. All of the conditions set forth below must be met prior to or concurrently with the effective date of the proposed Transfer; your failure to meet any such condition is a reasonable basis for withholding our consent to the Transfer

(1) *Compliance.* You are in compliance with this Agreement; you and your affiliates have paid all amounts owed to us and our affiliates related to this Agreement or any other agreement entered into between you or your affiliates and us or our affiliates.

(2) *Transferee.* The proposed transferee and its direct and indirect owners must be individuals of good moral character and otherwise meet our then applicable and reasonable standards for **PLANET FITNESS** franchisees in the Country. You have disclosed to us all ownership information, including, but not limited to any trust which will become an Owner pursuant to the transfer, any such trust instrument has been reviewed by us and our external legal counsel at your expense, and the material terms of such trust have been approved by us, with such approval not being unreasonably withheld, conditioned, or delayed.

(3) *Transfer Terms.* We approve of the material terms of such transfer as not materially and adversely impacting the transferee's operation of the BUSINESS.

(4) *Agreements.* You (and your transferring Owners) have executed (a) a general release, in form satisfactory to us, of any and all claims against us and our shareholders, officers, directors, employees and agents and (b) a written affirmation confirming that (i) you and/or any transferring Owner(s) remain bound by the restrictions contained in Articles 16.5, 16.6, 16.7 and 18.4 hereof as if this Agreement had terminated and (ii) the provisions of Article 19.13 and 19.14 survive the partial or full Transfer of an Owner's interest in you (although such provisions will continue to apply regardless of whether you and/or any transferring Owner(s) actually execute such written reaffirmation). Except as otherwise provided in Article 13.3(6)(c), this Agreement has been amended to reflect the post-transfer ownership and your new Owners have signed Appendix C hereof.

(5) *Costs.* You have reimbursed us for any reasonable external (i.e., not in-house) legal and administrative costs we incurred in connection with the transfer.

(6) *Third-party Transfers.* If the proposed Transfer is a Third-Party Transfer, the following additional conditions must be met prior to or concurrently with the effective date of the proposed Transfer:

(a) *Transferee.* We have approved the proposed transferee, based on our reasonable assessment of the proposed transferee and its direct and indirect owners, and the capabilities and characteristics of any existing or acquired business and management team and, if applicable, remaining Owners. In connection with our assessment, we may consider the proposed transferee's moral character, aptitude, attitude, experience, references, acumen and financial capacity to operate the BUSINESS in the Country, and whether the proposed transferee, together with any existing or acquired management or infrastructure and/or remaining Owners, has (a) substantial existing or previous operations and commercial relationships in the Country, (b) directly or indirectly operated a material number of units of a multi-national or United States brand, (c) adequate operational capacity and infrastructure to operate a sophisticated multi-unit franchise in the Country and, if applicable, in multiple countries, (d) demonstrated, to our satisfaction, that its management team has an adequate understanding of our industry and our brand, (e) a history and reputation consistent with our anti-corruption requirements, and (f) no other investments that compete with or, in our judgment, are incompatible with, our brand. Neither the transferee, nor any of its Owners (with the exception of Silent Investors) may be a Publicly-Held Entity, or an affiliate of a Publicly-Held Entity, as that term is defined in Article 1.4 hereof.

(b) *Training.* The transferee (or its Responsible Owner) and its managers, shift supervisors and personnel must have completed our initial training program or must be currently certified by us to operate and/or manage a **PLANET FITNESS** business to our satisfaction prior to closing.

(c) *Agreements.* If the Transfer is a Transfer of a non-controlling interest in you (which is not one of a series of proposed Transfers which, in the aggregate, would constitute or result in the transfer of a controlling interest in you), the transferee has agreed to be bound by all of the terms and conditions of this Agreement for the remainder of the Term. Otherwise, the transferee, at our option, must execute our then-current standard form of franchise agreement for the Country and any ancillary agreements which we are then customarily offering for new franchises in the Country (which may provide for different advertising contributions and expenditures, and other rights and obligations than those provided for in this Agreement). The Continuing Fees in such new franchise agreement will be equal to Continuing Fees set forth in this Agreement and the terms related to Vendor Revenue shall be at least as favorable to the transferee as set forth in this Agreement. The term of such new franchise agreement shall be equal to the remaining Term of this Agreement, provided, however, that if the remaining Term of this Agreement would be, as of the date of the proposed Transfer, three (3) years or less, then the new franchise agreement shall be for a term equal to the remaining Term of this Agreement plus ten (10) additional years, with the Continuing Fees applicable to the final ten (10) years of such new franchise agreement equal to our then-current Continuing Fees in the Country as of the date of Transfer (which may be higher than the Continuing Fees set forth in this Agreement).

(d) *Transfer Fees.* You have paid us (i) a transfer fee equal to Ten Thousand U.S. Dollars (US$10,000) in connection with the Transfer, unless the proposed Transfer is a transfer of a five percent (5%) or less ownership interest in you (and is not one of a series of Transfers which, in the aggregate with other Transfers to the same or an affiliated transferee, would constitute or result in the transfer of greater than a five percent (5%) interest in you) or we, in our sole discretion, determine that such transfer is de minimis such that a lesser or no transfer fee may apply.

(e) *Right to Operate.* You have provided us with proof of transferee's right to operate a **PLANET FITNESS** business at the Location, whether by an assignment of lease, new lease, acquisition or otherwise, and we approve of the material terms of such assignment or acquisition, with such approval not being unreasonably withheld, conditioned, or delayed.

(f) *Capital Structure.* If you or your Owners finance any part of the sale price of the transferred interest, you and/or your Owners have agreed that all of the transferee's obligations pursuant to any promissory notes, agreements or security interests that you or your Owners have reserved in the BUSINESS are subordinate to the transferee's obligation to pay Royalties, NAF contributions and other amounts due to us and otherwise to comply with this Agreement.

For purposes of this Article 13.3, we will make the determination as to what constitutes (a) a change in control, which may include, without limitation, any change in control of any entity owning a legal or beneficial interest in you or an effective change in control due to the acquisition by any party of any rights or obligations or voting rights in any agreements related to such transfer, as we shall reasonably determine and (b) a controlling interest. The conditions set forth in Article 13.3 are intended to be representative and not exhaustive.

**13.4    TRANSFER TO A WHOLLY OWNED CORPORATION.**  Notwithstanding Article 13.3., if you are in full compliance with this Agreement, you may Transfer this Agreement to a corporation, business trust, limited liability company or similar entity,   which conducts no business other than the BUSINESS and, if applicable, other **PLANET FITNESS** businesses, in which you maintain management control and of which you own and control one hundred percent

(100%) of the equity and voting power of all issued and outstanding capital stock, and further provided that all assets of the BUSINESS are owned, and the entire business of the BUSINESS is conducted, by a single corporation. Transfers of shares in such corporation will be subject to the provisions of Article 13.3. Notwithstanding anything to the contrary herein, you agree to remain personally liable under this Agreement as if the Transfer to such corporation had not occurred.

13.5     **TRANSFER UPON YOUR DEATH OR DISABILITY.**   Upon your death or permanent disability or, if you are a corporation or partnership, the death or permanent disability of the Owner of a controlling interest in you, your or such Owner's executor, administrator, conservator, guardian or other personal representative must Transfer your interest in this Agreement or such Owner's interest in you to a third party. Such disposition of this Agreement or the interest in you (including, without limitation, Transfer by bequest or inheritance) must be completed within a reasonable time, not to exceed six (6) months from the date of death (or if later, such date that such Transfer may be legally completed) or permanent disability, and will be subject to all of the terms and conditions applicable to Transfers contained in this Article. A failure to Transfer your interest in this Agreement or the ownership interest in you within this period of time constitutes a breach of this Agreement. For purposes hereof, the term "permanent disability" means a mental or physical disability, impairment or condition that is reasonably expected to prevent or actually does prevent you or an Owner of a controlling interest in you from managing and operating the BUSINESS for a period of three (3) months from the onset of such disability, impairment or condition.

13.6     **OPERATION UPON YOUR DEATH OR DISABILITY.**   If, upon your death or permanent disability or the death or permanent disability of the Owner of a controlling interest in you, the BUSINESS is not being managed by a Responsible Owner or Approved Operator, your or such Owner's executor, administrator, conservator, guardian or other personal representative must within a reasonable time, not to exceed fifteen (15) days from the date of death or permanent disability, appoint an Approved Operator to operate the BUSINESS. Such manager will be required to successfully complete training at your expense within sixty (60) days of being appointed to operate the BUSINESS. Pending the appointment of an Approved Operator as provided above or if, in our judgment, the BUSINESS is not being managed properly any time after your death or permanent disability or after the death or permanent disability of the Owner of a controlling interest in you, we have the right, but not the obligation, to appoint a manager for the BUSINESS. All funds from the operation of the BUSINESS during the management by our appointed manager will be kept in a separate account, and all expenses of the BUSINESS, including compensation, other costs and travel and living expenses of our manager, will be charged to this account. We also have the right to charge a reasonable management fee (in addition to the Continuing Fees and NAF contributions payable under this Agreement) during the period that our appointed manager manages the BUSINESS. Operation of the BUSINESS during any such period will be on your behalf, provided that we only have a duty to utilize reasonable efforts in doing so and will not be liable to you or your Owners for any debts, losses or obligations incurred by the BUSINESS or to any of your creditors for any products, materials, supplies or services the BUSINESS purchases during any period it is managed by our appointed manager.

13.7     **BONA FIDE OFFERS.**   If you (or any of your Owners) at any time determine to sell, assign or Transfer for consideration an interest in this Agreement and the BUSINESS or an ownership interest in you, you (or such Owner) agree to obtain a *bona fide*, executed written offer and a complete franchise application from a fully disclosed offeror including lists of the owners of record and beneficially of any corporate or limited liability company offeror and all general and limited partners of any partnership and immediately submit to us a true and complete copy of such offer, which includes details of the payment terms of the proposed sale. To be a valid, *bona fide* offer, the proposed purchase price must be denominated in a dollar amount. The offer must apply only to an interest in you or in this Agreement and the BUSINESS and may not include an offer to purchase any of your (or your Owners') other property or rights. However, if the offeror proposes to buy any other property or rights from you (or your Owners) under a separate, contemporaneous offer, such separate, contemporaneous offer must be disclosed to us, and the price and terms of

purchase offered to you (or your Owners) for the interest in you or in this Agreement and the BUSINESS must reflect the *bona fide* price offered therefor and not reflect any value for any other property or rights. Any Transfer in violation of our right of first refusal is null and void.

13.8 **OUR RIGHT OF FIRST REFUSAL.**  For any proposed Transfer which would constitute a transfer of this Agreement to a third party, would constitute a Transfer to a third party of a controlling interest in you (or a series of proposed Transfers which in the aggregate would constitute the Transfer to a third party of a controlling interest in you), or would constitute a Transfer of substantially all the assets of the BUSINESS under Article 13.3.2 to a third party, we have the right, exercisable by written notice delivered to you or your selling Owners within thirty (30) days from the date of the delivery to us of both an exact copy of such *bona fide* offer and all other information we request, to purchase such interest for the price and on the terms and conditions contained in such *bona fide* offer, provided that:

(1)     we may substitute cash for any form of payment proposed in such offer;

(2)     our credit will be deemed equal to the credit of any proposed purchaser;

(3)     we will have not less than sixty (60) days after giving notice of our election to purchase to prepare for closing; and

(4)     we are entitled to receive, and you and your Owners agree to make, all customary representations and warranties given by the seller of the assets of a business or the capital stock of an incorporated business, as applicable, including, without limitation, representations and warranties as to:

(a)     ownership and condition of and title to stock or other forms of ownership interest and/or assets;

(b)     liens and encumbrances relating to the stock or other ownership interest and/or assets; and

(c)     validity of contracts and the liabilities, contingent or otherwise, of the corporation whose stock is being purchased.

(5)     If the proposed Transfer is part of a contemporaneous transfer involving additional **PLANET FITNESS** businesses or one or more area development agreements (collectively, the "Transfer Group"), then we will refrain from exercising our right of first refusal to purchase less than the entire Transfer Group.

13.9 **NON-EXERCISE.**  If we do not exercise our right of first refusal, you or your Owners may complete the sale to such purchaser pursuant to and on the exact terms of such *bona fide* offer, subject to our approval of the Transfer as provided in Articles 13.2, 13.3 and 13.4. If the sale to such purchaser is not completed within one hundred twenty (120) days after delivery of such *bona fide* offer to us, or if there is a material change in the terms of the sale (which you agree promptly to communicate to us), the sale will be treated as a new sale subject to our right of first refusal as provided in Article 13.8.

## 14.     EXPIRATION OF THIS AGREEMENT.

14.1 **ACQUISITION OF A SUCCESSOR FRANCHISE.**  Subject to the conditions set forth in this Article 14.1, on expiration of the Term of this Agreement, you will have the right to acquire a successor franchise for a term of ten (10) years, so long as:

(1)     you  provide us notice (which must be in a format reasonably acceptable to us, which would include email to our General Counsel) of your desire to acquire a successor franchise not less than six (6) months nor more than twelve (12) months prior to the expiration of this Agreement. We will give you notice ("Our Notice"), not later than sixty (60) days after receipt of your notice, of our decision, pursuant to Article 14;

(2)     you remodel and/or expand the BUSINESS as we may reasonably require, including, adding or replacing improvements, installing new equipment and renovating signs, furnishings, fixtures, and décor, and otherwise modify the BUSINESS as we require to bring it into compliance with specifications and standards then applicable for **PLANET FITNESS** businesses; provided, however, if you have completed a substantial remodel or substantial replacement of equipment in the final two (2) years of the Term as described in Article 9.4 you will not be required to substantially remodel the areas substantially remodeled in the final two (2) years of the Term and you will not be required to replace equipment that was replaced in the final two (2) years of the Term as a condition to acquire a successor franchise;

(3)     you are not in default of any provision of this Agreement or any other agreement between you and us or our affiliates and you must have substantially complied with all the terms and conditions of this Agreement during its term(s) (including timely payment of all monies owed) provided that we previously communicated to you any defaults hereunder;

(4)     you establish to our satisfaction that you can maintain possession of the BUSINESS for the length of the successor term, or if you are unable to establish that you can maintain possession of the Location,  you secure substitute premises we approve, develop such premises in compliance with specifications and standards then applicable for **PLANET FITNESS**  businesses, and continue to operate the BUSINESS at the Location until operations are transferred to the substitute premises; provided, however, that we reserve the right to require that you relocate the premises of the BUSINESS, if, in our reasonable discretion, we determine the BUSINESS should be relocated based on our current brand standards, and so long as we provide you with written notice of this determination at least (a) eighteen (18) months prior to requiring you to relocate and (b) twelve (12) months prior to the end of the Term of this Agreement;

(5)     you and your Owners and affiliates, as applicable, must execute, as it relates to the BUSINESS at the Location, our then-current standard form of successor franchise agreement and any ancillary agreements for the Country which we are then customarily offering for successor franchises, which shall supersede this Agreement in all respects, and the terms of which may differ materially from the terms of this Agreement, including a higher rate for the Continuing Fees, different calculation for the Continuing Fees, additional continuing fees, different LAF advertising expenditure requirements and NAF advertising contribution, except that you will not be required to pay an initial franchise fee and such successor franchise agreement shall provide you with the right to acquire a successor franchise for an additional, successor term of ten (10) years;   (For the avoidance of doubt, this Agreement does not guarantee you any rights to acquire a successor franchise beyond such additional, successor term.);

(6)     you and your Owners execute and deliver a mutual general release, in the form we prescribe from time to time, of any and all claims arising out of or related to the **PLANET FITNESS** business at the Location that we may have against each other, and our respective parents, affiliates and subsidiaries, and their respective officers, directors, shareholders and employees in both their corporate and individual capacities, including, without limitation, claims under other agreements between you and us which relate to the **PLANET FITNESS** business at the Location;

(7)      you comply with our then-current qualification and training requirements;

(8)      you pay us a successor franchise fee in an amount equal to our initial franchise fee we are then currently customarily charging for new franchises, which shall be no higher than our then-current initial franchise fee in the United States; and

(9)      you are current with respect to your obligations to us, our affiliates, our Preferred Vendors and your lessor, unless you are, in good faith, contesting such obligations.

## 15.   **TERMINATION OF AGREEMENT.**

**15.1    BY YOU.** If:

(1) you and your Owners are in compliance with this Agreement and we materially fail to comply with this Agreement and do not correct such failure within sixty (60) days after written notice of such material failure is delivered to us, you may terminate this Agreement effective thirty (30) days after delivery to us of written notice of termination, or

(2) you and your Owners are in compliance with this Agreement, the BUSINESS has been open and operating for three (3) years or more, the EFT Dues Draft of the BUSINESS has remained in the lowest five percent (5%) of similarly-sized **PLANET FITNESS** businesses (as we determine in our reasonable business judgment) for twelve (12) consecutive months immediately preceding the date of such termination, and you can demonstrate to our reasonable satisfaction that the BUSINESS is not profitable, you will have a right to terminate this Agreement on ninety (90) days written notice to us.

You agree to comply with all your post-termination obligations described in Article 16 hereof.

Your termination of this Agreement for any other reason or without such notice will be deemed null and void.

**15.2    IMMEDIATE TERMINATION.**   You are in material breach of this Agreement, and this Agreement will automatically terminate (be rescinded) without notice, without us incurring any liability therefor, and without the need for us to obtain an arbital or judicial resolution, if you:

(1)      become insolvent by reason of your inability to pay your debts as they mature, or a procedure under Mexico's Insolvency Law (Ley de Concursos Mercantiles) is initiated by or against you and/or any of your principal owners;

(2)      are adjudicated bankrupt or insolvent;

(3)      file a bankruptcy, reorganization or similar proceeding under applicable bankruptcy laws or have such a proceeding filed against you which is not discharged within thirty (30) days;

(4)      have a receiver or other custodian, permanent or temporary, is appointed for your business, assets or property;

(5)      request the appointment of a receiver or make a general assignment for the benefit of creditors;

(6)      have bank accounts, property or accounts receivable which are attached;

(7)      have an execution levied against your business or property;

(8)     have suit filed to foreclose any lien or mortgage against any of your assets and such suit is not dismissed within thirty (30) days; or

(9)     voluntarily dissolve or liquidate or have a petition filed for corporate or partnership dissolution and such petition is not dismissed within thirty (30) days.

**15.3    TERMINATION UPON NOTICE.**  In addition to our right to terminate (rescind) pursuant to other provisions of this Agreement and under applicable law, we have the right to terminate (rescind) this Agreement, effective upon delivery of simple notice of termination to you, without responsibility, and without the need to obtain arbitral or judicial resolution, if you:

(1)     fail to open your BUSINESS and start business, in the time period required under this Agreement, and such failure remains uncured thirty (30) days following your receipt of written notice from us;

(2)     abandon or fail to actively operate your BUSINESS for three (3) consecutive days, except where such failure to actively operate results solely from causes beyond your reasonable control, provided, however, that we shall not have the right to terminate this Agreement if your failure to actively operate the BUSINESS for three (3) consecutive days is due to your completion of a remodel or refurbishment of the BUSINESS that we have approved;

(3)     surrender or transfer control of the operation of your BUSINESS without our prior written consent;

(4)     make or have made any material misrepresentation or omission in connection with your purchase of the Franchise, including any such misrepresentation or omission in the appendices hereto;

(5)     suffer cancellation or termination of the lease or sublease for your BUSINESS;

(6)     are convicted of, or plead no contest to, a serious offense or other crime or offense that we reasonably believe may adversely affect the System or the goodwill associated with the Marks (each a "Material Offense"). Notwithstanding the foregoing, if any of your Owners is convicted of a felony or Material Offense, we will not have the right to terminate this Agreement if such Owner relinquishes or otherwise disposes of such Owner's interest in the franchisee entity (pursuant to Article 13 of this Agreement) within thirty (30) days following the conviction or plea;

(7)     make or attempt to make an unauthorized Transfer of this Agreement or of an ownership interest in you or the BUSINESS;

(8)     make any unauthorized use or disclosure of any Confidential Information, including any industrial secrets or trade secrets, or use, duplicate or disclose any portion of the Operations Manual in violation of this Agreement;

(9)     fail or refuse to comply with any mandatory specification, standard, or operating procedure prescribed by us relating to the cleanliness or sanitation of your BUSINESS or violate any health, safety or sanitation law, ordinance or regulation, that we reasonably believe may pose harm to the public or to your or our reputation, and do not correct such failure, refusal or violation within forty-eight (48) hours after written notice thereof is delivered to you;

(10)    fail to establish, maintain and/or have sufficient funds available in the Designated Bank Account as required by Article 5.3. of this Agreement or fail to make payment of any

amounts due us or any of our Affiliates, and do not correct such failure within ten (10) business days after written notice of such failure is delivered to you;

(11)     fail to make a timely payment of any amount related to the BUSINESS due to a lender, supplier or other commercial party unaffiliated with us (other than payments which are subject to bona fide dispute), the cure period, if any, for making such payment has expired, and you do not correct such failure within thirty (30) days after we deliver to you notice of such failure to comply;

(12)

(a)     commit a default at another **PLANET FITNESS** BUSINESS under any other Franchise Agreement in the Country, between you (or any of your Owners or affiliates) and us or our affiliates which default is comparable to defaults under Articles 15.3.3; 15.3.4, 15.3.7, or Appendix E (Para. 7) of this Agreement, if such default is deemed, in our reasonable judgment, to affect the brand as a whole (not simply any one **PLANET FITNESS** BUSINESS), and such default was carried out willfully or negligently; or

(b)     you or any of your affiliates fail to comply with any three (3) other Franchise Agreements in the Country between you (or any of your Owners or affiliates) and us or our affiliates such that we have terminated three (3) or more such agreements, on the basis of such noncompliance;

(13)     receive three (3) or more notices of default from us on separate occasions within any period of twelve (12) consecutive months including, without limitation, default notices for failure to submit when due reports or other data, information or supporting records or to pay when due Royalties, NAF contributions or other payments due us, any of our Affiliates or any unaffiliated suppliers or otherwise fail to comply with this Agreement, whether or not such failures are corrected after notice is delivered to you;

(14)     fail to pay when due any applicable federal, state, or municipal income, goods and services, service, sales, value-added, employment related taxes or other taxes due on the operations of the BUSINESS, unless you are, in good faith, legally contesting your liability for such taxes;

(15)     fail to request approval of an Approved Operator and/or Responsible Owner within fifteen (15) days after your death or permanent disability or the death or permanent disability of the Owner of a controlling interest in you or such Approved Operator and/or Responsible Owner fails to complete our training within sixty (60) days after such request;

(16)     fail to lease, sublease or purchase the Location in accordance within the timeframe set forth in Article 4.2, and do not cure such failure within thirty (30) days following your receipt of written notice of such default;

(17)     violate Article 6.8 herein and do not cure within seven (7) days;

(18)     fail to comply with the requirements for the condition of your BUSINESS under Article 9.4 hereof and do not cure such failure within thirty (30) days following your receipt of written notice of such default;

(19)     made any material misrepresentation to us that was false, or there was any material omission in information you provided to us, as an inducement to our entering into this Agreement;

(20)     fail to meet any construction deadline set forth in Article 4 hereof and do not cure such failure within forty-five (45) days following your receipt of written notice of such default;

(21)     fail to provide us with weekly progress reports during construction as set forth in Article 4.4 hereof and do not cure such failure within ten (10) days following your receipt of written notice of such default;

(22)     fail to provide us, if, and to the extent, requested pursuant to Article 10.5, with copies of invoices and other documentation relating to Article 10.5 LAF spending requirements, and do not cure such failure within thirty (30) days following your receipt of written notice of such default;

(23)     fail to spend the monthly or quarterly amounts required by Article 10.5, and do not cure such failure within the next thirty (30) or ninety (90) days, as applicable, following your receipt of any written notice of such default from us;

(24)     fail to comply with any other provision of this Agreement and do not correct such failure to our reasonable satisfaction within thirty (30) days after notice of such failure to comply is delivered to you; or

(25)     If any of your Owners commits a default (each a "Defaulting Owner") or multiple defaults under an agreement between the Defaulting Owner and us or our affiliate(s), and the Defaulting Owner fails to cure such default before the expiration of all applicable notice and cure periods, sufficient to trigger the application of this Article 15.3.25, and we would otherwise have the right to terminate this Agreement, we will not terminate this Agreement if the Defaulting Owner relinquishes or otherwise disposes of the Defaulting Owner's interest in the franchisee entity (pursuant to Article 13 of this Agreement) within thirty (30) days following the date you receive written notice from us informing you of the Defaulting Owner's uncured breach. Notwithstanding the foregoing, failure to comply with the Development Schedule under an ADA with us shall not be the basis for termination under this Article 15.3.25.

We have no obligation whatsoever to refund any portion of the franchise fee upon any termination of this Agreement.

**15.4    OUR RIGHT TO OPERATE THE BUSINESS.**  If we issue you a notice of default and you fail to cure such default within any applicable time period, we have the right, without the obligation, and without waiving our right to terminate (rescind) this Agreement, including, without limitation, our right to terminate (rescind) this Agreement through simple written notice, without responsibility, and without the need to obtain arbitral or judicial resolution, as a result of such failure, to assume the operation of the BUSINESS for such length of time as we determine in our business judgment.  You authorize us, or our designee to operate the BUSINESS for so long as we deem necessary and practical, and without waiver of any other rights or remedies we may have under this Agreement.  All monies from the operation of the BUSINESS during such period of operation by us shall be accounted for separately and the expenses of the business, including travel, food, lodging, and salaries of our representatives who operate the BUSINESS, shall be charged to such account.  You shall indemnify us and our representatives from any and all claims arising from the acts and omissions of us and our representatives pursuant to this Article 15.4.

**15.5    ALTERNATIVES TO TERMINATION.**  In addition to our rights under Article 15.4, if we issue you a notice of default and you fail to cure such default within any applicable time period, we have the right in our business judgment, without the obligation, and without waiving our right to terminate this Agreement as a result of such failure, to temporarily or permanently limit, curtail,

or remove certain services or benefits provided or required to be provided to you hereunder, including, but not limited to:

(1)     restricting your or any of your staff's attendance at any training, meetings, workshops, or conventions;

(2)     requiring you to pay to us, via EFT, up to an additional two percent (2%) of Revenue for the Business each Billing Day;

(3)     replacing the Continuing Fees in Article 5.2 of this Agreement with the Continuing Fees offered in our then current franchise agreement;

(4)     refusing to sell or furnish to you any advertising or promotional materials;

(5)     refusing to provide you with ongoing advice about the operation of the BUSINESS;

(6)     refusing any of your requests to approve a new supplier or the use of any advertising or promotional materials; and

(7)     refusing to permit you (or any of your Owners) to enter into a new franchise agreement for a **PLANET FITNESS** business at any other location.

Such alternatives to termination as described in this Article 15.5 shall only apply until such time as you have cured the applicable default.  You shall hold us harmless with respect to any action we take pursuant to this Article 15.5; and you agree that we shall not be liable for any loss, expense, or damage you incur because of any action we take pursuant to this Article 15.5.  Nothing in this Article 15.5 constitutes a waiver of any of our rights or remedies under this Agreement or any other agreement between us and you, including the right to terminate (rescind) this Agreement, including, without limitation, our right to terminate (rescind) this Agreement through simple written notice, without responsibility, and without the need to obtain arbitral or judicial resolution. You agree that our exercise of our rights pursuant to this Article 15.5 shall not be deemed a constructive termination of this Agreement or of any other agreement between us and you, and shall not be deemed a breach of any provision of this Agreement.  We may, in our business judgment, reinstate any services or benefits removed, curtailed, or limited pursuant to this Article 15.5, and you agree to accept immediately any such reinstatement of services or benefits so removed, curtailed, or limited.  If we limit any services or benefits under this Article 15.5, you shall continue to pay timely all fees and payments required under this Agreement and any other agreement between us and you, including any fees associated with services or benefits limited by us.  You shall have no right to a refund of any fees paid in advance for such services or benefits.

**16.     OUR AND YOUR RIGHTS AND OBLIGATIONS UPON TERMINATION OR EXPIRATION OF THIS AGREEMENT.**

On expiration, without your acquisition of a successor franchise, or termination of this Agreement for any reason whatsoever, you agree to comply with all of the obligations described in this Article 16.

**16.1     PAYMENT OF AMOUNTS OWED TO US.**  You agree to pay us within fifteen (15) days after the effective date of termination, for any reason, or expiration, without your acquisition of a successor franchise, of this Agreement, or on such later date that the amounts due to us are determined, such Royalties, NAF contributions, amounts owed for purchases from us, interest due on any of the foregoing and all other amounts owed to us which are then unpaid.

**16.2     MARKS.**  Upon the termination, for any reason, or expiration, without your acquisition of a successor franchise, of this Agreement:

(1)     you may not directly or indirectly, at any time or in any manner (except with respect to other **PLANET FITNESS** businesses you own and operate), identify yourself or any business as a current or former **PLANET FITNESS** business, or as one of our licensees or franchisees, use any Marks, any colorable imitation thereof or other indicia of a **PLANET FITNESS** business in any manner or for any purpose or utilize for any purpose any trade name, trademark or service mark or other commercial symbol that indicates or suggests a connection or association with us;

(2)     you agree to take such action and sign whatever documents as may be required to cancel (a) all fictitious or assumed names or equivalent registrations relating to your use of any Marks, and (b) the recording of the Summary of Franchise Agreement referred to in Article 7.6 hereof;

(3)     if we do not exercise our option to purchase the BUSINESS pursuant to Article 16.14, you agree to deliver to us within thirty (30) days after the Notification Date the Operations Manual, all signs, sign-faces, sign-cabinets, marketing materials, forms, packaging and other materials containing any Marks or otherwise identifying or relating to a **PLANET FITNESS** business and allow us, without liability to you or third parties, to remove all such items from the BUSINESS;

(4)     if we do not exercise our option to purchase the BUSINESS pursuant to Article 16.14, you agree that, after the Notification Date, you will promptly and at your own expense make such alterations as we may specify to distinguish the BUSINESS clearly from its former appearance and from other **PLANET FITNESS** businesses so as to prevent confusion therewith by the public;

(5)     if we do not exercise our option to purchase the BUSINESS pursuant to Article 16.14, you agree that, after the Notification Date, you will promptly notify the telephone company and all telephone directory publishers of the termination, rescission, or expiration of your right to use any telephone, telecopy or other numbers and any regular, classified or other telephone directory listings associated with any Marks, authorize the transfer of such numbers and directory listings to us or at our direction and/or instruct the telephone company to forward all calls made to your telephone numbers to numbers we specify;

(6)     you hereby irrevocably assign to us or our designee the telephone number or numbers and listings issued to you with respect to the BUSINESS ("Telephone Numbers"). This assignment is for collateral purposes only and we have no liability or obligation of any kind whatsoever arising from this assignment, unless we desire to take possession and control over the Telephone Numbers.  Upon the termination, for any reason, or expiration, without your acquisition of a successor franchise, of this Agreement, and without any further notice to you, we hereby are authorized and empowered to notify the telephone company, as well as any other company that publishes telephone directories ("Telephone Companies"), to transfer the Telephone Numbers to us or such other person or entity as we designate. You hereby grant to us an irrevocable power of attorney and appoint us as your attorney-in-fact to take any necessary actions to assign the Telephone Numbers, including but not limited to, executing any forms that the Telephone Companies may require to effectuate the assignment. This assignment is also for the benefit of the Telephone Companies, and the Telephone Companies may accept this assignment and our instructions as conclusive evidence of our rights in the Telephone Numbers and our authority to direct the amendment, termination or transfer of the Telephone Numbers, as if they had originally been issued to us. In addition, you agree to hold the Telephone Companies harmless from any and all claims against them arising out of any actions or instructions by us or our designee in compliance with this Agreement regarding the Telephone Numbers; and

(7)     you agree to furnish us, within thirty (30) days after the Notification Date, with evidence satisfactory to us of your compliance with the foregoing obligations.

16.3    **COMMUNICATION TO MEMBERS.** In connection with the termination of this Agreement or the expiration of this Agreement without your acquisition of a successor franchise, we may contact your members directly to notify them of the closing and/or de-branding of the BUSINESS and inform them of nearby **PLANET FITNESS** fitness clubs that they may join. We may make such communication (a) in the case of termination by you or expiration without acquisition of a successor franchise, on or after five (5) business days prior to the date this Agreement would terminate or expire, or such longer period of time in advance of termination or expiration as applicable law may require you to notify members of the closing and/or de-branding of the BUSINESS or (b) in the case of termination by us, once the cure period for your default has expired (we may, for example, delay the effective date of termination for several days after your cure period expires to make such communication). Notwithstanding any notices we may send to your members, you are solely responsible for compliance with any applicable laws related to notifying members in connection with the closing and/or de-branding of the BUSINESS.

