UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Planet Fitness International Franchise

       v.

                                    Civil No. 20-cv-693-LM
                                    Opinion No. 2022 DNH 117 P

JEG-United, LLC

# O R D E R

Planet Fitness International Franchise ("Planet Fitness"), a franchisor of gyms, and JEG-United, LLC, a business that operates several Planet Fitness franchises in Mexico, bring claims against each other in this commercial dispute. JEG-United also brings counterclaims against Planet Fitness's Chief Development Officer, Raymond Miolla. Planet Fitness and Miolla move for summary judgment (doc. no. 81) on JEG-United's counterclaims. JEG-United objects. JEG-United also filed two assented-to motions to seal exhibits attached to its objection and surreply (doc. nos. 88 and 97).

For the following reasons, Planet Fitness's motion for summary judgment is denied in part and granted in part. JEG-United's motions to seal are granted.

## STANDARD OF REVIEW

Summary judgment is proper only if the moving party can demonstrate that there is no evidence in the record to support a judgment for the nonmoving party. Borges v. Serrano-Isern, 605 F.3d 1, 5, 8 (1st Cir. 2010); see also Fed. R. Civ. P. 56(a). If the moving party succeeds in making that showing, "the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear

the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Borges, 605 F.3d at 5. The nonmoving party's failure to meet that burden by reference to "significantly probative" materials "of evidentiary quality" entitles the moving party to summary judgment. Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016). In evaluating a motion for summary judgment, the courts must view the evidence in the light most favorable to the nonmoving party, must draw all reasonable inferences in that party's favor, and may neither make credibility determinations nor weigh the evidence. Harris v. Scarcelli, 835 F.3d 24, 29 (1st Cir. 2016); Hicks v. Johnson, 755 F.3d 738, 743 (1st Cir. 2014).

## BACKGROUND

The disputes in this case relate to negotiations between Planet Fitness and JEG-United from 2015 through 2020. During that time and under the auspices of contracts known as "side letter agreements," Planet Fitness and JEG-United negotiated toward a more expansive contract—known to the parties as an "area development agreement" or "ADA"—that would have provided JEG-United with the exclusive right to open and operate new Planet Fitness franchises in all or parts of Mexico. Ultimately, JEG-United and Planet Fitness agreed to contracts granting JEG-United rights to open and operate five Planet Fitness franchises in parts of the Monterrey, Mexico, metropolitan area. For the rest of Mexico, Planet Fitness agreed to an ADA with a third party, Ibarra Group. In this suit, JEG-United

alleges that Planet Fitness acted improperly in various respects during their negotiations.

Specifically, in Counts I and II of its counterclaims, JEG-United alleges that Planet Fitness's conduct during negotiations breached the operative side letter agreement (Count I) and breached the implied covenant of good faith and fair dealing (Count II).  In Count III, JEG-United claims that, during the same time period, Planet Fitness and Miolla tortiously interfered with JEG-United's attempts to consummate transactions with several third parties—a Mexico-based grocery chain (Soriana), a competing chain of gyms (California Fitness), and Ibarra Group. In Count IV, JEG-United alleges that Planet Fitness and Miolla violated the New Hampshire Consumer Protection Act, RSA 358-A:2.[1]  While not at issue in the present motion for partial summary judgment, Planet Fitness's claims against JEG-United seek to enforce a provision in the operative side letter agreement that required Planet Fitness to buy JEG-United's Mexico franchises.

I.      JEG-United explores opening Planet Fitness franchises in Mexico and signs the first side-letter agreement.

Between 2015 and 2016 and consistent with Planet Fitness's efforts to expand its brand beyond the United States, JEG-United's founders[2] explored

---

[1] Counts I and II are against Planet Fitness alone, while Counts III and IV are against both Planet Fitness and Miolla.

[2] More precisely, another entity that appears to have been controlled by some of JEG-United's founders, JEG-Mex, began developing clubs in 2015.  JEG-United

opening Planet Fitness franchises in Mexico.  In April 2017, Planet Fitness and
JEG-United executed a "franchise agreement."  This franchise agreement allowed
JEG-United to open one Planet Fitness franchise in Monterrey, a city in northern
Mexico.  At the same time, Planet Fitness and JEG-United executed the first of
several "side letter agreements."

 Specifically, among other terms, the April 2017 side letter agreement
granted JEG-United "exclusive rights to the municipalities of Santa Catarina,
Mexico and San Pedro Garza García."  These two areas are part of the Mexico state
of Nuevo León and within the Monterrey metropolitan area.  The April 2017 side
letter agreement also provided JEG-United with a "right of first refusal" to develop
Planet Fitness franchises in Monterrey, Mexico, under certain terms.  Beyond
Monterrey, the side letter agreement set terms for an ADA for Mexico if the parties
finalized the ADA before December 31, 2018.[3]

At the time it negotiated the April 2017 side letter agreement, JEG-United's
primary goal was to obtain an ADA for all of Mexico.  An ADA provides a franchisee

_____

(the counterclaim plaintiff in this case) was not created until 2018, after JEG-Mex's
ownership agreed to partner with another Planet Fitness franchisee, United PF
Holdings.  Unlike this court's order on Planet Fitness's first motion for partial
summary judgment, see Planet Fitness International Franchise v. JEG-United,
LLC, 561 F. Supp. 3d 9 (2021), there is no reason here for the court to explore the
nuances of JEG-United's history and ownership structure.  For simplicity and
because it does not affect the outcome of Planet Fitness's motion, the court refers
only to JEG-United throughout this order.

    [3] On December 21, 2017, Planet Fitness and JEG-United executed a contract
that adjusted some of the April 2017 side letter's terms.

with exclusive rights to open franchises in a certain geographic area.  These rights are valuable to franchisees such as JEG-United because they avoid competition in the covered area from other franchisees of the same brand.  (That is, with an ADA, JEG-United would not have to worry about another Planet Fitness franchisee leasing real estate or poaching a customer base in any region covered by the ADA).  For the franchisor, Planet Fitness, an ADA is valuable because it commits the selected franchisee to a "development schedule"—that is, to opening a specific number of franchises over a specified period—ensuring that the franchisor's brand expands to the locations covered by the ADA.  Planet Fitness's ADAs and accompanying franchise agreements also typically require the franchisee to pay Planet Fitness fees for each franchise opened and royalty payments based on franchise revenues.

II.   <u>JEG-United opens its first Planet Fitness franchise in Mexico.</u>

On April 26, 2018, JEG-United opened its first Planet Fitness franchise in Mexico.  The franchise was in the Monterrey metropolitan area[4] per the April 2017 franchise and side letter agreement.  But opening the franchise—and preparing to open additional franchises—was not easy.  The task was made more difficult because neither Planet Fitness nor JEG-United had experience opening franchises in Mexico.

---

[4] Specifically, JEG-United opened the club in Santa Catarina, Nuevo León, Mexico.

For example, JEG-United had to identify and acquire rights to real estate in locations suitable to profitably sustain Planet Fitness franchises.  To that end, JEG-United's executives built relationships in Mexico with people and businesses involved in construction, law, accounting, banking, and marketing.  After obtaining real estate, the facility for the gym had to be constructed and management teams hired.  These steps were complicated in Mexico because of language differences and the hesitancy of Mexico-based real estate owners to work with American developers like JEG-United.  JEG-United's challenges also included developing payment systems that worked in Mexico and obtaining agreements with banks—for example, Planet Fitness's preferred vendor for payment systems was not interested in making its system functional in Mexico.