16.4    **DE-BRANDING.** You agree that, upon termination, for any reason, or expiration, without your acquisition of a successor franchise, of this Agreement or of your rights to conduct the BUSINESS at the Location, you will immediately comply with our then-current de-branding checklist, which shall require you to, among other things:

(1)     remove and destroy all interior and exterior signage, point of sale materials, business forms, and stationery received from us;

(2)     delete from all computer hard drives, all materials, information, communications, manuals, and marketing and promotion materials received from us;

(3)     remove all decals containing the **PLANET FITNESS** name, slogans, purple/yellow color scheme, or Marks;

(4)     repaint or remove all purple and yellow colors from all equipment, walls, doors, floors, and other surfaces;

(5)     remove any coverings containing the **PLANET FITNESS** name, slogans, purple/yellow color scheme, or Marks from all exercise or other equipment;

(6)     immediately cease selling memberships;

(7)     promptly instruct all third-party internet sites and telephone directories to remove all listings identifying the location as a **PLANET FITNESS**;

(8)     post signage approved by us and notify all existing members in a communication approved by us describing the members' rights and options;

(9)     return all uniforms, sales materials, operations manuals, and other items that contain any Confidential Information;

(10)    cancel all fictitious or assumed names or equivalent registrations relating to your use of any of the Marks;

(11)    change your corporate or legal business name, if necessary, so that it does not contain any of the Marks;

(12)    return to us all signs, sign-faces, sign-cabinets, marketing materials, forms, packaging, and other materials that contain any of the Marks;

(13)    remove all total body enhancement booths; and

(14)    remove and cease selling any other items and materials that we determine, in our reasonable judgment, are similar to those used under or in connection with the **PLANET FITNESS** Methods of Operation, and similarly, immediately cease using any other **PLANET FITNESS** procedures, systems, and any other information that we designate as proprietary and confidential.

**16.5**    <u>**CONFIDENTIAL INFORMATION; DOMAIN NAMES**</u>.  You agree that, upon termination of this Agreement (including the full or partial transfer of rights by Franchisee or any Owner), for any reason, or expiration, without your acquisition of a successor franchise, of this Agreement, unless you own a franchise for another **PLANET FITNESS** business, you will immediately and forever cease to use any of our Confidential Information in any business or otherwise and return to us all copies of the Operations Manual, including any adaptation or translations thereof, and any other confidential materials including, without limitation, computer software and any mechanisms (electronic key) used to access the software, that we have allowed you to use. You shall assign to us ownership of any domain names you have used in connection with the BUSINESS, even if such domain names were registered in violation hereof, and do hereby appoint us as your attorney in fact to execute any documents on your behalf required for such assignment.

**16.6**    <u>**IN-TERM COVENANT NOT TO COMPETE.**</u>  You specifically acknowledge that, pursuant to this Agreement, you will receive valuable, specialized training, Confidential Information (as defined in Article 8.1 hereof), and other proprietary and specialized information and knowledge that provide a valuable, competitive advantage in operating a men's, women's, children's, or co-ed fitness, exercise, athletic or wellness facility of any kind. You further acknowledge that we would be unable to protect the Confidential Information against unauthorized use or disclosure or to encourage the free exchange of ideas and information among our franchisees if you were permitted to hold interests in or perform services for a Competitive Business, and we have granted you the rights hereunder in consideration of, and in reliance upon, your agreement to deal exclusively with us. You therefore covenant that during the Term of this Agreement (except as otherwise approved in writing by us), you, your Owners, and you and their Immediate Families shall not, either directly, indirectly or through, on behalf of, or in conjunction with any person or legal entity:

(1)    Divert or attempt to divert any present or prospective business or customer of any **PLANET FITNESS** business to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System; or

(2)    Own, maintain, operate, engage in, be employed by, act as a consultant for, perform services for, provide assistance to, or have any interest in (as owner or otherwise) any Competitive Business.

**16.7**    <u>**POST-TERM COVENANT NOT TO COMPETE**</u>.  You covenant that, except as otherwise approved in writing by us, you and your Owners shall not, for a continuous, uninterrupted period of two (2) years commencing upon the date of (a) a transfer permitted under Article 13 of this Agreement, (b) expiration, without your acquisition of a successor franchise, of this Agreement, (c) termination or non-renewal of this Agreement (regardless of the cause for termination or non-renewal), or (d) a final order of a duly authorized arbitrator, panel of arbitrators, or a court of competent jurisdiction (after all appeals have been taken) with respect to any of the foregoing or with respect to enforcement of this Article 16.7, either directly or indirectly, for yourself or your Immediate Family, or through, on behalf of, or in conjunction with any person or legal entity, own, maintain, operate, engage in, be employed by, act as a consultant for, perform services for,

provide assistance to, or have any interest in (as owner or otherwise) any Competitive Business that is, or is intended to be, located (a) at the Location, (b) within twenty-five (25) kilometers of the Location, or (c) twenty-five (25) kilometers of any **PLANET FITNESS** business in operation or under construction as of the date that you are required to comply with this Article 16.7.  You agree and acknowledge that the two (2) year period of this restriction shall be tolled during any time period in which you are in violation of this restriction.

16.8     <u>**OWNER AND OPERATOR COVENANTS**</u>. If you are a business corporation, partnership, limited liability company or other legal entity, Your Responsible Owner, Approved Operator and each person that has any direct or indirect legal or beneficial ownership interest in you is bound by the restrictions in Articles 16.6 and 16.7, and must sign Appendix C to this Agreement (Personal Covenants Regarding Confidentiality and Non-Competition) to acknowledge such restrictions unless such person (excluding your Responsible Owner and Approved Operator) is designated a Silent Investor in Appendix F. If the franchisee is a partnership entity, then each person or entity who, now or hereafter is or becomes a general partner is deemed an Owner who must sign Appendix C.

16.9     <u>**APPLICATION TO SECURITIES**</u>. The restrictions in Articles 16.6.3 and 16.7 do not apply to: (a) interests in or operation of a **PLANET FITNESS** business under a Franchise Agreement with us; or (b) the ownership of shares of a class of securities of a Publicly-Held Company that are listed on a public stock exchange or traded on the over-the-counter market and that represent less than five percent (5%) of that class of securities.

16.10     <u>**REASONABLE SCOPE OF COVENANTS.**</u>  You acknowledge that the scope of the restrictions in Articles 16.6 and 16.7 are reasonable and necessary to protect us, the Confidential Information, and the System, and that such restrictions are designed solely to prevent you from taking information, materials, training, and know-how that we provided to you and using them to compete with us. In addition, your operation of a Competitive Business in violation of Article 16.6 or 16.7 would necessarily involve your use of Confidential Information that would result in an unfair competitive advantage vis-à-vis other **PLANET FITNESS** franchisees.  You further acknowledge that you and your Owners possess skills and abilities of a general nature and have other opportunities for exploiting these skills. Consequently, our enforcement of the covenant in Article 16.7 will not deprive you or your Owners of personal goodwill or the ability to engage in a lawful trade or business and earn a living.

16.11     <u>**REDUCTION OF SCOPE OF COVENANTS.**</u>  You understand and acknowledge that we shall have the right, in our business judgment, to reduce the scope of any covenant set forth in Articles 16.6 and 16.7, or any portion thereof, without your consent, effective immediately upon receipt by you of written notice thereof; and you agree that you shall comply forthwith with any covenant as so modified, which shall be fully enforceable.

16.12     <u>**COVENANT NOT TO COMPETE UPON EXERCISE OF RIGHT OF FIRST REFUSAL.**</u> If we exercise our right of first refusal pursuant to Article 13.8. above, you and your selling Owner(s) agree that, for a period of two (2) years commencing on the date of the closing, you and they will be bound by the noncompetition covenant contained in Article 16.7 hereof.

16.13     <u>**COMMENCEMENT BY ORDER.**</u>  If any person restricted by this Article refuses voluntarily to comply with the foregoing obligations, the Restriction Period will commence with the entry of an order of an arbitrator, or court if necessary, enforcing this provision.

16.14     <u>**OUR RIGHT TO PURCHASE ASSETS OF THE BUSINESS.**</u>

(1)     <u>Exercise of Option</u>.  Upon termination or expiration, without your acquisition of a successor franchise, of this Agreement in accordance with its terms and conditions, we have the option, exercisable by giving written notice thereof to you (by the later of (a) sixty (60) days from the date of such termination or expiration, without your acquisition

of a successor franchise, or (b) seven (7) days after determination of the purchase price), to purchase the assets of the BUSINESS from you, including the leasehold rights to the Location, free and clear of all liens, restrictions or encumbrances. (The date on which we notify you whether or not we are exercising our option is referred to in this Agreement as the "Notification Date.") We have the unrestricted right to assign this option to purchase such assets. We will be entitled to all customary warranties and representations in connection with our asset purchase, including, without limitation, representations and warranties as to ownership and condition of and title to assets; liens and encumbrances on assets; validity of contracts and agreements; and liabilities effecting the assets, contingent or otherwise.

(2)     Leasehold Rights.   You agree, at our election, to assign your leasehold interest in the Location to us or to enter into a sublease for the remainder of the lease term on the same terms (including renewal options) as the prime lease.

(3)     Purchase Price.   The purchase price for the assets will be their fair market value, determined in a manner consistent with reasonable depreciation of the assets' equipment, signs, inventory, materials and supplies, provided that their value will not include any value for the Franchise or any rights granted by this Agreement, the Marks, or participation in the network of **PLANET FITNESS** businesses.  The assets' fair market value will not include any goodwill or any compensation for any clientele or customers of the BUSINESS.

(4)     Exclusions.  We may exclude from the assets purchased hereunder cash or its equivalent and any equipment, signs, inventory, materials and supplies that are not reasonably necessary (in function or quality) to the BUSINESS's operation or that we have not approved as meeting standards for **PLANET FITNESS** businesses, and the purchase price will reflect such exclusions.

(5)     Appraisal.  If we and you are unable to agree on the assets' fair market value, their fair market value will be determined by an appraiser agreeable to both parties. If we and you are unable to agree on an appraiser, then the assets' fair market value will be determined by three (3) independent appraisers who collectively will conduct one (1) appraisal. We will appoint one (1) appraiser, you will appoint one (1) appraiser and the two (2) party appointed appraisers will appoint the third appraiser. You and we agree to select our respective appraisers within fifteen (15) days after the date we determine that we are unable to agree on the assets' fair market value, and the two (2) appraisers so chosen are obligated to appoint the third appraiser within fifteen (15) days after the date on which the last of the two (2) party appointed appraisers was appointed.  You and we will bear the cost of our own appraisers and share equally the reasonable fees and expenses of the third appraiser chosen by the two party appointed appraisers.  You and we will take reasonable actions to cause the appraisers to complete their appraisal within thirty (30) days after the third appraiser's appointment.  If you fail to select one (1) appraiser within fifteen (15) calendar days after the date we notify you that we have determined that are unable to agree on the assets' fair market value, the appraiser selected by us shall unilaterally determine the fair market value.

(6)     Closing.  The purchase price will be paid at the closing of the purchase, which will take place not later than ninety (90) days after determination of the purchase price. We have the right to set off against the purchase price, and thereby reduce the purchase price by, any and all amounts you or your Owners owe to us.

(7)     Instruments.  At the closing, you agree to deliver instruments transferring:

(a)      good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us, if any), with all sales and other transfer taxes paid by you;

(b)      all licenses and permits of the BUSINESS which may be assigned or transferred; and

(c)      the leasehold interest in the Location and improvements thereon.

(8)    <u>Escrow</u>.  If you cannot deliver clear title to all of the purchased assets, or if there are other unresolved issues, the closing of the sale will, at our election, be accomplished through an escrow arrangement with an independent escrow agent selected by us.

(9)    <u>Releases</u>.  You and your owners agree to execute general releases, in form satisfactory to us, of any and all claims against us, our affiliates, and the shareholders, officers, directors, employees, agents, successors and assigns thereof.

**16.15**    **CONTINUING OBLIGATIONS**.  All of our and your (and your owners' and affiliates') obligations which expressly or by their nature survive the expiration or termination of this Agreement will continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied in full or by their nature expire.

**16.16**    **FUTURE ROYALTIES**. If you properly terminate this Agreement pursuant to Article 15.1 and cease operating as required hereunder, we agree to waive any rights we may have to seek future lost Royalties that would have been due to us from your operation of the BUSINESS after you cease operation of the BUSINESS.

## 17.    **SECURITIES OFFERINGS.**

**17.1**    **SECURITIES OFFERINGS**.  Neither you nor any of your owners may issue or sell, or offer to issue or sell, any of your securities or any securities of any of your affiliates, without obtaining our prior consent and complying with all of our requirements and restrictions concerning use of information about us and our Affiliates.  For any proposed securities offering approved in principle by us, you shall submit to us for our prior review all materials required by applicable law for the offering. No such materials shall be submitted to a government agency or to prospective investors unless and until we have furnished our written approval. No offering materials shall imply, by use of the Marks or otherwise, that we, our affiliates, or our respective directors, officers, employees, shareholders, or agents is participating as an underwriter, issuer, or offeror of securities of either you or us, or that we have approved the offering prospectus or any other aspect of the offering.  Any review by us of the offering materials or the information included therein shall be conducted solely for our benefit to determine their conformance with our internal policies, and not to benefit or protect any other person.  No investor should interpret such review by us, nor shall you or anyone acting on your behalf suggest, that our review constitutes an approval, endorsement, acceptance, or adoption of any representation, warranty, covenant, or projection contained in the materials reviewed; and the offering documents shall include legends and statements, in the form and manner specified by us, disclaiming our liability for, or involvement in, the transaction described in the offering documents.  You and the other participants in the offering must fully indemnify us, our affiliates and our respective directors, officers, employees, shareholders, and agents from any and all losses and expenses that arise directly or indirectly from, as a result of, or in connection with the offering.  For each proposed offering, you shall pay to us a non-refundable fee of Twenty-Five Thousand U.S. Dollars (US$25,000), at the time that you submit materials for review by us and shall pay additional sums to cover our out-of-pocket costs to review the materials when incurred.  You shall give us written notice at least sixty (60) days prior to the date of commencement of any offering or other transaction covered by this Article 17.1.  Any such offering shall be subject to our right of first refusal as provided in Article 13.8 hereof.

18.    **RELATIONSHIP OF THE PARTIES AND INDEMNIFICATION.**

18.1    **INDEPENDENT CONTRACTORS.**    Neither this Agreement nor the dealings of the parties pursuant to this Agreement shall create any fiduciary relationship or any other relationship of trust or confidence between the parties hereto. Franchisor and Franchisee, as between themselves, are and shall be independent contractors. If applicable law shall imply a covenant of good faith and fair dealing in this Agreement, the parties hereto agree that such covenant shall not imply any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement. Additionally, if applicable law shall imply such covenant, we and you acknowledge and agree that (a) this Agreement (and the relationship of the parties which arises from this Agreement) grants us the right to make decisions, take actions and/or refrain from taking actions not inconsistent with your explicit rights and obligations hereunder that may affect favorably or adversely your interests; (b) we will use our judgment in exercising such rights based on our assessment of our own interests and balancing those interests against the interests of the owners of **PLANET FITNESS** businesses generally (including ourselves, and our Affiliates and other franchisees), and specifically without considering your individual interests or the individual interests of any other particular franchisee; (c) we will have no liability to you for the exercise of our rights in this manner so long as such rights are not exercised in bad faith toward you; and (d) in the absence of such bad faith, no trier of fact in any legal action or arbitration proceeding shall substitute its judgment for our judgment so exercised. Nothing contained in this Agreement, or arising from the conduct of the parties hereunder, is intended to make either party a general or special agent, joint venturer, partner or employee of the other for any purpose whatsoever. You must conspicuously identify yourself in all dealings with customers, lessors, contractors, suppliers, public officials, employees and others as the owner of your BUSINESS and must provide written notice to all employees identifying yourself as a separate and distinct business from us, with such notice being affirmatively acknowledged by each of your employees in a form we specify in the Operations Manual or otherwise in writing from time to time. You must place such other notices of independent ownership on such forms, business cards, stationery, advertising and other materials as we may require from time to time. You may not make any express or implied agreements, warranties, guarantees or representations or incur any debt in our name or on our behalf or represent that the relationship of the parties hereto is anything other than that of independent contractors. You represent and warrant that with respect to articles 12 and 13 of the Mexican Federal Labor Law (Ley Federal de Trabajo), you are not an intermediary and that you have the necessary and sufficient material and human resources to perform your obligations under this Agreement.   In addition, you agree that you are an independent contractor acting within its ordinary course of business and, therefore, your activities do not, and shall not, create any type of permanent establishment for us in Mexico pursuant to Article 2 of the Mexican Income Tax Law (Ley del Impuesto Sobre la Renta).  We will not be obligated by or have any liability under any agreements made by you with any third party or for any representations made by you to any third party.  We will not be obligated for any damages to any person or property arising directly or indirectly out of the operation of your business hereunder.

18.2    **NO LIABILITY FOR ACTS OF OTHER PARTY.**  You agree not to employ any of the Marks in signing any contract or applying for any license or permit, or in a manner that may result in our liability for any of your indebtedness or obligations, and that you will not use the Marks in any way we have not expressly authorized. Neither we nor you will make any express or implied agreements, warranties, guarantees or representations or incur any debt in the name or on behalf of the other, represent that our respective relationship is other than franchisor and franchisee or be obligated by or have any liability under any agreements or representations made by the other that are not expressly authorized in writing. We will not be obligated for any damages of any nature whatsoever to any person or property directly or indirectly arising out of the BUSINESS's operation or the business you conduct pursuant to this Agreement.

18.3    **TAXES.**

(1)     You acknowledge that this Agreement contemplates that we will not be responsible for any taxes (other than U.S. federal and state income taxes) with respect to any transactions or payments contemplated by or pursuant to this Agreement. We will have no liability for any sales, use, value-added service, occupation, employment related, excise, gross receipts, income, property, non-resident withholding or other taxes, duties, contract registration charges, interest, or penalties, whether levied upon you or the BUSINESS, in connection with the business you conduct hereunder (except any taxes we are required by law to collect from you with respect to purchases from us).  Accordingly, with respect to Continuing Fees payable to us, you will deduct and remit to the appropriate tax authorities the tax withholdings required pursuant to applicable law and provide us with timely corresponding withholding notice. Notwithstanding anything to the contrary in this Agreement, this provision does not apply to taxes imposed on us by the state or municipality where we have our principal place of business.

(2)     If you are required to deduct any non-resident withholding tax from any payment to us or any of our affiliates, you are required to timely deliver to us the corresponding tax withholding receipts demonstrating that all taxes were properly withheld in compliance with applicable law.

(3)     In the event any jurisdiction imposes or seeks to impose any taxes on us or any of our affiliates (other than U.S. federal or state income taxes) as a result of or in connection with the transactions contemplated by this Agreement or receipt of payment therefor, you agree to indemnify and hold us and our affiliates harmless on an after-tax basis, for the full amount of:     (1) any such additional taxes; (2) any penalties, interest, inflation adjustments or additional taxes with respect thereto; (3) any expenses incurred in connection with contesting the imposition of such additional taxes; and (4) any other costs or expenses incurred in connection therewith.

**18.4    <u>INDEMNIFICATION</u>.   YOU AND EACH OF THE GUARANTORS IDENTIFIED IN APPENDIX B, AND EACH OWNER SIGNING APPENDIX D, AGREE THAT YOU SHALL, AT ALL TIMES, INDEMNIFY, EXCULPATE, DEFEND AND HOLD HARMLESS, TO THE FULLEST EXTENT PERMITTED BY LAW, US, OUR SUCCESSOR, ASSIGNS, AND AFFILIATES (INCLUDING BUT NOT LIMITED TO PLANET FITNESS DISTRIBUTION LLC AND PFIP INTERNATIONAL), AND THE RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, AGENTS, REPRESENTATIVES, INDEPENDENT CONTRACTORS, SERVANTS, AND EMPLOYEES OF EACH OF THEM (THE "INDEMNIFIED PARTIES") FROM ALL LOSSES AND EXPENSES INCURRED IN CONNECTION WITH ANY ACTION, SUIT, PROCEEDING, CLAIM, DEMAND, INVESTIGATION, OR INQUIRY (FORMAL OR INFORMAL), OR ANY SETTLEMENT THEREOF, WHICH ARISES OUT OF OR IS BASED UPON ANY OF THE FOLLOWING: THE INFRINGEMENT, ALLEGED INFRINGEMENT OR ANY OTHER VIOLATION BY YOU, YOUR GUARANTORS OR PRINCIPALS OF ANY PATENT, MARK, COPYRIGHT, OR OTHER PROPRIETARY RIGHT OWNED OR CONTROLLED BY THIRD PARTIES DUE TO YOUR UNAUTHORIZED USE OF ALL OR ANY PORTION OF THE MARKS AND/OR SYSTEM; THE VIOLATION, BREACH, OR ASSERTED VIOLATION OR BREACH BY YOU, YOUR GUARANTORS OR PRINCIPALS OF ANY FEDERAL, STATE, OR MUNICIPAL LAW, REGULATION, RULING OR INDUSTRY STANDARD; LIBEL, SLANDER, OR ANY OTHER FORM OF DEFAMATION BY YOU OR YOUR GUARANTORS OR PRINCIPALS; THE VIOLATION OR BREACH BY YOU OR BY YOUR GUARANTORS OR PRINCIPALS OF ANY WARRANTY, REPRESENTATION, AGREEMENT, OR OBLIGATION OF THIS AGREEMENT OR IN ANY OTHER AGREEMENT BETWEEN YOU AND US OR OUR AFFILIATES; ANY CYBER EVENT, IDENTITY THEFT, OR THEFT, MISUSE, OR DISPOSAL, OF PERSONAL INFORMATION OR HEALTHCARE INFORMATION OF A CUSTOMER DUE SOLELY TO ANY SECURITY BREACH BY YOU, YOUR AGENTS, OR YOUR EMPLOYEES;**

**ACTS, ERRORS, OMISSIONS OF YOU, ANY OF YOUR AFFILIATES, ANY OF YOUR PRINCIPALS, OFFICERS, DIRECTORS, SHAREHOLDERS, AGENTS, REPRESENTATIVES, INDEPENDENT CONTRACTORS, AND EMPLOYEES OF YOU AND YOUR AFFILIATES IN CONNECTION WITH THE ESTABLISHMENT AND OPERATION OF THE BUSINESS, INCLUDING, BUT NOT LIMITED TO, ANY ACTS, ERRORS, OR OMISSIONS OF ANY OF THE FOREGOING IN THE OPERATION OF ANY MOTOR VEHICLE OR IN THE ESTABLISHMENT OR IMPLEMENTATION OF SECURITY FOR THE BUSINESS; UNLESS (AND THEN ONLY TO THE EXTENT THAT) THE CLAIMS, OBLIGATIONS, AND DAMAGES ARE DETERMINED TO BE CAUSED SOLELY BY THE INDEMNIFIED PARTY'S NEGLIGENCE OR WILLFUL MISCONDUCT ACCORDING TO A FINAL, UNAPPEALABLE RULING ISSUED BY A COURT OR ARBITRATOR WITH COMPETENT JURISDICTION. FOR PURPOSES OF THIS INDEMNIFICATION, "LOSSES AND EXPENSES" INCLUDE ALL OBLIGATIONS, DAMAGES (ACTUAL, CONSEQUENTIAL OR OTHERWISE) AND COSTS INCURRED IN THE DEFENSE OF ANY CLAIM AGAINST ANY OF THE INDEMNIFIED PARTIES, INCLUDING, WITHOUT LIMITATION, REASONABLE ACCOUNTANTS', ARBITRATORS', ATTORNEYS' AND EXPERT WITNESS FEES, COSTS OF INVESTIGATION AND PROOF OF FACTS, COURT COSTS, OTHER EXPENSES OF LITIGATION, ARBITRATION OR ALTERNATIVE DISPUTE RESOLUTION AND TRAVEL AND LIVING EXPENSES. WE HAVE THE RIGHT TO DEFEND ANY SUCH CLAIM AGAINST US AT YOUR EXPENSE WITH COUNSEL WE SELECT. THIS INDEMNITY WILL CONTINUE IN FULL FORCE AND EFFECT SUBSEQUENT TO AND NOTWITHSTANDING THE EXPIRATION OR TERMINATION OF THIS AGREEMENT.**

18.5     <u>**MITIGATION NOT REQUIRED.**</u>   Under no circumstances will we or any other Indemnified Party be required to seek recovery from any insurer or other third party, or otherwise to mitigate our, their or your losses and expenses, in order to maintain and recover fully a claim against you. You agree that a failure to pursue such recovery or mitigate a loss will in no way reduce or alter the amounts we or another Indemnified Party may recover from you.

18.6     <u>**NOTIFICATION OF ADVERSE ACTION.**</u> You shall promptly notify us in writing of a material threat that is likely to result in the commencement of any action, suit, or proceeding, the actual commencement of any such action, suit or proceeding, and of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, against you, any of your Affiliates or owners, us, or our Affiliate, or that relates to the BUSINESS. Upon our request, you shall furnish to us within five (5) business days after receipt thereof, a copy of any notices, subpoenas, or other initial pleadings served upon or received by you in connection with such proceeding, provide us with updates of substantive developments and otherwise cooperate with us in monitoring the progress of any such proceeding. You shall furnish to us within two (2) business days after receipt thereof, a copy of any material violation or citation which indicates your violation of any local law, regulation, or ordinance in the operation of the BUSINESS or of your lease for the Location, or of any alleged health or safety code violation from any governmental agency.

19.     <u>**ENFORCEMENT AND MISCELLANEOUS MATTERS.**</u>

19.1     <u>**SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS**</u>. Except as expressly provided to the contrary herein, each provision of this Agreement, and any portion thereof, will be considered severable, and if, for any reason, any such provision is held to be invalid or contrary to or in conflict with any applicable present or future law or regulation in a final, unappealable ruling issued by any court, agency or tribunal with competent jurisdiction in a proceeding to which we are a party, that ruling will not impair the operation of, or have any other effect upon, such other portions of this Agreement as may remain otherwise intelligible, which will continue to be given full force and effect and bind the parties hereto, although any portion held to be invalid will be

deemed not to be a part of this Agreement from the date the time for appeal expires, if you are a party thereto, otherwise upon your receipt from us of a notice of non-enforcement thereof.

**19.2**   **LESSER COVENANT ENFORCEABLE.**   If any covenant herein which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited and/or length of time, but would be enforceable by reducing any part or all thereof, you and we agree that such covenant will be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction whose law is applicable to the validity of such covenant.

**19.3**   **GREATER NOTICE.**   If any applicable and binding law or rule of any jurisdiction requires a greater prior notice than is required hereunder of the termination of this Agreement or of our refusal to enter into a successor franchise agreement, or the taking of some other action not required hereunder, or if, under any applicable and binding law or rule of any jurisdiction, any provision of this Agreement or any part of Methods of Operation is invalid or unenforceable the prior notice and/or other action required by such law or rule will be substituted for the comparable provisions hereof, and we will have the right to modify such invalid or unenforceable provision or unenforceable part of this Agreement or the Operations Manual or any part of Methods of Operation to the extent required to be valid and enforceable. You agree to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision hereof as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof, or any part of Methods of Operation, any portion or portions which a court or arbitrator may hold to be unenforceable in a final decision to which we are a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order or arbitration award. Such modifications to this Agreement will be effective only in such jurisdiction, unless we elect to give them greater applicability, and will be enforced as originally made and entered into in all other jurisdictions.

**19.4**   **WAIVER OF OBLIGATIONS.**   We and you may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under this Agreement, effective upon delivery of written notice thereof to the other or such other effective date stated in the notice of waiver. Any waiver we grant will be without prejudice to any other rights we may have, will be subject to our continuing review and may be revoked at any time and for any reason, effective upon delivery to you of ten (10) days' prior written notice.

**19.5**   **NON-WAIVER.**   We and you will not be deemed to have waived or impaired any right, power or option reserved by this Agreement (including without limitation the right to demand exact compliance with every term, condition and covenant herein or to declare any breach thereof to be a default and to terminate (rescind) this Agreement prior to the expiration of its term), including, without limitation, our right to terminate (rescind) this Agreement through simple written notice, without responsibility, and without the need to obtain arbitral or judicial resolution by virtue of any custom or practice at variance with the terms hereof; our or your failure refusal or neglect to exercise any right under this Agreement or to insist upon exact compliance by the other with our and your obligations hereunder including without limitation Methods of Operation; our waiver, forbearance, delay, failure, or omission to exercise any right, power or option whether of the same, similar or different nature with respect to other **PLANET FITNESS** businesses; the existence of other franchise agreements for **PLANET FITNESS** businesses which contain different provisions from those contained herein; or our acceptance of any payments due from you after any breach of this Agreement. No special or restrictive legend or endorsement on any check or similar item given to us will constitute a waiver, compromise, settlement or accord and satisfaction. We are authorized to remove or obliterate any legend or endorsement, and such legend or endorsement will have no effect.

19.6    **FORCE MAJEURE.**  Neither we nor you will be liable for loss or damage or deemed to be in breach of this Agreement if our or your failure to perform our or your obligations is not our or your fault and results from:

(1)     transportation shortages, inadequate supply of equipment, products, merchandise, supplies, labor, material or energy or the voluntary foregoing of the right to acquire or use any of the foregoing in order to accommodate or comply with the orders, requests, regulations, recommendations or instructions of any federal, state, or municipal government or any department or agency thereof;

(2)     acts of nature;

(3)     fires, strikes, embargoes, war or riot;

(4)     failure to obtain land use or environmental approvals from the applicable government body or agency, so long as you diligently pursue any such required approvals; or

(5)     any other similar event or cause.

Notwithstanding the above, lack of funds and economic conditions shall not constitute a force majeure condition hereunder.

19.7    **EXTEND PERFORMANCE.**  Any delay resulting from any of said causes will extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, except that said causes will not excuse payments of amounts owed at the time of such occurrence or payment of Royalties and Ad Fees due on any sales thereafter.

19.8    **OUT-OF-STOCK AND DISCONTINUED.**  We are not liable to you for any loss or damage, or deemed to be in breach of this Agreement, if we cannot deliver, or cause to be delivered, or if our Affiliates or designated sources or Approved Suppliers cannot deliver, all of your orders for products, merchandise, equipment, supplies, etc., where such things are out-of-stock or discontinued.

19.9    **COSTS AND ATTORNEYS' FEES.**  If we incur expenses in connection with your failure to pay when due amounts owed to us or to submit when due any reports, information or supporting records or otherwise to comply with this Agreement, you agree to reimburse us for any of the costs and expenses which we incur, including, without limitation, reasonable accounting, attorneys', arbitrators' and, or other related fees.

19.10    **YOU MAY NOT WITHHOLD PAYMENTS DUE TO US.**  You agree that you will not withhold payment of any amounts owed to us on the grounds of our alleged nonperformance of any of our obligations hereunder. You agree that all such claims will, if not otherwise resolved by us, be submitted to arbitration as provided in Article 19.12.

19.11    **RIGHTS OF PARTIES ARE CUMULATIVE.**  Our and your rights hereunder are cumulative, and no exercise or enforcement by us or you of any right or remedy hereunder will preclude our or your exercise or enforcement of any other right or remedy hereunder which we or you are entitled by law to enforce.

19.12    **DISPUTE RESOLUTION**.

(1)     _Mediation_.  Except as provided in Article 19.12.3, prior to filing any demand for arbitration, the parties agree to mediate any dispute, controversy or claim between and among the parties and any of our or your affiliates, officers, directors, shareholders, members, quota holders, guarantors, employees or owners arising under, out of, in

connection with or in relation to this Agreement, any lease or sublease for your Business, any loan or other finance arrangement between us or our affiliates and you, the parties' relationship, your Business, or any System Standard in accordance with the following procedures:

(a)     The party seeking mediation must commence mediation by sending the other party, in accordance with Article 20, a written notice of its request for mediation headed "Notification of Dispute."  The Notification of Dispute will specify, to the fullest extent possible, the party's version of the facts surrounding the dispute; the amount of damages and the nature of any injunctive or other relief such party claims.  The party (or parties as the case may be) receiving a Notification of Dispute will respond within twenty (20) days after receipt thereof, in accordance with Article 20, stating its version of the facts and, if applicable, its position as to damages sought by the party initiating the dispute procedure; provided, however, that if the dispute has been the subject of a default notice given under Article 15 of this Agreement, the other party will respond within ten (10) business days.

(b)     Upon receipt of a Notification of Dispute and response under Article 19.12.1, the parties will endeavor, in good faith, to resolve the dispute outlined in the Notification of Dispute and response. If the parties have been unable to resolve a dispute outlined in a Notification of Dispute or a response thereto within twenty (20) days after receipt of the response, either party may initiate a mediation procedure with the International Centre for Dispute Resolution ("ICDR"), pursuant to its International Mediation Rules, and unless otherwise agreed by the parties will take place in the city of our then-current corporate headquarters. The parties must jointly select and share equally in the payment of a mediator.