III.   Planet Fitness hires Ray Miolla and changes its strategy about how to expand into Mexico.

In the late spring of 2018—soon after JEG-United opened its first franchise in Mexico—Planet Fitness hired Ray Miolla as its "Chief Development Officer."  At that time and with Miolla's input, Planet Fitness decided to develop Mexico with two franchisees: JEG-United and another, Mexico-based franchisee.  Planet Fitness planned to provide JEG-United with an ADA focused on northern Mexico, while the Mexico-based franchisee would have an ADA over southern Mexico.

Planet Fitness was concerned that a United States-based franchisee such as JEG-United would not be able to successfully develop franchises outside of northern Mexico; Planet Fitness believed northern Mexico to have more similarities to the

United States than southern Mexico.  Planet Fitness believed that a Mexico-based franchisee with more established business connections in Mexico would have more success opening franchises in southern Mexico.

In his affidavit, Miolla acknowledged that this strategy was a change from Planet Fitness's prior approach to expanding to international markets.  That is, before summer 2018, Planet Fitness contracted with United States-based franchisees to open franchises in international markets.  But, in Planet Fitness's view, this approach was successful only in Panama; it was unsuccessful in Canada and the Dominican Republic.  Thus, between 2018 and 2019, Planet Fitness rejected proposals from United States-based franchisees to build gyms in Ireland, Spain, China, and the Philippines.

In a summer 2018 email with other Planet Fitness executives in which he outlined his reasoning for this change of strategy, Miolla noted that he had a great relationship with a Mexican billionaire named Carlos Ibarra.  Miolla stated that Ibarra had worked to develop several retail brands in Mexico.  Miolla believed that Ibarra's business (Ibarra Group) would be a good fit to develop Mexico for Planet Fitness.  By contrast, Miolla did not have a strong relationship with JEG-United and, in particular, JEG-United Chief Executive Officer Kevin Kelly.

IV.   <u>JEG-United leases the Estanzuela property from Soriana.</u>

In late spring and through 2018, JEG-United's executives toured real estate and engaged in due diligence for obtaining real estate from developers and "big-box locations."  In particular, JEG-United discussed the possibility of leasing real estate

7

from a Mexico-based grocery store chain called Soriana.  By June 2018, JEG-United had signed a deal to lease property from Soriana for a second Planet Fitness franchise in Monterrey.  This second franchise became known as the Estanzuela location.  Kelly thought that if the Estanzuela deal went well, Soriana would "kind of open up the portfolio to other locations throughout Mexico . . . ."  Doc. no. 90-46 at 18.

In June 2018, Kelly and Miolla spoke by telephone.  During this phone call, Kelly told Miolla that JEG-United had signed a deal to lease property from Soriana for the Estanzuela location and that JEG-United was discussing the possibility of leasing more real estate from Soriana.  Kelly, however, believed that Miolla did not react well to this news and the possibility that JEG-United might lease further locations from Soriana.

Some of the real estate Kelly discussed with Soriana was outside of Monterrey and some was within Monterrey.  Kelly did not discuss any particular number of locations that Soriana would lease if the Estanzuela deal went well; rather, in Kelly's words, Soriana "just expressed the desire that they were downsizing and that we [i.e., Planet Fitness and JEG-United] were a great fit for them."  Id. at 21.  Soriana made no promises to JEG-United in writing about "opening" Soriana's real estate portfolio if the Estanzuela deal went well.  Kelly said in his deposition that he convinced Soriana to lease properties to Planet Fitness instead of other United States-based retailers.  Only one lease was ever signed between JEG-United and Soriana.  The discussions with Soriana after the

Estanzuela lease were all "pretty high level" and did not involve determined locations or possible rent rates.  Id.

On August 24 and 25, 2018, Miolla and Carlos Ibarra exchanged emails about Soriana's real estate.  Specifically, Miolla asked Ibarra to call him because he wanted Ibarra's advice about a lease being offered to Planet Fitness by Soriana in Monterrey (the email did not specify whether the lease was the Estanzuela location or another location in Monterrey).  Miolla was concerned that the "US franchisee" (presumably JEG-United) was "making a mess of it."  Doc. no. 90-59 at 2.

By the end of 2018, JEG-United and Soriana were no longer in discussions to lease additional real estate.  In his deposition, Kelly asserted that his real estate agents told him that "somebody" at Planet Fitness told Soriana not to deal with Kelly anymore, that Kelly was just a franchisee, and that Kelly did not speak for Planet Fitness.  Further, Kelly testified that Jennifer Annello, a Planet Fitness executive, told him that she was in a room when Miolla said that he told Soriana not to talk to Kelly.[5]  Kelly stated in his deposition that Miolla's statements to Soriana destroyed JEG-United's credibility with real estate agents and landlords. Kelly testified that, by the end of 2018, Soriana had gone "cold" and was no longer willing to talk to JEG-United.

---

[5] Annello, however, testified in her deposition that she was "not a part of a conversation between [Miolla] and Soriana" and that she did not know what was said in any conversation that occurred between Miolla and Soriana.  Annello stated that Kelly told her that Miolla told Soriana not to talk to JEG-United.

In contrast, in his affidavit Miolla states that neither he nor anyone else at Planet Fitness ever contacted or had discussions with anyone at Soriana about JEG-United.  Miolla states that he did not tell Soriana not to speak to JEG-United. Nonetheless, Miolla adds that it would be "consistent with normal industry and Planet Fitness practice" to manage national retail partnerships and landlord relationships and to share opportunities with franchisees if the opportunities are within their territory.

V.    Planet Fitness decides to proceed with Ibarra and JEG-United.

In September 2018, Miolla met with Ibarra and his team to discuss opening Planet Fitness franchises in Mexico.  Ibarra's presentation confirmed Miolla's belief that Ibarra was better suited to develop Mexico for Planet Fitness than JEG-United.  Miolla told Planet Fitness CEO Chris Rondeau that Ibarra was "all in" on Mexico.  Miolla noted that Ibarra was "open" to purchasing JEG-United, starting a joint venture with JEG-United, or giving JEG-United a minority interest in Ibarra's business.

Miolla also met with JEG-United's management.  As to this meeting, Miolla reported to Rondeau that JEG-United had made a "good" presentation about how they could work around the challenges of "being foreigners" in Mexico.  Doc. no. 90-62.  Miolla told Rondeau that the "next steps" were to "resolve our Monterrey strategy."  Miolla said that his "gut" told him to give JEG-United rights to Nuevo León (i.e., the Mexican state including Monterrey) but to also encourage JEG-United to start a joint venture with Ibarra.  Miolla concluded that Planet Fitness

10

should enter an ADA with Ibarra for central and southern Mexico while holding

Tijuana "and some other key northern cities until" Planet Fitness saw how JEG-

United performed in developing their areas.

In an October 2018 email, Miolla told JEG-United that it had begun

negotiating with a "second franchise applicant" and that Planet Fitness was willing

to negotiate with JEG-United for an ADA focused on northern Mexico.  Doc. no. 83-

12.  JEG-United did not learn until later that Ibarra was the other franchisee.

On December 20, 2018, Miolla corresponded with Ibarra in advance of a

planned meeting in Portsmouth, New Hampshire.  Miolla provided Ibarra a

"reminder" that "the existing franchisee, JEG-United & Kevin Kelly" were "already

talking with Soriana about a location in Saltillo and about the idea of additional co-

tenancy opportunities."  Miolla asked Ibarra if he could "forewarn" JEG-United and

Kelly that Ibarra would also be reaching out to Soriana or if Ibarra would prefer to

"keep it confidential for now."  Ibarra responded that he would prefer that "our"

appointment with Soriana be kept confidential "to avoid noise with the owners."

Doc. no. 90-54.