(c)     All mediation sessions will occur in Portsmouth, New Hampshire (or in the city of our then-current headquarters, if our headquarters are no longer in New Hampshire), and must be attended by your Responsible Owner (and any other persons with authority to settle the dispute on your behalf) and our representative(s) who is/are authorized to settle the dispute.  The parties may be represented by counsel at the mediation.  The parties agree to participate in the mediation proceedings in good faith and with the intention of resolving the dispute if at all possible within thirty (30) days of the notice from the party seeking to initiate the mediation procedures.  If the dispute is not resolved within thirty (30) days, any party may initiate an arbitration pursuant to Article 19.12.2. In addition, if the party receiving notice of mediation has not responded within five (5) days of delivery of the notice or a party fails to participate in the mediation, this Article 19.12.1 will no longer be applicable and the other party can pursue arbitration.  Each party must pay its own fees and expenses incurred in connection with the mediation.   The mediation proceeding and any negotiations and results thereof will be treated as a compromise settlement negotiation and the entire process is confidential, except as otherwise expressly provided by applicable law.  At least five (5) days prior to the initial mediation session, each party must deliver a written statement of positions.

(2)     <u>Arbitration</u>.  Except as provided in Article 19.12.3, any dispute, controversy or claim between you and us and any of our or your affiliates, officers, directors, shareholders, members, quota holders, guarantors, employees or owners arising under, out of, in connection with or in relation to this Agreement, any lease or sublease for your Business, any loan or other finance arrangement between us or our affiliates and you, the parties' relationship, your Business, or any System Standard or the scope of validity of the arbitration obligation under this Article not resolved by mediation must be submitted to

binding arbitration. The arbitration will be administered by the ICDR pursuant to its International Arbitration Rules then in effect by one arbitrator.

(a)     In connection with any arbitration proceeding, each party will submit or file any claim which arises out of the same transaction or occurrence that is the subject matter of the opposing party's claim. Any such claim which is not submitted or filed in such proceeding will be barred.

(b)     Any arbitration must be on an individual basis only as to a single franchisee (and not as or through an association) and the parties and the arbitrator will have no authority or power to proceed with any claim on a class-wide basis or otherwise to join or consolidate any claim with any claim or any other proceeding involving third parties or any other franchisee.

(c)     The arbitration shall be conducted in the English language and must take place in Portsmouth, New Hampshire (or in the city of our then-current headquarters, if our headquarters are no longer in New Hampshire), and you agree not to file an objection to such locale. Notwithstanding the foregoing, where the dispute includes or consists of a claim under the franchise legislation of a state or district that requires arbitration in such jurisdiction, then the arbitration shall take place in the state or district in which the business of the franchise is located.

(d)     The arbitrator must follow the law and not disregard the terms of this Agreement. The arbitrator must be an attorney or former judge with at least fifteen (15) years of significant experience in international commercial legal matters. The arbitrator may not consider any settlement discussions or offers that might have been made by either you or us. The arbitrator may not under any circumstance (a) stay the effectiveness of any pending termination of this Agreement, (b) assess punitive or exemplary damages, (c) certify a class or a consolidated action, or (d) make any award which extends, modifies or suspends any lawful term of this Agreement or any reasonable standard of business performance that we set. The arbitrator will have the right to make a determination as to any procedural matters as would a court of competent jurisdiction be permitted to make in the state in which our corporate headquarters is then located. The arbitrator will also decide any factual, procedural, or legal questions relating in any way to the dispute between the parties, including, but not limited to: any decision as to whether Article 19.14 is applicable and enforceable as against the parties, subject matter, timeliness, scope, remedies, unconscionability, and any alleged fraud in the inducement.

(e)     Other than as may be required by law, the entire arbitration proceedings (including, but not limited to, any rulings, decisions or orders of the arbitrator), will remain confidential and will not be disclosed to anyone other than the parties to this Agreement.

(f)     We reserve the right, but have no obligation, to advance your share of the costs of any arbitration proceeding in order for such arbitration proceeding to take place and by doing so will not be deemed to have waived or relinquished our right to seek recovery of those costs in accordance with Article 19.9 or 19.12.4.

(3)     <u>Injunctive Relief/No Waiver of Arbitration</u>. Notwithstanding Articles 19.12.1 and 19.12.2 of this Agreement, either party shall have the right to request injunctive relief (without any requirement to post a bond) from any court of competent jurisdiction, including, without limitation, application for judicial relief to protect against trademark infringement, unauthorized use of trademark, loss of possession of real or personal property, violations of non-competition or confidentiality obligations, termination of this

Agreement, or to maintain the efficacy of an ongoing arbitration, and that such request shall not constitute a waiver of the moving party's right to demand arbitration of any dispute pursuant to Article 19.12.2 and its subparts.

(4) <u>Costs and Attorneys' Fees</u>.  The prevailing party in any action or proceeding arising under, out of, in connection with, or in relation to this Agreement will be entitled to recover its reasonable costs and expenses (including attorneys' fees, arbitrator's fees and expert witness fees, costs of investigation and proof of facts, court costs, and other arbitration or litigation expenses) incurred in connection with the claims on which it prevailed.

(5) <u>Survival</u>.  The provisions of this Article 19.12 are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

(6) <u>Tolling of Statute of Limitations</u>.  All applicable statutes of limitation and defenses based on the passage of time are tolled while the dispute resolution procedures in this Article 19.12 are pending.  The parties will take such action, if any, required to effectuate such tolling.

(7) <u>Performance to Continue</u>.  Each party must continue to perform its obligations under this Agreement pending final resolution of any dispute pursuant to this Article 19.12, unless to do so would be impossible or impracticable under the circumstances.

**19.13** **GOVERNING LAW.**  This Agreement shall be interpreted and construed exclusively under the laws of the United Mexican States.

**19.14** **CONSENT TO JURISDICTION.**  Subject to Article 19.12., you and your Owners agree that we may institute any action against you or your Owners in any state or federal court of general jurisdiction in New Hampshire and you (and each Owner) irrevocably submit to the jurisdiction of such courts and waive any objection you (or he or she) may have to either the jurisdiction of or venue in such courts.  Notwithstanding the foregoing, where the action includes or consists of a claim under franchise legislation of a state or district that requires venue in such jurisdiction for a dispute hereunder, then such action shall be commenced in the state or district in which the BUSINESS is located.  You hereby waive all objections to personal jurisdiction or venue for purposes of this Article 19.14.

**19.15** **WAIVER OF PUNITIVE DAMAGES, JURY TRIAL AND CLASS ACTIONS.  EXCEPT WITH RESPECT TO YOUR OBLIGATION TO INDEMNIFY US PURSUANT TO ARTICLES 18.4 AND 18.5 AND CLAIMS WE BRING AGAINST YOU FOR YOUR UNAUTHORIZED USE OF THE MARKS OR UNAUTHORIZED USE OR DISCLOSURE OF ANY CONFIDENTIAL INFORMATION, WE AND YOU AND YOUR RESPECTIVE OWNERS WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER AND AGREE THAT, IN THE EVENT OF A DISPUTE BETWEEN US, THE PARTY MAKING A CLAIM WILL BE LIMITED TO EQUITABLE RELIEF AND TO RECOVERY OF ANY ACTUAL DAMAGES IT SUSTAINS.  WE AND YOU IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF US.  THIS WAIVER IS EFFECTIVE EVEN IF A COURT OF COMPETENT JURISDICTION DECIDES THAT THE ARBITRATION PROVISION IN THIS ARTICLE 19 IS UNENFORCEABLE. WE EACH WAIVE TO THE FULLEST EXTENT POSSIBLE UNDER THE LAW OUR RESPECTIVE RIGHTS TO BRING AGAINST THE OTHER OR ANY AFFILIATE OR THE OTHER ANY CLAIMS DENOMINATED AS A CLASS ACTION, CONSOLIDATED ACTION, OR JOINT ACTION, WHETHER OR NOT PERMITTED UNDER**

**APPLICABLE COURT RULES.  EACH PARTY ACKNOWLEDGES THAT IT HAS HAD A FULL OPPORTUNITY TO CONSULT WITH COUNSEL CONCERNING THIS WAIVER, AND THAT THIS WAIVER IS INFORMED, VOLUNTARY, INTENTIONAL, AND NOT THE RESULT OF UNEQUAL BARGAINING POWER.**

19.16   **BINDING EFFECT.**  This Agreement is binding upon us and you and our respective executors, administrators, heirs, beneficiaries, assigns and successors in interest and may not be modified except by written agreement signed by you and us.

19.17   **LIMITATIONS OF CLAIMS.**   Except for claims arising from your nonpayment or underpayment of amounts you owe us pursuant to this Agreement, or claims related to your unauthorized use of the Marks, any and all claims arising out of or relating to this Agreement or our relationship with you will be barred unless an arbitration or judicial proceeding is commenced within one (1) year from the date on which the party asserting such claim knew or should have known of the facts giving rise to such claims.

19.18   **CONSTRUCTION.**  The preambles and exhibits are a part of this Agreement which, together with the Operations Manual and our other written policies, constitute our and your entire agreement except as provided below, and there are no other oral or written understandings or agreements between us and you relating to the subject matter of this Agreement, except that you acknowledge that we justifiably have relied on your representations made prior to the execution of this Agreement as set forth in Article 1 hereof. Except as contemplated by the provisions of Article 19.12, nothing in this Agreement is intended, nor is deemed, to confer any rights or remedies upon any person or legal entity not a party hereto.

19.19   **WITHHOLD APPROVAL.**  Except where this Agreement expressly obligates us reasonably to approve or not unreasonably to withhold our approval of any of your actions or requests, we have the absolute right to refuse any request you make or to withhold our approval of any of your proposed or effected actions that require our approval.

19.20   **HEADINGS.**  The headings of the several Articles hereof are for convenience only and do not define, limit or construe the contents of such Articles.

19.21   **JOINT AND SEVERAL OWNERS' LIABILITY.**  If two (2) or more persons are at any time the owner of the BUSINESS hereunder, whether as partners or joint venturers, their obligations and liabilities to us will be joint and several. References to "owner" mean any person holding a direct or indirect, legal or beneficial ownership interest or voting rights in you (or a transferee of this Agreement and the BUSINESS or an interest in you), including, without limitation, any person who has a direct or indirect interest in you (or a transferee), this Agreement, the Franchise or the BUSINESS and any person who has any other legal or equitable interest, or the power to vest in himself any legal or equitable interest, in the revenue, profits, rights or assets thereof. References to a "controlling interest" in you mean thirty three and one-third (33.33%) percent or more of your voting shares or other voting rights if you are a corporation, limited liability company or partnership owned by three (3) or more persons; otherwise, fifty (50%) percent or more of your voting shares or other voting rights will constitute a "controlling interest." "Person" means any natural person, corporation, limited liability company, general or limited partnership, unincorporated association, cooperative or other legal or functional entity.

19.22   **ANTI-TERRORISM LAWS.**  You acknowledge that it is our intent to comply with all anti-terrorism laws enacted by the U.S. Government and other comparable laws in the Country applying to the Location, including but not limited to the USA PATRIOT ACT or Executive Order 13324. You acknowledge that you are not now, nor have you ever been, a suspected terrorist or otherwise associated directly or indirectly with terrorist activity.  At any time during the Term of this Agreement, if we are prohibited from doing business with you under any anti-terrorism law enacted by the U.S. Government or other comparable laws in the Country applying to the Location, then this Agreement may be terminated immediately.

19.23   **RIGHT TO INFORMATION.**  You consent to us obtaining, using and disclosing to third parties (including, without limitation, financial institutions, legal and financial advisors, and prospective franchisees), for any purpose we specify or as may be required by law, all financial and other information (including, without limitation, membership data and customer lists) contained in or resulting from information, data, materials, statements and reports related, directly or indirectly, to the BUSINESS.

19.24   **MULTIPLE COPIES AND ELECTRONIC RECORDS.**  This Agreement may be executed in multiple copies, each of which will be deemed an original, and all of which when taken together shall constitute one and the same document.  You expressly consent and agree that we may provide and maintain all disclosures, agreements, amendments, notices, and all other evidence of transactions between us and you in electronic form. You expressly agree that electronic copies of this Agreement and related agreements between us and you are valid. You also expressly agree not to contest the validity of the originals or copies of this Agreement and related agreements, absent proof of altered data or tampering. You also expressly agree to execution of this Agreement and related agreements by electronic means and that such execution shall be legally binding and enforceable as an "electronic signature" and the legal equivalent of your handwritten signature.

19.25   **ENTIRE AGREEMENT BETWEEN THE PARTIES.**  This Agreement together with any exhibits, addenda and appendices hereto constitute the sole agreement between you and us with respect to the entire subject matter of this Agreement and embody all prior agreements and negotiations with respect to your BUSINESS authorized hereunder.  There are no representations or warranties of any kind, express or implied, provided to you in connection with this Agreement.

19.26   **AREA DEVELOPMENT AGREEMENT ADDENDUM**.  This Article 19.26 is only applicable if you or your affiliate have entered into an ADA with us, as referenced in Appendix I hereto if applicable. The ADA entered into with us contains certain negotiated provisions which are intended to apply to, and modify, future franchise agreements entered into between the parties. These negotiated provisions are set forth in Appendix I. Therefore, notwithstanding anything to the contrary set forth in this Agreement, to the extent any provision in Appendix I contradicts any provision in this Agreement, or is in addition to any provision of this Agreement, Appendix I shall control to the extent of such inconsistency or addition.  Both we and you acknowledge and agree that Appendix I has been added at the request and for the convenience and benefit of all parties and with advice from their counsel.  Accordingly, both we and you agree to work in good faith to resolve any disputes regarding the application or intent of Appendix I. Should a dispute arise as to the application or intent of Appendix I to this Agreement, the parties agree to resolve any such dispute pursuant to the dispute resolution procedures set forth in this Agreement.

19.27   **NO COMMERCIAL AGENCY.**  You acknowledge and agree that this Agreement is a contract calling for Franchisee to operate a **PLANET FITNESS** BUSINESS in the Country, but that this Agreement does not cover an agency of any product or service; and, therefore, does not constitute or create any commercial agency as provided under the laws of the Country. You acknowledge and agree that this Agreement should not be interpreted or construed as a commercial agency, and you and we further acknowledge and agree that no party will attempt to register this Agreement with the government of the Country.

19.28   **ANTI-CORRUPTION.**  You acknowledge and agree that you are familiar with the prohibitions of the United States Foreign Corrupt Practices Act ("FCPA") and other comparable laws in the Country applicable to the Location, and have not previously been accused of violating the FCPA or any other such laws; or engaged in any practice that would be deemed to be the making of an improper payment under the FCPA or any other such laws. In connection with the FCPA and other comparable laws in the Country applicable to the Location, you acknowledge and agree (to the best of your knowledge) as follows:

(1)      None of your "Personnel" (and none of those Personnel's "Family Members") are "Government Officials" (as defined below).

(2)     "Family Member" means a person's spouse, children, parents, siblings, and/or first- or second-cousins.

(3)     "Government Official" means an official of any government, government agency, or political party in the Country applicable to the Location or elsewhere, whether by election, appointment, employment, or otherwise, and also includes: (a) candidates to become a Government Official; (b) a Family Member of any of the foregoing persons; and (c) Personnel of a company that is owned by a government.

(4)     "Personnel" means shareholders, members, quota holders, partners, officers, directors, executives, and employees, as well as any of their Family Members.

(5)     If any of your Personnel or their Family Members becomes a Government Official, you shall immediately notify us in writing.

(6)     You have not made, and will not make, any payment or transfer of value, directly or indirectly, to any Governmental Official or to any other person or entity if that payment or transfer would violate the laws of the country where you reside or in which the payment or transfer is made.

(7)     You have not made, and will not make, any payment or transfer of value, directly or indirectly, for the purpose or effect of public or commercial bribery, or acceptance of or acquiescence in extortion, kickbacks, money laundering or other unlawful or improper means of obtaining or retaining business.

(8)     You will comply with the FCPA (a copy of which can be found at www.usdoj.gov/criminal/fraud/fcpa.html), and any other comparable law or regulation in the Country applicable to the Location, as well as any international conventions that outlaw bribery and corrupt practices.

19.29   **ENGLISH LANGUAGE.**   All notices, reports, invoices, documents, and communications provided under this Agreement shall be given by parties to one another in the English language, and you shall translate into English and provide to us any such items required to be provided to us hereunder that you have received from third parties.  If translation of any communication into another language is required, you will be responsible for any costs incurred to accomplish this. This Agreement has been executed in English.  If it is executed in another language as well, the English version will control for all purposes.  In the event it becomes legally necessary to translate into Spanish this Franchise Agreement, its Exhibits and/or any other document related thereto or derived herefrom, the parties agree that the Spanish versions that shall prevail shall be those to be prepared by an official certified translator in the Country, duly authorized by the Superior Court of justice of the Federal District, to be appointed and selected by us.

19.30   **ACKNOWLEDGMENT.**  You acknowledge and agree that we have no experience operating or franchising **PLANET FITNESS** businesses under the System or the Marks in the Country; that we have made no representations or guarantees to you as to the viability, marketability, or adaptability in the Country of the System, the **PLANET FITNESS** businesses, or any of the products or services sold therefrom; and that you have performed your own independent research and investigation as to the viability, marketability, and adaptability in the Country of the System, the **PLANET FITNESS** businesses, and the products and services to be sold, and assumes all of the business risks associated therewith.

19.31   **GOVERNMENTAL APPROVALS.**

(1)     This Agreement shall be executed subject to any and all required government approvals described in this Section. Where required, we will take such actions as may be required

from time to time to obtain required government approvals and authorizations from any government department or agency, and, if necessary, from any other organization whose approval or authorization is required under applicable law or regulation for this Agreement to be effective or for the payments required under this Agreement to be made to us as directed herein. All such approvals or authorizations shall be obtained at your expense. You shall cooperate with us all such undertakings as requested.

(2)    If, at any time during the term of this Agreement, any governmental agency in the Country should require, directly or indirectly, alteration or modification of any term or condition of this Agreement, or of the performance of the parties hereunder, you and we agree to use our best efforts to comply with such request.  Should, however, either party reasonably consider such request to be material and adverse to such party, the parties agree to work together in good faith to reach a reasonable and mutually agreeable resolution, but, failing such a resolution, then such party may terminate (rescind) this Agreement by giving written notice to this effect to the other party within thirty (30) days of notice of such governmental requirement, without responsibility, and without the need to obtain arbitral or judicial resolution.

19.32    **FRANCHISEE DULY ORGANIZED.**  You represent that you are a company duly organized and validly existing in accordance with the laws of the United Mexican States, as evidenced in public deed No. 33,553, Serial number 152,401, Book 764, dated January 19, 2017, granted before Gustavo Escamilla Flores, Notary Public No. 26 for Monterrey, Nuevo Leon, which first true copy was recorded with the Public Registry of Commerce of Nuevo Leon under Mercantile Folio No. 2017013909, effective as of February 14, 2017.

19.33    **AUTHORITY TO EXECUTE AGREEMENT.**  You represent that your legal representative who signs this Agreement on your behalf has the necessary authority to do so as evidenced in public deed No. 33,553, Serial number 152,401, Book 764, dated January 19, 2017, granted before Gustavo Escamilla Flores, Notary Public No. 26, for Nuevo Leon, which first true copy was recorded with the Public Registry of Commerce of Nuevo Leon, under Mercantile Folio No. 2017013909, effective as of February 14, 2017.

19.34    **NO CONSENT OR FURTHER ACTION REQUIRED.**  You represent that you desire to enter into this Agreement for the purposes set forth herein and that no consent or further act is required for you to execute this Agreement and comply with the obligations derived hereunder.

19.35    **MEXICO SPECIFIC PROVISIONS.**  For the purposes of complying with Article 142 Bis of the Industrial Property Law of Mexico, this Article 19.35 is hereby made a part of this Agreement.  To the extent that any terms or conditions of this Article 19.35 conflict with the other terms or conditions of this Agreement, the terms of this Article 19.35 shall control.

(1)    The ideal site from which you will perform the activities resulting from this Agreement shall be approximately 15,000 to 25,000 square feet and typically may be located in a strip centers, mall, or freestanding location. We consider a number of factors when evaluating a proposed site, including, but not limited to, the general location and neighborhood, demographic information, traffic patterns, access, visibility, location of other competing facilities, location of existing **PLANET FITNESS** businesses, size, configuration, appearance and other physical characteristics of the site. However, we evaluate proposed sites on a case by case basis and may, in our business judgment, approve a site that deviates from these ideal characteristics if business circumstances warrant.

(2)    The policies with respect to inventory and provisions in connection with merchandise supply and engagement of vendors are set forth in Articles 4,5, and 9 of this Agreement and are further established in the Operations Manual as modified from time to time by us.

Our policies with respect to marketing and advertising are set forth in Article 10 of this Agreement and as further established in the Operations Manual from time to time by us.

(3) The policies and procedures and terms in relation to reimbursements, financing and other consideration to be paid by the parties are set forth in Articles 3.1, 4.8, 4.12, 5.1, 5.2, 5.3, 5.4 5.5, 5.6, 5.7, 5.8, 5.9, 5.10, 5.11, 5.12, 6.2, 6.4.7, 6.6, 7.5, 8.2, 9.4, 9.6, 9.9, 10.1, 10.5, 10.6, 10.7, 10.11, 12.3, 13.3.5, 14.1, 15.2, 17.1, 18.3, 18.9, 19.9, and 19.12 of this Agreement and as further established in the Operations Manual from time to time by us. We do not provide any financing to you.

(4) We do not have any policies and procedures pursuant to which we govern the profit margin or commissions earned by you. Your ability to earn commission or generate a profit margin shall be determined by the manner in which you operate the Franchised Business and the prevailing market forces where the Franchised Business is located. We do not have any restrictions on "commissions" or "profit margins," and you are able to earn as much as your relevant market will allow, so long as you are operating the BUSINESS in compliance with the terms of this Agreement and the Operations Manual, as modified from time to time by us.

(5) The technical and operational training specifications for your personnel and the method whereby we will provide business assistance are set forth in Articles 4, 6, and 9 of this Agreement and in the Operations Manuals, as modified from time to time by us.

(6) Our rights with respect to the supervision, information, evaluation and rating performance and quality of your services are provided for in Articles 4, 5, 6, 9, 11, 12 and 15 of this Agreement. You may, but are not obligated to, perform an informational evaluation of the services provided by us under this Agreement within fifteen (15) calendar days following each anniversary of the date of this Agreement. The results of your evaluation and supervision shall be for informational purposes only and may be used by us in our discretion, to assist us in improving our franchise system generally and/or our working relationship with you. We will not be obligated to respond or react to the information received from you. The results of your evaluation and supervision shall not constitute, nor shall they be deemed to constitute, evidence of a breach by us of any of our obligations under this Agreement, nor shall they entitle you to terminate or rescind this Agreement for any reason.

(7) You shall not, in any respect, have the right to sub-license or sub-franchise the right to use the Marks or any other right or benefit derived from this Agreement.

(8) You and we acknowledge that the causes set forth in Article 15 shall be good and just causes for termination or rescission of this Agreement.

(9) This Agreement may only be reviewed and/or amended in accordance with Article 19.25.

(10) You are obliged to transfer ownership of your assets to us only as set forth in Article 13.

(11) You are obliged to sell or transfer your company shares to us or to make us a partner in your company only as set forth in Article 13.

## 20. NOTICES AND PAYMENTS.

20.1 **NOTICES.** All written notices and reports permitted or required to be delivered by the provisions of this Agreement or the Operations Manual to us must be addressed to the General Counsel at the most current principal business address of which you have been notified and must be in the English language. Any required payment or report which we do not actually receive during

regular business hours on the date due (or postmarked by local postal authorities at least five (5) days prior thereto) will be deemed delinquent. All written notices and reports permitted or required to be delivered by the provisions of this Agreement to you shall be addressed to your Responsible Owner or Approved Operator at your most current principal business address of which we have been notified, or the mailing address listed for your Responsible Owner or Approved Operator as listed on Appendix E. Such notices or reports must be in the English language and will be deemed so delivered:

(1)     at the time delivered by hand;

(2)     one (1) business day after transmission by telecopy, facsimile or other electronic system, provided there is evidence of delivery and notice is also promptly provided pursuant to the methods set forth in subsections (1), (3), or (4);

(3)     one (1) business day after being placed in the hands of a commercial courier service for next business day delivery, provided there is evidence of delivery; or

(4)     Five (5) business days after delivery to an international courier or other means which affords the sender evidence of delivery; and must be addressed to the party to be notified at its most current principal business address of which the notifying party has been notified.

**20.2     PAYMENTS.** All payments required to be delivered by the provisions of this Agreement or the Operations Manual will be deemed so delivered as provided in Article 20.1. above, and will be deemed delivered by EFT or bank-wire transfer upon telephone or electronic confirmation with the receiving bank.

*[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]*

**IN WITNESS WHEREOF,** the parties hereto have executed and delivered this Agreement as of the Effective Date.

THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.

PLANET FITNESS INTERNATIONAL FRANCHISE

By: _____

Print Name:  Darren Riley

Title:  Director

**EFFECTIVE DATE:**  March 5, 2019

> I, John Cullinane, Notary Public in and for the Cayman Islands, do hereby certify that
>
> DARREN RILEY
>
> appeared before me and executed this document, in witness where of I have subscribed my name and set and affixed my seal of office.
>
> John Cullinane
> Date:  5/3/19
> My appointment expires: 31 January 20 20

**EACH OF THE UNDERSIGNED PARTIES WARRANTS AND REPRESENTS THAT SUCH PARTY HAS NOT RELIED UPON ANY GUARANTEES CONCERNING REVENUE, PROFIT OR THE SUCCESS OF THIS FRANCHISE IN SO SIGNING.**

JEG-MEXICO BUENO, S DE RL DE CV

By: _____
    (Authorized Representative)
Print Name:_____
Title: Legal Representative_____
Dated: _____

**FRANCHISEE ACKNOWLEDGES AND AGREES THAT IT (1) HAS SPECIFICALLY REVIEWED THE COMPLETED VERSION OF APPENDICES E (OWNERSHIP ADDENDUM), F (SILENT INVESTORS), AND J (AREA DEVELOPMENT AGREEMENT ADDENDUM), (2) IS BOUND THEREBY, AND (3) IS BEST POSITIONED, BETWEEN THE PARTIES, TO VERIFY THE ACCURACY OF THE INFORMATION PROVIDED AND CONTAINED THEREIN. AS SUCH, WE ARE ENTITLED TO RELY ON SUCH INFORMATION. FRANCHISEE REPRESENTS AND WARRANTS THAT ALL SUCH INFORMATION IS TRUE, CORRECT AND COMPLETE AS OF THE DATE OF FRANCHISEE'S EXECUTION OF THIS AGREEMENT, PROVIDED, HOWEVER, THAT AN IMMATERIAL INACCURACY IN SUCH INFORMATION SHALL NOT BE A DEFAULT UNDER THIS AGREEMENT.**

JEG-MEXICO BUENO, S DE RL DE CV

By: _____
    (Authorized Representative)
Print Name:_____
Title: Legal Representative_____
Dated: _____

**IN WITNESS WHEREOF,** the parties hereto have executed and delivered this Agreement as of the Effective Date.

THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.

PLANET FITNESS INTERNATIONAL FRANCHISE

By: _____

Print Name:  Darren Riley

Title:  Director

**EFFECTIVE DATE:** _____

**EACH OF THE UNDERSIGNED PARTIES WARRANTS AND REPRESENTS THAT SUCH PARTY HAS NOT RELIED UPON ANY GUARANTEES CONCERNING REVENUE, PROFIT OR THE SUCCESS OF THIS FRANCHISE IN SO SIGNING.**

JEG-MEXICO BUENO, S DE RL DE CV

By: X _____
        (Authorized Representative)
Print Name: ___John T-Williams_____
Title: Legal Representative
Dated: ___3|5|19_____

**FRANCHISEE ACKNOWLEDGES AND AGREES THAT IT (1) HAS SPECIFICALLY REVIEWED THE COMPLETED VERSION OF APPENDICES E (OWNERSHIP ADDENDUM), F (SILENT INVESTORS), AND J (AREA DEVELOPMENT AGREEMENT ADDENDUM), (2) IS BOUND THEREBY, AND (3) IS BEST POSITIONED, BETWEEN THE PARTIES, TO VERIFY THE ACCURACY OF THE INFORMATION PROVIDED AND CONTAINED THEREIN. AS SUCH, WE ARE ENTITLED TO RELY ON SUCH INFORMATION. FRANCHISEE REPRESENTS AND WARRANTS THAT ALL SUCH INFORMATION IS TRUE, CORRECT AND COMPLETE AS OF THE DATE OF FRANCHISEE'S EXECUTION OF THIS AGREEMENT, PROVIDED, HOWEVER, THAT AN IMMATERIAL INACCURACY IN SUCH INFORMATION SHALL NOT BE A DEFAULT UNDER THIS AGREEMENT.**

JEG-MEXICO BUENO, S DE RL DE CV

By: X _____
        (Authorized Representative)
Print Name: ___John T-Williams_____
Title: Legal Representative
Dated: ___3|5|19_____