VI.    <u>JEG-United continues to expand its footprint in Mexico and signs the March
2019 Side Letter Agreement with Planet Fitness.</u>

The April 2017 side letter agreement expired on December 31, 2018, with no

ADA executed between JEG-United and Planet Fitness.  Nonetheless, through 2018

and early 2019, JEG-United and Planet Fitness continued to negotiate about an

ADA for Monterrey and other parts of northern Mexico.  By this point, however, the

relationship between Kelly and Miolla had soured.  Thus, negotiations toward what culminated in the March 2019 side letter agreement were conducted "principally" between Miolla and Ray ("Trey") Owen III, who was part of JEG-United's ownership structure.[6]

On March 5, 2019, JEG-United and Planet Fitness entered a new side letter agreement in which they agreed to negotiate toward an ADA for northern Mexico or parts of northern Mexico.  The March 2019 agreement stated that "the Existing Side Letters are hereby terminated."  Doc. no. 83-13 at 4 ¶ 9.  The agreement required negotiations for the ADA to occur in good faith "consistent with" a "non-binding summary of terms" attached to the contract.  Id. at 2-3 ¶ 2.  Some of the proposed terms included fees to Planet Fitness per location built (e.g., a $10,000 "area development agreement fee" and a $20,000 "franchise fee") and royalty rates.  As noted, unlike the April 2017 side letter agreement, the March 2019 side letter agreement limited the scope of negotiations for the ADA to northern Mexico— specifically, the cities of Monterrey, Saltillo, and Torreón.

Critically, the March 2019 side letter agreement left open the "development schedule," which, in short, sets how many franchises the franchisee must open and the time over which the franchisee must open them.  Specifically, the March 2019 side letter stated that the development schedule for the ADA would be 30 franchises over 8 years—but noted that this schedule was "subject to revision based upon

---

[6] As discussed in the court's order denying Planet Fitness's first motion for summary judgment, the precise nature of Trey Owen's relationship with JEG-United is a subject of dispute between the parties.

future discussions."[7] Id. at 12.  Similarly, the March 2019 side letter agreement left the parties to "work in good faith to mutually agree on a form franchise agreement." Id. at 13.

In addition to those terms relating to the ADA, the March 2019 side letter agreement included a "put option," which granted JEG-United the option to sell its franchises in Mexico to Planet Fitness at their "book value"[8] if JEG-United and Planet Fitness were unable to come to an agreement for an ADA.[9]  The March 2019 side letter agreement was originally set to expire on December 31, 2019, before it was later extended until June 30, 2020.  Doc. no. 83-13; doc. no. 93-4 (agreement to extend expiration of March 2019 side letter agreement).

VII.   Kevin Kelly tries to negotiate a deal with California Fitness.

In May 2019, Kelly contacted Planet Fitness about what he characterized as an urgent opportunity.  Kelly had begun discussing a potential purchase of a competitor's fitness clubs in Mexico.  The competitor, California Fitness, owned five clubs in Mexico, none of which were in or near Monterrey.  California Fitness, however, represented to Kelly that that it was negotiating leases in Monterrey.

---

[7] Planet Fitness asserts that it initially asked for JEG-United to develop 40 franchises over 5 years, but during negotiation for the March 2019 side letter agreement reduced its request to 30 franchises over 8 years.

[8] The agreement describes how "book value" should be calculated.

[9] The put option is the subject of Planet Fitness's claims, which are not presently at issue.

In an email to Planet Fitness executives, Kelly requested Planet Fitness's approval of the negotiations, suggesting five separate options for moving forward, in order of JEG-United's stated preference:

1. A joint venture between JEG-United and the second Mexico franchisee (whose identity, Ibarra, was at the time unknown to Kelly and JEG-United) takes control of the California Fitness clubs.

2. "JEG-United buys California Fitness and operates 100% of five (5) locations." Doc. no. 83-21 at 5.

3. Another franchisee purchases California Fitness.

4. Planet Fitness purchases and operates the California Fitness clubs before giving the clubs to another franchisee.

5. Planet Fitness passes on the deal.

Unsurprisingly, Kelly preferred that his business, JEG-United, be part of any franchisee group that took control of the California Fitness franchises. Both of Kelly's proposed options that included JEG-United involved converting the California Fitness franchises to Planet Fitness franchises.

At the time, however, Planet Fitness and California Fitness were litigating about California Fitness's alleged infringement of Planet Fitness trademarks. Planet Fitness was unwilling to engage with California Fitness unless Planet Fitness representatives could be part of the negotiations and the due diligence for the purchase. And, according to Kelly, California Fitness was unwilling to allow Planet Fitness representatives to be part of the negotiations or due diligence—

fearing that Planet Fitness would take advantage of any insight into California Fitness's business.  Further, Kelly reported that California Fitness was "unwilling to enter into any formal legal agreement" with Planet Fitness and preferred to discuss a transaction that did not involve Planet Fitness.  Id. at 5-6.

Kelly testified in his deposition that Planet Fitness "killed" the deal because Planet Fitness told him that California Fitness should negotiate with Miolla rather than Kelly.  Kelly stated that negotiations did not progress beyond Kelly providing "some boundaries" on how JEG-United and California Fitness would come to an agreement.  In his affidavit, Miolla states that he "had no discussions whatsoever with anyone at California Fitness regarding the terms of a potential purchase of California Fitness location[s] in Mexico."  Doc. no. 83-1 ¶ 18.

VIII.  <u>Planet Fitness and JEG-United negotiate development schedule for northern Mexico ADA.</u>

Meanwhile, Ibarra and Planet Fitness continued negotiations for an ADA. On June 10, 2019, Miolla contacted Ibarra, asking for updates on the status of Ibarra's proposal for a marketing budget, a development schedule, and potential partners.  Miolla told Ibarra that JEG-United was working on its third lease in Monterrey, and Miolla told Ibarra that he did not want JEG-United to "get too far ahead" of him.  Doc. no. 90-63.

Negotiations between JEG-United and Planet Fitness for the northern Mexico ADA also continued.  In June 2019, JEG-United asked Planet Fitness if it would change the proposed development schedule for the northern Mexico ADA

from 30 franchises over 8 years to 20 over 10 years.[10]  JEG-United believed that this was a more feasible schedule than the 30-franchise/8-year schedule contained in the March 2019 side letter agreement because of the limited availability of suitable real estate in Mexico.

Jennifer Annello, a Planet Fitness executive who had attended a meeting in which JEG-United and its real estate brokers explained the reasoning for the reduced development schedule, agreed with JEG-United's concern about the availability of real estate.  Annello brought JEG-United's information and proposal to Miolla and Planet Fitness.

During a June 19, 2019 phone call, JEG-United and Planet Fitness discussed JEG-United's proposed 20-franchise/10-year schedule.  Planet Fitness was concerned that a competitor would outmaneuver Planet Fitness in the real estate market.  Miolla believed that JEG-United could open 20 franchises in the development area over a shorter period.

Two days later, on June 21, Planet Fitness proposed a counteroffer by email.  Doc. no. 83-15; doc. no. 83-1 ¶ 12.  In that counteroffer, Planet Fitness agreed to JEG-United's proposal of opening 20 franchises, but those franchises had to be opened over 7 years rather than 10 years.  Planet Fitness (via Annello) offered to have another phone call to "work this out."  Doc. no. 83-15.

---

[10] Since JEG-United had opened or was in the process of opening 5 franchises in Mexico under existing contracts, JEG-United intended this term to mean that JEG-United would open an additional 15 franchises over 10 more years.

Kelly called Annello frequently throughout the summer of 2019 seeking a response to or additional discussion about JEG-United's 20-franchise/10-year offer. Annello testified in her deposition that she followed up with her supervisor and Miolla but did not get a response from them.  In her deposition, Annello further explained that she was not part of the higher-level conversations about how Mexico would be developed.