**APPENDIX A**
**TO FRANCHISE AGREEMENT**

**LIST OF TRADEMARK REGISTRATIONS AND/OR APPLICATIONS IN THE COUNTRY**

| TITLE | STATUS | APPLN. NO. | APPLN. DATE | REG. NO. | REG. DATE | CLASS |
|---|---|---|---|---|---|---|
|  | Registered | 1472774 | Apr 1, 2014 | 1467292 | Apr 1, 2014 | 41 |
| 30 MINUTOS, ¡A DARLE! | Registered | 1964063 | Oct 24, 2017 | 1863617 | Mar 21, 2018 | 41 |
| ALARMA ANTI-CRITICONES | Registered | 1964062 | Oct 24, 2017 | 1846334 | Feb 15, 2018 | 41 |
| BAGEL MORNING | Registered | 1472795 | Apr 1, 2014 | 1467301 | Apr 1, 2014 | 41 |
| BLACK CARD | Pending | 2051618 | May 23, 2018 | | | 41 |
| BLACK CARD CUTS | Pending | 2000042 | Jan 23, 2018 | | | 44 |
|  | Registered | 1472778 | Apr 1, 2014 | 1467294 | Apr 1, 2014 | 41 |
| BURN CALORIES, NOT CASH | Registered | 83119 | May 31, 2013 | 773831 | Sep 13, 2013 | 41 |
|  | Registered | 1472777 | Apr 1, 2014 | 1467293 | Apr 1, 2014 | 41 |
|  | Registered | 1472782 | Apr 1, 2014 | 1517058 | Apr 1, 2014 | 41 |
| CRAZY, NUTS, YOU BETCHA! | Registered | 1472797 | Apr 1, 2014 | 1467302 | Apr 1, 2014 | 41 |
|  | Registered | 1472779 | Apr 1, 2014 | 1467295 | Apr 1, 2014 | 41 |
| FITNESS PLANET | Registered | 1472798 | Apr 1, 2014 | 1467303 | Apr 1, 2014 | 41 |
|  | Registered | 1293507 | Jul 20, 2012 | 1330662 | Nov 26, 2012 | 41 |
|  | Pending | 1940743 | Aug 31, 2017 | | | 25 |
|  | Pending | 1940744 | Aug 31, 2017 | | | 41 |
| GIMTIMIDACION | Registered | 1516447 | Aug 13, 2014 | 1507003 | Aug 13, 2014 | 41 |
| GYMTIMIDATION | Registered | 1152764 | Jan 22, 2013 | 1419614 | Dec 17, 2013 | 41 |
|  | Registered | 1473396 | Apr 2, 2014 | 1475522 | Apr 2, 2014 | 16 |

| | | | | | | |
|---|---|---|---|---|---|---|
|  | Registered | 1473896 | Apr 2, 2014 | 1538157 | May 14, 2015 | 25 |
|  | Registered | 1473398 | Apr 2, 2014 | 1471629 | Apr 2, 2014 | 41 |
|  | Pending | M1473397 | Apr 2, 2014 | | | 21 |
| I LIFT THINGS UP AND PUT THEM DOWN | Registered | 83117 | May 31, 2013 | 77379 | Sep 13, 2013 | 41 |
| IT'S GYM CLASS WITHOUT THE ANNOYING GUY WITH THE WHISTLE. | Registered | 89103 | Apr 2, 2014 | 83114 | Apr 2, 2014 | 25 |
| IT'S GYM CLASS WITHOUT THE ANNOYING GUY WITH THE WHISTLE. | Registered | 89104 | Apr 2, 2014 | 83115 | Apr 2, 2014 | 41 |
| IT'S GYM CLASS WITHOUT THE DODGEBALLS HITTING YOUR FACE. | Registered | 89105 | Apr 2, 2014 | 83116 | Apr 2, 2014 | 25 |
|  | Registered | 1472783 | Apr 1, 2014 | 1517059 | Apr 1, 2014 | 41 |
|  | Registered | 1472784 | Apr 1, 2014 | 1517060 | Apr 1, 2014 | 41 |
| IT'S WORKING OUT IN YOUR FAVOR. | Registered | 89075 | Apr 1, 2014 | 82253 | Apr 1, 2014 | 41 |
| JFZ GYMS | Registered | 1472799 | Apr 1, 2014 | 1467304 | Apr 1, 2014 | 41 |
|  | Registered | 1472792 | Apr 1, 2014 | 1467299 | Apr 1, 2014 | 41 |
| JUDGEMENT FREE | Registered | 1473405 | Apr 2, 2014 | 1476464 | Sept 2, 2014 | 25 |
| JUDGEMENT FREE ZONE | Registered | 1173052 | Apr 20, 2011 | 1239460 | Sep 23, 2011 | 41 |
| JUDGEMENT FREE ZONE | Registered | 1940725 | Aug 31, 2017 | 1912950 | Aug 14, 2018 | 25 |
| JUDGEMENT FREE ZONE | Registered | 1265958 | Apr 13, 2012 | 1309632 | Sep 6, 2012 | 25 |
| JUDGMENT FREE | Registered | 1473403 | Apr 2, 2014 | 1475523 | Apr 2, 2014 | 25 |
| JUDGMENT FREE | Registered | 1473404 | Apr 2, 2014 | 1475524 | Apr 2, 2014 | 41 |
| JUDGMENT FREE ZONE | Registered | 1173055 | Apr 20, 2011 | 1273338 | Mar 13, 2012 | 41 |
| JUDGMENT FREE ZONE | Registered | 1265951 | Apr 13, 2012 | 1309628 | Sep 6, 2012 | 25 |
| LEAVE EGOS HERE | Registered | 1472801 | Apr 1, 2014 | 1467305 | Apr 1, 2014 | 41 |

| | | | | | | |
|---|---|---|---|---|---|---|
|  | Registered | 1472780 | Apr 1, 2014 | 1467193 | Apr 1, 2014 | 41 |
| LUNES DE PIZZA | Registered | 1964064 | Oct 24, 2017 | 1846335 | Feb 15, 2018 | 41 |
| LUNK | Registered | 1473406 | Apr 2, 2014 | 1476465 | Sept 2, 2014 | 25 |
| LUNK | Registered | 1473407 | Apr 2, 2014 | 1476466 | Apr 2, 2014 | 41 |
| LUNK ALARM | Registered | 1940728 | Aug 31, 2017 | 1912951 | Aug 14, 2018 | 41 |
| LUNK ALARM | Registered | 1173054 | Apr 20, 2011 | 1239462 | Sep 23, 2011 | 41 |
| LUNK ALARM | Registered | 1265960 | Apr 13, 2012 | 1309633 | Sep 6, 2012 | 25 |
|  | Registered | 1473385 | Apr 2, 2014 | 1471622 | Apr 2, 2014 | 41 |
| LUNKHEAD | Registered | 1473389 | Apr 2, 2014 | 1471624 | Apr 2, 2014 | 25 |
| LUNKHEADS | Registered | 1473388 | Apr 2, 2014 | 1471623 | Apr 2, 2014 | 25 |
| LUNKS | Registered | 1473391 | Apr 2, 2014 | 1471626 | Apr 2, 2014 | 25 |
| MARTES DE FRUTAS | Registered | 1964067 | Oct 24, 2017 | 1846336 | Feb 15, 2018 | 41 |
| NEW LOCATION! SAME PLANET! | Registered | 1472802 | Apr 1, 2014 | 1467306 | Apr 1, 2014 | 41 |
| NEW NAME-NEW ATMOSPHERE-NO ATTITUDE | Registered | 1472804 | Apr 1, 2014 | 1467307 | Apr 1, 2014 | 41 |
| NO AL BULLGYM | Registered | 1964057 | Oct 24, 2017 | 1846331 | Feb 15, 2018 | 41 |
| NO COMMITMENT! | Registered | 1472805 | Apr 1, 2014 | 1465482 | Apr 1, 2014 | 41 |
| NO COMMITMENT! NO CATCHES! NO KIDDING! | Registered | 83120 | May 31, 2013 | 77382 | Sep 13, 2013 | 41 |
| NO COMMITMENT! NO KIDDING! | Registered | 1472807 | Apr 1, 2014 | 1465483 | Apr 1, 2014 | 41 |
| NO CRITICOS | Registered | 83619 | Jun 27, 2013 | 78801 | Dec 3, 2013 | 41 |
| NO CRITICS | Registered | 1173047 | Apr 20, 2011 | 1243934 | Oct 14, 2011 | 41 |
| NO CRITICS | Registered | 1940737 | Aug 31, 2017 | 1912952 | Aug 14, 2018 | 41 |
| NO CRITICS | Registered | 1265959 | Apr 13, 2012 | 1367092 | May 13, 2013 | 25 |
|  | Registered | 1472785 | Apr 1, 2014 | 1467194 | Apr 1, 2014 | 41 |
| NO DUMBELLS ALLOWED | Registered | 1472808 | Apr 1, 2014 | 1465484 | Apr 1, 2014 | 41 |
| NO EGOS | Registered | 83121 | May 31, 2013 | 77383 | Sep 13, 2013 | 41 |
| NO GIMMICKS | Registered | 1472809 | Apr 1, 2014 | 1465485 | Apr 1, 2014 | 41 |
| NO GIMTIMIDACION | Registered | 1516448 | Aug 13, 2014 | 1507004 | Aug 13, 2014 | 41 |
| NO GYMTIMIDATION | Registered | 1152251 | May 21, 2013 | 1419615 | Jan 22, 2013 | 41 |
| NO GYMTIMIDATION | Pending | 1940735 | Aug 31, 2017 | | | 41 |
| NO HASSELS. NO LUNKS. ALWAYS 10 BUCKS. | Registered | 1472812 | Apr 1, 2014 | 1465488 | Apr 1, 2014 | 41 |
| NO HASSLES. NO BRAINER. | Registered | 1472811 | Apr 1,2014 | 1465487 | Apr 1, 2014 | 41 |
| NO INTIMIDATION | Registered | 1472815 | Apr 1, 2014 | 1465491 | Apr 1, 2014 | 41 |

| | | | | | | |
|---|---|---|---|---|---|---|
| NO INTIMIDATION WHATSOEVER! | Registered | 1472814 | Apr 1, 2014 | 1465490 | Apr 1, 2014 | 41 |
| NO JUDGEMENTS | Registered | 1271199 | May 3, 2012 | 1313103 | Sep 24, 2012 | 25 |
| NO JUDGEMENTS | Registered | 1271200 | May 3, 2012 | 1313104 | Sep 24, 2012 | 41 |
| NO JUDGMENTS | Registered | 1173049 | Apr 20, 2011 | 1239459 | Sep 23, 2011 | 41 |
| NO JUDGMENTS | Registered | 1265961 | Apr 13, 2012 | 1309634 | Sep 6, 2012 | 25 |
| NO LUNKHEADS | Registered | 1473392 | Apr 2, 2014 | 1471627 | Apr 2, 2014 | 25 |
| NO LUNKS | Registered | 1473394 | Apr 2, 2014 | 1471628 | Apr 2, 2014 | 25 |
| NO LUNKS | Registered | 1473395 | Apr 2, 2014 | 1477128 | Apr 2, 2014 | 41 |
| NO LUNKS @ PLANET FITNESS | Registered | 1473393 | Apr 2, 2014 | 1616039 | Feb 22, 2016 | 25 |
| NO SALESMEN. NO CONTRACT. NO KIDDING! | Registered | 1472818 | Apr 1, 2014 | 1465494 | Apr 1, 2014 | 41 |
| NO SALESMEN. NO PRESSURE | Registered | 1473411 | Apr 2, 2014 | 1476469 | Sept 2, 2014 | 41 |
| NO SALESMEN-NO COMMITMENT-NO KIDDING | Registered | 1472819 | Apr 1, 2014 | 1465495 | Apr 1, 2014 | 41 |
| NO SOMOS UN GIMNASIO, SOMOS PLANET FITNESS. | Registered | 83616 | Jun 27, 2013 | 78101 | Oct 28, 2013 | 41 |
| NO SOMOS UN GYM, SOMOS PLANET FITNESS | Registered | 115938 | Oct 24, 2017 | 106553 | Apr 5, 2018 | 41 |
| NO STRINGS, NO OBLIGATIONS, WE PROMISE... | Registered | 1473412 | Apr 2, 2014 | 1476470 | Apr 2, 2014 | 41 |
| NON INTIMIDATING | Registered | 1472817 | Apr 1, 2014 | 1465493 | Apr 1, 2014 | 41 |
| ONE GYM HAS EVOLVED BEYOND GRUNTING | Registered | 89076 | Apr 1, 2014 | 82254 | Apr 1, 2014 | 41 |
| ONLY A DUMBELL WOULD PAY MORE | Registered | 89077 | Apr 1, 2014 | 82255 | Apr 1, 2014 | 41 |
| PE@PF | Pending | 1473386 | Apr 2, 2014 | | | 25 |
| PE@PF | Registered | 1473387 | Apr 2, 2014 | 1613135 | Feb 12, 2016 | 41 |
|  | Registered | 1472786 | Apr 1, 2014 | 1517061 | Apr 1, 2014 | 41 |
| PERTENECES AQUI | Registered | 83618 | Jun 27, 2013 | 78800 | Dec 3, 2013 | 41 |
| PF 12 MINUTE ABS | Registered | 1473414 | Apr 2, 2014 | 1473414 | Jul 4, 2016 | 41 |
|  | Registered | 1473390 | Apr 2, 2014 | 1471625 | Apr 2, 2014 | 25 |
| PF BLACK CARD | Registered | 1378993 | May 31, 2013 | 1400645 | Sep 27, 2013 | 41 |
| PF BLACK CARD CUTS | Pending | 2051609 | May 23, 2018 | | | 44 |
|  | Pending | 2051613 | May 23, 2018 | | | 44 |

| Mark | Status | Serial/App No. | App Date | Reg No. | Reg Date | Class |
|---|---|---|---|---|---|---|
| PF EXPRESS | Registered | 1473415 | Apr 2, 2014 | 1475714 | Apr 2, 2014 | 41 |
| PF EXPRESS 30 MINUTE WORKOUT | Registered | 1473416 | Apr 2, 2014 | 1475715 | Apr 2, 2014 | 41 |
|  | Registered | 1472789 | Apr 1, 2014 | 1467297 | Apr 1, 2014 | 41 |
|  | Registered | 1472788 | Apr 1, 2014 | 1467296 | Apr 1, 2014 | 41 |
|  | Registered | 1472793 | Apr 1, 2014 | 1467300 | Apr 1, 2014 | 41 |
|  | Pending | M1473399 | Apr 2, 2014 | | | 18 |
|  | Pending | M1473400 | Apr 2, 2014 | | | 21 |
|  | Pending | M1473401 | Apr 2, 2014 | | | 25 |
|  | Registered | 1473402 | Apr 2, 2014 | 1651019 | July 4, 2016 | 41 |
| planet fitness | Registered | 1265953 | Apr 13, 2012 | 1309629 | Sep 6, 2012 | 25 |
| planet fitness | Pending | 1940747 | Aug 31, 2017 | | | 25 |
| PF STORE | Registered | 1378994 | May 31, 2013 | 1394098 | Aug 29, 2013 | 35 |
| PF TV | Registered | 1378991 | May 31, 2013 | 1403707 | Oct 15, 2013 | 41 |
|  | Registered | 1375877 | May 22, 2013 | 1651745 | July 5, 2016 | 41 |
|  | Registered | 1472794 | Apr 1, 2014 | 1517063 | Apr 1, 2014 | 41 |
| PIZZA NIGHT | Registered | 1473417 | Apr 2, 2014 | 1475716 | Apr 2, 2014 | 41 |
| PLANET FITNESS | Registered | 1265955 | Apr 13, 2012 | 1309631 | Sep 6, 2012 | 05 |
| PLANET FITNESS | Registered | 1265954 | Apr 13, 2012 | 1309630 | Sep 6, 2012 | 28 |
| PLANET FITNESS | Registered | 1332793 | Dec 10, 2012 | 1358634 | Apr 1, 2013 | 32 |
| PLANET FITNESS | Registered | 1701880 | Jan 13, 2016 | 1637063 | May 9, 2016 | 25 |

| | | | | | | |
|---|---|---|---|---|---|---|
| PLANET FITNESS | Registered | 1818602 | Nov 9, 2016 | 1734728 | May 21, 2017 | 44 |
| PLANET FITNESS | Registered | 1701881 | Jan 13, 2016 | 1637064 | May 9, 2016 | 41 |
|  = no critics | Registered | 1472791 | Apr 1, 2014 | 1517062 | Apr 1, 2014 | 41 |
| PLANET FITNESS VISIONARY | Registered | 1378995 | May 31, 2013 | 1400646 | Sep 27, 2013 | 42 |
|  planet fitness | Registered | 1472790 | Apr 1, 2014 | 1467298 | Apr 1, 2014 | 41 |
|  | Registered | 1173057 | Apr 20, 2011 | 1239463 | Sep 23, 2011 | 41 |
|  | Registered | 1265952 | Apr 13, 2012 | 1309963 | Sep 6, 2012 | 25 |
|  | Registered | 1940739 | Aug 31, 2017 | 1912953 | Aug 14, 2018 | 25 |
|  | Pending | 1940741 | Aug 31, 2017 | | | 41 |
|  | Registered | 1940745 | Aug 31, 2017 | 1823444 | Nov 23, 2017 | 41 |
|  | Registered | 1375876 | May 22, 2013 | 1399907 | Sept 25, 2013 | 41 |
|  | Registered | 1375879 | May 22, 2013 | 1399908 | Sep 25, 2013 | 41 |
| PLANET OF TRIUMPHS | Registered | 1261948 | Nov 24, 2014 | 1261948 | Apr 24, 2017 | 16, 18, 21, 24, 25, 41, 42 |
| PLANETA DE LOGROS | Registered | 1964068 | Oct 24, 2017 | 1846337 | Feb 15, 2018 | 25 |
| PLANETA DE LOGROS | Registered | 1964069 | Oct 24, 2017 | 1843315 | Feb 09, 2018 | 41 |

| | | | | | | |
|---|---|---|---|---|---|---|
| PLANETA DE LOGROS | Registered | 1964070 | Oct 24, 2017 | 1846338 | Feb 15, 2018 | 42 |
| PLANETA LIBRE DE CRITICAS | Registered | 1964060 | Oct 24, 2017 | 1846332 | Feb 15, 2018 | 25 |
| PLANETA LIBRE DE CRITICAS | Registered | 1964061 | Oct 24, 2017 | 1846333 | Feb 15, 2018 | 41 |
| RELAXATION ZONE | Registered | 1473419 | Apr 2, 2014 | 1475717 | Apr 2, 2014 | 41 |
| THIS IS YOUR PLANET | Registered | 83122 | May 31, 2013 | 773834 | Sep 13, 2013 | 41 |
|  | Pending | 1346477 | Nov 3, 2016 | | | 6, 16, 18, 21, 24, 25, 41 |
| WE'RE NOT A GYM. WE'RE PLANET FITNESS. | Registered | 83118 | May 31, 2013 | 77380 | Sep 13, 2013 | 41 |
| WE'RE NOT A GYM. WE'RE... | Registered | 1473409 | Apr 2, 2014 | 1476467 | Sept 2, 2014 | 25 |
| WE'RE NOT A GYM. WE'RE... | Registered | 1473410 | Apr 2, 2014 | 1476468 | Sept 2, 2014 | 41 |
| WWW.PLANETFITNESS.COM | Registered | 1473421 | Apr 2, 2014 | 1475719 | Apr 2, 2014 | 41 |
| YOU BELONG | Registered | 1275264 | May 18, 2012 | 1315642 | Sep 27, 2012 | 41 |
|  | Registered | 1378990 | May 31, 2013 | 1400644 | Sep 27, 2013 | 41 |
| YOWZAH... | Registered | 1473420 | Apr 2, 2014 | 1475718 | Apr 2, 2014 | 41 |
| ZONA DE NO JUZGAR | Registered | 83617 | Jun 27, 2013 | 78799 | Dec 3, 2013 | 41 |

*[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]*

Santa Catarina, NL FA - Appendix A-7

## APPENDIX B-1 – NOT APPLICABLE
## TO THE FRANCHISE AGREEMENT

### OWNERS' PERSONAL GUARANTY OF
### FRANCHISEE'S OBLIGATIONS ("Guaranty")

In consideration of, and as an inducement to, the execution of the Planet Fitness International Franchise Franchise Agreement dated as of the Effective Date, (the "Agreement") by and between Planet Fitness International Franchise ("Franchisor"), and _____ ("Franchisee") each of the undersigned Owners hereby personally and unconditionally: (1) guarantees to Franchisor and its successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement, that Franchisee shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement (and any amendments) and that each and every representation of Franchisee made in connection with the Agreement (and any amendments) are true, correct and complete in all respects at and as of the time given; and (2) agrees personally to be bound by, and personally liable for the breach of, each and every provision in the Agreement (and any amendments), including, without limitation, the confidentiality obligations and non-competition covenants in Articles 8 and 16 of the Agreement, respectively.

Each of the undersigned waives: (a) acceptance and notice of acceptance by Franchisor of the foregoing undertakings; (b) notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed; (c) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed; (d) any right the undersigned may have to require that an action be brought against Franchisee or any other person as a condition of liability; (e) notice of any amendment to the agreement; and (f) any and all other notices and legal or equitable defenses to which the undersigned may be entitled.

Each of the undersigned consents and agrees that: (i) the undersigned's direct and immediate liability under this guaranty shall be joint and several; (ii) the undersigned shall render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses to do so punctually; (iii) such liability shall not be contingent or conditioned upon pursuit by Franchisor of any remedies against Franchisee or any other person; and (iv) such liability shall not be diminished, relieved or otherwise effected by any extension of time, credit or other indulgence which the Franchisor may from time to time grant to Franchisee or to any other person including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims, none of which shall in any way modify or amend this guaranty, which shall be continuing and irrevocable until satisfied in full.

It is further understood and agreed by the undersigned that the provisions, covenants and conditions of the Guaranty will inure to the benefit of our successors and assigns.

This Guaranty shall be governed by the governing law provisions set forth in Article 19.13 of the Agreement and all disputes related to it shall be resolved in accordance with the dispute resolution provisions set forth in Articles 19.12, 19.14, 19.15, and 19.17 of the Agreement.

**IN WITNESS WHEREOF,** each of the undersigned has hereunto affixed the undersigned's signature, under seal, as of the Effective Date of the Agreement.

### GUARANTOR(S):

_____
(Signature)

_____
(Print Name)


_____
(Signature)

_____
(Print Name)

**APPENDIX B-2**
**TO FRANCHISE AGREEMENT**

**AFFILIATE GUARANTY OF**
**FRANCHISEE'S OBLIGATIONS ("AFFILIATE GUARANTY")**

In consideration of, and as an inducement to, the execution of the Planet Fitness International Franchise Franchise Agreement dated as of the Effective Date, (the "Agreement") by and between the Planet Fitness International Franchise ("Franchisor"), and JEG-Mexico Bueno, S de RL de CV ("Franchisee") the undersigned affiliate(s) of Franchisee hereby unconditionally: (1) guarantee to Franchisor and its successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement, that Franchisee shall punctually pay and perform each and every undertaking, agreement and covenant of the Franchisee set forth in the Agreement (and any amendments) and that each and every representation of Franchisee made in connection with the Agreement (and any amendments) are true, correct and complete in all respects at and as of the time given; and (2) agree to be bound by, and liable for the breach of, each and every provision in the Agreement (and any amendments) binding on the Franchisee.

The undersigned waives: (a) acceptance and notice of acceptance by Franchisor of the foregoing undertakings; (b) notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed; (c) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed; (d) any right it may have to require that an action be brought against Franchisee or any other person as a condition of liability; (e) notice of any amendment to the agreement; and (f) any and all other notices and legal or equitable defenses to which it may be entitled.

The undersigned consents and agrees that: (i) its direct and immediate liability under this guaranty shall be joint and several; (ii) it shall render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses to do so punctually; (iii) such liability shall not be contingent or conditioned upon pursuit by Franchisor of any remedies against Franchisee or any other person; and (iv) such liability shall not be diminished, relieved or otherwise effected by any extension of time, credit or other indulgence which the Franchisor may from time to time grant to Franchisee or to any other person including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims, none of which shall in any way modify or amend this guaranty, which shall be continuing and irrevocable until satisfied in full.

It is further understood and agreed by the undersigned that the provisions, covenants and conditions of the Affiliate Guaranty will inure to the benefit of our successors and assigns.

This Affiliate Guaranty shall be governed by the governing law provisions set forth in Article 19.13 of the Agreement and all disputes related to it shall be resolved in accordance with the dispute resolution provisions set forth in Articles 19.12, 19.14, 19.15, and 19.17 of the Agreement.

The undersigned represents and warrants that it is duly formed and in good standing in the jurisdiction in which it is organized; and shall promptly provide to Franchisor its organizational documents, shall, upon request by Franchisor, provide its balance sheet and statement of income on an annual basis by March 30 of each year; and shall promptly provide to Franchisor any information regarding any transfers of interest or sale of substantial assets in the undersigned. In the event of a transfer of control of the undersigned or impairment of the financial capacity of the undersigned to act as a guarantor hereunder, in Franchisor's reasonable judgment, Franchisor shall have the right to require a personal guaranty from Franchisee's Owners in substantially the same form as in this Guaranty.

No default or failure to comply with the terms of this Affiliate Guaranty shall constitute a default of any other franchise agreement that the undersigned may have with Franchisor.

**IN WITNESS WHEREOF,** the undersigned has hereunto affixed its signature, under seal, as of the Effective Date of the Agreement.

JEG-MEX LLC

By: X _____
     (Authorized Representative)

Print Name: _____

Title: Authorized Person.

Dated: _____

Santa Catarina, NL FA - Appendix B-2-1

**APPENDIX C**
**TO FRANCHISE AGREEMENT**

**PERSONAL COVENANTS REGARDING**
**CONFIDENTIALITY AND NON-COMPETITION**
**(OWNER(S) AND OPERATOR)**

In conjunction with your role in **JEG-Mexico Bueno, S de RL de CV** ("Franchisee"), you acknowledge and agree as follows:

1.    Franchisee owns and operates, or is developing, a **PLANET FITNESS** business located or to be located at Ubicado en: Plaza Clouthier Avenida Manuel J. Clouthier 899-A Colonia Mártires de Cananea Santa Catarina, Nuevo León C.P. 66120 (the "Location"), pursuant to an international franchise agreement ("Franchise Agreement") with Planet Fitness International Franchise, which Franchise Agreement requires Responsible Owner, Approved Operator and persons with legal or beneficial ownership interests in Franchisee under certain circumstances to be personally bound by the confidentiality and noncompetition covenants contained in the Franchise Agreement. All capitalized terms contained herein shall have the same meaning set forth in the Franchise Agreement.

2.    You own or intend to own a legal or beneficial ownership interest in Franchisee, or you have been designated an Approved Operator (as defined by the Franchise Agreement) of Franchisee and acknowledge and agree that your execution of this Personal Covenants Regarding Confidentiality and Non-Competition Agreement ("Agreement") is a condition to such ownership interest or such designation, as applicable, and that you have received good and valuable consideration for executing this Agreement. We may enforce this Agreement directly against you and Your Owners (as defined below).

3.    If you are a corporation, partnership, limited liability company or other entity, all persons who have a legal or beneficial interest in you ("Your Owners") must also execute this Agreement.

4.    You and Your Owners, if any, may gain access to parts of our Confidential Information as a result of investing in Franchisee. The Confidential Information is proprietary and includes our trade secrets and industrial secrets. Any Confidential Information you receive shall be subject to the provisions of the Franchise Agreement and any other limitations that we may impose in writing from time-to-time, and You and Your owners agree to abide by such limitations. You and Your Owners hereby agree that while you and they have a legal or beneficial ownership interest in Franchisee and thereafter you and they: (a) will not use the Confidential Information in any other business or capacity (such use being an unfair method of competition) or in any manner not expressly authorized by us; (b) will exert best efforts to maintain the confidentiality of the Confidential Information; and (c) will not make unauthorized copies of any portion of the Confidential Information disclosed in written, electronic or other form. If you or Your Owners cease to have an interest in Franchisee, you and Your Owners, if any, must deliver to us any such Confidential Information in your or their possession.

5.    You specifically acknowledge that you will receive valuable, specialized training, Confidential Information (as defined in Article 8.1 of the Franchise Agreement), and other proprietary and specialized information and knowledge that provide a valuable, competitive advantage in operating a men's, women's, children's, or co-ed fitness, exercise, athletic or wellness facility of any kind. You further acknowledge that we would be unable to protect the Confidential Information against unauthorized use or disclosure or to encourage the free exchange of ideas and information among our franchisees if you were permitted to hold interests in or perform services for a Competitive Business (as defined in Article 1.4 of the Franchise Agreement), and we have granted you the Franchisee certain rights under the Franchise Agreement in consideration of, and in reliance upon, your agreement to deal exclusively with us. You therefore covenant that during the Term of the Franchise Agreement (except as otherwise approved in writing by us), you, Your Owners, and you and their Immediate Families shall not, either directly, indirectly or through, on behalf of, or in conjunction with any person or legal entity:

(a)    Divert or attempt to divert any present or prospective business or customer of any **PLANET FITNESS** business to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System; or

(b)    Own, maintain, operate, engage in, be employed by, act as a consultant for, perform services for, provide assistance to, or have any interest in (as owner or otherwise) any Competitive Business.

You agree that the breach by you of your confidentiality obligations assumed herein shall require you to pay us a conventional penalty of One Thousand U.S. Dollars (US $1,000) for each day that you or any other related party is in violation of this provision, in addition to such other remedies we may have, including the right to injunctive relief, and without the need to obtain an arbitral or judicial resolution.

6.    You covenant that, except as otherwise approved in writing by us, you and Your Owners shall not, for a continuous, uninterrupted period of two (2) years commencing upon the date of (a) a transfer permitted under Article 13 of the Franchise Agreement, (b) expiration of the Franchise Agreement, without your acquisition of a successor franchise, (c) termination of the Franchise Agreement (regardless of the cause for termination), or (d) a final order of a duly authorized arbitrator, panel of arbitrators, or a court of competent jurisdiction (after all appeals have been taken) with respect to any of the foregoing or with respect to enforcement of this Paragraph, either directly or indirectly, for yourself or your Immediate Family, or through, on behalf of, or in conjunction with any person or legal entity, own, maintain, operate, engage in, be employed by, act as a consultant for, perform services for, provide assistance to, or have any interest in (as owner or otherwise) any Competitive Business that is, or is intended to be, located (a) at the Location of the **PLANET FITNESS** business, (b) within twenty five (25) kilometers of the Location, or (c) within twenty five (25) kilometers of any **PLANET FITNESS** business in operation or under construction as of the date that you are required to comply with this Paragraph 6.  You agree and acknowledge that the two (2) year period of this restriction shall be tolled during any time period in which you are in violation of this restriction.

7.    You and each of Your Owners expressly acknowledge the possession of skills and abilities of a general nature and the opportunity to exploit such skills in other ways, so that enforcement of the covenants contained in Articles 5 and 6 will not deprive any of you of your personal goodwill or ability to earn a living. If any covenant herein which restricts competitive activity is deemed unenforceable by virtue of its scope or in terms of geographical area, type of business activity prohibited and/or length of time, but could be rendered enforceable by reducing any part or all of it, you and we agree that it will be enforced to the fullest extent permissible under applicable law and public policy. We may obtain in any court of competent jurisdiction any injunctive relief, including temporary restraining orders, preliminary injunctions, provisional or precautionary measures under applicable Mexican law, against conduct or threatened conduct for which no adequate remedy at law may be available or which may cause it irreparable harm. You and each of Your Owners acknowledges that any violation of Articles 4, 5 or 6 hereof would result in irreparable injury for which no adequate remedy at law may be available. If we file a claim to enforce this Agreement and prevail in such proceeding, you agree to reimburse us for all its costs and expenses, including reasonable attorneys' fees.

*[**Remainder of page intentionally blank, signature page follows**]*

**IN WITNESS WHEREOF,** each of the undersigned has hereunto affixed the undersigned's signature, under seal, as of the Effective Date of the Franchise Agreement.

**RESPONSIBLE OWNER:**

By: _____
    Trey Owen, Individually

Date: _3/4/2019_____

**APPROVED OPERATOR:**

By: _____
    John Williams, Individually

Date: _____

**OTHER OWNERS:**

UNITED PF HOLDINGS, LLC

By: _____
Name & Title:  Ray Owen III, Manager

UNITED PF PARTNERS, LLC

By: _____
Name & Title:  Ray Owen, III, Manager

JLM FINANCIAL PARTNERS, LLC

By: _____
Name & Title:  Ray Owen III, Manager

AK BLAIR PARTNERS, LP

By: _____
Name & Title:  Ray Owen, III, Manager

MPF FINANCIAL, LLC

By: _____
Name & Title:  Larry Meyer, Manager

EZ PF, LLC

By: _____
Name & Title:  Jeff Ezell, Manager

UPFP PREF, LLC

By: _____
Name & Title:  Ray Owen III, Manager

PF LOMASNEY FAMILY, LLC

By: _____
Name & Title: David Lomasney, Managing Member

PF FAMILY INVESTORS, LLC

By: _____
Name & Title:  Greg Henson, President

LANDRY PREFERRED, LLC

By: _____
Name & Title:  John G. Landry, Jr., Manager Partner

LANDRY FOUNDERS, LLC

By: _____
Name & Title:  John G. Landry, Jr., Manager Partner

THE BAJ2911 COMPANY, LLC

By: _____
Name & Title:  Brandon Robinson, Manager

EMP PF, LLC

By: _____
Name & Title:  Andrew Hirsekorn, Manager

AK BLAIR GP, LLC

By: _____
Name & Title:  Ray Owen, III, Manager

GULF COAST PF, LLC

By: _____
Name & Title:  Gary Sinopoli, Managing Member

AZ FAMILY FIT, LLC

By: _____
Name & Title: Steven Thomas, Managing Member

THE CLM 2015 IRREVOCABLE TRUST

By: _____
Name & Title:  Larry Meyer, Trustee

**IN WITNESS WHEREOF,** each of the undersigned has hereunto affixed the undersigned's signature, under seal, as of the Effective Date of the Franchise Agreement.