In October 2019, Miolla reiterated Planet Fitness's 20-franchise/7-year offer to JEG-United.  In an October 12, 2019 email, Annello confirmed to Miolla that the 20-franchise offer involved an ADA for Monterrey, Saltillo, and Torreón.  Annello also told Miolla that she spoke to "him" (presumably Kelly, though the record is not clear) the prior day (October 11) and that it sounded like Kelly wanted a meeting with "everyone."  Annello told Miolla that if the Tijuana area were added to the ADA offer, JEG-United could develop more than 20 franchises.  Annello expressed optimism about reaching a deal between JEG-United and Planet Fitness and added that she and Kelly "had a good conversation yesterday."  Doc. no. 90-70 at 1.

IX.  <u>JEG-United stops negotiating for northern Mexico ADA and negotiates with Ibarra Group for a joint venture.</u>

Kelly believed that Miolla was "funneling everything" to Ibarra[11] and that Miolla wanted Ibarra to be the only franchisee in Mexico.  In late November 2019, Trey Owen told Miolla that JEG-United was no longer interested in negotiating an

---

[11] It is unclear at what point JEG-United became aware that Ibarra was the second franchisee in Mexico.

ADA.  Instead, JEG-United intended to seek a joint venture agreement with, or sale of its existing franchises to, Ibarra Group.[12]  Kelly stated in his deposition that he requested a meeting with Ibarra "out of desperation" because the negotiation period and put option in the March 2019 side letter agreement were expiring soon.

A.   JEG-United and Ibarra Group meet and propose terms for a sale or joint venture.

On December 5, 2019, representatives from Ibarra Group (including Carlos Ibarra) and JEG-United met to discuss a possible joint venture.  Miolla also attended the meetings.

After the initial meeting, on December 17, 2019, Trey Owen sent Ibarra a "high-level construct" of the deal proposed by JEG-United.  Ibarra responded to the email with comments on each proposed term.  Doc. no. 90-73.  Specifically, Owen proposed that Ibarra purchase 100% of JEG-United or "the MX entity."[13]  Ibarra responded, "Let's have a better understanding of the interest in [JEG-United], maybe ownership of the MX entity."  Owen stated that the purchase price would be $40 million cash.  Ibarra responded to this with a question about whether the price was "book value" or "capex" because he needed to "understand the valuation."  Nonetheless, Ibarra stated that "in principle" the purchase price "sounds ok."  JEG-United asked for 20% equity ownership of whatever entity would "own all clubs" in

---

[12] In his affidavit, Miolla states that JEG-United and Planet Fitness negotiated about the ADA under the side letter until mid-March 2020.  Miolla states that JEG-United ended negotiations at that point.

[13] Presumably the "MX entity" is a JEG-United subsidiary, but the exact nature of the entity is not stated in the email.

Mexico; Ibarra responded "Ok." JEG-United also requested consulting deals for its management (including Kelly and others). JEG-United suggested closing the transaction on or before January 29, 2020, to which Ibarra responded "it can work" but that he needed to "see the previous steps." He also responded "Ok" to JEG-United's proposal that the sale would be as-is with no representations or warranties. Owen closed: "Thank you, in advance, for your consideration and we look forward to your thoughts and our potential partnership," to which Ibarra responded: "Thank you for sharing this."

Two days later, on December 19, Miolla emailed Ibarra, raising a concern that JEG-United and Kelly, in particular, were looking to be 50% or equal partners in the proposed joint venture and that an upcoming "strategy" meeting proposed by Kelly was a backdoor to Kelly lobbying for an equal partnership. Miolla told Ibarra that "[t]his is the challenge with Kevin [Kelly]. When he doesn't get what he wants, he goes after it again in a less direct way." Doc. no. 90-79. Thus, Miolla recommended that Ibarra not waste two days being lobbied for an equal partnership when Miolla had already rejected such a plan.

Miolla added, however, that it would be beneficial for JEG-United and Ibarra to "share notes" about what has worked well in Mexico and what are unique challenges for Planet Fitness in that country. Miolla was concerned, however, that Kelly was not planning on that type of meeting. Therefore, Miolla suggested that Ibarra have a "private pre-meeting" with Kelly in which he could "set expectations" that Planet Fitness was requiring Ibarra to have 51% control and to discuss

purchase price.  Ibarra responded to the email, informing Miolla that his plan sounded "perfect" and that they were on the same page.

On December 30, 2019, Miolla and Ibarra corresponded again by email. Miolla said that he spoke with Kelly and that Kelly had agreed to postpone the meeting and to send Ibarra a term sheet for the proposed joint venture.  Ibarra responded that he would "do [the deal] only under our terms."  Doc. no. 90-76.  On January 3, 2020, Kelly sent Ibarra a term sheet reflecting the "high level" terms for the purchase as outlined by Owen in December.  A few weeks later, Miolla sent an email to Ibarra informing Ibarra that Owen had called him about the sale; Miolla wished to "compare notes" with Ibarra and suggested a phone call.

In February 2020, Miolla and JEG-United representatives corresponded by email.  Miolla relayed to JEG-United that Ibarra believed he and JEG-United were far apart on numbers and that a deal between JEG-United and Ibarra was unlikely to happen quickly.  Trey Owen responded that he agreed with Miolla's assessment, that JEG-United and Ibarra had agreed on high level terms over the holidays, and that Ibarra had backed out in January.  Owen stated that he did not think Ibarra saw the value of JEG-United going forward.  Owen added that he did not think a partnership with Ibarra was as likely as it had been in January, such that he felt that the parties should explore a "fair solution" to transition JEG-United's Mexico franchises to Ibarra Group.

Miolla states in his affidavit that he did not comment on or participate in any deal points associated with discussions between JEG-United and Ibarra Group

about a possible joint venture.  Miolla states that Planet Fitness told JEG-United and Ibarra Group that Ibarra Group must own at least 51% of any entity created by JEG-United and Ibarra Group.

### B.    JEG-United exercises the put option and litigation begins.

On March 19, 2020, JEG-United exercised the put option in the side letter agreement.[14]  Kelly believes that there was no benefit to Planet Fitness to hinder JEG-United's success in Mexico and that "it was a personal agenda by Ray Miolla."

Planet Fitness filed this lawsuit in June 2020, and JEG-United answered and asserted its counterclaims soon thereafter.  The March 2019 side letter agreement expired at the end of June 2020.  A few months later, Planet Fitness and Ibarra Group agreed to an ADA for most of Mexico.

### X.    Evidence about damages.

JEG-United seeks damages for the money it expended developing Planet Fitness franchises in Mexico in reliance on Planet Fitness's promise to negotiate in good faith.  JEG-United asserts that it expended approximately $20 million in its business in Mexico as of March 2020 and in reliance on Planet Fitness's promise to negotiate toward an ADA in good faith.  However, in his deposition, Kelly testified that he believes the current fair market value of JEG-United or its franchises in Mexico is more than $40 million.

---

[14] Although JEG-United told Planet Fitness that it was exercising the put option, the parties never consummated the sale of the clubs to Planet Fitness because of a dispute over the purchase price.  Planet Fitness's claims, not at issue in the present motion, focus on that issue.

JEG-United also asks for damages for the profits it lost from not entering an ADA with Planet Fitness.  In support of that request, JEG-United offers a proposed expert opinion asserting that, if JEG-United had opened 100 franchises in Mexico, the present value of damages for lost profits would be approximately $232 million. According to JEG-United's experts, if JEG-United opened 20 franchises in the Monterrey area, JEG-United's damages for lost profits would be approximately $46 million.