**RESPONSIBLE OWNER:**

By: _____
      Trey Owen, Individually

Date: _____

**APPROVED OPERATOR:**

By: _____
      John Williams, Individually

Date: _____3|5|19_____

**OTHER OWNERS:**

UNITED PF HOLDINGS, LLC

By: _____
Name & Title:  Ray Owen III, Manager

UNITED PF PARTNERS, LLC

By: _____
Name & Title:  Ray Owen, III, Manager

JLM FINANCIAL PARTNERS, LLC

By: _____
Name & Title:  Ray Owen III, Manager

AK BLAIR PARTNERS, LP

By: _____
Name & Title:  Ray Owen, III, Manager

MPF FINANCIAL, LLC

By: _____
Name & Title:  Larry Meyer, Manager

EZ PF, LLC

By: _____
Name & Title:  Jeff Ezell, Manager

UPFP PREF, LLC

By: _____
Name & Title:  Ray Owen III, Manager

PF LOMASNEY FAMILY, LLC

By: _____
Name & Title: David Lomasney, Managing Member

PF FAMILY INVESTORS, LLC

By: _____
Name & Title:  Greg Henson, President

LANDRY PREFERRED, LLC

By: _____
Name & Title:  John G. Landry, Jr., Manager Partner

LANDRY FOUNDERS, LLC

By: _____
Name & Title:  John G. Landry, Jr., Manager Partner

THE BAJ2911 COMPANY, LLC

By: _____
Name & Title:  Brandon Robinson, Manager

EMP PF, LLC

By: _____
Name & Title:  Andrew Hirsekorn, Manager

AK BLAIR GP, LLC

By: _____
Name & Title:  Ray Owen, III, Manager

GULF COAST PF, LLC

By: _____
Name & Title:  Gary Sinopoli, Managing Member

AZ FAMILY FIT, LLC

By: _____
Name & Title: Steven Thomas, Managing Member

THE CLM 2015 IRREVOCABLE TRUST

By: _____
Name & Title:  Larry Meyer, Trustee

**IN WITNESS WHEREOF,** each of the undersigned has hereunto affixed the undersigned's signature, under seal, as of the Effective Date of the Franchise Agreement.

| | |
|---|---|
| **RESPONSIBLE OWNER:** | **APPROVED OPERATOR:** |

By: _____
    Trey Owen, Individually
Date: _____

By: _____
    John Williams, Individually
Date: _____

**OTHER OWNERS:**

UNITED PF HOLDINGS, LLC

By: _____
Name & Title:  Ray Owen III, Manager

UNITED PF PARTNERS, LLC

By: _____
Name & Title:  Ray Owen, III, Manager

JLM FINANCIAL PARTNERS, LLC

By: _____
Name & Title:  Ray Owen III, Manager

AK BLAIR PARTNERS, LP

By: _____
Name & Title:  Ray Owen, III, Manager

MPF FINANCIAL, LLC

By: _____
Name & Title:  Larry Meyer, Manager

EZ PF, LLC

By: _____
Name & Title:  Jeff Ezell, Manager

UPFP PREF, LLC

By: _____
Name & Title:  Ray Owen III, Manager

PF LOMASNEY FAMILY, LLC

By: _____
Name & Title: David Lomasney, Managing Member

PF FAMILY INVESTORS, LLC

By: _____
Name & Title:  Greg Henson, President

LANDRY PREFERRED, LLC

By: _____
Name & Title:  John G. Landry, Jr., Manager Partner

LANDRY FOUNDERS, LLC

By: _____
Name & Title:  John G. Landry, Jr., Manager Partner

THE BAJ2911 COMPANY, LLC

By: _____
Name & Title:  Brandon Robinson, Manager

EMP PF, LLC

By: _____
Name & Title:  Andrew Hirsekorn, Manager

AK BLAIR GP, LLC

By: _____
Name & Title:  Ray Owen, III, Manager

GULF COAST PF, LLC

By: _____
Name & Title:  Gary Sinopoli, Managing Member

AZ FAMILY FIT, LLC

By: _____
Name & Title: Steven Thomas, Managing Member

THE CLM 2015 IRREVOCABLE TRUST

By: _____
Name & Title:  Larry Meyer, Trustee

**OTHER OWNERS (continued):**

JEG-MEX LLC

By: X _____
    (Authorized Representative)

Print Name: _John T. Williams_

Title: Authorized Person

Dated: _3/5/19_

JEG-FIT ARIZONA LLC

By: X _____
    (Authorized Representative)

Print Name: _John T. Williams_

Title: Authorized Person

Dated: _3/5/19_

JEG-UNITED LLC

By: X _____
    (Authorized Representative)

Print Name: _John T. Williams_

Title: Chief Operating Officer

Dated: _3/5/19_

JEG-PF MEXICO LLC

By: X _____
    (Authorized Representative)

Print Name: _John T. Williams_

Title: Authorized Person

Dated: _3/5/19_

UNITED PF MEX, LLC

By: _____
    (Authorized Representative)

Print Name: _____

Title: _____

Dated: _____

**OTHER OWNERS (continued):**

JEG-MEX, LLC

By: _____
      (Authorized Representative)
Print Name:_____
Title: _____
Dated: _____


JEG-FIT ARIZONA, LLC

By: _____
      (Authorized Representative)
Print Name:_____
Title: _____
Dated: _____


JEG-UNITED, LLC

By: _____
      (Authorized Representative)
Print Name:_____
Title: _____
Dated: _____


JEG-FIT PF MEXICO, LLC

By: _____
      (Authorized Representative)
Print Name:_____
Title: _____
Dated: _____


UNITED PF MEX, LLC

By: _____
      (Authorized Representative)
Print Name:_____
Title: __Larry Meyer_____
Dated: __Manager_____

**AS INDIVIDUALS:**

By: _____
Ray Owen III, Individually

By: _____
Jeff Ezell, Individually

By: _____
Chris Votaw, Individually

By: _____
David Lomasney, Individually

By: _____
John Landry, Individually

By: _____
E. Stockton Croft, Individually

By: _____
Bill Lundstrom, Individually

By: _____
Brad Henson, Individually

By: _____
Debbie Benner, Individually

By: _____
Jennifer Wilson, Individually

By: _____
Scott Lyons, Individually

By: _____
Gary Sinopoli, Individually

By: _____
Michael D. Hurring, Individually

By: _____
Kevin Kelly, Individually

By: _____
John Williams, Individually

By: _____
Larry Meyer, Individually

By: _____
Josh Meyer, Individually

By: _____
Greg Henson, Individually

By: _____
Sharon Lomasney, Individually

By: _____
Brandon Robinson, Individually

By: _____
Ransom James, Individually

By: _____
Andrew Hirsekorn, Individually

By: _____
Seth Henson, Individually

By: _____
Abigail Henson, Individually

By: _____
Rachel Gant, Individually

By: _____
Shannon G. Owen, Individually

By: _____
Robert J. Siragusa, Individually

By: _____
Steven Thomas, Individually

By: _____
Tom Bock, Individually

**AS INDIVIDUALS:**

By: _____
Ray Owen III, Individually

By: _____
Jeff Ezell, Individually

By: _____
Chris Votaw, Individually

By: _____
David Lomasney, Individually

By: _____
John Landry, Individually

By: _____
E. Stockton Croft, Individually

By: _____
Bill Lundstrom, Individually

By: _____
Brad Henson, Individually

By: _____
Debbie Benner, Individually

By: _____
Jennifer Wilson, Individually

By: _____
Scott Lyons, Individually

By: _____
Gary Sinopoli, Individually

By: _____
Michael D. Hurring, Individually

By: _____
Kevin Kelly, Individually

By: _____
John Williams, Individually

By: _____
Larry Meyer, Individually

By: _____
Josh Meyer, Individually

By: _____
Greg Henson, Individually

By: _____
Sharon Lomasney, Individually

By: _____
Brandon Robinson, Individually

By: _____
Ransom James, Individually

By: _____
Andrew Hirsekorn, Individually

By: _____
Seth Henson, Individually

By: _____
Abigail Henson, Individually

By: _____
Rachel Gant, Individually

By: _____
Shannon G. Owen, Individually

By: _____
Robert J. Siragusa, Individually

By: _____
Steven Thomas, Individually

By: _____
Tom Bock, Individually

**AS INDIVIDUALS:**

By: _____
Ray Owen III, Individually

By: _____
Jeff Ezell, Individually

By: _____
Chris Votaw, Individually

By: _____
David Lomasney, Individually

By: _____
John Landry, Individually

By: _____
E. Stockton Croft, Individually

By: _____
Bill Lundstrom, Individually

By: _____
Brad Henson, Individually

By: _____
Debbie Benner, Individually

By: _____
Jennifer Wilson, Individually

By: _____
Scott Lyons, Individually

By: _____
Gary Sinopoli, Individually

By: _____
Michael D. Hurring, Individually

By: _____
Kevin Kelly, Individually

By: _____
John Williams, Individually

By: _____
Larry Meyer, Individually

By: _____
Josh Meyer, Individually

By: _____
Greg Henson, Individually

By: _____
Sharon Lomasney, Individually

By: _____
Brandon Robinson, Individually

By: _____
Ransom James, Individually

By: _____
Andrew Hirsekorn, Individually

By: _____
Seth Henson, Individually

By: _____
Abigail Henson, Individually

By: _____
Rachel Gant, Individually

By: _____
Shannon G. Owen, Individually

By: _____
Robert J. Siragusa, Individually

By: _____
Steven Thomas, Individually

By: _____
Tom Bosk, Individually

**APPENDIX D**
**TO FRANCHISE AGREEMENT**

**ASSUMPTION OF JOINT OBLIGATION AGREEMENT**

**(See attached.)**

| | |
|---|---|
| **CONTRATO DE ASUNCIÓN DE OBLIGACIÓN SOLIDARIA** | **ASSUMPTION OF JOINT OBLIGATION AGREEMENT** |

**CONTRATO DE ASUNCIÓN DE OBLIGACIÓN SOLIDARIA DE FECHA 5 DE MARZO DE 2019 QUE CELEBRAN PLANET FITNESS INTERNATIONAL FRANCHISE (EN LO SUCESIVO "PLANET FITNESS"); Y JEG-MEX, LLC (EN LO SUCESIVO LOS "OBLIGADOS SOLIDARIOS"), POR SU PROPIO DERECHO, DE CONFORMIDAD CON LO SIGUIENTE:**

**ASSUMPTION OF JOINT OBLIGATION AGREEMENT DATED March 5, 2019, ENTERED INTO BY AND BETWEEN PLANET FITNESS INTERNATIONAL FRANCHISE (HEREINAFTER "PLANET FITNESS"); AND JEG-MEX, LLC (HEREINAFTER THE "JOINT OBLIGORS"), ON THEIR OWN BEHALF, ACCORDING TO THE FOLLOWING:**

**A N T E C E D E N T E**

Con fecha 5 de Marzo de 2019, PLANET FITNESS celebró con la sociedad denominada JEG-MEXICO BUENO, SRL (el "**Franquiciatario**"), un contrato de franquicia mediante el cual PLANET FITNESS, en carácter de franquiciante, otorgó al Franquiciatario, en tal carácter, una licencia y franquicia para el uso de un sistema y de ciertas marcas para establecer y operar un negocio denominado Planet Fitness, bajo la marca "Planet Fitness", que se encuentra en el territorio de Santa Catarina, Nuevo León C.P. 66120, México, con una duración de diez 10 años a partir de 14 de Abrilde , 2018 (el "**Contrato de Franquicia**").

**A N T E C E D E N T**

On March 5, 2019, PLANET FITNESS entered into a franchise agreement with the company named JEG-MEXICO BUENO, SRL (the "**Franchisee**"), whereby PLANET FITNESS, in its capacity as franchisor, granted the Franchisee, in such capacity, a license and franchise for the use of a system and certain marks to establish and operate one Planet Fitness business under the trademark "Planet Fitness", consisting of fitness training facilities offering exercise machines and free weights, fitness training services, tanning services, related services and ancillary goods, to be located in the territory of Santa Catarina, Nuevo León C.P. 66120, Mexico, with a duration of ten (10) years as of April 14, 2018 (the "**Franchise Agreement**").

**D E C L A R A C I O N E S**

1. **Declara PLANET FITNESS, por conducto de su representante, que:**

a) Es una sociedad debidamente constituida y existente conforme a las leyes del Cayman Islands y que su representante cuenta con las facultades necesarias a fin de celebrar el presente Contrato en su nombre y representación, y que dichas facultades no le han sido revocadas, restringidas ni modificadas de modo alguno.

b) Es su deseo celebrar el presente Contrato con el objeto de que los Obligados Solidarios se constituyan en obligados solidarios del Franquiciatario y respondan

**R E C I T A L S**

1. **PLANET FITNESS states, through its representative, that:**

a) It is a company duly organized and existing according to the laws of the Cayman Islands and that its representative has the necessary authority to execute this Agreement on its behalf and representation, and that such authority has not been revoked, limited nor modified in any manner whatsoever.

b) It desires to enter into this Agreement in order for the Joint Obligors to constitute themselves in joint obligors of the

y garanticen en favor de PLANET FITNESS el cumplimiento de las obligaciones asumidas por el Franquiciatario conforme al Contrato de Franquicia.

**2.    Declaran los Obligados Solidarios, por su propio derecho, que:**

a)    Es una entidad de los Estados Unidos, con capacidad legal y económica suficiente para celebrar el presente Contrato y responder por el cumplimiento de las obligaciones que asumen conforme al mismo.

b)    Comparecen a celebrar el presente Contrato con el fin de constituirse en obligados solidarios del Franquiciatario y responder y garantizar en favor de PLANET FITNESS el cumplimiento de las obligaciones asumidas por el Franquiciatario conforme al Contrato de Franquicia.

Con base en lo anterior, las partes convienen en otorgar y obligarse conforme a las siguientes:

## C L Á U S U L A S

**PRIMERA.**    Los Obligados Solidarios en este acto se constituye en obligados solidarios del Franquiciatario frente a y en favor de SCH PLANET FITNESS, y se obliga a responder por y garantizar el oportuno cumplimiento de todas y cada una de las obligaciones asumidas por el Franquiciatario conforme al Contrato de Franquicia, de conformidad con lo previsto en los artículos 1987, 1988, 1989, 1995 y 2002 y demás aplicables del Código Civil Federal y artículos correlativos de los Códigos Civiles para cada una de la entidades federativas que conforman los Estados Unidos Mexicanos y para el Distrito Federal.

**SEGUNDA.**    La obligación solidaria asumida por los Obligados Solidarios conforme al presente Contrato estará en plena fuerza y vigor durante el tiempo en que se encuentre vigente el Contrato de Franquicia y hasta en tanto PLANET FITNESS se dé por satisfecha del cumplimiento de todas y cada una de las obligaciones a cargo del Franquiciatario en términos del Contrato de Franquicia, y emita en favor de los Obligados Solidarios un finiquito de

Franchisee and respond and guarantee in favor of PLANET FITNESS the fulfillment of the obligations assumed by the Franchisee according to the Franchise Agreement.

**2.    The Joint Obligors state, on their own behalf, that:**

a)    It is a United States entity, with sufficient legal and economic capacity to execute this Agreement and to respond for the compliance of the obligations assumed herein.

b)    They appear to enter into this Agreement in order to constitute themselves in joint obligors of the Franchisee and to respond and guarantee in favor of PLANET FITNESS the fulfillment of the obligations assumed by the Franchisee according to the Franchise Agreement.

Based on the foregoing, the parties agree to grant and be bound in accordance with the following:

## C L A U S E S

**FIRST.** The Joint Obligors hereby constitute themselves in joint obligors of the Franchisee, in front and in favor of PLANET FITNESS, and assume the obligation to respond for and guarantee the timely compliance of each and all obligations assumed by the Franchisee according to the Franchise Agreement, pursuant to the provisions contained in articles 1987, 1988, 1989, 1995 and 2002 and other applicable of the Federal Civil Code and correlative articles of the Civil Codes for each of the federative entities conforming the United Mexican States and for the Federal District.

**SECOND.**    The joint obligation assumed by the Joint Obligors according to this Agreement shall be in full force and effect during the time on which the Franchise Agreement is in effect and until PLANET FITNESS is satisfied for the compliance of each and all of the obligations in charge of the Franchisee in terms of the Franchise Agreement, and a written release of obligations evidencing the foregoing is issued by PLANET FITNESS in favor of the Joint Obligors. This Agreement and the obligations assumed by the Joint Obligors according to same shall continue in full force and effect notwithstanding that the

obligaciones por escrito que así lo acredite. El presente Contrato y las obligaciones asumidas por los Obligados Solidarios conforme al mismo continuarán en plena fuerza y vigor no obstante que el Contrato de Franquicia sea modificado, prorrogado, expire o termine anticipadamente por cualquier causa.

**TERCERA.** Ante cualquier incumplimiento del Franquiciatario respecto de sus obligaciones conforme al Contrato de Franquicia, PLANET FITNESS estará facultada para exigir el cumplimiento de dicha obligación a todos y/o a cualquiera de los Obligados Solidarios, sin que sea necesario que PLANET FITNESS agote procedimiento alguno en forma previa en contra del Franquiciatario y/o de uno o más de los Obligados Solidarios. Las partes acuerdan que en caso de que se verifique el supuesto señalado en la presente cláusula y de que uno o más de los Obligados Solidarios se vean obligados a subsanar cualquier incumplimiento del Franquiciatario respecto de las obligaciones de este último derivadas del Contrato de Franquicia, los Obligados Solidarios que hayan subsanado dicha obligación quedarán subrogados en los derechos de PLANET FITNESS frente al Franquiciatario y a los otros Obligados Solidarios, de ser el caso, por lo que se refiere a la obligación subsanada y podrán, a su entera discreción, repetir en contra del Franquiciatario y de los otros Obligados Solidarios.

**CUARTA.** En caso de que los Obligados Solidarios deban cumplir con cualquier obligación a cargo del Franquiciatario conforme al Contrato de Franquicia, en cumplimiento del presente Contrato, éstos deberán cumplir con dicha obligación, a partir de la fecha en que así lo requiera PLANET FITNESS a cualquiera de los Obligados solidarios, conforme a lo establecido en el Contrato de Franquicia.

**QUINTA.** Los Obligados Solidarios garantizan y asumen en forma solidaria e ilimitada todas y cada una de las obligaciones asumidas por el Franquiciatario conforme al Contrato de Franquicia, según dicho instrumento pueda ser modificado de tiempo en tiempo, el cual, con sus respectivos anexos se adjunta en copia simple al presente Contrato como Anexo "A". Será responsabilidad de los Obligados Solidarios obtener del Franquiciatario la información relativa a cualquier modificación del Contrato de Franquicia que PLANET FITNESS y el Franquiciatario puedan pactar, sin que la falta de

Franchise Agreement is modified, extended, expires or terminates in advance for any reason.

**THIRD.** Upon any breach by the Franchisee with respect to its obligations under the Franchise Agreement, PLANET FITNESS will be entitled to request to all and/or any of the Joint Obligors the compliance of such obligation, without being necessary that PLANET FITNESS previously completes any procedure against the Franchisee and/or one or more of the Joint Obligors. The parties hereby agree that upon the case indicated in this clause and if one or more of the Joint Obligors are obliged to remedy any breach of the Franchisee with respect to the obligations of the latter derived from the Franchise Agreement, the Joint Obligors that have remedied said obligation shall subrogate themselves in the rights of PLANET FITNESS in front of the Franchisee and the other Joint Obligors, if that is the case, as to the remedied obligation and will be entitled, at their sole discretion, to repeat against the Franchisee and the other Joint Obligors.

**FOURTH.** In the event that under this Agreement the Joint Obligors are obliged to fulfill any obligation in charge of the Franchisee according to the Franchise Agreement, the Joint Obligors shall have to comply with their obligation, as of the date on which any of them receives the corresponding requirement from PLANET FITNESS.

**FIFTH.** The Joint Obligors guarantee and assume in a jointly and unlimited manner each and all of the obligations assumed by the Franchisee under the Franchise Agreement, as such instrument may be modified from time to time, which simple copy with its respective exhibits is attached hereto as Exhibit "A". It will be the Joint Obligors' responsibility to obtain from the Franchisee the information related to any amendment of the Franchise Agreement that PLANET FITNESS and the Franchisee may agree, and the failure by the Joint Obligors to obtain such information will not limit or affect in any manner the obligations of the Joint Obligors pursuant to this Agreement.

**SIXTH.** This Agreement constitutes the entire

obtención de dicha información limite o afecte de modo alguno las obligaciones de los Obligados Solidarios conforme al presente Contrato.

**SEXTA.** El presente Contrato constituye la totalidad de los acuerdos de las partes en relación con los asuntos aquí contemplados, por lo que cualquier pacto, convenio o acuerdo, verbal o escrito que hayan celebrado con anterioridad a la fecha de firma de este documento, respecto del objeto de este Contrato, quedará sin efecto alguno.

**SÉPTIMA.**     Este Contrato sólo podrá ser modificado mediante acuerdo por escrito entre las partes. Los Obligados Solidarios no podrán ceder los derechos que adquieren ni las obligaciones que asumen en los términos de este instrumento. Por su parte, PLANET FITNESS estará facultada para ceder el presente Contrato, ya sea parcial o totalmente, mediante simple aviso por escrito a los Obligado Solidarios.

**OCTAVA.**     Todos los avisos y notificaciones que las partes deban o deseen hacerse en los términos de este Contrato se realizarán por escrito a los domicilios que se indican a continuación.  La parte que realice el aviso o notificación deberá obtener prueba de que el mismo fue entregado y recibido por el destinatario en el domicilio respectivo.  Para dichos efectos y hasta en tanto las partes no notifiquen cambio de domicilio conforme a lo anterior, las partes señalan como sus domicilios los siguientes:

PLANET FITNESS
**Planet Fitness International Franchise**
190 Elgin Avenue
Georgetown, Grand Cayman
KY1-9005
Atención: General Counsel

**Los Obligados Solidarios**

**JEG-MEX, LLC**
7101 W Hwy 71, Suite U-2, Austin, TX 78735

**NOVENA.**     Para todo lo relativo a la interpretación y cumplimiento del presente Contrato, las partes se someten a las leyes aplicables y a los tribunales competentes del Distrito Federal, México, renunciando expresamente a cualquier otro fuero que pudiera corresponderles en virtud de sus domicilios presentes o futuros, por la ubicación de

agreement between the parties in connection with the subject matter contemplated hereby; therefore, any written or verbal agreement, contract or arrangement, entered into prior to the date of execution of this document, with respect to the subject matter hereof, shall have no effect.

**SEVENTH.**     This Agreement can only be amended by written agreement of the parties. The Joint Obligors will not be entitled to assign the rights that they acquire nor the obligations that they assume in terms of this instrument. On its part, PLANET FITNESS shall be entitled to assign this Agreement, partially or totally, through simple written notice to the Joint Obligors.

**EIGHTH.**     All notices and notifications to be given by the parties under this Agreement shall be made in writing to the addresses indicated below. The party giving the notice or notification shall obtain evidence that the same was delivered and received by the addressee at the respective domicile. For such purposes and until the parties notify a change of address according to the foregoing, the parties appoint the following as their domiciles:

PLANET FITNESS
**Planet Fitness International Franchise**
190 Elgin Avenue
Georgetown, Grand Cayman
KY1-9005
Attention: General Counsel

**The Joint Obligors**

**JEG-MEX, LLC**
7101 W Hwy 71, Suite U-2, Austin, TX 78735

**NINTH.** For all related to the interpretation and performance of this Agreement, the parties expressly submit themselves to the applicable laws and the corresponding courts of the Federal District, Mexico, expressly waiving any other forum to which they might be entitled by reason of their present or future domiciles, for the location of their assets, or by any other cause.

sus bienes, o por cualquier otra causa.

**DÉCIMA.**        El presente Contrato se firma en idioma español con su traducción al idioma inglés para efectos informativos únicamente. En caso de cualquier diferencia entre ambas versiones, la versión en español prevalecerá.

**EN TESTIMONIO DE LO CUAL**, el presente Contrato se firma con efectos a partir de la fecha indicada en el encabezado del mismo.

**TENTH.**        This Agreement is executed in Spanish language with its translation into English language for informative purposes only. In case of any difference between both versions, the Spanish version shall prevail.

**IN WITNESS WHEREOF**, this Agreement is executed effective as of the date first above written.

[El siguiente espacio se deja en blanco intencionalmente; firmas en la siguiente hoja]
[The following space is left in blank intentionally; signature on next page]

I, John Cullinane, Notary Public in and
for the Cayman Islands, do hereby certify that

DARREN RILEY

appeared before me and executed this
document, in witness where of I have
subscribed my name and set and affixed my
seal of office.

John Cullinane
Date: 5 /3/ 19
My appointment expires: 31 January 20 20

**PLANET FITNESS INTERNATIONAL FRANCHISE**

Por / By: _____

Nombre / Name:  Darren Riley

Cargo / Title:  Director

**LOS OBLIGADOS SOLIDARIOS / THE JOINT OBLIGORS**

JEG-MEX, LLC

Por / By: _____

Nombre / Name: _____

Cargo / Title: Authorized Person

La presente es la hoja de firmas del Contrato de Asunción de Obligación solidaria de fecha 5 de Marzo de 2019, celebrado entre Planet Fitness International Franchise y JEG-MEX LLC.

This is the signatures page of the Assumption of Joint Obligation Agreement dated March 5, 2019, entered into between Planet Fitness International Franchise and JEG-MEX LLC.

\*        \*        \*

**PLANET FITNESS INTERNATIONAL FRANCHISE**

Por / By: _____

Nombre / Name:  Darren Riley

Cargo / Title:  Director

**LOS OBLIGADOS SOLIDARIOS / THE JOINT OBLIGORS**

JEG-MEX, LLC

Por / By: _____

Nombre / Name: _____

Cargo / Title: Legal Representative

La presente es la hoja de firmas del Contrato de Asunción de Obligación solidaria de fecha 5 de Marzo de 2019, celebrado entre Planet Fitness International Franchise y JEG-MEX LLC.

This is the signatures page of the Assumption of Joint Obligation Agreement dated March 5, 2019, entered into between Planet Fitness International Franchise and JEG-MEX LLC.

\*          \*          \*

<table>
<tr><td align="center">

**ANEXO "A"**

**COPIA DEL CONTRATO DE FRANQUICIA Y SUS ANEXOS**

</td><td align="center">

**EXHIBIT "A"**

**COPY OF THE FRANCHISE AGREEMENT AND ITS EXHIBITS**

</td></tr>
</table>

**APPENDIX E**
**TO FRANCHISE AGREEMENT**

**OWNERSHIP ADDENDUM**

1.     **RESPONSIBLE OWNER**. The name, address, and e-mail address of the Responsible Owner is as follows: Ray Owen, III (trey@owencompany.com), 9108 Zyle Road, Austin, Texas 78737

2.     **APPROVED OPERATOR**. The name, home address, and e-mail address of the Approved Operator is as follows: John Williams (john.williams@planetfitness.com), 105 Ferris Lane, Unit A5, New Britain, PA 18901

3.     **ENTITY DETAILS.**

Franchisee is a company duly organized and validly existing in accordance with the laws of the United Mexican States, as evidenced in public deed No. 33,553, Serial number 152,401, Book 764, dated January 19, 2017, granted before Gustavo Escamilla Flores, Notary Public No. 26 for Monterrey, Nuevo Leon, which first true copy was recorded with the Public Registry of Commerce of Nuevo Leon under Mercantile Folio No. 2017013909, effective as of February 14, 2017..  The tax ID for Franchisee is JBU170119F79.

| Name of Each Director/Officer/Partner/Manager/Managing Member | Position(s) Held |
| --- | --- |
| JEG-United LLC | Indirect Owner |
| Andrew Hirsekorn | Manager of JEG-United |
| Larry Meyer | Manager of JEG-United |
| Jeff Ezell | Manager of JEG-United |
| Stockton Croft | Manager of JEG-United |
| Kevin Kelly | Manager of JEG-United |
| Tom Bock | Manager of JEG-United |
| John Williams | Manager of JEG-United |

4.     **OWNERS.**

(a)     Franchisee and each of its Owners represent and warrant that the following is a complete and accurate list of all Owners of any interest whatsoever in Franchisee, including the full name, e-mail address, and mailing address of each Owner, and fully describes the nature and extent of each Owner's interest in Franchisee. Franchisee and each Owner as to his ownership interest, represents and warrants that each Owner is the sole and exclusive legal and beneficial owner of such Owner's ownership interest in Franchisee, free and clear of all liens, restrictions, agreements and encumbrances of any kind or nature, other than those required or permitted by this Agreement.

| Owners of Franchisee | Percentage and Nature of Ownership Interest |
| --- | --- |
| JEG-MEX, LLC (FEIN: FEIN: 81-3753736) | 99% |
| A Wyoming limited liability company | |
| 7101 W Hwy 71, Suite U-2, Austin, Texas 78735 | |
| | |
| JEG-FIT ARIZONA, LLC (FEIN: 45-1766091) | 1% |
| An Arizona limited liability company | |
| 7101 W Hwy 71, Suite U-2, Austin, Texas 78735 | |

| Owner of JEG-MEX, LLC | Percentage and Nature of Ownership Interest |
| --- | --- |
| JEG-United, LLC (FEIN: 83-1846202) | 100% |
| A Delaware limited liability company | |
| 7101 W Hwy 71, Suite U-2, Austin, Texas 78735 | |

Owner of JEG-FIT ARIZONA, LLC       Percentage and Nature of Ownership Interest
JEG-United LLC (FEIN: 83-1846202)            100%
A Delaware limited liability company
7101 W Hwy 71, Suite U-2, Austin, Texas 78735

Owners of JEG-United, LLC       Percentage and Nature of Ownership Interest
JEG-PF Mexico, LLC (FEIN: 83-1846093)          50%
A Delaware limited liability company
2800 Southampton Road, Philadelphia, PA 19154

United PF MEX, LLC (FEIN: 83-1751569)          50%
A Delaware limited liability company
7101 W Hwy 71, Suite U-2, Austin, Texas 78735

Owners of JEG-PF Mexico       Percentage and Nature of Ownership Interest
Tom Bock          33 1/3%
c/o JEG-PF Mexico LLC
2800 Southampton Road, Philadelphia, PA 19154

Kevin Kelly          33 1/3%
12950 N. 119th Street, Scottsdale, AZ 85259

John Williams          33 1/3%
105 Ferris Lane, Unit A5, New Britain, PA 18901

Owner of United PF MEX, LLC       Percentage and Nature of Ownership Interest
United PF Holdings, LLC (FEIN: 81-3686064)          100%
A Delaware Limited Liability Company
7101 W Hwy 71, Suite U-2, Austin, Texas 78735

Owner of United PF Holdings, LLC       Percentage and Nature of Ownership Interest
United PF Partners, LLC (FEIN: 81-3701914)          100%
A Delaware Limited Liability Company
7101 W Hwy 71, Suite U-2, Austin, Texas 78735

Owners of United PF Partners, LLC       Percentage and Nature of Ownership Interest
JLM Financial Partners, LLC (FEIN: 38-3975373)       41.4350%
A Texas Limited Liability Company
3839 Bee Caves Road, Suite 205, Austin, TX 78746

     AK Blair Partners, LP (FEIN: 35-2562969)       45.50%
     A Texas Limited Partnership
     9108 Zyle Road,  Austin, Texas 78737
     c/o Ray "Trey" Owen III

         Ray "Trey" Owen III (trey@owencompany.com)       49.5%
         9108 Zyle Road, Austin, Texas 78737

         Shannon G. Owen (trey@owencompany.com)       49.5%
         9108 Zyle Road, Austin, Texas 78737

         AK Blair GP, LLC (FEIN: 81-2772908)       1%
         A Texas Limited Liability Company
         9108 Zyle Road, Austin, Texas 78737
         c/o Ray "Trey" Owen III (trey@owencompany.com)

|  |  |
|---|---|
| Ray "Trey" Owen III (trey@owencompany.com)<br>9108 Zyle Road, Austin, Texas 78737 | 50% |
| Shannon G. Owen (trey@owencompany.com)<br>9108 Zyle Road, Austin, Texas 78737 | 50% |

MPF Financial, LLC (FEIN: 32-0470280)                    42%
A Texas Limited Liability Company
P.O. Box 154369, Waco, Texas 76150
c/o Larry Meyer, Its Manager

    The CLM 2015 Irrevocable Trust                    100%
    c/o Larry Meyer, Trustee (lmeyer@larrymeyer.com)
    P.O. Box 154369, Waco, Texas 76150

EZ PF, LLC (FEIN: 81-4063731)                    5.0%
A Texas Limited Liability Company
1109 Mission Ridge, Austin, Texas 78704
c/o Jeff Ezell, Its Sole Member

    Jeff Ezell (jeff@jlmfinancialinvestments.com)                    100%
    1109 Mission Ridge, Austin, Texas 78704

Josh Meyer (josh@jlmfinancialinvestments.com)                    0.5%
2607 Chalk Knoll Cove, Austin, Texas 78735

Jessica and Chris Votaw                    0.5%
8404 Burkwood Cove, Austin, Texas 78735
(cvotaw@jlmfinancialinvestments.com)

EMP PF, LLC (FEIN: 81-4211763)                    34.6420% in the aggregate
A Delaware Limited Liability Company
3060 Peachtree Road, Suite 360, Atlanta, Georgia 30305

    <u>Eagle Individuals</u>
    E. Stockton Croft (SCroft@eaglemerchantpartners.com)
    3060 Peachtree Road, Suite 360, Atlanta, Georgia 30305

    Ransom James (RJames@eaglemerchantpartners.com)
    3060 Peachtree Road, Suite 360, Atlanta, Georgia 30305

    Bill Lundstrom (BLundstrom@eaglemerchantpartners.com)
    3060 Peachtree Road, Suite 360, Atlanta, Georgia 30305

    Andrew Hirsekorn (AHirsekorn@eaglemerchantpartners.com)
    3060 Peachtree Road, Suite 360, Atlanta, Georgia 30305

UPFP Pref, LLC (FEIN: 81-4176651)                    10%
A Delaware Limited Liability Company
7101 W Hwy 71, Suite U-2, Austin, Texas 78735

    PF Lomasney Family, LLC (FEIN: 81-4229929)                    5%
    A Delaware Limited Liability Company
    33 Castlebridge Lane, Hilton Head, South Carolina 29928
    c/o David and Sharon Lomasney (dlomasney@planetfitnessgyms.com)

David Lomasney (dlomasney@planetfitnessgyms.com)    50%
33 Castlebridge Lane, Hilton Head, South Carolina 29928

Sharon Lomasney (slomasney00@aol.com)    50%
33 Castlebridge Lane, Hilton Head, South Carolina 29928

PF Family Investors, LLC (FEIN: 81-4180926)    5%
A Missouri Limited Liability Company
4251 North East Port Drive, Lee's Summit, Missouri 64064
c/o Greg Henson (greg@heartlandtan.com)

Greg Henson (greg@heartlandtan.com)    52%
4251 North East Port Drive, Lee's Summit, Missouri 64064

Brad Henson (bradh@heartlandtan.com)    25%
15170 Lakeport Lane, Smithville, Missouri 64089

Seth Henson (sethh@pfkcmo.com)    10%
12 East 69th Terrace, Kansas City, Missouri 64113

Debbie Benner (debnsteve@comcast.net)    5%
4928 Peck Avenue, Independence, Missouri 64055

Abigail Henson (abbyclemmer@mac.com)    4%
12447 S. Ortega Drive, Olathe, Kansas 66062

Jennifer Wilson (Wilson61502@yahoo.com)    4%
3108 SW Ragan Drive, Lee's Summit, Missouri 64082

Landry Preferred, LLC (FEIN: 81-4172618)    6%
A Mississippi Limited Liability Company
24629 Oak Island Drive, Pass Christian, Mississippi 39571
c/o John Landry (johnlandry@cableone.net)

John Landry (johnlandry@cableone.com)    77.4%
24629 Oak Island Drive, Pass Christian, Mississippi 39571

Rachel Gant (charlie@gant-brown.com)    17.6%
9326 Lobouy Road, Pass Christian, Mississippi 39571

Scott Lyons (slyons100@yahoo.com)    5%
1314 Berwick Drive, Hoover, Alabama 35242

The BAJ2911 Company, LLC (FEIN: 81-4225764)    2%
A Louisiana Limited Liability Company
1130 S. Fieldspan Road, Duson, Louisiana 70529
c/o Brandon Robinson (brandonandammie@cox.net)