## DISCUSSION

Planet Fitness and Miolla move for summary judgment on all JEG-United's counterclaims.  As to Counts I and II (JEG-United's breach of contract and breach of the implied covenant of good faith and fair dealing claims against only Planet Fitness), Planet Fitness argues that JEG-United cannot recover damages for relying on Planet Fitness's representations because JEG-United has made a profit and that damages for future lost profits are too speculative.  As to Count III (JEG-United's counterclaim for tortious interference with prospective economic relationships against Planet Fitness and Miolla), Planet Fitness and Miolla argue that the evidence is insufficient to support the claim as to JEG-United's negotiations with California Fitness, Soriana, and Ibarra Group.  As to Count IV (violation of the New Hampshire Consumer Protection Act against Planet Fitness and Miolla), Planet Fitness and Miolla contend that the counterclaim necessarily fails if the court grants summary judgment as to Count III.

22

JEG-United objects, arguing that it can recover reliance damages if the court enforces the put option and that damages for lost profits are recoverable here. And, as to Counts III and IV, JEG-United argues that genuine disputes of material fact exist. Planet Fitness and Miolla filed a reply, and JEG-United filed a surreply.

I.   Damages for Reliance & Lost Profits

To start, Planet Fitness asks for summary judgment on JEG-United's breach of contract and implied covenant claims on the ground that JEG-United has no damages to recover. Planet Fitness asserts that JEG-United's reliance damages are offset by the value of the franchises it owns and that JEG-United's lost profits damages are speculative.

A.   Summary judgment is unnecessary as to reliance damages because JEG-United concedes that it will not seek these damages unless the court enforces the "put option."

JEG-United submitted evidence that it relied on Planet Fitness's promises in making a $20 million investment opening its Mexico franchises. Planet Fitness observes, however, that JEG-United also submitted evidence that these franchises, which JEG-United still owns, are now worth $40 million. Thus, Planet Fitness asserts that JEG-United has profited or will profit as a result of relying on Planet Fitness's promises to negotiate in good faith, so JEG-United cannot recover for expenditures it made in reliance on those promises.

In response, JEG-United acknowledges that its franchises are worth more than its investment, but observes that Planet Fitness brought claims—not at issue in this round of summary judgment—that would require JEG-United to sell the

23

clubs to Planet Fitness for a "book value" below $20 million if Planet Fitness were to prevail (i.e., if the court enforces the "put option" in the March 2019 side letter agreement). JEG-United states that if the court does not enforce the "put option," then JEG-United will not seek reliance damages for its breach of contract and implied covenant claims. JEG-United asserts that, therefore, the court should not resolve the question of whether reliance damages are warranted until after Planet Fitness's claims are resolved.

The court agrees that it need not address the question of whether reliance damages are warranted unless both Planet Fitness <u>and</u> JEG-United prevail on their claims. The court accepts JEG-United's concession that it will only seek reliance damages if the court enforces the "put option."

Planet Fitness argues that if it prevails on its claims then "JEG-United will have lost its claims, and will not be entitled to any relief." Doc. no. 93 at 7 n.8. But that is just another way of saying that the issue is immaterial; it is unclear why the court should opine on and resolve an issue that Planet Fitness argues cannot occur in this case.[15] Planet Fitness's summary judgment motion is denied in this respect.

---

[15] Other than its conclusory statement that both sides cannot prevail in their respective claims, Planet Fitness did not explain why it would be inconsistent to find for both Planet Fitness and JEG-United. While that may very well end up being the case, it is potentially possible for both Planet Fitness and JEG-United to have been in breach of the side letter agreement in some respects, depending on whether any breach was material. <u>See</u> Fitz v. Coutinho, 136 N.H. 721, 724-25 (1993) ("Not every breach of duty by one party to a contract discharges the duty of performance of the other.").

**B.**     <u>Damages for lost profits are too speculative as to an ADA for 100 franchises, but not for 20 franchises.</u>

Planet Fitness next argues that JEG-United cannot show that lost profits were reasonably certain to result from the alleged breach of contract and breach of the implied covenant.  Specifically, Planet Fitness contends that JEG-United's experts, who assert that JEG-United is entitled to between $46 million (if the ADA were limited to 20 franchises) and $232 million (ADA for 100 franchises) in damages for lost profits, relied on unsupported and speculative assumptions about the ADA that JEG-United and Planet Fitness would have reached had Planet Fitness negotiated in good faith.  In response, JEG-United argues that it has submitted evidence sufficient to allow a jury to find lost profits with reasonable certainty.  JEG-United says that its expert witnesses opine that JEG-United would have accrued at least $46 million in profits had it received an ADA for Monterrey.  JEG-United argues that it and Planet Fitness would have come to terms on the ADA if Planet Fitness had negotiated in good faith.

A plaintiff in a breach of contract case may recover lost profits only if its loss of profits was a foreseeable consequence of the breach and a particular amount of lost profits were reasonably certain to result from the breach.  See <u>Independent Mech. Contractors, Inc. v. Gordon T. Burke & Sons, Inc.,</u> 138 N.H. 110, 114 (1993); <u>Great Lakes Aircraft Co. v. City of Claremont,</u> 135 N.H. 270, 296 (1992); <u>cf.</u> <u>Boyle v. City of Portsmouth,</u> 172 N.H. 781, 792 (2020) (applying rule to damages for tort claim).  The court cannot allow lost profits damages for speculative and hypothetical future business dealings.  See <u>Great Lakes Aircraft Co.,</u> 135 N.H. at 296; <u>Fitz,</u> 137

N.H. at 725.  At the same time, proving a precise amount of future losses with absolute certainty is unnecessary because "[a] degree of uncertainty is inherent in any projection of future profits."  Independent Mech. Contractors, Inc., 138 N.H. at 117-18.  At bottom, the question is "whether the evidence on lost profits provides enough information under the circumstances to permit the fact finder to reach a reasonably certain determination of the amount of gains prevented."  Id. at 118.

1.   JEG-United cannot recover lost profit damages flowing from a 100-franchise ADA.

Here, the evidence produced and identified by JEG-United in response to Planet Fitness's summary judgment motion is insufficient to permit a jury to find with reasonable certainty that JEG-United lost profits from an ADA with a 100-franchise development schedule.  JEG-United's breach of contract and implied covenant claims are premised only on breaches related to the March 2019 side letter agreement, which promised negotiation toward an ADA for certain parts of northern Mexico.  See doc. no. 9 at 18 ¶ 21.  Given the scope of that territory, a sticking point of those negotiations was JEG-United's desire for a 20-franchise development schedule.  There is no evidence that a 100-club development schedule was ever considered by the parties in conjunction with the March 2019 side letter agreement.  Given these facts, a reasonable jury could not find that lost profits for a 100-club development schedule were reasonably certain to result from breaching the March 2019 side letter agreement or the implied covenant of good faith and fair dealing.  In other words, it is speculation at best that JEG-United and Planet

Fitness would, at some unknown point in the future, have contracted for a 100-franchise ADA if Planet Fitness had negotiated with JEG-United in good faith per the March 2019 side letter agreement.  As a result, JEG-United cannot receive damages on that premise, and summary judgment is granted in Planet Fitness's favor as to damages for a 100-franchise ADA.

      2.     <u>Planet Fitness has not demonstrated entitlement to judgment as a matter of law as to damages for a 20-franchise ADA.</u>

As to lost profits deriving from an ADA for 20 franchises, however, Planet Fitness has failed to show there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law.  Unlike a 100-franchise development schedule, a 20-franchise development schedule was contemplated during the parties' negotiations.  Viewed favorably, the record supports a jury finding that—in the absence of the alleged bad faith during negotiations—Planet Fitness and JEG-United were reasonably certain to agree to an ADA with a 20-club development schedule.