Brandon Robinson (brandonandammie@cox.net)    100%
1130 S. Fieldspan Road, Duson, Louisiana 70529

Gulf Coast PF, LLC (FEIN 82-2835738)    6%
A Mississippi Limited Liability Company
5603 Chalone Place, Ocean Springs, MS, 39564
c/o Gary Sinopoli (gjsinopoli@yahoo.com)

| | |
|---|---|
| Gary Sinopoli<br>5603 Chalone Place, Ocean Springs, MS, 39564 | 33.33% |
| Robert J. Siragusa<br>6001 Olde Oak View Road, Ocean Springs, MS 39564 | 33.33% |
| Micheal D. Hurring<br>9621 Oak Crest Lane, Ocean Springs, MS, 39564 | 33.33% |

AZ Family Fit, LLC (FEIN: 45-4496753)     1.34%
An Arizona Limited Liability Company
70 N Payne Place, Suite 2, Sedona, AZ 86336
c/o Steve Thomas (stevesedona@gmail.com)

> Steve Thomas (stevesedona@gmail.com)     100%
> 70 N Payne Place, Suite 2, Sedona, AZ 86336

<u>Management Stock Options</u>     7.13% in the aggregate
Landry Founders, LLC (FEIN: 81-4190322)     0.5%
A Mississippi Limited Liability Company
24629 Oak Island Drive, Pass Christian, Mississippi 39571
c/o John Landry (johnlandry@cableone.net)

> John Landry (johnlandry@cableone.net)     100%
> 24629 Oak Island Drive, Pass Christian, Mississippi 39571

The BAJ2911 Company, LLC (FEIN: 81-4225764)     1.0%
A Louisiana Limited Liability Company
1130 S. Fieldspan Road, Duson, Louisiana 70529
c/o Brandon Robinson (brandonandammie@cox.net)
(See above for ownership breakdown)

PF Lomasney Family, LLC (FEIN: 81-4229929)     1.0%
A Delaware Limited Liability Company
33 Castlebridge Lane, Hilton Head, South Carolina 29928
c/o David and Sharon Lomasney (dlomasney@planetfitnessgyms.com)
(See above for ownership breakdown)

PF Family Investors, LLC (FEIN: 81-4180926)     0.5%
A Missouri Limited Liability Company
4251 North East Port Drive, Lee's Summit, Missouri 64064
c/o Greg Henson (greg@heartlandtan.com)
(See above for ownership breakdown)

(b)    **Ownership Group.** *Intentionally omitted.*


*[This space intentionally left blank; end of Appendix E]*

## APPENDIX F
## TO THE FRANCHISE AGREEMENT

### SILENT INVESTORS

Franchisee owns and operates, or is developing, a **PLANET FITNESS** business pursuant to the Franchise Agreement. Capitalized terms not defined herein have the meanings set forth in the Franchise Agreement. Franchisee and its Owners each acknowledge and agree as follows:

1.   Silent Investor.   As used in the Franchise Agreement and herein, the term "Silent Investor" means and refers to the following individuals and/or entities:

| Silent Investor Name and Address | Percentage Ownership Interest |
|---|---|
| Silent Investor: Addington Square United PF Holdings Inc.<br>Address: 500 West 5th Street, Suite 1100, Austin, TX 78701<br>Contact: Justin Grimm | 0.8833562% in United PF Partners, LLC |
| Silent Investor: AB Private Credit Investors Middle Market Direct Lending Fund, L.P.<br>Address: 500 West 5th Street, Suite 1100, Austin, TX 78701<br>Contact: Justin Grimm | 2.51314348% in United PF Partners, LLC |
| Silent Investor: Goldman, Sachs & Co.<br>Address: 2001 Ross Avenue, Suite 2800, Dallas, TX 75201<br>Contact: Colleen Edmondson | 3.3965% in United PF Partners, LLC |
| Silent Investor: Chaucer Investments, LLC<br>Address: 3209 Rustic Rover Cove, Austin TX 78701 | 1% in JLM Financial Partners, LLC |
| Silent Investor: Frank Krasovec<br>Address: 98 San Jacinto Blvd, Suite 2020, Austin, TX 78701 | 1% in JLM Financial Partners, LLC |
| Silent Investor: Kevin Irons<br>Address: 6341 Spanish Oaks Club Blvd., Austin, TX 78738 | 1% in JLM Financial Partners, LLC |
| Silent Investor: John C. Lewis<br>Address: 3839 Bee Caves Road, Suite 204, Austin, TX 78746 | 1% in JLM Financial Partners, LLC |
| Silent Investor: Palmieri Family Revocable Trust<br>Address: 6907 Capital of Texas Highway, Austin, TX 78731 | 0.5% in JLM Financial Partners, LLC |
| Silent Investor: John T. Mitchell<br>Address: 5018 Latrobe Drive, Windermere, FL 34786 | 2% in JLM Financial Partners, LLC |
| Silent Investor: Minturn Partners<br>Address: 200 Providence Road, Ste 210, Charlotte, NC 28207<br>Contact: Sam Bowles | 2% in UPFP Pref, LLC |
| Silent Investor: Service Lloyds Insurance Company<br>Address: 6907 Capital of Texas Highway, Austin, TX 78731<br>Contact: Cosmo Palmieri | 16.2% in UPFP Pref, LLC |
| Silent Investor: Fitness 3 Amigos, LLC<br>Address: 6907 Capital of Texas Highway, Austin, TX 78731<br>Contact: Cosmo Palmieri | 3% in UPFP Pref, LLC |
| Silent Investor: Mansfield Group Ltd.<br>Address: 6907 Capital of Texas Highway, Austin, TX 78731<br>Contact: Cosmo Palmieri | 1% in UPFP Pref, LLC |
| Silent Investor: Palmieri Family Revocable Trust<br>Address: 6907 Capital of Texas Highway, Austin, TX 78731<br>Contact: Cosmo Palmieri | .18% in UPFP Pref, LLC |
| Silent Investor: JGT Asset Management, Ltd.<br>Address: 6907 Capital of Texas Highway, Austin, TX 78731<br>Contact: Janey Gray Trowbridge | 2% in UPFP Pref, LLC |
| Silent Investor: Trowbridge 2006 Revocable Trust<br>Address: 6907 Capital of Texas Highway, Austin, TX 78731<br>Contact: Janey Gray Trowbridge | 2% in UPFP Pref, LLC |
| Silent Investor: William C. Pfluger<br>Address: 2133 Office Park Drive, San Angelo, TX 76904<br>Contact: Bill Pfluger | 11.96% in UPFP Pref, LLC |
| Silent Investor: Pfluger Limited Partnership II<br>Address: 2133 Office Park Drive, San Angelo, TX 76904<br>Contact: Bill Pfluger | 0.5% in UPFP Pref, LLC |

| | |
|---|---|
| Silent Investor: B & K Pfluger Limited Partnership II<br>Address: 2133 Office Park Drive, San Angelo, TX 76904<br>Contact: Bill Pfluger | 0.5% in UPFP Pref, LLC |
| Silent Investor: Karyl Johnson<br>Address: 2133 Office Park Drive, San Angelo, TX 76904 | 0.04% in UPFP Pref, LLC |
| Silent Investor: Reid Pfluger<br>Address: 2133 Office Park Drive, San Angelo, TX 76904 | 1.2% in UPFP Pref, LLC |
| Silent Investor: Zachary C. Pfluger Irrevocable Trust<br>Address: 2133 Office Park Drive, San Angelo, TX 76904<br>Contact: Reid Pfluger | 0.26% in UPFP Pref, LLC |
| Silent Investor: Allyson M. Pfluger Irrevocable Trust<br>Address: 2133 Office Park Drive, San Angelo, TX 76904<br>Contact: Reid Pfluger | 0.26% in UPFP Pref, LLC |
| Silent Investor: Patricia E. Pfluger Irrevocable Trust<br>Address: 2133 Office Park Drive, San Angelo, TX 76904<br>Contact: Reid Pfluger | 0.26% in UPFP Pref, LLC |
| Silent Investor: Matthew B. Pfluger Trust<br>Address: 4605 Wild Cow Cove, Spicewood, TX 78669<br>Contact: Michael or Lori Pfluger | 0.6% in UPFP Pref, LLC |
| Silent Investor: Katherine Pfluger Trust<br>Address: 4605 Wild Cow Cove, Spicewood, TX 78669<br>Contact: Michael or Lori Pfluger | 0.6% in UPFP Pref, LLC |
| Silent Investor: F. L. Stephens<br>Address: 3471 Knickerbocker Road, Suite 312,<br>San Angelo, TX 76904<br>Contact: Steve Stephens | 10% in UPFP Pref, LLC |
| Silent Investor: William and Dorothy Green<br>Address: 9108 Zyle Road, Austin, TX 78737 | 2.6% in UPFP Pref, LLC |
| Silent Investor: Edward and Ellen McClaran<br>Address: 1522 NE 49th Ave, Portland, OR 97213 | 0.7% in UPFP Pref, LLC |
| Silent Investor: Kent Daniel<br>Address: 13315 La Vista Drive, San Antonio, TX 78216 | 1.3% in UPFP Pref, LLC |
| Silent Investor: Tracy Daniel<br>Address: 4618 28th Street, Lubbock, TX 79410 | .5% in UPFP Pref, LLC |
| Silent Investor: Cecile C. Bartman Trust dated 9/26/2001<br>Address: 11777 San Vicente Blvd., Suite 600,<br>Los Angeles, CA 90049<br>Contact: David or John Bartman | 1.9% in UPFP Pref, LLC |
| Silent Investor: Brett and Alison Bartman Family Trust<br>Address: 609 Tullitan Road, Los Angeles, CA 90049<br>Contact: Brett Bartman | 0.8% in UPFP Pref, LLC |
| Silent Investor: Carl Stolle<br>Address: 3112 Windsor Road, Suite A #386, Austin, TX 78703 | 3.0% in UPFP Pref, LLC |
| Silent Investor: Elizabeth Stolle<br>Address: 3112 Windsor Road, Suite A #386, Austin, TX 78703 | 3.0% in UPFP Pref, LLC |
| Silent Investor: Joe and Nancy Green Management Trust<br>Address: 6627 Wagner Way, San Antonio, TX 78256<br>Contact: Joe or Nancy Green | 1.0% in UPFP Pref, LLC |
| Silent Investor: Thomas D. Fritz<br>Address: 221 West 6th Street, Suite 960, Austin, TX 78701 | 0.5% in UPFP Pref, LLC |
| Silent Investor: Irons Family Limited Partnership<br>Address: 6341 Spanish Oaks Club Blvd., Austin, TX 78738<br>Contact: Kevin Irons | 4% in UPFP Pref, LLC |
| Silent Investor: Joseph and Lynna Longaro<br>Address: 11700 Uplands Ridge Drive, Bee Cave, TX 73788 | 0.5% in UPFP Pref, LLC |
| Silent Investor: Jack Weiss<br>Address: 314 Ridgewood Road, Austin, TX 78746 | 0.6% in UPFP Pref, LLC |
| Silent Investor: John Lewis<br>Address: 3839 Bee Caves Road, Suite 204, Austin, TX 78746 | 1.0% in UPFP Pref, LLC |
| Silent Investor: Ben Edelstein<br>Address: 3303 Northland Drive, Suite 212, Austin, TX 78731 | 0.8% in UPFP Pref, LLC |
| Silent Investor: Michael Murphy<br>Address: 1717 West 6th Street, Suite 400, Austin, TX 78703 | 0.6% in UPFP Pref, LLC |
| Silent Investor: David Putnam | 0.2% in UPFP Pref, LLC |

| | |
|---|---|
| Address: 2306 Greenlee Drive, Austin, TX 78703 | |
| Silent Investor: Robert Mitchell<br>Address: 10817 West Highway 71, Austin, TX 78735 | 0.1% in UPFP Pref, LLC |

2.   <u>Additional Silent Investors/Franchisor Approval</u>.  The addition of Silent Investors, as well as the equity interest of each such Silent Investor, is subject to the Franchisor's prior written approval.  Specifically, Franchisee Parties may not add any new Silent Investor unless such person or entity, and any other person or entity that directly or indirectly controls such person or entity, first satisfies, to Franchisor's satisfaction, Franchisor's then-current character and financial requirements applicable to all **PLANET FITNESS** franchisees at the time, including, without limitation, the completion of a satisfactory background check and credit check conducted by (or on behalf of) Franchisor.  Franchisee and Responsible Owner ("Franchisee Parties") must notify Franchisor within seven (7) calendar days of the date that any Silent Investor ceases having an ownership interest in Franchisee.

3.   <u>Silent Investor Prohibitions</u>.  Franchisee Parties each agree that no Silent Investor will:

A.      Undertake or exercise an active role in the management or operation of the BUSINESS;

B.      Have or otherwise acquire access to Confidential Information, including trade secrets or industrial secrets, or other operating information, including information set forth in the Operations Manual (and/or any component thereof); or

C.      Disclose his/her/its ownership interest in the BUSINESS to any third party, except for professional advisors that need to know or as required by law.

4.   <u>Covenants of Franchisee Parties</u>.  Franchisee Parties each covenant that they will not give, provide, disseminate, create access to, or otherwise release any of the following to any Silent Investor:  Confidential Information, including trade secrets or industrial secrets, operating information other than financial statements, marketing techniques or materials that are similar to those used under or in connection with the **PLANET FITNESS** Methods of Operations, member rate structures similar to those used under or in connection with the **PLANET FITNESS** Methods of Operations, any of Franchisor's procedures or systems, and any other information that we designate as proprietary or confidential.  Franchisee Parties further acknowledge, understand and agree that if a Silent Investor learns Confidential Information or other operating information at any time during or after the term of the Franchise Agreement, Franchisee Parties will be presumed to have disclosed such Confidential Information or other operating information to the Silent Investor(s).

5.   <u>Representation and Warranty</u>.  Franchisee Parties expressly represent and warrant to Franchisor that the individuals and/or entities identified in Article 1 above constitute all Silent Investors as of the Effective Date, and that no different or additional Silent Investors will acquire or otherwise obtain an interest in Franchisee absent compliance with the conditions described in Article 2 above.

6.   <u>Liability for Damages</u>.  If any or all of the Franchisee Parties violate the confidentiality or non-competition provisions of the Franchise Agreement and/or Article 4 (above), the Franchisee Parties will be jointly and severally liable for any such breach, including, to the fullest extent possible, all damages and costs resulting from Franchisor's enforcement or attempted enforcement against any or all Franchisee Parties of any provision of this Appendix or the Franchise Agreement as well as a conventional penalty of One Thousand U.S. Dollars (US $1,000) for each day that the Franchisee Parties is in violation of the confidentiality or non-competition provisions.

7.   <u>Cross Default</u>.  For the avoidance of doubt, any breach or default under this Appendix F (including, without limitation, Article 4 above) will be deemed an incurable default under the Franchise Agreement. Franchisee Parties acknowledge that a violation of Articles 3 and/or 4 of this Appendix F would result in irreparable injury for which no adequate remedy at law may be available. If Franchisor files a claim to enforce the terms of this Appendix and prevails in such proceeding, Franchisee Parties agree to reimburse Franchisor for all its costs and expenses, including reasonable attorneys' fees.

**APPENDIX G**
**TO FRANCHISE AGREEMENT**

**LEASE PROVISIONS**

1.  Landlord shall deliver to Franchisor a copy of any notice of default or termination of the Lease at the same time such notice is delivered to Franchisee. Notice shall be sent to Franchisor at 4 Liberty Lane West, Hampton, New Hampshire 03842, Attn: General Counsel, or such other address as Franchisor shall specify by written notice to Landlord.

2.  Franchisee hereby assigns to Franchisor or its affiliate, with Landlord's irrevocable and unconditional consent, all of Franchisee's rights, title and interest to and under the Lease upon any termination or non-renewal of the Franchise Agreement, but no such assignment shall be effective unless: (a) the Franchise Agreement is terminated or expires without renewal; and (b) Franchisor notifies the Franchisee and Landlord in writing that Franchisor assumes Franchisee's obligations under the Lease.

3.  Franchisor or its affiliate shall have the right, but not the obligation, upon giving written notice of its election to Franchisee and Landlord, to cure any breach of the Lease and, if so stated in the notice, to also succeed to Franchisee's rights, title and interests thereunder.

4.  Franchisee and Landlord acknowledge and agree that Franchisor shall have no liability or obligation whatsoever under the Lease unless and until Franchisor assumes the Lease in writing pursuant to Article 2 or 3 above.

5.  If Franchisor or its affiliate assumes the lease as provided for in Articles 2 or 3 above, Landlord and Franchisee agree that (i) Franchisee will remain liable for the responsibilities and obligations, including amounts owed to Landlord, prior to the date of assignment and assumption, and (ii) Franchisor or its affiliate will have the right to sublease the Premises to another franchisee, provided the franchisee agrees to operate the Location as a **PLANET FITNESS** business pursuant to a Franchise Agreement with Franchisor. Franchisor or its affiliate will be responsible for the lease obligations incurred after the effective date of the assignment.

6.  Landlord and Franchisee hereby acknowledge that Franchisee has agreed under the Franchise Agreement that Franchisor and its employees or agents shall have the right to enter the Location for certain purposes. Landlord hereby agrees not to interfere with or prevent such entry by Franchisor, its employees or agents. Landlord and Franchisee hereby further acknowledge that in the event the Franchise Agreement or the Lease expires (without renewal) or is terminated, Franchisee is obligated to take certain steps under the Franchise Agreement to de-identify the location as a **PLANET FITNESS** business. Landlord agrees to permit Franchisor, its employees or agents, to enter the Location and remove signs, decor and materials displaying any marks, designs or logos owned by Franchisor, provided Franchisor shall bear the expense of repairing any damage to the Location as a result thereof.

7.  Landlord agrees to allow Franchisee to remodel, equip, paint and decorate the interior and exterior of the Location pursuant to the terms of the Lease, the Franchise Agreement and any successor Franchise Agreement under which Franchisee may operate the Business at the Location. Subject to applicable law, Landlord agrees to provide Tenant the opportunity to conduct a physical presale at the Location subsequent to Landlord delivering possession of the Location to Franchisee and prior to the opening of the Business.

8.  Landlord agrees to allow Franchisee to use ultraviolet tanning devices, massage chairs and similar devices, operate twenty-four (24) hours per day and seven (7) days per week and serve food and beverages to its members.

9.  Franchisor is a third party beneficiary under this Addendum.

10. References to the Lease and the Franchise Agreement include all amendments, addenda, extensions and renewals to such documents. In the event the terms of the Lease conflict with the terms of this Appendix, this Appendix shall control. No subsequent amendment, renewal, assignment or modification to the Lease shall adversely affect Franchisor's rights hereunder, absent Franchisor's prior written consent.

11. References to the Landlord, Franchisee and Franchisor include the successors and assigns of each of the parties.

**APPENDIX H**
**TO FRANCHISE AGREEMENT**

**SUMMARY OF FRANCHISE AGREEMENT**

**(See attached.)**

| RESUMEN DEL CONTRATO DE FRANQUICIA | 2. | SUMMARY OF THE FRANCHISE AGREEMENT |
|---|---|---|

**1. RESUMEN DEL CONTRATO DE FRANQUICIA CELEBRADO EL 5DE MARZO DE 2019, ENTRE PLANET FITNESS INTERNATIONAL FRANCHISE, (EN LO SUCESIVO EL *"FRANQUICIANTE"*), REPRESENTADA EN ESTE ACTO POR _____, POR LA OTRA PARTE, JEG-MEXICO BUENO, SRL, REPRESENTADA EN ESTE ACTO POR _____, CADA UNO DE ELLOS, POR SU PROPRIO DERECHO (EN LO SUCESIVO, CONJUNTAMENTE LOS "*FRANQUICIATARIOS*"), DE CONFORMIDAD CON LAS SIGUIENTES DECLARACIONES Y CLÁUSULAS:**

**SUMMARY OF FRANCHISE AGREEMENT ENTERED INTO ON March 5, 2019, BY AND BETWEEN PLANET FITNESS INTERNATIONAL FRANCHISE, (HEREINAFTER THE *"FRANCHISOR"*), REPRESENTED HEREIN BY _____, AND BY JEG-MEXICO BUENO, SRL, REPRESENTED HEREIN BY _____, EACH OF THEM ON THEIR OWN BEHALF (HEREINAFTER COLLECTIVELY THE "*FRANCHISEE*"), PURSUANT TO THE FOLLOWING REPRESENTATIONS AND CLAUSES:**

**DECLARACIONES**

**REPRESENTATIONS**

**I. Declara el Franquiciante, por conducto de su representante legal, que:**

**I. The Franchisor represents, through its legal representative, that:**

**I.1** Es una sociedad constituida de conformidad con las leyes de las Islas Caimán.

**I.1** It is an entity organized in accordance with the laws of the Cayman Islands.

**I.2** Su domicilio se encuentra ubicado en 190 Elgin Avenue, George Town, Grand Cayman KY1-9005.

**I.2** Its domicile is located at 190 Elgin Avenue, George Town, Grand Cayman KY1-9005.

**I.3** Cuenta con el derecho suficiente para licenciar y franquiciar un sistema único y distintivo que incluye, entre otros conceptos, las marcas, el diseño y los diseños del edificio, el equipo, el entrenamiento, ciertos estándares y políticas de funcionamiento y de negocio, secretos industriales y demás información confidencial (el *"Sistema"*) para el establecimiento y operación de negocios de fitness que ofrecen servicios de facilidades de entrenamiento de fitness, incluyendo máquinas de ejercicios y pesos libres, servicios de entrenamiento físico, servicios de bronceado, servicios relacionados y mercancías auxiliares (the "***Planet Fitness Businesses***").

**I.3** It has the necessary right to license and franchise a unique and distinctive system which includes, among other things, the Marks, building design and layouts, equipment, training, certain operating and business standard and policies, industrial secrets and other confidential information (the "***System***") for the establishment and operation of fitness businesses offering offering fitness training facility services, including exercise machines and free weights, fitness training services, tanning services, related services, and ancillary merchandise (the "***Planet Fitness Businesses***").

**I.4** El Franquiciador tiene una licencia de su afiliado, PFIP International (el "propietario de la marca registrada"), para usar las Marcas y para sublicenciar el nombre y la marca comercial "Planet Fitness," así como otras marcas registradas, marcas en trámite de registro, nombres comerciales, logotipos, diseños y otros símbolos comerciales que el Franquiciante autorice de tiempo en tiempo o indique usar a los

**I.4** Franchisor has a license from its affiliate, PFIP International (the "**Trademark Owner**"), to use the Marks and to sublicense the name and the trademark "Planet Fitness," as well as other registered trademarks, trademarks in the process of registration, trade names, logotypes, designs and other commercial

Franquiciatarios en relación con el establecimiento y operación de las empresas de Planet Fitness (las "***Marcas***").

**I.5** Algunas de las Marcas se encuentran debidamente registradas o en trámite de registro en los Estados Unidos Mexicanos, ante el Instituto Mexicano de la Propiedad Industrial, las cuales se señalan en el **Apéndice 1** del presente Resumen de Contrato de Franquicia (las "***Marcas Licenciadas***").

**II. Declaran los Franquiciatarios, por su propio derecho, que:**

**II.1** Es una entidad mexicana, con capacidad suficiente para celebrar el presente Resumen de Contrato de Franquicia.

**II.2** Su domicilio se encuentra ubicado en _____.

**III. Declaran el Franquiciante y los Franquiciatarios, que:**

**III.1** El presente documento constituye un resumen del contrato de franquicia que las partes celebraron el 5 de Marzo de 2019 (el "***Contrato de Franquicia***") y lo celebran única y exclusivamente para efectos de inscripción ante el Instituto Mexicano de la Propiedad Industrial, de acuerdo a lo establecido en las disposiciones aplicables de la Ley de la Propiedad Industrial y su Reglamento, incluyendo lo señalado en los artículos 136 y 137 de la citada Ley.

**III.2** El Contrato de Franquicia cumple con todos y cada uno de los requisitos establecidos en el artículo 142 Bis y demás aplicables de la Ley de la Propiedad Industrial y parte de la información contenida en el Contrato de Franquicia constituye información confidencial en términos de lo previsto en el penúltimo párrafo del artículo 10 del Reglamento de la Ley de la Propiedad Industrial, por lo que se omite su inclusión en el presente Resumen del Contrato de Franquicia.

**21.**

Con base en las Declaraciones que anteceden, las Partes están de acuerdo en obligarse conforme a las siguientes:

**22.**

symbols as Franchisor may from time to time authorize or direct the Franchisees to use in connection with the establishment and operation of the Planet Fitness Businesses (the "***Marks***").

**I.5** Some of the Marks are duly registered or in the process of registration in the United Mexican States, with the Mexican Institute of Industrial Property, same which are referred in **Appendix 1** of this Summary of Franchise Agreement (the "***Licensed Marks***").

**II. The Franchisees represent, on their own behalf, that:**

**II.1** It is a Mexican entity, with sufficient capacity to enter into this Summary of Franchise Agreement.

**II.2** Their domicile is located at _____.

**III. The Franchisor and the Franchisees represent, that:**

**III.1** This document constitutes a summary of the franchise agreement entered into by the parties on March 5, 2019 (the "***Franchise Agreement***") and the parties execute the same only and exclusively for purposes of registration before the Mexican Institute of Industrial Property, pursuant to what is foreseen in the applicable provisions of the Industrial Property Law and its Regulations, including what is provided in articles 136 and 137 of said Law.

**III.2** The Franchise Agreement complies with each and every one of the requisites set forth in article 142 Bis and other applicable provisions of the Industrial Property Law and part of the information contained in the Franchise Agreement constitutes confidential information pursuant to what is provided in the penultimate last paragraph of article 10 of the Regulations of the Industrial Property Law and, therefore, its inclusion in this Summary of the Franchise Agreement is omitted.

Based on the above Representations, the Parties agree to be bound pursuant to the following:

**CLAUSES**

**FIRST.-** Under the terms and conditions

**CLÁUSULAS**

**23.**
**PRIMERA.-** El Franquiciante en este acto otorga a los Franquiciatarios, bajo los términos y condiciones establecidos en el presente Resumen del Contrato de Franquicia, el derecho, licencia y franquicia para usar las Marcas Licenciadas y el Sistema, exclusivamente para establecer y operar una (1) empresas de Planet Fitness (en lo sucesivo el *"**Negocio Franquiciado**"*) en la zona geográfica y ubicación que se señala en la Cláusula Segunda Siguiente.

**24.**
**SEGUNDA.-** La ubicación geográfica del Negocio Franquiciado será la siguiente dirección: Ubicado en: Plaza Clouthier Avenida Manuel J. Clouthier 899-A Colonia Mártires de Cananea Santa Catarina, Nuevo León C.P. 66120, México.

**25.**
**TERCERA.-** El Franquiciante y los Franquiciatarios en este acto designan y autorizan irrevocablemente a los señor Jorge Mondragón D. para que cualquiera de ellos inscriba el presente Resumen del Contrato de Franquicia ante el Instituto Mexicano de la Propiedad Industrial, para tomar cualquier otra acción necesaria o conveniente relacionada con la inscripción y cancelación de inscripción de este Resumen del Contrato de Franquicia, en caso de que dichas acciones sean consideradas apropiadas por el Franquiciante o requeridas por la ley y/o por la licencia de las Marcas Licenciadas contenida en este Resumen del Contrato de Franquicia. En adición a lo anterior y para los efectos señalados en el presente párrafo, los Franquiciatarios se obligan a otorgar un poder especial irrevocable en términos del poder especial que se adjunta al presente Contrato como **Apéndice 2**, el cual deberá ser otorgado ante Notario Público en favor de las personas señaladas anteriormente y entregado por los Franquiciatarios al Franquiciante dentro de los 5 (cinco) días hábiles siguientes a que reciban una solicitud por escrito emitida por el Franquiciante en tal sentido.

**26.**
**CUARTA.-** El término de este Resumen del Contrato de Franquicia diez (10) años contados a partir de la fecha de este Resumen del Contrato de Franquicia, por lo que expirará a las 11:59 PM del día 13 de Abril de 2028. No obstante lo anterior, la terminación por cualquier causa del Contrato de Franquicia tendrá como consecuencia y efecto inmediato y natural la terminación del Resumen del Contrato de Franquicia, el cual es accesorio del Contrato de Franquicia, sin que sea necesario obtener resolución arbitral, judicial o

established in this Summary of the Franchise Agreement, Franchisor hereby grants to the Franchisees the right, license and franchise to use the Licensed Marks and the System, exclusively for purposes of the establishment and operation of one (1) Planet Fitness Business (the "***Franchised Business***") to be located in the geographic zone indicated in Clause Second below.

**SECOND.-** The geographic location of the Franchised Business shall be the following address: Ubicado en: Plaza Clouthier Avenida Manuel J. Clouthier 899-A Colonia Mártires de Cananea Santa Catarina, Nuevo León C.P. 66120, México.

**THIRD.-** The Franchisor and the Franchisees hereby irrevocably appoint and authorize Messr. Jorge Mondragón D., in order to register this Summary of the Franchise Agreement before the Mexican Institute of Industrial Property, to take any other necessary or convenient action related to the registration and cancellation of registration of this Summary of Franchise Agreement, in the event that such actions are considered appropriate by Franchisor or required by law and/or the trademark license contained in this Summary of Franchise Agreement. In addition to the foregoing and for the purposes established in this paragraph, the Franchisees shall grant before Notary Public an irrevocable special power of attorney in terms of the power of attorney attached hereto as **Appendix 2** to those individuals mentioned above and deliver to Franchisor the document containing such power of attorney within the next 5 (five) business days following receipt of a written request in such regard issued by Franchisor.

**FOURTH.-** The term of this Summary of Franchise Agreement is ten (10) years counted as from the date of this Summary of Franchise Agreement, in consequence it shall expire precisely at 11:59 PM of April 13, 2028. Therefore and notwithstanding the foregoing, the termination by any cause of the Franchise Agreement shall have as consequence and immediate and natural effect the termination of this Summary of Franchise Agreement which is ancillary to the Franchise Agreement, without the need to obtain an arbitral, judicial or administrative resolution nor of any other nature.

**FIFTH.-** Franchisor represents to have the right to license the use of the Licensed Marks in favor of the Franchisees. Franchisor expressly reserves for itself the right of changing, altering or modifying any of the Licensed Marks, color and design that Franchisor may regularly use in connection with the System and the Planet Fitness Business, or

administrativa alguna, ni de cualquier otra naturaleza.

**27.**

**QUINTA.-** El Franquiciante declara que tiene el derecho de licenciar el uso de las Marcas Licenciadas en favor de los Franquiciatarios. El Franquiciante expresamente se reserva el derecho de cambiar, alterar o modificar cualesquiera de las Marcas Licenciadas, color y diseño que el Franquiciante pueda utilizar regularmente en relación con el Sistema y las empresas de Planet Fitness, o sustituir cualquier Marca Licenciada en cualquier momento. En caso de cualquier cambio, alteración o modificación de cualquiera de las Marcas Licenciadas, los Franquiciatarios acuerdan que únicamente la Marca Licenciada sustituta, modificada o alterada deberá ser utilizada por los Franquiciatarios para identificar el Sistema o el Negocio Franquiciado, según sea el caso y conforme lo indique el Franquiciante, sujeto a que el Franquiciante o una sociedad afiliada del Franquiciante (incluyendo, sin limitar, PFIP International) haya obtenido o solicitado el o los registros correspondientes.

**28.**

El Franquiciante y PFIP International se reservan el derecho y las facultades para ejercitar las acciones de protección sobre los derechos de propiedad industrial derivados de las Marcas Licenciadas. Los Franquiciatarios deberán notificar de inmediato al Franquiciante sobre cualquier reclamación, demanda o causa de acción que el Franquiciante pudiera tener por el surgimiento de cualquier intento a cargo de una persona o sociedad del uso no autorizado de las Marcas Licenciadas, o cualquier variación en los colores, o cualquier otra marca, nombre o denominación respecto de la cual el Franquiciante sea titular o licenciatario. Los Franquiciatarios deberán proporcionar ayuda al Franquiciante cuando éste lo requiera y bajo el costo de los Franquiciatarios, para llevar a cabo tales acciones, en su caso, cuando el Franquiciante lo considere apropiado, con la finalidad de detener dichas actividades.

**29.**

El Franquiciante se reserva el derecho de sustituir cualesquiera de las Marcas Licenciadas para identificar el Sistema y el Negocio Franquiciado, en caso de que las Marcas Licenciadas no puedan seguir siendo utilizadas o en caso de que el Franquiciante, a su entera discreción, determine que la sustitución de diferentes Marcas Licenciadas será benéfica para el Sistema y el Negocio Franquiciado.

**30.**

substitute any Licensed Mark at any time. In the event of any change, alteration or modification of any of the Licensed Marks, the Franchisees agree that only the substituted, modified or altered Licensed Mark shall be used by the Franchisees to identify the System or the Franchised Business, as the case may be, and pursuant to Franchisor's indications, subject that Franchisor or an affiliate of Franchisor (including without limitation, PFIP International) have obtained or requested the corresponding registration or registrations.