Planet Fitness argues that JEG-United cannot show the amount of lost profits with reasonable certainty because the development schedule was open for negotiation.  But JEG-United's claim is that the parties would have agreed to JEG-United's proposed 20-club development schedule, or a similar schedule, if Planet Fitness had acted in good faith.  The court cannot find as a matter of law that damages for lost profits for a 20-franchise ADA would not be reasonably certain to result from Planet Fitness's breach unless there is no genuine dispute of material

fact that Planet Fitness acted in good faith as to that aspect of negotiations. The record contains several disputed facts about whether Planet Fitness acted in bad faith when negotiating the ADA, and, in any event, Planet Fitness did not move for summary judgment on the substance of JEG-United's breach of contract and implied covenant claims. For these reasons, Planet Fitness has not demonstrated that it is entitled to judgment as a matter of law as to lost profits for a 20-franchise ADA. Planet Fitness's motion for summary judgment is therefore denied in this respect.

II.   <u>Tortious Interference in Prospective Contractual Relationship</u>

Next, Planet Fitness and Miolla move for summary judgment as to JEG-United's claims for tortious interference in prospective contractual relations. They contend that JEG-United cannot produce evidence to show that they improperly interfered in any of JEG-United's prospective contractual relationships.[16] JEG-United responds that Planet Fitness and Miolla improperly interfered with JEG-United's prospective contractual relationships with California Fitness, Soriana, and Ibarra Group.

To establish liability for tortious interference with contractual relations under New Hampshire law, a plaintiff must show that: "(1) the plaintiff had an

---

[16] In its reply, Planet Fitness expanded its argument to include an assertion that JEG-United lacked sufficient evidence about damages. Arguments raised for the first time in reply briefing are considered waived. See LR 7.1(e)(1); Faiella v. Green Tree Serv. LLC, No. 16-cv-88-JD, 2016 WL 3546232, at *3 n.2 (D.N.H. June 23, 2016). Therefore, the court does not consider Planet Fitness's argument that there is insufficient evidence about damages for intentional interference.

economic relationship with a third party; (2) the defendant knew of this relationship; (3) the defendant intentionally and improperly interfered with this relationship; and (4) the plaintiff was damaged by such interference." Hughes v. N.H. Div. of Aeronautics, 152 N.H. 30, 40-41 (2005); see also Montrone v. Maxfield, 122 N.H. 724, 726 (1982).  When the alleged improper interference is with a prospective rather than established contractual relationship, the relationship between the plaintiff and third party must "give rise to a reasonable expectation of economic advantage." Wilcox Indus. Corp. v. Hansen, 870 F. Supp. 2d 296, 307 (D.N.H. 2012).  "[T]he scope of actionable conduct is narrower" in a case involving a prospective contractual relationship than an existing contractual relationship. Id. (citing Restatement (Second) of Torts § 767 cmt. j (1979)).[17]  Moreover, "the use of ordinary means of persuasion or the exertion of limited economic pressure will not, by itself, be sufficient" to establish tortious interference with a prospective contractual relationship. Id.

 A. Planet Fitness and Miolla did not improperly interfere with the California Fitness buyout proposed by Kevin Kelly.

As to California Fitness, Planet Fitness and Miolla argue that there is no evidence that they interfered with any potential deal between JEG-United and

---

[17] The New Hampshire Supreme Court has frequently used the Restatement (Second) of Torts when addressing claims for tortious interference with contractual relationships.  E.g., Roberts v. Gen. Motors Corp., 138 N.H. 532, 540-41 (1994); Baker v. Dennis Brown Realty, Inc., 121 N.H. 640, 644 (1981); Bricker v. Cane, 118 N.H. 249, 252 (1978).

California Fitness. JEG-United responds that Miolla improperly "commandeer[ed]" negotiations between JEG-United and California Fitness.

"[T]ortious interference with a contractual relationship requires interference by one who is not a party to the contract." Tessier v. Rockefeller, 162 N.H. 324, 338 (2011). JEG-United's tortious interference claim as to California Fitness fails because the evidence shows that JEG-United sought to include Planet Fitness in the proposed transaction with California Fitness, and Planet Fitness merely declined to be included. To be sure, Kelly's proposal to Planet Fitness included options where JEG-United funded the transaction. But there is no reasonable explanation for Kelly presenting Planet Fitness with these and other options— including an option where Planet Fitness passed on the deal—unless Planet Fitness was meant to be part of the deal Kelly was proposing. In other words, the prospective economic relationship sought by JEG-United included Planet Fitness, and Planet Fitness declined to engage in the relationship unless it could be involved in negotiations. No reasonable jury could find that these actions constituted improper interference with JEG-United's prospective contractual relationship with a third party. See id.[18]

---

[18] The court rejected a similar argument Planet Fitness presented in a motion for judgment on the pleadings. Planet Fitness Int'l Franchise v. JEG-United, LLC, 561 F. Supp. 3d 182, 186-87 (2021). In denying the motion, the court held that the mere fact that Planet Fitness is JEG-United's franchisor does not automatically make it a party to all contracts between JEG-United and third parties. See id. That holding remains, but now, where the evidence includes more than just JEG-United's allegations, the court finds that there is no genuine dispute that the economic relationship proposed by JEG-United would have included Planet Fitness.

Even if the economic relationship would have been between California Fitness and JEG-United alone, there is no evidence supporting JEG-United's claim that Planet Fitness or Miolla improperly interfered with the third party, that is, California Fitness. The only evidence about Planet Fitness's or Miolla's actions with respect to Kelly's California Fitness deal consists of communications between Planet Fitness/Miolla and JEG-United. There is no evidence that Planet Fitness or Miolla communicated with California Fitness about Kelly's proposed deal. Furthermore, there is no evidence that Planet Fitness or Miolla did anything to prevent JEG-United, on its own, from purchasing or attempting to purchase California Fitness's business.

Planet Fitness and Miolla are entitled to summary judgment as to this aspect of Count III.

B.    <u>JEG-United did not have a reasonable expectation of economic relations with Soriana.</u>

Next as to the alleged interference with JEG-United's economic relationship with Soriana alleged in Count III, Planet Fitness and Miolla argue that the "high level" conversations JEG-United had with Soriana about the possibility of leasing real estate do not create the reasonable expectation necessary to sustain a tortious interference claim.[19] JEG-United responds that its prospective economic

---

[19] Planet Fitness also argues that there is insufficient evidence to show it improperly interfered with any economic relations. Because the court finds that JEG-United did not have a reasonable expectation of economic relations with Soriana, the court does not reach the issue of whether improper interference occurred.

relationship with Soriana would have included leases for several pieces of real estate.

As noted, for interference to be actionable, a plaintiff's prospective economic relation must "give rise to a reasonable expectation of economic advantage." Wilcox Indus. Corp., 870 F. Supp. 2d at 307. The prospective relationship must be "sufficiently concrete" to be reasonable; mere hope for a future successful negotiation that might result in a contract is not sufficient. Sheppard v. River Valley Fitness One, L.P., No. 00-111-M, 2003 WL 21688159, at *2, *4 (D.N.H. July 16, 2003) (quoting Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 195 (3d Cir. 1992), which was applying Restatement (Second) of Torts § 766). In short, discussions about a potential economic relationship, without identification of any terms or scope of the relationship, are insufficient to create a reasonable expectation of consummating an economically advantageous transaction. See Sindi v. El-Moslimany, 896 F.3d 1, 25 (1st Cir. 2018) (applying Massachusetts law and holding that plaintiff failed to prove she had a reasonable expectation of an economic relationship when she failed to introduce evidence about "the content of her negotiations with [the] third parties, the details of any potential arrangement, or the likelihood that," without tortious interference, the economic relationship "would come to pass").