Franchisor and PFIP International reserve for themselves the right and authority to exercise the actions to protect the industrial property rights derived from the Licensed Marks. The Franchisees shall immediately notify Franchisor about any claim, lawsuit or cause of action that Franchisor may have as a consequence of any intent by any individual or company of the non authorized use of the Licensed Marks, or any variation in the colors, or any other trademark or name of which Franchisor is the owner or a licensee. The Franchisees shall provide assistance to Franchisor when requested by Franchisor and at the Franchisees' cost, in order to carry out such actions, if applicable, when deemed appropriate by Franchisor, with the purpose of stopping such activities.

Franchisor reserves for itself the right to substitute any of the Licensed Marks to identify the System and the Franchised Business, in the event that the Licensed Marks may not continue to be used or in the event that Franchisor, at its sole discretion, determines that the substitution of some of the Licensed Marks shall benefit the System and the Franchised Business.

**SIXTH.-** All notifications to be performed pursuant to this Summary of Franchise Agreement shall be in writing and shall be personally delivered or through one of the following professional reputable overnight couriers: FedEx, DHL, UPS or other reputable overnight courier service. For such purposes, the parties indicate the following as their respective domiciles:

**Franchisor**

**SEXTA.-** Todas las notificaciones que deban realizarse conforme al presente Resumen del Contrato de Franquicia serán por escrito y deberán ser enviadas personalmente o mediante cualquiera de las siguientes compañías reconocidas de mensajería especializada, FEDEX, DHL, UPS o cualquier otro servicio nocturno de mensajería con reputación. Para tales efectos, las partes señalan como sus domicilios los siguientes:

**31.**
**Franchisor**
**Planet Fitness International Franchise**
190 Elgin Avenue,
George Town, Grand Cayman KY1-9005

**Con copia para (sin que dicha copia constituya una notificación):**

Jorge Mondragón D.
González Calvillo, S.C.
Montes Urales 632, Piso 3
Lomas de Chapultepec
11000 México, D.F.
Facsimile No.: (5255) 5520-7671

**Franquiciatarios:**

JEG-MEXICO BUENO, SRL
c/o **JEG-UNITED, LLC**
7101 W Hwy 71, Suite U-2, Austin, TX 78735

**SÉPTIMA.** Para todo lo relativo a la interpretación y cumplimiento del presente Resumen del Contrato de Franquicia, las partes se someten expresamente a las leyes aplicables de México. Asimismo, las partes se someten expresamente al procedimiento arbitral establecido en el Contrato de Franquicia, renunciando expresamente a cualquier otro fuero que pudiera corresponderles en virtud de sus domicilios presentes o futuros o por cualquier otra causa.

**OCTAVA.** Los encabezados en el presente Resumen del Contrato de Franquicia son únicamente por conveniencia y no deberán controlar o afectar el significado o interpretación de cualquier disposición en este Resumen del Contrato de Franquicia.

**NOVENA.** Para todo lo no previsto en el presente Resumen del Contrato de Franquicia, se estará a lo dispuesto en el propio Contrato de Franquicia.

**DÉCIMA.** El presente Resumen del Contrato de Franquicia se firma en idioma español con su traducción al idioma inglés para efectos informativos únicamente. En caso de cualquier

**Planet Fitness International Franchise**
190 Elgin Avenue,
George Town, Grand Cayman KY1-9005

**With a copy to (without such copy being considered a notice):**

Jorge Mondragón D.
González Calvillo, S.C.
Montes Urales 632, Piso 3
Lomas de Chapultepec
11000 México, D.F.
Facsimile No.: (5255) 5520-7671

**Franchisees:**

JEG-MEXICO BUENO, SRL
c/o **JEG-UNITED, LLC**
7101 W Hwy 71, Suite U-2, Austin, TX 78735

**SEVENTH.-** For all related to the interpretation and performance of this Summary of the Franchise Agreement, the parties expressly submit themselves to the applicable laws of Mexico. Likewise, the parties expressly submit themselves to the arbitration procedure established in the Franchise Agreement, waiving any other forum to which they might be entitled by reason of their present or future domiciles or by any other cause.

**EIGHT.-** The headings of this Summary of Franchise Agreement are for convenience purposes only and shall not control or affect the meaning or interpretation of any provision of this Summary of Franchise Agreement.

**NINTH.-** All that is not contemplated in this Summary of the Franchise Agreement will be governed by the provisions of the Franchise Agreement.

**TENTH.** This Summary of the Franchise Agreement is executed in Spanish language with its translation into English language for informative purposes only. In case of any difference between both versions, the Spanish version shall prevail.

**IN WITNESS WHEREOF** the parties hereto execute this Summary of the Franchise Agreement on the date first above written.

| | | |
|---|---|---|
| diferencia entre ambas versiones, la versión en español prevalecerá.<br><br>**EN TESTIMONIO DE LO CUAL,** las partes celebran el presente Resumen del Contrato de Franquicia en la fecha indicada en el proemio del mismo. | | |
| | **3.** | |

Santa Catarina, NL FA - Appendix H-7



I, John Cullinane, Notary Public in and
for the Cayman Islands, do hereby certify that

DARREN RILEY

appeared before me and executed this
document, in witness where of I have
subscribed my name and set and affixed my
seal of office.

John Cullinane
Date: 5 / 3 / 19
My appointment expires: 31 January 20 20

**Franquiciante / Franchisor**

**PLANET FITNESS INTERNATIONAL FRANCHISE**

Por / By: _____

Nombre / Name:  Darren Riley

Cargo / Title:  Director

**Franquiciatarios / Franchisees**

**JEG-MEXICO BUENO, S DE RL DE CV**

Por / By: _____

Nombre / Name: _____

Cargo / Title: Legal Representative _____

**Franquiciante / Franchisor**

**PLANET FITNESS INTERNATIONAL FRANCHISE**

Por / By: _____

Nombre / Name:  Darren Riley

Cargo / Title:  Director

**Franquiciatarios / Franchisees**

**JEG-MEXICO BUENO, S DE RL DE CV**

Por / By: _____

Nombre / Name: _____

Cargo / Title: <u>Legal Representative</u>

**APÉNDICE / APPENDIX 1**
**MARCAS LICENCIADAS / LICENSED MARKS**

| TITLE | STATUS | APPLN. NO. | APPLN. DATE | REG. NO. | REG. DATE | CLASS |
|---|---|---|---|---|---|---|
|  | Registered | 1472774 | Apr 1, 2014 | 1467292 | Apr 1, 2014 | 41 |
| BAGEL MORNING | Registered | 1472795 | Apr 1, 2014 | 1467301 | Apr 1, 2014 | 41 |
|  | Registered | 1472778 | Apr 1, 2014 | 1467294 | Apr 1, 2014 | 41 |
| BURN CALORIES, NOT CASH | Registered | 83119 | May 31, 2013 | 773831 | Sep 13, 2013 | 41 |
|  | Registered | 1472777 | Apr 1, 2014 | 1467293 | Apr 1, 2014 | 41 |
|  | Registered | 1472782 | Apr 1, 2014 | 1517058 | Apr 1, 2014 | 41 |
| CRAZY, NUTS, YOU BETCHA! | Registered | 1472797 | Apr 1, 2014 | 1467302 | Apr 1, 2014 | 41 |
|  | Registered | 1472779 | Apr 1, 2014 | 1467295 | Apr 1, 2014 | 41 |
| FITNESS PLANET | Registered | 1472798 | Apr 1, 2014 | 1467303 | Apr 1, 2014 | 41 |
|  | Registered | 1293507 | Jul 20, 2012 | 1330662 | Nov 26, 2012 | 41 |
| GIMTIMIDACION | Registered | 1516447 | Aug 13, 2014 | 1507003 | Aug 13, 2014 | 41 |
|  | Registered | 1473396 | Apr 2, 2014 | 1475522 | Apr 2, 2014 | 16 |
|  | Registered | 1473896 | Apr 2, 2014 | 1538157 | May 14, 2015 | 25 |
|  | Registered | 1473398 | Apr 2, 2014 | 1471629 | Apr 2, 2014 | 41 |
| I LIFT THINGS UP AND PUT THEM DOWN | Registered | 83117 | May 31, 2013 | 77379 | Sep 13, 2013 | 41 |
| IT'S GYM CLASS WITHOUT THE ANNOYING GUY WITH THE WHISTLE. | Registered | 89103 | Apr 2, 2014 | 83114 | Apr 2, 2014 | 25 |

| | | | | | | |
|---|---|---|---|---|---|---|
| IT'S GYM CLASS WITHOUT THE ANNOYING GUY WITH THE WHISTLE. | Registered | 89104 | Apr 2, 2014 | 83115 | Apr 2, 2014 | 41 |
| IT'S GYM CLASS WITHOUT THE DODGEBALLS HITTING YOUR FACE. | Registered | 89105 | Apr 2, 2014 | 83116 | Apr 2, 2014 | 25 |
|  | Registered | 1472783 | Apr 1, 2014 | 1517059 | Apr 1, 2014 | 41 |
|  | Registered | 1472784 | Apr 1, 2014 | 1517060 | Apr 1, 2014 | 41 |
| IT'S WORKING OUT IN YOUR FAVOR. | Registered | 89075 | Apr 1, 2014 | 82253 | Apr 1, 2014 | 41 |
| JFZ GYMS | Registered | 1472799 | Apr 1, 2014 | 1467304 | Apr 1, 2014 | 41 |
|  | Registered | 1472792 | Apr 1, 2014 | 1467299 | Apr 1, 2014 | 41 |
| JUDGEMENT FREE | Registered | 1473405 | Apr 2, 2014 | 1476464 | Sept 2, 2014 | 25 |
| JUDGEMENT FREE ZONE | Registered | 1173052 | Apr 20, 2011 | 1239460 | Sep 23, 2011 | 41 |
| JUDGEMENT FREE ZONE | Registered | 1265958 | Apr 13, 2012 | 1309632 | Sep 6, 2012 | 25 |
| JUDGMENT FREE | Registered | 1473403 | Apr 2, 2014 | 1475523 | Apr 2, 2014 | 25 |
| JUDGMENT FREE | Registered | 1473404 | Apr 2, 2014 | 1475524 | Apr 2, 2014 | 41 |
| JUDGMENT FREE ZONE | Registered | 1173055 | Apr 20, 2011 | 1273338 | Mar 13, 2012 | 41 |
| JUDGMENT FREE ZONE | Registered | 1265951 | Apr 13, 2012 | 1309628 | Sep 6, 2012 | 25 |
| LEAVE EGOS HERE | Registered | 1472801 | Apr 1, 2014 | 1467305 | Apr 1, 2014 | 41 |
|  | Registered | 1472780 | Apr 1, 2014 | 1467193 | Apr 1, 2014 | 41 |
| LUNK | Registered | 1473406 | Apr 2, 2014 | 1476465 | Sept 2, 2014 | 25 |
| LUNK | Registered | 1473407 | Apr 2, 2014 | 1476466 | Apr 2, 2014 | 41 |
| LUNK ALARM | Registered | 1173054 | Apr 20, 2011 | 1239462 | Sep 23, 2011 | 41 |
| LUNK ALARM | Registered | 1265960 | Apr 13, | 1309633 | Sep 6, | 25 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | 2012 | | 2012 | |
|  | Registered | 1473385 | Apr 2, 2014 | 1471622 | Apr 2, 2014 | 41 |
| LUNKHEAD | Registered | 1473389 | Apr 2, 2014 | 1471624 | Apr 2, 2014 | 25 |
| LUNKHEADS | Registered | 1473388 | Apr 2, 2014 | 1471623 | Apr 2, 2014 | 25 |
| LUNKS | Registered | 1473391 | Apr 2, 2014 | 1471626 | Apr 2, 2014 | 25 |
| NEW LOCATION! SAME PLANET! | Registered | 1472802 | Apr 1, 2014 | 1467306 | Apr 1, 2014 | 41 |
| NEW NAME-NEW ATMOSPHERE-NO ATTITUDE | Registered | 1472804 | Apr 1, 2014 | 1467307 | Apr 1, 2014 | 41 |
| NO COMMITMENT! | Registered | 1472805 | Apr 1, 2014 | 1465482 | Apr 1, 2014 | 41 |
| NO COMMITMENT! NO CATCHES! NO KIDDING! | Registered | 83120 | May 31, 2013 | 77382 | Sep 13, 2013 | 41 |
| NO COMMITMENT! NO KIDDING! | Registered | 1472807 | Apr 1, 2014 | 1465483 | Apr 1, 2014 | 41 |
| NO CRITICOS | Registered | 83619 | Jun 27, 2013 | 78801 | Dec 3, 2013 | 41 |
| NO CRITICS | Registered | 1173047 | Apr 20, 2011 | 1243934 | Oct 14, 2011 | 41 |
| NO CRITICS | Registered | 1265959 | Apr 13, 2012 | 1367092 | May 13, 2013 | 25 |
|  | Registered | 1472785 | Apr 1, 2014 | 1467194 | Apr 1, 2014 | 41 |
| NO DUMBELLS ALLOWED | Registered | 1472808 | Apr 1, 2014 | 1465484 | Apr 1, 2014 | 41 |
| NO EGOS | Registered | 83121 | May 31, 2013 | 77383 | Sep 13, 2013 | 41 |
| NO GIMMICKS | Registered | 1472809 | Apr 1, 2014 | 1465485 | Apr 1, 2014 | 41 |
| NO GIMTIMIDACION | Registered | 1516448 | Aug 13, 2014 | 1507004 | Aug 13, 2014 | 41 |
| NO HASSELS. NO LUNKS. ALWAYS 10 BUCKS. | Registered | 1472812 | Apr 1, 2014 | 1465488 | Apr 1, 2014 | 41 |
| NO HASSLES. NO BRAINER. | Registered | 1472811 | Apr 1, 2014 | 1465487 | Apr 1, 2014 | 41 |
| NO INTIMIDATION | Registered | 1472815 | Apr 1, 2014 | 1465491 | Apr 1, 2014 | 41 |
| NO INTIMIDATION WHATSOEVER! | Registered | 1472814 | Apr 1, 2014 | 1465490 | Apr 1, 2014 | 41 |
| NO JUDGEMENTS | Registered | 1271199 | May 3, 2012 | 1313103 | Sep 24, 2012 | 25 |
| NO JUDGEMENTS | Registered | 1271200 | May 3, 2012 | 1313104 | Sep 24, 2012 | 41 |

| | | | | | | |
|---|---|---|---|---|---|---|
| NO JUDGMENTS | Registered | 1173049 | Apr 20, 2011 | 1239459 | Sep 23, 2011 | 41 |
| NO JUDGMENTS | Registered | 1265961 | Apr 13, 2012 | 1309634 | Sep 6, 2012 | 25 |
| NO LUNKHEADS | Registered | 1473392 | Apr 2, 2014 | 1471627 | Apr 2, 2014 | 25 |
| NO LUNKS | Registered | 1473394 | Apr 2, 2014 | 1471628 | Apr 2, 2014 | 25 |
| NO LUNKS | Registered | 1473395 | Apr 2, 2014 | 1477128 | Apr 2, 2014 | 41 |
| NO LUNKS @ PLANET FITNESS | Registered | 1473393 | Apr 2, 2014 | 1616039 | Feb 22, 2016 | 25 |
| NO SALESMEN. NO CONTRACT. NO KIDDING! | Registered | 1472818 | Apr 1, 2014 | 1465494 | Apr 1, 2014 | 41 |
| NO SALESMEN. NO PRESSURE | Registered | 1473411 | Apr 2, 2014 | 1476469 | Sept 2, 2014 | 41 |
| NO SALESMEN-NO COMMITMENT-NO KIDDING | Registered | 1472819 | Apr 1, 2014 | 1465495 | Apr 1, 2014 | 41 |
| NO SOMOS UN GIMNASIO, SOMOS PLANET FITNESS. | Registered | 83616 | Jun 27, 2013 | 78101 | Oct 28, 2013 | 41 |
| NO STRINGS, NO OBLIGATIONS, WE PROMISE... | Registered | 1473412 | Apr 2, 2014 | 1476470 | Apr 2, 2014 | 41 |
| NON INTIMIDATING | Registered | 1472817 | Apr 1, 2014 | 1465493 | Apr 1, 2014 | 41 |
| ONE GYM HAS EVOLVED BEYOND GRUNTING | Registered | 89076 | Apr 1, 2014 | 82254 | Apr 1, 2014 | 41 |
| ONLY A DUMBELL WOULD PAY MORE | Registered | 89077 | Apr 1, 2014 | 82255 | Apr 1, 2014 | 41 |
| PE@PF | Pending | 1473386 | Apr 2, 2014 | | | 25 |
| PE@PF | Registered | 1473387 | Apr 2, 2014 | 1613135 | Feb 12, 2016 | 41 |
|  | Registered | 1472786 | Apr 1, 2014 | 1517061 | Apr 1, 2014 | 41 |
| PERTENECES AQUI | Registered | 83618 | Jun 27, 2013 | 78800 | Dec 3, 2013 | 41 |
| PF | Pending | 1473413 | Apr 2, 2014 | | | 41 |
| PF 12 MINUTE ABS | Pending | 1473414 | Apr 2, 2014 | | | 41 |
|  | Registered | 1473390 | Apr 2, 2014 | 1471625 | Apr 2, 2014 | 25 |
| PF BLACK CARD | Registered | 1378993 | May 31, 2013 | 1400645 | Sep 27, 2013 | 41 |
| PF EXPRESS | Registered | 1473415 | Apr 2, | 1475714 | Apr 2, | 41 |

| | | | 2014 | | 2014 | |
|---|---|---|---|---|---|---|
| PF EXPRESS 30 MINUTE WORKOUT | Registered | 1473416 | Apr 2, 2014 | 1475715 | Apr 2, 2014 | 41 |
|  | Registered | 1472789 | Apr 1, 2014 | 1467297 | Apr 1, 2014 | 41 |
|  | Registered | 1472788 | Apr 1, 2014 | 1467296 | Apr 1, 2014 | 41 |
|  | Registered | 1472793 | Apr 1, 2014 | 1467300 | Apr 1, 2014 | 41 |
|  | Pending | 1473402 | Apr 2, 2014 | | | 41 |
|  | Registered | 1265953 | Apr 13, 2012 | 1309629 | Sep 6, 2012 | 25 |
| PF STORE | Registered | 1378994 | May 31, 2013 | 1394098 | Aug 29, 2013 | 35 |
| PF TV | Registered | 1378991 | May 31, 2013 | 1403707 | Oct 15, 2013 | 41 |
|  | Pending | 1375877 | May 22, 2013 | | | 41 |
|  | Pending | 1472787 | Apr 1, 2014 | | | 41 |
|  | Registered | 1472794 | Apr 1, 2014 | 1517063 | Apr 1, 2014 | 41 |
| PIZZA NIGHT | Registered | 1473417 | Apr 2, 2014 | 1475716 | Apr 2, 2014 | 41 |
| PLANET FITNESS | Registered | 1265955 | Apr 13, 2012 | 1309631 | Sep 6, 2012 | 05 |
| PLANET FITNESS | Registered | 1265954 | Apr 13, 2012 | 1309630 | Sep 6, 2012 | 28 |
| PLANET FITNESS | Registered | 1332793 | Dec 10, 2012 | 1358634 | Apr 1, 2013 | 32 |
| PLANET FITNESS | Pending | 1701880 | Jan 13, 2016 | | | 25 |
| PLANET FITNESS | Pending | 1701881 | Jan 13, 2016 | | | 41 |

| | | | | | | |
|---|---|---|---|---|---|---|
|  | Registered | 1472791 | Apr 1, 2014 | 1517062 | Apr 1, 2014 | 41 |
| PLANET FITNESS VISIONARY | Registered | 1378995 | May 31, 2013 | 1400646 | Sep 27, 2013 | 42 |
| planet fitness | Registered | 1472790 | Apr 1, 2014 | 1467298 | Apr 1, 2014 | 41 |
|  | Registered | 1173057 | Apr 20, 2011 | 1239463 | Sep 23, 2011 | 41 |
|  | Registered | 1265952 | Apr 13, 2012 | 1309963 | Sep 6, 2012 | 25 |
|  | Registered | 1375876 | May 22, 2013 | 1399907 | Sept 25, 2013 | 41 |
|  | Registered | 1375879 | May 22, 2013 | 1399908 | Sep 25, 2013 | 41 |
| RELAXATION ZONE | Registered | 1473419 | Apr 2, 2014 | 1475717 | Apr 2, 2014 | 41 |
| THIS IS YOUR PLANET | Registered | 83122 | May 31, 2013 | 773834 | Sep 13, 2013 | 41 |
| WE'RE NOT A GYM. WE'RE PLANET FITNESS. | Registered | 83118 | May 31, 2013 | 77380 | Sep 13, 2013 | 41 |
| WE'RE NOT A GYM. WE'RE... | Registered | 1473409 | Apr 2, 2014 | 1476467 | Sept 2, 2014 | 25 |
| WE'RE NOT A GYM. WE'RE... | Registered | 1473410 | Apr 2, 2014 | 1476468 | Sept 2, 2014 | 41 |
| WWW.PLANETFITNESS.COM | Registered | 1473421 | Apr 2, 2014 | 1475719 | Apr 2, 2014 | 41 |
| YOU BELONG | Registered | 1275263 | May 18, 2012 | 1375484 | Jun 17, 2013 | 25 |
| YOU BELONG | Registered | 1275264 | May 18, 2012 | 1315642 | Sep 27, 2012 | 41 |
|  | Registered | 1378990 | May 31, 2013 | 1400644 | Sep 27, 2013 | 41 |
| YOWZAH... | Registered | 1473420 | Apr 2, 2014 | 1475718 | Apr 2, 2014 | 41 |
| ZONA DE NO JUZGAR | Registered | 83617 | Jun 27, 2013 | 78799 | Dec 3, 2013 | 41 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Planet ◎ Triumphs** REAL STORIES. REAL MEMBERS. 100% JUDGEMENT FREE. | Pending | A0046596 | Nov 24, 2014 | | | 16, 18, 21, 24, 25, 41, 42 |
| GYMTIMIDATION | Registered | A0033668 | May 21, 2013 | 1152764 | Jan 22, 2013 | 41 |
| NO GYMTIMIDATION | Registered | A0033674 | May 21, 2013 | 1152251 | Jan 22, 2013 | 41 |
| PLANET OF TRIUMPHS | Pending | A0046589 | Nov 24, 2014 | | | 16, 18, 21, 24, 25, 41, 42 |

[*Remainder of page intentionally blank*]

## APÉNDICE / APPENDIX 2

## PODER ESPECIAL IRREVOCABLE

Cada uno de JEG-MEXICO BUENO, SRL otorgan y confieren en favor de los señor Jorge Mondragón D., un **PODER ESPECIAL IRREVOCABLE**, para ser ejercido en los siguientes términos:

JEG-MEXICO BUENO, SRL grants and confers in favor of Jorge Mondragón D., an **IRREVOCABLE SPECIAL POWER OF ATTORNEY**, to be exercised in the following terms:

Poder especial irrevocable, pero dentro de su especialidad tan amplio como en derecho sea necesario, de conformidad con lo previsto en los dos primeros párrafos del artículo dos mil quinientos cincuenta y cuatro del Código Civil para el Distrito Federal y artículos correlativos del Código Civil Federal y de los Códigos Civiles de las diversas entidades que conforman los Estados Unidos Mexicanos, para realizar y mantener ante el Instituto Mexicano de la Propiedad Industrial la inscripción de cualesquiera contratos de franquicia y/o licencia que celebren JEG-MEXICO BUENO, SRL con **Planet Fitness International Franchise**, así como para cancelar dicha inscripción en cualquier tiempo a su entera discreción, quedando facultados para firmar, presentar y obtener todo tipo de documentación, así como para realizar cualquier trámite de naturaleza administrativa que de conformidad con las leyes aplicables sea necesario para dichos propósitos.

Irrevocable special power of attorney, but as broad as required in accordance to law, pursuant to the provisions of the first two paragraphs of article two thousand five hundred and fifty four of the Civil Code for the Federal District and correlative articles of the Federal Civil Code and the Civil Codes of the entities conforming the United Mexican States, to carry out and maintain before the Mexican Institute of Industrial Property, the recording of any franchise and/or license agreements entered into by JEG-MEXICO BUENO, SRL with **Planet Fitness International Franchise**, as well as to cancel said recording at any time at their sole discretion, being authorized to sign, file and obtain all kinds of documentation, as well as to carry out any proceeding of administrative nature that may be necessary according to the applicable laws for such purposes.

**APPENDIX I – NOT APPLICABLE**
**TO FRANCHISE AGREEMENT**

**AREA DEVELOPMENT AGREEMENT ADDENDUM**

<u>Area Developer</u>:

<u>Effective Date</u>:

<u>ADA-Specific Provisions</u>: In reference to the Area Development Agreement entered into by and between [AREA DEVELOPER] ("Area Developer" or "you") and Planet Fitness International Franchise ("Franchisor," "we," or "us") effective [ADA EFFECTIVE DATE], pursuant to Article 19.26 of the Franchise Agreement, the provisions set forth below shall control.

## ACKNOWLEDGMENT ADDENDUM TO
## THE PLANET FITNESS® FRANCHISE AGREEMENT

As you know, you and we are entering into a Franchise Agreement for the operation of a PLANET FITNESS® franchise. The purpose of this Acknowledgment Addendum is to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading, and to be certain that you understand the limitations on claims that may be made by you by reason of the offer and sale of the franchise and operation of your business.  Please review each of the following questions carefully and provide honest responses to each question.

**Acknowledgments and Representations\***.

1.     Have you received and personally reviewed our Franchise Agreement and each exhibit attached to it? Check one: ☒Yes.  ☐  No.

2.     Do you understand all of the information contained in the Franchise Agreement and each exhibit attached to it? Check one: ☒Yes.  ☐  No.

3.     Do you understand that we have the right to increase the Continuing Fees from the current rate in any subsequent franchise agreements that you sign?

4.     Do you understand that we have the right, upon thirty (30) days written notice to you, to increase the required Ad Fund contribution and Local Adverting Fee and to change the ratio of the Ad Fund contribution and Local Adverting Fee amounts?  Check one: ☒Yes.  ☐  No.

5.     Have you discussed the benefits and risks of operating a **PLANET FITNESS** business with an attorney, accountant   or   other   professional   advisor   and   do   you   understand   those   risks? Check one: ☒Yes.  ☐  No.

6.     Do you understand that the Franchise Agreement contains the entire agreement between you and us concerning the franchise, meaning that any prior oral or written statements not included in the Franchise Agreement will not be binding?  Check one: ☒Yes.  ☐  No.

7.     Do you understand that the success or failure of your business will depend in large part on your skills and experience, your business acumen, your location, the local market for products, interest rates, the economy, inflation, the number of employees you hire and their compensation, competition and other economic and business factors?  Check one: ☒Yes.  ☐  No.

8.     Do you understand that that, unless there exists a currently effective Area Development Agreement between you and us, the franchise granted is for the right to operate a single **PLANET FITNESS** fitness facility at the authorized location only and includes no exclusive area or protected territory, and that we and our affiliates have the right to issue franchises or operate competing businesses for or at locations, as we determine, near your authorized location?  Check one: ☒Yes.  ☐  No.

9.     Do you understand that you will be bound by the non-compete covenants (both in-term and post-term) listed in Article 16 and that an injunction is an appropriate remedy to protect the interests of the **PLANET FITNESS** system if you violate the covenant(s)?  Further, do you understand that the term "you" for purposes of the non-compete covenants is defined broadly in Article 16, such that any actions in violation of the covenants by those holding any interest in the franchisee entity may result in an injunction, default and termination of the Franchise Agreement? Check one: ☒Yes.  ☐  No.

10.     Do you understand that any changes to the economic and political environment in your country, in the United States, or around the world could have a negative impact on the fitness industry, the PLANET FITNESS® franchise system and your business? Check one: ☒Yes.  ☐  No.

If you answered "No" to questions 1-10, please explain (attached additional sheets if necessary): _____

_____

11.     Has any employee or other person speaking on our behalf made any statement or promise regarding the amount of money you may earn in operating a **PLANET FITNESS** business? Check one:  ☐ Yes. ☒ No.

12.     Has any employee or other person speaking on our behalf made any statement or promise concerning the total amount of revenue a **PLANET FITNESS** business will generate?  Check one:  ☐ Yes. ☒ No.

13.     Has any employee or other person speaking on our behalf made any statement or promise concerning the likelihood of success that you should or might expect to achieve from operating a **PLANET FITNESS** business? Check one:  ☐ Yes.  ☒ No.

If you answered "Yes" to questions 11-13, please explain in detail the claim, representation or statement (attached additional sheets if necessary): _____

_____
_____
_____

14.     Did you receive a Disclosure Document from us?  Check one: ☒ Yes.  ☐  No.

If you answered "Yes" to question 14, please answer the following questions 15-19.  If you answered "No" to question 14, please skip to question 20.

15.     Have you received and personally reviewed the Disclosure Document we provided to you?
        Check one: ☒ Yes.  ☐  No.
16.     Do you understand all of the information contained in the Disclosure Document?
        Check one: ☒ Yes.  ☐  No.
17.     Has any employee or other person speaking on our behalf made any statement or promise regarding the costs you may incur in operating a **PLANET FITNESS** business that is contrary to, or different from, the information contained in the Disclosure Document?  Check one: ☐ Yes. ☒ No.
18.     Was any oral, written or visual claim or representation made to you which contradicted the disclosures in the Disclosure Document?  Check one: ☐ Yes. ☒ No.
19.     Did any employee or other person speaking on our behalf make any statement or promise regarding the costs involved in operating a franchise that is not contained in the Disclosure Document or that is contrary to or different from the information in the Disclosure Document? Check one: ☐ Yes. ☒ No.

If you answered "Yes" to questions 17-19, please explain in detail the claim, representation or statement (attached additional sheets if necessary): _____

_____
_____
_____

20.     Do you understand that in all dealings with you, our officers, directors, employees and agents act only in a representative capacity and not in an individual capacity and such dealings are solely between you and the Franchisor?  Check one: ☒ Yes.  ☐  No.

YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO US AND THAT WE WILL RELY ON THEM.  BY SIGNING THIS ADDENDUM, YOU ARE REPRESENTING THAT YOU HAVE CONSIDERED EACH QUESTION CAREFULLY AND RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS.  IF MORE SPACE IS NEEDED FOR ANY ANSWER, CONTINUE ON A SEPARATE SHEET AND ATTACH.

**<u>NOTE</u>:  IF THE RECIPIENT IS A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY, SUCH ENTITY IS "YOU" FOR PURPOSES OF THIS ADDENDUM, AND THE RESPONSIBLE OWNER OF SUCH ENTITY MUST EXECUTE THIS ACKNOWLEDGMENT.**

Signed: _____

Print Name: Ray Owen, III

Date: _____3/4/2019_____


APPROVED ON BEHALF OF PLANET FITNESS INTERNATIONAL FRANCHISE


Signed:_____

Print Name:  Darren Riley, Director

Date:_____

If you answered "Yes" to questions 11-13, please explain in detail the claim, representation or statement (attached additional sheets if necessary): _____

_____

_____

_____

14.      Did you receive a Disclosure Document from us? Check one: ☐ Yes. ☐ No.

If you answered "Yes" to question 14, please answer the following questions 15-19. If you answered "No" to question 14, please skip to question 20.

15.      Have you received and personally reviewed the Disclosure Document we provided to you? Check one: ☐ Yes. ☐ No.

16.      Do you understand all of the information contained in the Disclosure Document? Check one: ☐ Yes. ☐ No.

17.      Has any employee or other person speaking on our behalf made any statement or promise regarding the costs you may incur in operating a **PLANET FITNESS** business that is contrary to, or different from, the information contained in the Disclosure Document? Check one: ☐ Yes. ☐ No.

18.      Was any oral, written or visual claim or representation made to you which contradicted the disclosures in the Disclosure Document? Check one: ☐ Yes. ☐ No.

19.      Did any employee or other person speaking on our behalf make any statement or promise regarding the costs involved in operating a franchise that is not contained in the Disclosure Document or that is contrary to or different from the information in the Disclosure Document? Check one: ☐ Yes. ☐ No.

If you answered "Yes" to questions 17-19, please explain in detail the claim, representation or statement (attached additional sheets if necessary): _____

_____

_____

_____

20.      Do you understand that in all dealings with you, our officers, directors, employees and agents act only in a representative capacity and not in an individual capacity and such dealings are solely between you and the Franchisor? Check one: ☐ Yes. ☐ No.

YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO US AND THAT WE WILL RELY ON THEM. BY SIGNING THIS ADDENDUM, YOU ARE REPRESENTING THAT YOU HAVE CONSIDERED EACH QUESTION CAREFULLY AND RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS. IF MORE SPACE IS NEEDED FOR ANY ANSWER, CONTINUE ON A SEPARATE SHEET AND ATTACH.

**NOTE:** **IF THE RECIPIENT IS A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY, SUCH ENTITY IS "YOU" FOR PURPOSES OF THIS ADDENDUM, AND THE RESPONSIBLE OWNER OF SUCH ENTITY MUST EXECUTE THIS ACKNOWLEDGMENT.**

Signed:_____

Print Name: Ray Owen, III

Date:_____

APPROVED ON BEHALF OF PLANET FITNESS INTERNATIONAL FRANCHISE

Signed:_____

Print Name:  Darren Riley, Director

Date:_____March 5, 2019_____

I, John Cullinane, Notary Public in and for the Cayman Islands, do hereby certify that

DARREN RILEY

appeared before me and executed this document, in witness where of I have subscribed my name and set and affixed my seal of office.