A reasonable fact finder would be unable to find JEG-United had more than a mere hope of a future contractual relationship with Soriana at the time of the alleged interference. It is undisputed that Soriana and JEG-United only discussed

a possible future economic relationship at a "high level."  Although JEG-United identified at least one additional location it was interested in and toured others, it did not negotiate with Soriana about any about particular additional locations and rental rates.  There is no evidence that JEG-United or Soriana ever proposed specific terms for any additional locations.

Considering the evidence in the light most favorable to it, JEG-United has shown that it and Soriana discussed the possibility of negotiating further real estate transactions beyond the Estanzuela location.[20]  But the parties' mutual interest in future negotiations never progressed to the level of a sufficiently concrete prospective relation that would allow JEG-United to have a reasonable expectation of consummating an economically advantageous transaction.  Without any concrete details about the shape the economic relationship would have taken, it is impossible to say that JEG-United and Soriana would have entered the relationship without the potential improper interference.  For those reasons, the court grants summary judgment in Planet Fitness and Miolla's favor as to this aspect of Count III.

C.   <u>Planet Fitness and Miolla did not improperly interfere with the negotiations between JEG-United and Ibarra Group.</u>

Finally, Planet Fitness and Miolla argue that JEG-United has not provided evidence that they improperly interfered with any potential transaction with Ibarra

---

[20] JEG-United presents no evidence that Planet Fitness interfered with JEG-United's relationship with Soriana as to the Estanzuela lease.  The evidence indicates that JEG-United's lease with Soriana for the Estanzuela location remains ongoing.

Group.[21]  They contend that Miolla in fact facilitated the transaction by arranging for a meeting between JEG-United and Ibarra Group to discuss the deal in late 2019.  Planet Fitness asserts that its requirement that Ibarra Group control 51% of any joint venture between JEG-United and Ibarra Group was not interference because it was consistent with Planet Fitness's business practice of developing international markets through locally-based developers (i.e., developers based in the country in which the firm is expanding rather than developers based in the United States).

JEG-United responds that it had agreed to a deal in principle for Ibarra Group to purchase JEG-United or JEG-United's assets in Mexico.  According to JEG-United, Miolla undermined that agreement by telling Ibarra that the terms were unfavorable.

The evidence submitted at summary judgment is insufficient to allow a reasonable inference that Planet Fitness or Miolla improperly interfered with the proposed deal between JEG-United and Ibarra Group.  Interference that is improper "may be any conduct conveying to the third person [Ibarra] the actor's [Miolla's] desire to influence him [Ibarra] not to deal with the other [JEG-United]."  Restatement (Second) of Torts § 766 cmt. k.  However, in the case of a prospective economic relationship, courts look to whether the underlying conduct was itself

---

[21] Planet Fitness also contends that, like the Soriana deal, there is insufficient evidence that JEG-United had a reasonable expectation of an economic relationship.  Because the court finds that no improper interference occurred, the court does not reach the question of whether JEG-United had a reasonable expectation of a future economic relationship with Ibarra Group.

wrongful or tortious—e.g., whether it involved defamation, fraud, violence, or threats.  See id. § 766B cmt. e. (addressing interference with prospective economic relationships and stating that "when the means adopted is not innately wrongful and it is only the resulting interference that is in question as a basis of liability, the interference is more likely to be not improper"); see also id. § 767 cmt. d.  If the underlying conduct merely involved the use of "ordinary means of persuasion" then the defendant is generally not liable for tortious interference as a matter of law. See, e.g., id. § 766B cmt. e; Wilcox Indus. Corp., 870 F. Supp. 2d at 307 (contrasting "use of ordinary means of persuasion" against alleged fraudulent misrepresentations).

Here, the evidence indicates that Miolla tried to facilitate the transaction between JEG-United and Ibarra Group subject to certain conditions (51% ownership by Ibarra Group) that had been communicated to both JEG-United and Ibarra Group.  As JEG-United itself points out, doc. no. 90 at 4, Miolla thought that a joint venture between JEG-United and Ibarra Group or sale of JEG-United's assets to Ibarra Group was a possibility early in internal discussions.  To that end, in late 2019, when JEG-United stopped its pursuit of the northern Mexico ADA, Miolla helped set up the discussions between JEG-United and Ibarra Group.

JEG-United and Ibarra Group's discussions culminated in a proposal by JEG-United for Ibarra Group to purchase JEG-United's assets in exchange for cash and

equity in a company that would obtain a Mexico-wide ADA.[22]  However, JEG-United's ownership expressed concern that Ibarra did not see JEG-United's value.  Indeed, by January 2020, the deal was dead.  JEG-United argues that this was due to improper interference by Miolla but lacks evidence to back it up.

JEG-United's strongest evidence is an email from Miolla to Ibarra warning him that Planet Fitness would not accept a deal in which he and JEG-United were equal partners.  In that correspondence, Miolla advises Ibarra not to waste his time with a "strategy" meeting in which Miolla thought Kelly would lobby for a 50% partnership, and, in response to that advice, Ibarra agrees that he will do the deal only on their terms.  Ibarra eventually postponed the meeting in which Miolla expected Kelly to lobby for the equal partnership, and Miolla told Ibarra that this move was "well played."  Miolla's correspondence with Ibarra was not improper interference.  JEG-United knew about this limitation, and it identifies no rule

---

[22] JEG-United characterizes its proposal as an agreement between it and Ibarra Group "in principle," but that characterization goes beyond what the evidence supports.  First, "in principle" generally means that no agreement has been reached.  E.g., Venture Assocs. Corp. v. Zenith Data Sys. Corp., 96 F.3d 275, 277 (7th Cir. 1996); Engineered Data Prods., Inc. v. Art Style Printing, Inc., 71 F. Supp. 2d 1073, 1078 (D. Colo. 1999).  Second, Ibarra's response to JEG-United's proposal was far from agreement.  Ibarra said that the purchase price proposed by JEG-United was okay "in principle," (which, again, does mean agreement) but he also posed questions to JEG-United about how it came to that valuation and about the scope of the roles that JEG-United's leadership would play in the joint venture.  There is no evidence JEG-United ever answered Ibarra's questions to his satisfaction.  As to the other proposed terms, Ibarra merely responded "ok" without elaboration.  At most, Ibarra's responses indicate that he was open to a deal but needed more information before agreeing.

requiring Planet Fitness to allow two potential franchisees to agree to a 50% partnership.

Next, JEG-United speculates that the real reason the deal fell apart was because Miolla told Ibarra the purchase price or other terms were insufficient. There is no mention of purchase price in the emails identified by JEG-United as supporting this fact. The only other evidence potentially supporting this fact is Kelly's deposition testimony that Ibarra told him that Miolla said the purchase price was too high. Planet Fitness, however, argues that the court cannot consider Kelly's testimony on this subject because it is inadmissible hearsay. JEG-United did not respond to Planet Fitness's argument.

Hearsay is an out-of-court statement offered into evidence to prove the truth of the matter asserted in the statement. See Fed. R. Evid. 801(c). "It is black-letter law that hearsay evidence cannot be considered on summary judgment." Davila v. Corporacion de P.R. Para La Difusion Publica, 498 F.3d 9, 17 (1st Cir. 2007). Ibarra's out-of-court statement is, as relevant to this issue, offered by JEG-United for the truth of the matter asserted. And, JEG-United did not object or present any argument as to why Ibarra's out-of-court statement to Kelly falls into any hearsay exception. Accordingly, the court cannot consider Kelly's assertion at summary judgment. See Fed. R. Evid. 802; Travers v. Cotiviti, LLC, No. 18-562 WES, 2022 WL 834168, at *3 (D.R.I. Mar. 21, 2022) (granting motion to strike hearsay statements when opposing party failed to object).