John Cullinane
Date: 5 / 3 / 19
My appointment expires: 31 January 20__ __

4835-4005-2081.3                    Santa Catarina, NL FA - Acknowledgement Addendum-2

App. 165

**APPENDIX J**
**TO FRANCHISE AGREEMENT**

**INSTITUTIONAL INVESTOR ADDENDUM**

1.  <u>Franchise Agreement Amended</u>.  The Franchise Agreement is amended and supplemented by this Addendum.  Any conflict between this Addendum and the Franchise Agreement and any appendices, schedules, exhibits, or attachments or related agreements thereto, shall be governed and controlled by the terms of this Addendum. Capitalized terms used in this Addendum but not defined in it will have the meaning given such terms in the Franchise Agreement, except as modified by this Addendum.

2.  <u>Ownership and Ownership Group</u>.  Notwithstanding anything in the Franchise Agreement to the contrary, the following provisions will apply to your Owners:

    a.  With respect to EMP PF, LLC (the "Eagle Entities"), only the following individuals will be considered Owners for purposes of the Franchise Agreement:  E. Stockton Croft, Ransom James, Bill Lundstrom, and Andrew Hirsekorn (collectively, the "Eagle Individuals").  In the event that (i) any of the above-named Eagle Individuals cease to be employed by any of the Eagle Entities or (ii) any additional senior level employees become actively involved in the management or oversight of the BUSINESS, such departing individual's replacement and/or such additional employee shall be deemed to be an Eagle Individual and shall be required to execute Appendix C (Personal Covenants Regarding Confidentiality and Non-Competition) to the Franchise Agreement in the form attached hereto as Appendix C (each, a "**Confidentiality and Non-Competition Agreement**"), as an Eagle Individual prior to beginning such role.  Failure of any such individual to execute a Confidentiality and Non-Competition Agreement prior to beginning such role will result in a breach of this Franchise Agreement.

    b.  With respect to Addington Square United PF Holdings Inc., AB Private Credit Investors Middle Market Direct Lending Fund, L.P., and Goldman, Sachs & Co. (collectively with their assignees, the "PE Silent Investors") and the Eagle Entities, the investors and/or equity holders in the Eagle Entities and the PE Silent Investors will remain confidential and will not be required to be disclosed to us on the Franchise Agreement, or otherwise, except that the aggregate ownership percentage of all Eagle Entities and PE Silent Investors will be disclosed to us on Appendix E and/or Appendix F. Transfers of ownership interest between and among new and existing Eagle Entities and PE Silent Investors shall not require disclosure to us or our prior written approval pursuant to Article 13 of the Franchise Agreement, provided that the aggregate ownership percentage of the Eagle Entities and PE Silent Investors set forth on Appendix E and Appendix F does not change.   For the sake of clarity, the joint and several liability and any restrictive covenant (*e.g.*, non-competition, non-solicitation and standstill) set forth in the Franchise Agreement do not apply to the PE Silent Investors or any of the other Silent Investors listed on Appendix F.

    c.  It is understood and agreed that approximately 7.13% of the ownership interest in United PF Partners, LLC is reserved for "Management Stock Options," that United PF Partners, LLC may issue "Management Stock Options" at various times in the future to its owners, its employees, or the owners or employees of its owners, subsidiaries, or affiliates, and that such "Management Stock Options" may or may not vest over time.  Notwithstanding anything to the contrary in the Franchise Agreement to the contrary, the issuance and/or vesting/non-vesting of "Management Stock Options" shall not be required to be disclosed to us unless requested and does not require our prior written approval pursuant to Article 13 of the Franchise Agreement, provided that upon any individual exercising any such options which have vested, each such individual shall be deemed to be an Owner and shall be required, if they have not previously done so, to execute a Confidentiality and Non-Competition Agreement within fourteen (14) days of exercising on their options.  Failure of any such individual to execute a Confidentiality and Non-Competition Agreement within the required fourteen (14) day time period will result in a breach of this Franchise Agreement.

    d.  No Owner or any other individuals associated with you will be required to sign Appendix B-1 (Owner's Personal Guaranty of Franchisee's Obligations) or any other personal guaranty.

      e.     We will require your affiliate, JEG-MEX, LLC ("Affiliate Guarantor"), to sign Appendix B-2 to the Franchise Agreement (Affiliate Guaranty of Franchisee's Obligations). No other Affiliate will be required to sign Appendix B-2.

3.    <u>Confidentiality and Non-Disclosures</u>. For the avoidance of doubt, notwithstanding anything to the contrary in Articles 8.1 and 8.2 of the Franchise Agreement, the operating results and financial performance of the BUSINESS is not considered Confidential Information and you may share this information with your Silent Investors, lenders, affiliates, advisors and investors as necessary.

4.    <u>No Further Amendment</u>. No further amendment or modification of the Franchise Agreement shall be binding unless executed in writing by the parties or their authorized successors or assigns. No course of conduct or course of performance under this or any other agreement between the parties will be deemed to modify this Addendum. No waiver by any party of any provisions of this Addendum shall be deemed to be or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided. Except as expressly set forth in this Addendum, the Franchise Agreement remain in full force and effect.

5.    <u>Renewal Franchise Agreements</u>. If you acquire any successor franchise under Section 14 of the Franchise Agreement, we agree to amend any renewal Franchise Agreement executed in connection with the successor franchise with an Addendum to Franchise Agreement which will include the same provisions set forth in this Addendum.

6.    <u>Entire Agreement</u>. This Addendum, and the agreements, documents and instruments referred to herein, constitute the entire agreement between the parties with respect to the subject matter hereof, superseding and cancelling any and all prior and contemporaneous agreements, understandings, representations, inducements and statements, oral or written, of the parties in connection with the subject matter hereof.

7.    <u>Headings</u>. The section headings are inserted as a matter of convenience and in no way define, limit or describe the scope of such section or affect the interpretation of this Addendum.

8.    <u>Counterparts</u>. This Addendum may be signed in counterparts and each counterpart with a hand-written signature, whether an original or an electronic data text (including facsimile, electronic data interchange and electronic mail) is considered an original and all counterparts constitute one and the same instrument.

9.    <u>Miscellaneous</u>. If any provision of this Addendum is found to be unenforceable, the remaining provisions will continue to be in full force and effect. This Addendum shall be binding upon and shall inure to the benefit of the parties, their successors and permitted assigns.

*[This space intentionally left blank; signature to follow]*

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Addendum to be effective as of the Effective Date.

JEG-MEXICO BUENO, S DE RL DE CV                    PLANET FITNESS INTERNATIONAL FRANCHISE

By: _____          By: _____
     (Authorized Representative)

Print Name: _John T. Williams____                Print Name:  Darren Riley

Title: _Legal Representative____                 Title:  Director

Date: ____3/5/19____                             Date: _____

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Addendum to be effective as of the Effective Date.

JEG-MEXICO BUENO, S DE RL DE CV

By: _____
    (Authorized Representative)

Print Name: _____

Title: _____

Date: _____

PLANET FITNESS INTERNATIONAL FRANCHISE

By: _____

Print Name:  Darren Riley

Title:  Director

Date:  March 5, 2019

I, John Cullinane, Notary Public in and for the Cayman Islands, do hereby certify that

DARREN RILEY

appeared before me and executed this document, in witness where of I have subscribed my name and set and affixed my seal of office.

John Cullinane
Date: 5/3/19
My appointment expires: 31 January 20 20

Santa Catarina, NL FA - Appendix J-3

# Exhibit 4

**FIRST OMNIBUS AMENDMENT TO PLANET FITNESS FRANCHISE AGREEMENTS**

THIS FIRST OMNIBUS AMENDMENT TO PLANET FITNESS FRANCHISE AGREEMENTS (the "Amendment") is entered into as of the Effective Date set forth on the signature pages hereto (the "Effective Date") by and between Planet Fitness International Franchise, an exempted company formed under the laws of the Cayman Islands, (the "Franchisor"), the entity executing this Amendment as "Franchisees" on the signature pages hereto (collectively, the "Franchisees").

*Background:*

WHEREAS, the Franchisee operates and/or has right to certain PLANET FITNESS® businesses at certain locations pursuant to the PLANET FITNESS® Franchise Agreements, as amended, listed on <u>Attachment A</u> hereto, which is hereby incorporated by reference  (collectively, the "Franchise Agreements");  and

WHEREAS, at Franchisee's request, Franchisor has agreed to enter into this Amendment in order to amend the ownership of the Franchisee in the Franchise Agreements.

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree to amend the Franchise Agreements as follows:

1.  <u>**Non-Silent Ownership.**</u> Section 4 of Appendix E of each Franchise Agreement is hereby deleted in its entirety and Section 4 of Appendix E, attached hereto as <u>Attachment B</u>, which is hereby incorporated by reference, shall be inserted in lieu thereof.

2.  <u>**Franchisee Ownership Representation.**</u> Franchisee's indirect owners are completing a restructuring on the Effective Date in which United PF Holdings, LLC (the "Transferring Owner") will distribute all of its membership interests in United PF MEX, LLC to such Transferring Owner's immediate parent, which is United PF Partners, LLC. Immediately following such transfer, and as of the Effective Date, United PF Partners, LLC will own all of the membership interests in United PF MEX, LLC. Pursuant to Section 1 of this Amendment, Franchisor and Franchisee have agreed to amend the ownership information to reflect the restructuring and remove the Transferring Owner as an Owner as of the Effective Date. Franchisee represents and warrants to Franchisor that the revised ownership information provided to Franchisor herein on <u>Attachment B</u> will be current, complete and accurate in all respects as of the completion of the restructuring on the Effective Date and acknowledges that such representation is a material inducement to Franchisor entering into this Amendment.

3.  <u>**Outside Legal Fees.**</u> Franchisor's approval of the amendment of ownership interest in is contingent on the Franchisee's payment to Franchisor on or before the Effective Date of Franchisor's reasonable out-of-pocket expenses and external legal and administrative costs in connection with the amendment, which total Seven Hundred and Seventy Five Dollars ($775.00).

4.  <u>**Capitalized Terms.**</u> Capitalized terms not defined herein have the meaning as set forth in the Franchise Agreements unless expressly superseded by the terms of this Amendment.

5.  <u>**Binding Effect.**</u> This Amendment is made in a signed writing by the parties as required by the Franchise Agreements. To the extent of any inconsistency between the Franchise Agreements and this Amendment, this Amendment shall control.

*[Remainder of page intentionally left blank; signature page to follow]*

IN WITNESS WHEREOF, the parties have executed and delivered this Amendment effective as of the Effective Date.

**FRANCHISOR:**

PLANET FITNESS INTERNATIONAL FRANCHISE

By: _____

      (Authorized Representative)

Name Printed: Darren Riley

Title: Director

**EFFECTIVE DATE:** December 26, 2019_____

**FRANCHISEES:**

JEG-MEXICO BUENO, S DE RL DE CV

By: _____

      (Authorized Representative)

Name & Title: Ray Owen III, Manager

*[Remainder of page intentionally left blank]*

**ATTACHMENT A**

**Franchise Agreements**

|  | Franchisee Entity | Location | Effective Date |
|---|---|---|---|
| 1. | JEG-Mexico Bueno, S de RL de CV | 899-A Avenida Manuel J. Clouthier, Santa Catarina, Nuevo León 66120 Mexico | 03/05/2019 |
| 2. | JEG-Mexico Bueno, S de RL de CV | Carretera Nacional 7877, La Estanzuela, Monterrey, Nuevo León 64988 Mexico | 03/05/2019 |
| 3. | JEG-Mexico Bueno, S de RL de CV | Plaza Arcadia Ave Eloy Cavazos #3301, Suite 21, Colonia Camino Real Guadalupe, Nuevo León 67170 Mexico | 03/05/2019 |
| 4. | JEG-Mexico Bueno, S de RL de CV | Ave Carlos Salinas de Gortari #801, Suite A114, Cd Apodaca, Nuevo León 66600 Mexico | 08/29/2019 |
| 5. | JEG-Mexico Bueno, S de RL de CV | Boulevard Nazario Ortiz Garza No. 2060, Saltillo, Coahuila Mexico C.P. 25279 | 10/14/2019 |

*[End of Attachment A]*

**ATTACHMENT B**

**APPENDIX E**
**TO FRANCHISE AGREEMENT**

**OWNERSHIP ADDENDUM**

4.     **OWNERS.**

(a)     Franchisee and each of its Owners represent and warrant that the following is a complete and accurate list of all Owners of any direct or indirect ownership interest whatsoever in Franchisee, including the full name, email address, and mailing address of each Owner, and fully describes the nature and extent of each Owner's interest in Franchisee. Franchisee and each Owner as to such Owner's ownership interest, represents and warrants that each Owner is the sole and exclusive legal and beneficial owner of such Owner's ownership interest in Franchisee, free and clear of all liens, restrictions, agreements and encumbrances of any kind or nature, other than those required or permitted by this Agreement.

| Owner's Name and Contact Information | Percentage and Nature of Ownership Interest |
|---|---|
| JEG-MEX, LLC (FEIN: FEIN: 81-3753736)<br>A Wyoming limited liability company<br>2800 Southampton Rd, Philadelphia, PA 19154 | 99% |
| JEG-FIT ARIZONA, LLC (FEIN: 45-1766091)<br>An Arizona limited liability company<br>2800 Southampton Rd, Philadelphia, PA 19154 | 1% |

| Owner of JEG-MEX, LLC | Percentage and Nature of Ownership Interest |
|---|---|
| JEG-United, LLC (FEIN: 83-1846202)<br>A Delaware limited liability company<br>2800 Southampton Rd, Philadelphia, PA 19154 | 100% |

| Owner of JEG-FIT ARIZONA, LLC | Percentage and Nature of Ownership Interest |
|---|---|
| JEG-United LLC (FEIN: 83-1846202)<br>A Delaware limited liability company<br>2800 Southampton Rd, Philadelphia, PA 19154 | 100% |

| Owners of JEG-United, LLC | Percentage and Nature of Ownership Interest |
|---|---|
| JEG-PF Mexico, LLC (FEIN: 83-1846093)<br>A Delaware limited liability company<br>2800 Southampton Road, Philadelphia, PA 19154 | 50% |
| United PF MEX, LLC (FEIN: 83-1751569)<br>A Delaware limited liability company<br>4635 Boston Lane, Suite 200, Austin, Texas 78735 | 50% |

| Owners of JEG-PF Mexico, LLC | Percentage and Nature of Ownership Interest |
|---|---|
| Tom Bock<br>c/o JEG-PF Mexico LLC<br>2800 Southampton Road, Philadelphia, PA 19154 | 33 1/3% |
| Kevin Kelly<br>12950 N. 119th Street, Scottsdale, AZ 85259 | 33 1/3% |
| John Williams<br>105 Ferris Lane, Unit A5, New Britain, PA 18901 | 33 1/3% |

Owner of United PF MEX, LLC                  Percentage and Nature of Ownership Interest
United PF Partners, LLC (FEIN: 81-3701914)      100%
A Delaware Limited Liability Company
4635 Boston Lane, Suite 200, Austin, Texas 78735


Owners of United PF Partners, LLC           Percentage and Nature of Ownership Interest
JLM Financial Partners, LLC (FEIN: 38-3975373)     41.4350%
A Texas Limited Liability Company
4635 Boston Lane, Suite 200, Austin, Texas 78735

      AK Blair Partners, LP (FEIN: 35-2562969)      41.330164%
      A Texas Limited Partnership c/o Ray Owen III
      9108 Zyle Road,  Austin, Texas 78737

            Ray Owen III (trey@owencompany.com)      49.5%
            9108 Zyle Road, Austin, Texas 78737

            Shannon G. Owen (trey@owencompany.com)     49.5%
            9108 Zyle Road, Austin, Texas 78737

            AK Blair GP, LLC (FEIN: 81-2772908)      1%
            A Texas Limited Liability Company
            c/o Ray Owen III (trey@owencompany.com)
            9108 Zyle Road, Austin, Texas 78737

                  Ray Owen III (trey@owencompany.com)     50%
                  9108 Zyle Road, Austin, Texas 78737

                  Shannon G. Owen (trey@owencompany.com)     50%
                  9108 Zyle Road, Austin, Texas 78737

      MPF Financial, LLC (FEIN: 32-0470280)      36.958033%
      A Texas Limited Liability Company
      c/o Larry Meyer, Its Manager (lmeyer@larrymeyer.com)
      P.O. Box 154369, Waco, Texas 76150

            MTP Financial, LLC      100%
            A Texas limited liability company
            c/o Larry Meyer, Manager (lmeyer@larrymeyer.com)
            3839 Bee Cave Road, Suite 205, Austin, Texas 78746

                  The CLM 2015 Irrevocable Trust     79.8%
                  c/o Larry Meyer, Trustee (lmeyer@larrymeyer.com)
                  P.O. Box 154369, Waco, Texas 76150

                  CLM I Trust     7.4%
                  c/o Larry Meyer, Trustee (lmeyer@larrymeyer.com)
                  P.O. Box 154369, Waco, Texas 76150

                  CLM II Trust     8.3%
                  c/o Larry Meyer, Trustee (lmeyer@larrymeyer.com)
                  P.O. Box 154369, Waco, Texas 76150

CLM 2006 Irrevocable Trust                                          4.5%
c/o Larry Meyer, Trustee (lmeyer@larrymeyer.com)
P.O. Box 154369, Waco, Texas 76150

JLM Financial Investments 22, L.L.C. (FEIN:  32-0447354)    1%
A Texas Limited Liability Company
c/o Larry Meyer, Manager (lmeyer@larrymeyer.com)
P.O. Box 154369, Waco, Texas 76250

MPF Financial, LLC                                          50%
(see ownership breakdown above)

EZ PF, LLC (FEIN: 81-4063731)                              4.584590%
A Texas Limited Liability Company
c/o Jeff Ezell, Its Sole Member (jeff@jlmfinancialinvestments.com)
1109 Mission Ridge, Austin, Texas 78704

Jeff Ezell (jeff@jlmfinancialinvestments.com)              100%
1109 Mission Ridge, Austin, Texas 78704

Josh Meyer (josh@jlmfinancialinvestments.com)             0.5%
2607 Chalk Knoll Cove, Austin, Texas 78735

Jessica and Chris Votaw                                    0.5%
8404 Burkwood Cove, Austin, Texas 78735
(cvotaw@jlmfinancialinvestments.com)

David Lomasney Living Trust dated July 5, 2016[1]          1.281311%
c/o David and Sharon Lomasney, Trustees
33 Castlebridge Lane, Hilton Head, South Carolina 29928

Sharon Lomasney Living Trust dated July 5, 2016[2]        1.281311%
c/o David and Sharon Lomasney, Trustees
33 Castlebridge Lane, Hilton Head, South Carolina 29928

EMP PF, LLC (FEIN: 81-4211763)              34.6420% in the aggregate
A Delaware Limited Liability Company
3060 Peachtree Road, Suite 360, Atlanta, Georgia 30305

Eagle Individuals

E. Stockton Croft (SCroft@eaglemerchantpartners.com)
3060 Peachtree Road, Suite 360, Atlanta, Georgia 30305

Ransom James (RJames@eaglemerchantpartners.com)
3060 Peachtree Road, Suite 360, Atlanta, Georgia 30305

Bill Lundstrom (BLundstrom@eaglemerchantpartners.com)
3060 Peachtree Road, Suite 360, Atlanta, Georgia 30305

Andrew Hirsekorn (AHirsekorn@eaglemerchantpartners.com)
3060 Peachtree Road, Suite 360, Atlanta, Georgia 30305

---

[1] This trust is a new addition to the ownership.  To the extent not previously reviewed, Franchisor reserves the right to review and approve the trust.
[2] This trust is a new addition to the ownership.  To the extent not previously reviewed, Franchisor reserves the right to review and approve the trust.

UPFP Pref, LLC (FEIN: 81-4176651)                              10%
A Delaware Limited Liability Company
4635 Boston Lane, Suite 200, Austin, Texas 78735

    PF Lomasney Family, LLC (FEIN: 81-4229929)            5%
    A Delaware Limited Liability Company
    c/o David and Sharon Lomasney (dlomasney@planetfitnessgyms.com)
    33 Castlebridge Lane, Hilton Head, South Carolina 29928

        David Lomasney (dlomasney@planetfitnessgyms.com)          50%
        33 Castlebridge Lane, Hilton Head, South Carolina 29928

        Sharon Lomasney (slomasney00@aol.com)                    50%
        33 Castlebridge Lane, Hilton Head, South Carolina 29928

    PF Family Investors, LLC (FEIN: 81-4180926)            5%
    A Missouri Limited Liability Company
    4251 North East Port Drive, Lee's Summit, Missouri 64064
    c/o Greg Henson (greg@heartlandtan.com)

        Greg Henson (greg@heartlandtan.com)                      52%
        4251 North East Port Drive, Lee's Summit, Missouri 64064

        Brad Henson (bradh@heartlandtan.com)                     25%
        15170 Lakeport Lane, Smithville, Missouri 64089

        Seth Henson (sethh@pfkcmo.com)                           10%
        12 East 69th Terrace, Kansas City, Missouri 64113

        Debbie Benner (debnsteve@comcast.net)                    5%
        4928 Peck Avenue, Independence, Missouri 64055

        Abigail Henson (abbyclemmer@mac.com)                     4%
        12447 S. Ortega Drive, Olathe, Kansas 66062

        Jennifer Wilson (Wilson61502@yahoo.com)                  4%
        3108 SW Ragan Drive, Lee's Summit, Missouri 64082

    Landry Preferred, LLC (FEIN: 81-4172618)              6%
    A Mississippi Limited Liability Company
    24629 Oak Island Drive, Pass Christian, Mississippi 39571
    c/o John Landry (johnlandry@cableone.net)

        John Landry (johnlandry@cableone.com)                    77.4%
        24629 Oak Island Drive, Pass Christian, Mississippi 39571

        Rachel Gant (charlie@gant-brown.com)                     17.6%
        9326 Lobouy Road, Pass Christian, Mississippi 39571

        Scott Lyons (slyons100@yahoo.com)                        5%
        1314 Berwick Drive, Hoover, Alabama 35242

    The BAJ2911 Company, LLC (FEIN: 81-4225764)            2%
    A Louisiana Limited Liability Company
    1130 S. Fieldspan Road, Duson, Louisiana 70529
    c/o Brandon Robinson (brandonandammie@cox.net)

Brandon Robinson (brandonandammie@cox.net)      100%
1130 S. Fieldspan Road, Duson, Louisiana 70529

Gulf Coast PF, LLC (FEIN 82-2835738)      6%
A Mississippi Limited Liability Company
5603 Chalone Place, Ocean Springs, Mississippi 39564
c/o Gary Sinopoli (gjsinopoli@yahoo.com)

Gary Sinopoli      33.33%
5603 Chalone Place, Ocean Springs, Mississippi 39564

Robert J. Siragusa      33.33%
6001 Olde Oak View Road, Ocean Springs, Mississippi 39564

Micheal D. Hurring      33.33%
9621 Oak Crest Lane, Ocean Springs, Mississippi 39564

<u>Management Stock Options</u>      7.13% in the aggregate

Landry Founders, LLC (FEIN: 81-4190322)      0.5%
A Mississippi Limited Liability Company
24629 Oak Island Drive, Pass Christian, Mississippi 39571
c/o John Landry (johnlandry@cableone.net)

John Landry (johnlandry@cableone.net)      100%
24629 Oak Island Drive, Pass Christian, Mississippi 39571

The BAJ2911 Company, LLC (FEIN: 81-4225764)      1.0%
A Louisiana Limited Liability Company
1130 S. Fieldspan Road, Duson, Louisiana 70529
c/o Brandon Robinson (brandonandammie@cox.net)
(See above for ownership breakdown)

PF Lomasney Family, LLC (FEIN: 81-4229929)      1.0%
A Delaware Limited Liability Company
33 Castlebridge Lane, Hilton Head, South Carolina 29928
c/o David and Sharon Lomasney (dlomasney@planetfitnessgyms.com)
(See above for ownership breakdown)

PF Family Investors, LLC (FEIN: 81-4180926)      0.5%
A Missouri Limited Liability Company
4251 North East Port Drive, Lee's Summit, Missouri 64064
c/o Greg Henson (greg@heartlandtan.com)
(See above for ownership breakdown)

(b)    **Ownership Group.** *Intentionally omitted.*

*[End of Attachment B]*

# Exhibit 5

## GENERAL RELEASE AND AGREEMENT

This **GENERAL RELEASE** and **AGREEMENT** ("Release") is entered into as of the Effective Date set forth on the signature pages hereto (the "Effective Date" ") by and among the entity executing this Amendment as "Franchisee" on the signature pages hereto (the "Franchisee"), the entity executing this Amendment as "Transferring Owner" on the signature pages hereto (the "Transferring Owner") and Planet Fitness International Franchise, an exempted company formed under the laws of the Cayman Islands ("Franchisor"):

### WITNESSETH:

**WHEREAS**, Franchisor and Franchisee are parties to the PLANET FITNESS Franchise Agreements listed on Appendix A hereto (collectively, the "Franchise Agreements");

**WHEREAS**, Transferring Owner desires to transfer its rights under the Franchise Agreements; and

**WHEREAS**, Pursuant to the Franchise Agreements, Franchisor requires this Release from Franchisee and Transferring Owner, as a condition for such transfer.

**NOW THEREFORE**, in consideration of the mutual covenants and conditions contained in this Release, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Release. Franchisee and Transferring Owner, for themselves and their successors, predecessors, assigns, beneficiaries, executors, trustees, agents, representatives, employees, officers, directors, shareholders, partners, members, subsidiaries and affiliates (jointly and severally, the "Releasors"), irrevocably and absolutely release and forever discharge Franchisor and its successors, predecessors, assigns, beneficiaries, executors, trustees, agents, representatives, employees, officers, directors, shareholders, partners, members, subsidiaries and affiliates (jointly and severally, the "Releasees"), of and from all claims, obligations, actions or causes of action (however denominated), whether in law or in equity, and whether known or unknown, present or contingent, for any injury, damage, or loss whatsoever arising from any acts or occurrences occurring as of or prior to the date of this Release relating to the Franchise Agreements, the businesses operated under the Franchise Agreements, and/or any other previously existing agreement between any of the Releasees and any of the Releasors, including but not limited to, any alleged violations of any deceptive or unfair trade practices laws, franchise laws, or other local, municipal, state, federal, or other laws, statutes, rules or regulations, and any alleged violations of the Franchise Agreements or any other related agreement. The Releasors, and each of them, also covenant not to sue or otherwise bring a claim against any of the Releasees regarding any of the claims being released under this Release.

2.      Representations and Warranties. The Releasors hereby represent, warrant and covenant to the Franchisor that:

a. There are no claims, charges, lawsuits, or any similar matters of any kind filed by them or on their behalf or for their benefit presently pending against the Releasees, or any of them, in any forum whatsoever, including, without limitation, in any state or federal court, or before any federal, state, or local administrative agency, board, or governing body. The Releasors further represent and warrant that the Releasors have not heretofore assigned or transferred, or purported to assign or transfer, to any person, firm, corporation or entity any claim, charge, lawsuit, or any similar matter of any kind herein released.

b. As of the date of this Release, the Franchisee listed herein constitutes each and every entity (i) in which any of the Releasors have an interest related to any agreement with Franchisor and (ii) that is party to an agreement with any of the Releasees. In the event that there is a breach of this representation and warranty by any of the Releasors, such entity shall be bound by the terms and conditions of Section 1 of this Release as if such entity

were a party hereto and the Transferring Owner and such entity shall immediately execute a release in the same form as contained in Section 1 hereof on behalf of all such entities.

c. Each party whose signature is affixed hereto in a representative capacity represents and warrants that he or she is authorized to execute this Agreement on behalf of and to bind the entity on whose behalf his or her signature is affixed. In the event that there is a breach of any representation or warranty of authority to execute this Release, the Releasors shall indemnify and hold harmless the Releasees from any and all loss or damage, including reasonable attorneys' fees, incurred as result of the breach of such representation and warranty.

3.    <u>Acknowledgement of Release of Unknown Claims</u>. The Releasors hereby acknowledge that the release of claims set forth in Section 1 is intended to be a full and unconditional general release, as that phrase is used and commonly interpreted, extending to all claims of any nature, whether or not known, expected or anticipated to exist in favor of the Releasors against the Releasees. In making this voluntary express waiver, the Releasors acknowledge that claims or facts in addition to or different from those which are now known to exist may later be discovered and that it is the Releasors' intention to hereby fully and forever settle and release any and all matters, regardless of the possibility of later discovered claims or facts. Each of the Releasors expressly acknowledge that they are familiar with the provisions of Section 1542 of the California Civil Code which provides as follows:

**A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.**

Each of the Releasors hereby specifically and expressly waive all rights that they may have under Section 1542 of the California Civil Code or any similar provision of law in any other jurisdiction. This Release is and shall be and remain a full, complete and unconditional general release. The Releasors further acknowledge and agree that no violation of this Release shall void the releases set forth in this Release.

4.    <u>Ratification of Post-Term Covenants</u>. Transferring Owner agrees to remain bound by the confidentiality, non-competition and other restrictions contained in Appendix C of the Franchise Agreements as if such agreements had terminated.

5.    <u>Voluntary Nature of Agreement</u>. Franchisee and Transferring Owner acknowledge and agree that they have entered into this Release voluntarily and without any coercion. Franchisee and Transferring Owner further represent that they have had the opportunity to consult with an attorney of their own choice, that they have read the terms of this Release, and they fully understand and voluntarily accept the terms.

6.    <u>Binding Effect</u>. This Release shall be binding upon, inure to the benefit of and be enforceable by Franchisees, Transferring Owner, and Franchisor and their respective successors and assigns.

7.    <u>Severability</u>. If any provision of this Release is declared void or unenforceable, the other provisions of this Release shall remain in full force and effect, unless the provisions must be deemed to be indissolubly connected to the void or unenforceable provision. If the other provisions remain valid, the parties shall endeavor to replace the void or unenforceable provision by a valid provision that reflects the parties' original intent to the greatest possible extent.

8.    <u>Governing Law</u>. This Release shall be governed by, and construed in accordance with, the law of the State of New Hampshire, without regard to principles of conflicts of law that would result in the laws of another state being applied. The parties agree that any legal proceeding relating to this Release or the enforcement of any provision of this Release shall be brought or otherwise

commenced only in the State or Federal courts of the State of New Hampshire. The parties irrevocably submit to the jurisdiction of such courts and waive any objection they may have to either the jurisdiction of or venue in such courts.

9.  <u>Entire Agreement/Amendment</u>. This Release contains the entire agreement of the parties with respect to the subject matter hereof and shall not be amended except by the signed written agreement of each of the parties.

10. <u>Headings</u>. The headings of the Sections hereof are for convenience only and do not define, limit or construe the contents of such Sections.

11. <u>Counterparts and Electronic Records</u>. This Release may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement. The execution of this Release and related agreements by electronic means shall be legally binding and enforceable as an "electronic signature" and the legal equivalent of a handwritten signature. All disclosures, agreements, amendments, notices, and all other evidence of transactions between the parties hereto may be maintained in electronic form.

*[Remainder of page intentionally left blank; signatures to follow]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Release as of the date first above written.

<u>**FRANCHISOR**</u>:

PLANET FITNESS INTERNATIONAL FRANCHISE

By: _____
     (Authorized Representative)
Name Printed: Darren Riley
Title: Director
**EFFECTIVE DATE:**  December 26, 2019

<u>**FRANCHISEE**</u>:

JEG-MEXICO BUENO, S DE RL DE CV

By: _____
     (Authorized Representative)
Name & Title: Ray Owen III, Manager

<u>**TRANSFERRING OWNERS**</u>:

UNITED PF HOLDINGS, LLC

By: _____
     (Authorized Representative)
Name & Title: Ray Owen III, Manager

**APPENDIX A**

**FRANCHISE AGREEMENTS**

|  | Franchisee Entity | Location | Effective Date |
|---|---|---|---|
| 1. | JEG-Mexico Bueno, S de RL de CV | 899-A Avenida Manuel J. Clouthier, Santa Catarina, Nuevo | 03/05/2019 |
| 2. | JEG-Mexico Bueno, S de RL de CV | Carretera Nacional 7877, La Estanzuela, Monterrey, Nuevo | 03/05/2019 |
| 3. | JEG-Mexico Bueno, S de RL de CV | Plaza Arcadia Ave Eloy Cavazos #3301, Suite 21, Colonia | 03/05/2019 |
| 4. | JEG-Mexico Bueno, S de RL de CV | Ave Carlos Salinas de Gortari #801, Suite A114, Cd | 08/29/2019 |
| 5. | JEG-Mexico Bueno, S de RL de CV | Boulevard Nazario Ortiz Garza No. 2060, Saltillo, Coahuila Mexico C.P. 25279 | 10/14/2019 |

*[Remainder of page intentionally left blank; end of Appendix A]*