But even if JEG-United were able to produce at trial admissible evidence to substantiate Miolla's alleged comment—such as Ibarra's or Miolla's own testimony—it would not save the claim.  Miolla's comment about the purchase price of the potential transaction does not rise to the level of "improper" interference. There is nothing innately wrongful or tortious about opining on the purchase price of a contract.  There is no evidence or claim by JEG-United that, in conjunction with this comment, Miolla or Planet Fitness exerted any economic pressure on Ibarra, made any threat not to deal with Ibarra if Ibarra agreed to JEG-United's terms, or defamed JEG-United or fraudulently misrepresented anything to Ibarra.  Under the circumstances, Miolla's comment involved, at most, the use of "ordinary means of persuasion" to convince Ibarra to demand a more favorable price from JEG-United; this is not sufficient for a reasonable jury to find "improper" interference with a prospective economic relationship.  See Restatement (Second) of Torts § 767 & cmt. j.

In sum, the evidence is insufficient to allow a reasonable jury to find that Planet Fitness or Miolla improperly interfered with a prospective agreement between JEG-United and Ibarra Group.  Rather, the evidence submitted by JEG-United shows that JEG-United and Ibarra Group met to discuss a deal with Planet Fitness and Miolla's encouragement.  Miolla warned Ibarra that Kelly might have ulterior motives to obtain a 50% partnership against Planet Fitness's wishes, and Ibarra never agreed to any terms with JEG-United.  And, even if Miolla commented

on the purchase price, the circumstances do not suffice to create a cause of action for tortious interference with prospective economic relations.

In its objection to the summary judgment motion, JEG-United develops no further argument that Planet Fitness or Miolla tortiously interfered with any other prospective or actual economic relationships.[23]  Accordingly, Planet Fitness and Miolla, having shown that they are entitled to summary judgment as to the California Fitness, Soriana, and Ibarra Group relationships, are entitled to summary judgment on Count III as a whole.

III.   <u>Violation of New Hampshire Consumer Protection Act</u>

Finally, Planet Fitness and Miolla argue that the court must grant summary judgment in their favor as to Count IV, in which JEG-United alleges that Planet Fitness and Miolla violated the New Hampshire Consumer Protection Act, RSA 358-A:2.  Specifically, they argue that the court must grant summary judgment as to the Consumer Protection Act claim if—as has occurred here—the court grants summary judgment on JEG-United's tortious interference claim.  Planet Fitness and Miolla state—in summary fashion and without further analysis of the

---

[23] In its statement of material facts in its objection, JEG-United references in passing negotiations for real estate with companies other than Soriana.  Likewise, JEG-United submitted some evidence about negotiations with other businesses in which JEG-United's executives think Planet Fitness and Miolla meddled.  In its objection, however, JEG-United limits its argument to the proposed transactions with California Fitness, Soriana, and Ibarra Group.  Therefore, as to Count III, JEG-United has waived any theory involving businesses other than the three about which it argued.  See Perea v. Editorial Cultural, Inc., 13 F.4th 43, 55 n.24 (1st Cir. 2021).

applicable law or standards under the Consumer Protection Act—that "there is no evidence to support" JEG-United's claim. They add that a claim under the New Hampshire Consumer Protection Act cannot be premised on ordinary breach of contract claims. JEG-United responds that its evidence is sufficient to show that its claim goes beyond a mere breach of contract.

"The district court is free to disregard arguments that are not adequately developed . . . ." See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999). Although the court has found that summary judgment is warranted in Planet Fitness and Miolla's favor as to JEG-United's tortious interference claim, they have not developed their argument that granting summary judgment on the tortious interference claim necessarily requires granting summary judgment as to JEG-United's Consumer Protection Act claim. Planet Fitness and Miolla make no effort to compare the facts and standards applicable to Count III versus Count IV. See Perea, 13 F.4th at 55 n.24 (concluding that an argument was insufficiently developed when appellant "fail[ed] to set forth the relevant law" and did "not adequately explain how" the facts applied to the relevant law); Bos. Exec. Helicopters, LLC v. Maguire, 45 F.4th 506, 514 (1st Cir. 2022) ("BEH's one-paragraph argument in its reconsideration appeal fails to explain how Norwood breached this provision, nor does it cite any authority supporting its contention. So we find it waived.").

In short, Planet Fitness and Miolla offer no reasoning to justify granting their motion as to Count IV merely because the court granted the motion as to

Count III.  Finally, it is apparent from the record, discussed at length above, that JEG-United's Consumer Protection Act claim is premised on more than Planet Fitness's alleged breach of contract.  Accordingly, Planet Fitness and Miolla's motion for summary judgment as to Count IV is denied.

IV.    <u>JEG-United's motions to seal are granted.</u>

As a final matter, JEG-United moves to seal certain exhibits attached to its objection (doc. no. 88) and surreply (doc. no. 97).  JEG-United contends that the exhibits it wishes to seal include private financial data, market studies, and information about the negotiation positions of Planet Fitness and its franchisees. The exhibits JEG-United seeks to seal include doc. nos. 90-65 through 90-88, 98-7, and 98-8.  JEG-United's assented-to motions to seal these exhibits are granted.

Federal courts—and by extension many documents filed with federal courts— are public by default and remain that way unless extraordinary circumstances require otherwise.  <u>See</u> Bradford & Bigelow, Inc. v. Richardson, 109 F. Supp. 3d 445, 447 (D. Mass. 2015) (collecting cases and observing that "the longstanding tradition of public access to trials and pre-trial motions in our judicial system" is "protected both by the common law and the First Amendment"); <u>see also</u> FTC v. Std. Fin. Mgmt. Corp., 830 F.2d 404, 408 n.4 (1st Cir. 1987) (recognizing a common law presumption in favor of public access for documents and proceedings in civil cases). Furthermore, "[t]he court expends considerable resources to process and maintain sealed documents."  Bradford & Bigelow, Inc., 109 F. Supp. 3d at 447.  Accordingly, with respect to matters that bear on the merits of the case—such as the court's

41

present decision on summary judgment and the materials relied on in support—parties must show "compelling reasons" to overcome the presumption of public access.  See Std. Fin. Mgmt. Corp., 830 F.2d at 410.  Thus, "[t]he 'good cause' [under Federal Rule of Civil Procedure 26(c)(1)] that justifies an umbrella protective order at the discovery stage (and allows such designations) is not sufficient to meet the heightened standard to seal filings about dispositive motions or trial."  See Bradford & Bigelow, Inc., 109 F. Supp. 3d at 448.

The court finds that the assorted business materials identified by JEG-United in doc. nos. 88 and 97 may be placed under seal as requested.   In general, "courts have refused to permit their files to serve . . . as sources of business information that might harm a litigant's competitive standing."  See Nixon v. Warner Comms., Inc., 435 U.S. 589, 598 (1978).  Here, the parties agree that some of the evidence about Planet Fitness's financial information and negotiating positions may harm its competitive standing.

However, there are several other motions to seal exhibits related to other pending motions.  As this case moves closer to trial and the court begins ruling on the other pretrial motions before it, the public's right of access to court proceedings will likely outweigh the parties' interests in confidentiality, at least as they are presently conceived.  Unless the parties articulate a more developed justification for keeping swaths of the court's record under seal, the court will be disinclined to grant the other pending assented-to motions to seal and the exhibits submitted will be available to the public.

**CONCLUSION**

Planet Fitness and Miolla's motion for partial summary judgment (doc. no. 81) is granted in part and denied in part.  The counterclaims remaining for trial are Counts I, II, and IV.  Planet Fitness's claims also remain for adjudication. JEG-United's assented-to motions to seal (doc. nos. 88 and 97) are granted.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

September 27, 2022

cc:    Counsel of Record